EXHIBIT B

M0220290

IN THE COURT OF COMMON PLEAS OF LUCAS COUNTY, OHIO

David M. Yeager                    )   Case No.  89-2332
4805 Springbrook
Toledo, Ohio  43615,               )   Judge Bowman

              Plaintiff,           )   AMENDED COMPLAINT WITH JURY
                                       DEMAND ENDORSED HEREON
vs.                                )

Browning-Ferris Industries         )   BROWN, BAKER, SCHLAGETER  &  CRAIG
  of Ohio and Michigan, Inc.,          By:  Martin J. Holmes 0021002
6233 Hagman Road                   )        711 Adams Street
Erie, Michigan  48133,                      Toledo, Ohio  43624
                                   )        Telephone: (419) 243-6281
and                                    Attorney for Plaintiff
                                   )
Browning-Ferris Industries, Inc.
757 N. Eldridge-Box 3151           )
Houston, Texas  77253,
                                   )
and
                                   )
Bruce E. Ranck
11305 Greenvale                    )
Houston, TX
                                   )
and
                                   )
John R. Taddonio
                                   )

                                   )

                                   )
              Defendants.
                                   )

     Now comes Plaintiff, by and through his Attorney, and for his

Complaint against Defendants, herein alleges and avers the following:

M0220291

1.  Defendant, Browning-Ferris Industries of Ohio and Michigan, Inc., (hereinafter referred to as "BFI of Toledo"), is an Ohio Corporation transacting business in Lucas County, Ohio. BFI of Toledo is a wholly owned subsidiary of Defendant, Browning-Ferris Industries, Inc., and is under the direct control and direction of Browning-Ferris Industries, Inc., and as such, all acts of BFI of Toledo constitute acts of Browning-Ferris Industries, Inc. BFI of Toledo provides waste collection and disposal services for commercial, industrial, institutional, municipal, governmental and residential customers.

2.  Defendant, Browning-Ferris Industries, Inc., (hereinafter referred to as "BFI") is a corporation organized under the laws of the State of Delaware and maintains its principal place of business in Houston, Texas. BFI, through its wholly owned subsidiary, BFI of Toledo, provides waste collection and disposal services for commercial, industrial, institutional, municipal, governmental, and residential customers in Lucas County, Ohio. Any further references made to BFI of Toledo also incorporate Defendant, BFI, based upon the relationship between BFI of Toledo and BFI, as owner and wholly owned subsidiary.

3.  The acts and transactions alleged herein were performed in whole or in part by Defendants in Lucas County, Ohio. Further, Lucas County, Ohio is the County in which part of the claims for relief arose, therefore venue is established pursuant to Rule 3 of the Ohio Rules of Civil Procedure.

## FIRST CLAIM FOR RELIEF

4.  Plaintiff, David M. Yeager, says that on or about May 22, 1986, that the State of Ohio, through its Attorney General, Anthony J. Celebreeze, Jr. filed a civil action against Browning-Ferris Industries, Inc., (BFI), Browning-Ferris Industries of Ohio and Michigan, Inc., (BFI of Toledo) Bruce E. Ranck, John R. Taddonio, Waste Management of North America, Inc., Ohio Waste Systems, Inc., dba Waste Management of Toledo, Richard G. Evenhouse, and Greg A. Asciutto, wherein the State of Ohio charged said Defendants with market collusion resulting in customer allocation and price fixing in northwestern Ohio.  Said civil action was commenced in the United States District Court for the Northern District of Ohio Western Division.

5.  Plaintiff, David M. Yeager, says that Defendant, BFI of Toledo, joined Plaintiff as a Third-Party Defendant in the above-mentioned case by filing a Third-Party Complaint on April 25, 1988.  Therein, Defendant, BFI of Toledo, claims that Plaintiff should be held liable for reimbursement to BFI of Toledo for any damages which BFI of Toledo may be held liable for or be required to pay to the State of Ohio for violations or alleged violations of Section 1331.01 et seq of the Ohio Revised Code during the period October 1, 1976 to November 1, 1982.  Further, BFI of Toledo claims that Plaintiff should be held liable and required to pay to BFI of Toledo the sum of One Million Dollars ($1,000,000.00) to indemnify and hold BFI of Toledo harmless from fines incurred by BFI of Toledo as a result of their guilty plea in United States District Court, for these unauthorized

M0220293

acts committed by or at the discretion of Plaintiff in breach of his duties to BFI of Toledo. Defendant. BFI of Toledo, further requested that Plaintiff be held liable for additional sums for expenses, damages, and attorney fees, as well as other relief to which they alleged in the Third-Party Complaint.

6. Plaintiff, David M. Yeager, says that BFI of Toledo commenced the Third-Party Complaint against Plaintiff at a time when BFI of Toledo knew beyond a doubt that the Third-Party Complaint was entirely absent of probable cause, baseless, wholly false, was with entirely self serving interests, was an attempt to cover up for upper management's involvement in the alleged violations, was calculated to localize and therefore mitigate their potential liability and was brought with malicious and wanton disregard for the truth and Plaintiff, David M. Yeager's rights. BFI of Toledo's knowledge of the overwhelming and compelling evidence to the contrary included the following prior to the time of commencement of the Third-Party Complaint against Plaintiff:

(a) Knowledge that Bruce E. Ranck, Regional Vice-President of BFI and President of BFI of Toledo, had arranged for and directed Plaintiff, David M. Yeager, his subordinate, to meet with Ranck's co-conspirator and long time associate, Richard Evenhouse, Regional Vice President for Waste Management of North America, in order to fix prices and allocate customers in the greater Toledo Lucas County area. Defendants had this knowledge beyond a reasonable doubt when on October 21, 1987, BFI of Toledo's attorney, Allen C. Whitten and other attorneys for BFI of Toledo were

M0220294

permitted to review certain evidence delivered by Plaintiff to a Federal Grand Jury, which evidence included a taped conversation between Plaintiff and Richard Evenhouse, Regional Vice-President for Waste Management of North America.  This taped phone call took place within twenty-four (24) hours after Plaintiff was notified by his superior, Burce Ranck, that everything had been worked out with Waste Management and to expect a phone call from Richard Evehouse to arrange a time and place to get together to carry out the agreement previously made between BFI and Waste Management. Eight (8) days later, BFI of Toledo entered into a plea agreement with the United States of America, wherein, BFI of Toledo pleaded guilty to a one-count indictment charging a violation of Section 1 of the Sherman Act in connection with a conspiracy to allocate customers and to fix prices of trash hauling services in Lucas County, Ohio and its contiguous Counties in Ohio and Michigan.  By pleading guilty, BFI of Toledo, pursuant to the plea agreement, was able to prevent further criminal charges from being brought by the United States against Browning Ferris Industries, Inc., BFI of Toledo, Bruce Ranck, John Taddonio, and other current or former employees of BFI and BFI of Toledo.

(b)  Knowledge by BFI of Toledo that there existed numerous affidavits and written statements from employees, former employees and customers of BFI of Toledo indicating that a price fixing agreement and customer allocation program was in full force and effect at least two (2) years after Plaintiff left the employ of BFI of Toledo.

M0220295

(c)  Knowledge by BFI of Toledo that there appeared numerous notes in Bruce Ranck's appointment books linking him to his co-conspirator, Richard Evenhouse, the former Regional Vice-President for Waste Management of North America.

(d)  Knowledge that BFI of Toledo had in existence a written policy concerning a Non Compete Agreement between BFI and Waste Management in which they agreed to allocate customers and refrain from soliciting or competing for the business of each other's established customers on the basis of price, which included a reciprocal price fixing policy, joint price increases, and submission of non-competitive quotes and bids to each others' commercial, industrial, institutional, governmental, and municipal customers, with said written policy in the form of an "80-20 plan".  This Non-Compete Agreement put in writing and given to BFI of Toledo sales force commenced after Plaintiff, David M. Yeager, left his employ at BFI of Toledo.

(e)  Knowledge by BFI of Toledo that there existed falsified expense reports of the Vice-President of BFI of Toledo, John Taddonio, allegedly to cover up meetings with Greg Ascuitto, Local Manager for Waste Management, pertaining to BFI of Toledo's 80/20 plan, including the allocation of customers and price fixing that existed in Toledo between BFI and Waste Management after Plaintiff's termination.

(f)  Knowledge by BFI of Toledo that there existed telephone records of Bruce Ranck verifying Plaintiff's account of Ranck's role as Chief Architect in the allegations brought by the State of Ohio, Attorney General and the U.S. Department of Justice.

M0220296

(g)   Knowledge by BFI of Toledo that Bruce Ranck and the Vice-President of BFI of Toledo, John Toddonio, were named Defendants by the State of Ohio, Attorney General's office in their suit against BFI and Waste Management after conducting a two (2) year investigation.

(h)   Knowledge by BFI of Toledo that there existed a close, cooperative, helpful, and mutually beneficial relationship between John R. Taddonio, General Manager for BFI of Toledo and Greg A. Ascuitto, General Manager for Waste Management of Toledo, wherein they freely shared their parts inventories to strengthen and reinforce their comittment to each other to maintain a shared monopoly in the Toledo area.

(i)   Knowledge by BFI of Toledo that Waste Management granted BFI of Toledo exclusively, special favors and discounts at Waste Management's Landfill in Toledo, not available to other competitors, even though other competitors were dumping much large volumes of waste than BFI of Toledo.

7.   Plaintiff says that BFI of Toledo commenced the action by way of a Third-Party Complaint against Plaintiff in an attempt to perpetuate a cover-up of upper management involvement in the per se violations of anti-trust regulations and to localize and therefore mitigate their potential and far reaching liability as a result thereof.

8.   Plaintiff says that the Third-Party Complaint of BFI of Toledo against Plaintiff was dismissed without prejudice on June 22, 1988.

9.   Plaintiff says that the malicious prosecution by Defendant, BFI of Toledo, was a carefully calculated self-serving attempt to conceal the truth, cover up for corporate and regional officers' involvement in the

M0220297

price fixing and customer allocation scheme, and an attempt to mitigate their potential liability. This insidious act was motivated by malice, hostility and ill will and solely intended to harass and intimidate Plaintiff, David M. Yeager, in order to keep him from testifying freely in The State of Ohio Ex rel. Celebreeze v. BFI, Inc., et al., and pending National class action suit, as Plaintiff had freely testified before the Federal Grand Jury, investigating the customer allocation and price fixing activities of Defendant, BFI of Toledo.

10. Plaintiff says that as a direct and proximate result of this outrageous and malicious prosecution commenced by Defendant BFI of Toledo that David M. Yeager suffered damages and without limiting the generality of the foregoing, the following special damages:

(a)  Damage to his business, professional and personal integrity, reputation and standing in the community;

(b)  Legal expenses to defend the Third-party Complaint;

(c)  Loss of income because of the concentration and time spent by the Plaintiff in preparation for defending the Third-Party Complaint filed by BFI of Toledo;

(d)  Loss of profits due to the effect that the Third-Party Complaint had on Plaintiff's integrity and business reputation;

(e)  Severe emotional distress, mental anguish, anxiety, and well-being;

(f)  Depression, loss of sleep, stress, humiliation and embaressment;

M0220298

(g)  Aggravation of a preexisting chronic ulcer condition resulting in mental and physical pain and suffering;

(h)  Loss of future employment opportunity within the Waste System's Industry.

11.  Plaintiff, David M. Yeager, says that the acts of the Defendant were intentional, a wanton disregard for Plaintiff's rights, malicious, and made after a sufficient period of time had lapsed for which Defendant knew beyond a doubt that the lawsuit was baseless and totally without probable cause, by reason of which Plaintiff is entitled to punitive damages.

### SECOND CLAIM FOR RELIEF

12.  Plaintiff, David M. Yeager, incorporates by reference all of the allegations set forth in paragraph 1 through 11, as if fully rewritten herein.

13.  Plaintiff says that Defendant, BFI of Toledo, abused the legal process against Plaintiff primarily to accomplish a purpose for which it is not designed, namely, to cover up for upper management involvement in per se violations of anti-trust regulations and calculated to threaten and intimidate a key witness in the State Anti-Trust Action and the National Class Action Suit in order to mitigate Defendant's potential liability to the State of Ohio and the horrendous potential liability in the pending National Class Action Civil Suit, should upper management be found accountable.

M0220299

14. These acts of abuse of process made by Defendant, BFI of Toledo, were made with malice, were entirely self-serving and a wanton disregard for the truth and Plaintiff's rights.

15. The acts of Defendant, BFI of Toledo, were punitive, intended to harass and injure, as well as inflict potentially disastrous economic harm upon Plaintiff and serve as an example to others who might be required to testify.

16. As a direct and proximate result of the abuse of process committed by Defendant, BFI of Toledo, Plaintiff incurred damages, including his inability to sleep or effectively concentrate on his work and was extremely distraught, suffered fear, anxiety, mental and emotional distress, bouts of depression, harm to Plaintiff's business, professional and personal integrity, reputation and standing in the community, legal expenses to defend the abuse of process, and loss of income due to the time that Plaintiff incurred in defending the Third-Party Complaint filed by Defendant, BFI of Toledo.

17. As a direct and proximate result of the intentional, willful, and malicious abuse by process of Defendant, BFI of Toledo, Plaintiff is entitled to recover compensatory and punitive damages.

## THIRD CLAIM FOR RELIEF

18. Plaintiff, David M. Yeager, incorporates herein all of the allegations contained in paragraphs 1 through 17, as if fully rewritten herein.

M0220300

19.    Plaintiff, David M. Yeager, says that Defendant, BFI, and Defendant BFI of Toledo, did authorize a certain corporate spokesmen for BFI to communicate to the Wall Street Journal, the Toledo Blade, the Lorrain Journal, various trade publications and other publications and to members of the general public; to intentionally and maliciously make false, defamatory and misleading statements with the full and premeditated attempt to brand Plaintiff, David M. Yeager, as a criminal in order to displace suspicion and cover up for upper management involvement and to localize and therefore mitigate their liability by indicating that Plaintiff, David M. Yeager, acted out of the scope of his authority and was solely responsible for the criminal act that Defendant BFI of Toledo was convicted of, when in fact BFI and BFI of Toledo, had knowledge of overwhelming and compelling evidence which clearly and unequivically indicated that Plaintiff was directed to perform these acts while an employee of BFI of Toledo, with the clear knowledge, encouragement, and directive of his superior, Bruce Ranck, in furtherance of a plan or scheme by Ranck and his co-conspirator, Rich Evenhouse to fix prices, allocate customers, and restrain trade in areas throughout their regions where their markets overlapped, in order to eliminate the potential for multiple ongoing price wars.

20.    Plaintiff says that the statements concerning Plaintiff were wholly false, defamatory, self-serving, and were spoken or printed with malice, and wanton disregard for the truth and Plaintiff, David M. Yeager's rights.

21. Plaintiff says that the communication of such allegation by Defendant BFI and Defendant BFI of Toledo constitutes slander per se and libel per se for which Defendants are liable to Plaintiff for compensatory and punitive damages.

22. Plaintiff further says that as a direct and proximate result of the slander per se and libel per se committed by Defendants, BFI and BFI of Toledo, that Plaintiff has suffered bouts of depression, stress, harm to his business, professional and personal integrity, reputation and standing in the community, among his family, friends, shareholders, and associates; severe emotional distress and well being; humiliation and embaressment; and, physical and mental pain and suffering as a result of a pre-existing chronic ulcer condition aggravated by the slander per se and libel per se committed by the above named Defendants in carrying out their self-serving and malicious acts.

## FOURTH CLAIM FOR RELIEF

23. Plaintiff incorporates herein all of the allegations contained in paragraphs 1 through 22, as if fully rewritten herein.

24. Plaintiff says that Defendant, BFI, and Defendant, BFI of Toledo, did authorize a certain corporate spokesmen for BFI and BFI of Toledo to communicate to the Wall Street Journal, the Toledo Blade, the Lorrain Journal, various trade publications and other publications and to members of the general public, to intentionally and maliciously make false, defamatory and misleading statements indicating that Plaintiff, David M. Yeager, acted out of the scope of his authority and was solely responsible for the criminal act that Defendant BFI of Toledo was

M0220302

convicted of, when in fact BFI and BFI of Toledo had knowledge of overwhelming and compelling evidence which clearly and unequivocably indicated that Plaintiff was directed to perform said acts by his superior, Bruce Ranck, President of BFI of Toledo and Regional Vice-President of BFI. Plaintiff was directed to perform these acts while an employee of BFI of Toledo, with the clear knowledge, encouragement, and directive of his superior, Bruce Ranck, to fix prices, allocate customers, and restrain trade.

25. Plaintiff says that the statements concerning Plaintiff were wholly false, defamatory, self-serving, and were spoken or printed with malice, and wanton disregard for the truth and Plaintiff, David M. Yeager's rights.

26. Plaintiff says that the publications of these allegations by Defendant BFI and Defendant BFI of Toledo constitute slander and libel for which Defendants are liable to Plaintiff for compensatory and punitive damages.

27. Plaintiff further says that as a direct and proximate result of the slander and libel committed by Defendants, BFI and BFI of Toledo, that Plaintiff has suffered bouts of depression, stress, harm to his business, professional and personal integrity, reputation, and standing in the community, among his family, friends, shareholders, and associates; severe emotional distress and well being; humiliation and embaressment; and, physical and mental pain and suffering as a result of a pre-existing chronic ulcer condition aggravated by the slander and libel committed by the above named Defendants in carrying out their self-serving and malicious acts.

M0220303

## FIFTH CLAIM FOR RELIEF

28.    Plaintiff incorporates herein all of the allegations contained in paragraphs 1 through 27, as if fully rewritten herein.

29.    The claims alleged in the Fifth Claim for Relief arise under 18 U.S.C. Section 1341 (mail fraud), 1343 (wire fraud), 1962(c) (conducting the affairs of an enterprise through a pattern of racketeering activity) and 1962(d) (conspiring to violate Section 1962(c)).

30.    Waste Management, Inc. (hereinafter sometimes called WMI), is a foreign corporation as defined under Ohio law, and is the parent and/or holding company that owns and/or controls several subsidiary companies, including Defendant's, Waste Management of North America, Inc., (hereinafter sometimes called WMNA), and Ohio Waste Systems, Inc. (hereinafter sometimes called OWS).  The management of WMI forms the policies of WMI subsidiaries and controls the enforcement of the policies of said companies, including WMNA and OWS.  Some corporate officers of WMI also serve as officers of the subsidiary company.  WMI, by its ownership and control over WMNA and OWS, does business in Ohio, and did do business in Ohio at all relevant times herein, in a manner more specifically set forth hereinafter.

31.    WMNA is a wholly owned subsidiary of Waste Management, Inc. (hereinafter "Waste Management" or "WMI"), is organized under the laws of the State of Illinois and maintains its principal place of business in Oakbrook, Illinois.  WMNA provides waste collection and disposal services for commercial, industrial, governmental and residential customers.

M0220304

32.   Ohio Waste Systems, Inc., dba Waste Management of Northwest Ohio (hereinafter "Ohio Waste Systems"), is an Ohio corporation which transacts business in this county and has its principal place of business in this county.  Prior to June, 1986, Ohio Waste Systems was known as Waste Management of Toledo, a Waste Management Company.  Plaintiff alleges that Ohio Waste Systems is a wholly owned subsidiary of Waste Management of North America, Inc., (hereinafter "WMNA"), and is under the direct control of WMNA and that the acts of Ohio Waste Systems are the acts of WMNA and are the acts of Waste Management, Inc. (WMI).  Ohio Waste Systems provides waste collection and disposal services for commercial, industrial, governmental and residential customers.

33.   Richard G. Evenhouse (hereinafter "Evenhouse") is a resident of Dearborn, Wayne County, Michigan and was at all times relevant herein, the district/regional vice-president for WMNA having jurisdiction over Waste Management Companies in Ohio and Michigan.

34.   Andrew "Jack" Nichols (hereinafter "Nichols") is a resident of Grand Rapids, Wood County, Ohio and was at all times relevant herein, in sales management with WMNA with jurisdiction over Waste Management Companies in Ohio and Michigan.

35.   Dennis VanEvery (hereinafter "VanEvery") is a resident of Clifton, Fairfax County, Virginia and was at all times relevant herein, general manager of Waste Management's Toledo operation.

36.   Defendant, Bruce E. Ranck (hereinafter "Ranck") is a resident of Houston, Texas and was at all times relevant herein, the Regional Vice President of BFI for the East Central Region and President of BFIOM.

37.   Defendant, John R. Taddonio (hereinafter "Taddonio") is a resident of Manchester, Wastenau County, Michigan, and was at all times relevant herein, the Vice President and District Manager of BFIOH.

38.   Various other persons and companies, not made Defendants herein, participated in the offenses charged herein and performed acts and made statements in furtherance thereof.

39.   Plaintiff is the assignee of the claims of Toledo Mack Sales and Service, Inc., successor in interest to the claims of Dunrite Equipment, L.T.D., dba Community Disposal Service (hereinafter "CDS").

40.   In connection with the acts and transactions alleged herein, the Defendants and other co-conspirators conducted activity in Lucas County, Ohio, which gave rise to the claims for relief.  Further, Lucas County, Ohio is the county in which part of the claims for relief arose by reason of which venue is established pursuant to Rule 3 of the Ohio Rules of Civil Procedure.

41.   Defendants have all conducted business in this county which give rise to the claims alleged herein.

42.   Various other persons and firms, not made Defendants herein, participated as co-conspirators in the offenses charged herein and performed acts withheld evidence and made statements in furtherance thereof.

43.   In the early and middle part of 1980 and continuing in late 1980, Browning-Ferris Industries, Inc. (hereinafter called BFI), through its duly authorized corporate officers, and Regional Vice President Bruce

Ranck, encouraged the Plaintiff to end his aggressive competition with
Waste Management which had resulted in a price war.  Through a duly
authorized corporate officer, BFI directed the Plaintiff via Interstate
Telephone Communication from his corporate office in Houston, Texas to get
"together" with Waste Management and "work something out" saying "the only
one that wins in a price war is the customer".  Upon inquiry from the
Plaintiff as to how BFI expected him to do that, BFI, through its
corporate officer, responded "just call the manager and tell him you would
like to get together to discuss dumping in Waste Management's landfill -
then work something out".  Bruce Ranck, a Regional Vice President and long
time close personal friend and frequent companion of John Drury, President
of BFI, on behalf of BFI, or in the alternative individually, indicated
that he could help and that he had an associate with Waste Management he
worked with in other areas.  Thereafter, in January, 1981, at a regional
meeting of district managers in Baltimore, Maryland, in a hospitality
suite, Bruce Ranck referred to "the deteriorating condition of the Toledo
market" and said "Dave we have more to lose than we have to gain.  Waste
Management simply will not tolerate further embarrassment or loss of
market share".  Ranck then proceeded to instruct Plaintiff Yeager, at that
time Browning-Ferris Industries of Ohio and Michigan, Inc.'s (hereinafter
called BFI-OM, Inc.) vice president and general manager, to meet with
Evenhouse (who Ranck reiterated that he worked with in other areas and
could be trusted) to end the price war between BFI-OM, Inc., and Ohio
Waste Systems.  Ranck then culminated the necessary arrangements for this
meeting with his cohort, peer and co-conspirator at Waste Management,

Evenhouse, and instructed Plaintiff Yeager not to discuss this meeting with anyone else.

44.    On or about February 1, 1981, Ranck telephoned, or otherwise communicated with, co-conspirator Evenhouse for the purpose of making arrangements to facilitate this meeting, with the affect of initiating and orchestrating the combination and conspiracy which would end the aggressive competition between BFI-OM, Inc. and Ohio Waste Systems (Waste Management) and conform to their (Ranck and Evenhouse) master plan which was in effect in other areas throughout their overlapping jurisdiction.

45.    Later that day, (February 1, 1981), Ranck telephoned Plaintiff Yeager at his home to inform him that he (Ranck) had talked to Evenhouse and that Evenhouse would contact Yeager the following day (Monday) to set up this meeting.

46.    The following day, February 2, 1981, Ranck's co-conspirator Evenhouse, from his Michigan office, telephoned Plaintiff Yeager at his BFI-OM, Inc. office and related his conversation with his co-conspirator Bruce Ranck and arranged a meeting between Yeager and Evenhouse for February 5, 1981. Plaintiff Yeager then informed Ranck of the meeting.

47.    On or about February 5, 1981, Plaintiff Yeager and Ranck's peer and co-conspirator Evenhouse met at the Holiday Inn located in Monroe, Michigan to discuss and work out the details of a pre-arranged agreement between the co-conspirators Ranck and Evenhouse. (The type of which Ranck and Evenhouse implemented and was in effect in the greater Detroit area.) The result of this meeting was an acquiescence and

concurrence to allocated customers between BFI and Waste Management in the Toledo market, to refrain from soliciting each others' customers, and to quote "high and discouraging prices" to each others' existing customers when need be and to jointly raise prices for the waste collection and disposal services they provide to their existing customers including residential, commercial, industrial and governmental customers. Defendant Evenhouse warned Plaintiff Yeager not to discuss the agreement with any third party.

48.    Subsequently, in addition to co-conspirators Ranck and Evenhouse, other corporate officers of BFI, BFI-OM, Inc., WMNA, and Ohio Waste Systems, and without limiting the generality of the foregoing, including Charles Mooney, III, a corporate officer in BFI; John Taddonio, BFI-OM, Inc.'s Vice President and General Manager; Andrew "Jack" Nichols; Jeffrey Peckham, BFI's sales manager in Toledo; Dennis VanEvery, general manager of Waste Management's in Toledo; Greg A. Asciutto, General Manager of OWS; Carlton "Rick" Fox, Sales Manager of OWS; and others became knowing and willing participants in this combination and conspiracy.

49.    As a result of this conspiracy, Defendants and their co-conspirators met or otherwise communicated with each other from time to time, directly or indirectly, through the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and interstate transportation for the purpose and the effect of monitoring the agreement, developing collusive, complimentary and rigged bids to be submitted to various customers and to coordinate price increases.

50.    In furtherance of the conspiracy, the procedure that was used to ensure that each company, BFI-OM, Inc., and Ohio Waste Systems, retained their customers at high profit margins, involved a pre-arranged agreement whereby the prior contract holder would submit his bid, or raise prices across the board. The other company would then either refuse to quote the customer, or submit a complimentary (rigged) bid or quote prices which were high enough to force the customer to accept the seemingly lower but deceptive bid from the prior contractor.

51.    In furtherance of the conspiracy, Defendants and other co-conspirators met or otherwise communicated with one another from time to time, directly or indirectly, through means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and interstate transportation for the purposes, and the effects of monitoring the agreement, exchanging price information and coordinating price increases for waste collection and disposal services. These meetings or communications occurred in the states of Ohio, Michigan, Maryland, Texas and other places away from the company's offices in an effort to avoid detection. Various business records were falsified to hide the real purpose of these meetings and communications and to avoid detection. Further, the Defendants presented fraudulent and misleading evidence and concealed and withheld evidence.

52.    On or about November 2, 1982, Plaintiff Yeager left employment with BFI-OM, Inc.

53.    In December, 1982, Defendants and other co-conspirators met or otherwise communicated with one another for the purpose and with the effect of exchanging price information and plotting joint increases in

M0220310

landfill gate fees. By way of example, OWS charged BFI-OM, Inc. less for landfill rates than OWS charged other competitors. The amount varied from time to time, but was in excess of a 10% discount to OWS' co-conspirator. At least two of these meetings occurred at the Holiday Inn on Manhattan Boulevard in Toledo, Ohio. To hide the real purpose of this meeting, conceal evidence and avoid detection, business records were falsified.

54.   On or about late May or early June 1983, the conspiracy continued to evidence itself when Gregory Asciutto, a duly authorized manager of OWS, met with Carl Stevens, then owner of Town and Country Sanitations, Temperance, Michigan at the Royal Inn located in Toledo, Ohio. Asciutto told Stevens that if Stevens would raise his prices by 10%, Ohio Waste Systems would leave his customers alone and stop undercutting his prices to gain his customers for Ohio Waste Systems.

55.   In furtherance of the conspiracy, Defendants and other co-conspirators instructed their subordinates not to even solicit, let alone quote competitive prices to the established customers of the other National company (co-conspirator), and to avoid quoting any prices whatsoever to these customers. BFI-OM, Inc., and Ohio Waste Systems developed different price lists which, when needed, were to be used to quote inflated prices to the other company's customers, prices greatly above market rate, and disciplined salespersons who quoted competitive prices to their co-conspirators' established customers. To keep the salespersons from discovering the conspiracy, Defendants and other co-conspirators provided their salespersons with false but plausible excuses and misinformation with regard to the above practices.

M0220311

56.   In furtherance of the conspiracy, Defendant's salespersons refused to quote competitive prices to their co-conspirator's established customers and would, at times, encourage these customers to remain with the waste collection services of their co-conspirator.

57.   In furtherance of the conspiracy and upon direction of their respective parent companies, BFI-OM, Inc., and Ohio Waste Systems did jointly on or about May, 1983, fraudulently induce their customers to sign unsuspecting, long-term, self-renewing, waste collection service agreements which were virtually identical to each other with numerous technical, inconspicuous and unconscionable clauses and unrealistic, unnecessary and complicated cancellation terms for the purpose and effect of:

A.   Attempting to legitimize and further obfuscate their true motives for not soliciting each other's established customers and restraining trade. By way of example, note the striking differences in the way the two national waste handling companies do business (Exhibits 1 & 2) as compared to the way the smaller more competitive local hauler (CDS) does business.  (Exhibit 3).

BFI's and Waste Management's service agreements consist of 13 to 18 paragraphs respectively of inconspicuous fine print, which among other things, places virtually all the risk of doing business on the customer and is accompanied by a very misleading and deceptive, if not fraudulent, letter (Exhibits 4 & 5). Note in Exhibits 1 & 2 and 1a and 2a Terms and Conditions (enlarged for your convenience) the:

1.   Terms and conditions;

2.   Binding effect/customer duties and liabilities;

3.   Payments (customer even agrees to pay a late fee);

4.   Liability of haulers' equipment (customer accepts);

5.   Damage to pavement (caused by BFI's and Waste Management's heavy trucks);

M0220312

a)    Note Exhibit 7;

6.    Automatic price increases for landfill and fuel cost increases (without customer approval);

7.    Other rate adjustments (a third way to automatically increase a customer's rate without his approval);

8.    Failure to perform/liquidated damages (one-way penalty);

9.    Hold harmless clause (customer indemnifies BFI and Waste Management against all claims, lawsuits, or other liability. Literally accepts all the hauler's risk of doing business with him);

10.   Assignment (only BFI or Waste Management can assign this agreement);

11.   Attorney's fees (customer agrees to pay BFI's or Waste Management's attorney's fees to enforce the contract against themselves).

It is painfully clear that there is no mutuality in either BFI's or Waste Management's service agreements. The terms and conditions of BFI's and Waste Management's service agreements are nothing more than 13 to 18 paragraphs of customers' responsibilities, duties, and liabilities. Not a single advantage for the customer but a powerful weapon in the hands of BFI and Waste Management amounting to nothing short of economic violence against the consuming public.

To top it off, BFI blatantly admits and instructs its national sales force that, "it is impossible for BFI to breach its service agreement. Obviously, there can be no mutuality in such a contract."

In striking contrast is CDS's customer pledge (Exhibit 3). There is no "inconspicuous fine print" containing customer duties and liabilities. No exclusions from liabilities such as pavement damage (Exhibit 7). No "customer shall" clauses. Instead "CDS shall" clauses. No "automatic price increases" clauses. No "hold harmless" clauses or "liquidated damages" clauses. In fact, no place for the customer to even sign, only the officers and management of CDS sign this pledge.

There are 7 paragraphs of obligations, but not on the customer, on CDS, consisting of:

M0220313

a)    A guarantee of cost effective service;

b)    Obtain customer retention by encouragement and competitive practices.

c)    A commitment to properly maintain equipment so as not to leak juice, oil, grease, or spill trash on customer's property. (Note Exhibit 9).

d)    A commitment on behalf of CDS to clean up around containers. (Note Exhibit 10).

e)    To provide and maintain only containers in good appearance and working conditions.

f)    A promise never to take the customer for granted in exchange for the customer's loyalty and repeat business.

g)    To do business locally in support of the local economy.

CDS's pledge is the absolute direct opposite of BFI's and Waste Management's service agreements. CDS retains the customer's business by persuasion, respect, encouragement, and competitive practices. BFI and Waste Management retain the customer's business by entrapment, force and allocation.

What customer, not under compulsion, would sign a ridiculously one-sided document?? The answer lies in fine print, misdirection, and unreasonable restraint of trade.

The customer will sign the contract if he has no choice, and if no competitor will service him without a similar agreement. The customer will also sign it if he misconceives the purpose or significance of the document - if he misses the fine print or assumes that the business with which he is dealing is not determined to take unconscionable advantage of him.

This last is the key to BFI and Waste Management's success in marketing the contract. Consider again the form letter which BFI and Waste Management (Exhibits 4 & 5) sent to its customers when the 3-year service agreement was introduced to the local market. The letter deliberately misleads the customer into thinking that by signing the agreement, he would make no change in the "current status of (his) account". He is led to think that he should verify the name and address

M0220314