shown on the form (and in BFI's case, highlighted with red "X's") and return it to BFI or Waste Management so that BFI or Waste Management could "insure accuracy" in a "recently installed...computer system or properly update their account by indicating a name of an individual to contact should the need arise which would enable BFI or Waste Management to serve (the customer) more efficiently"

BFI and Waste Management now attempt to dignify their so-called service agreement with the title "contract". But the rules of law which provide for the enforcement of promissory undertakings - the law of contracts - presuppose consent, negotiation, a "meeting of the minds" and a measure of fair dealing. These essential underpinnings are entirely missing.

B. Furthering their allocation of customers and restraint of trade. By their joint enforcement of these service agreements, better than 75% of the relevant market was literally "sewed up", thereby eliminating any possibility of a competitive threat and allowing the co-conspirators to enjoy and exercise monoplistic powers.

C. Preventing entrepreneurs from starting new waste hauling companies by erecting and enforcing this insurmountable barrier to entry. By way of example, a competitor who even solicits a customer of BFI or Waste Management (evidenced by one of their dumpsters on a customer's property) is sued or threatened "among other things" with litigation for tortious interference with these co-conspirators' contractual rights to the customer also known as "property rights". See Exhibit 12 attached.

D. Preventing existing waste hauling companies (competitors) from gaining a meaningful share of the market by literally tying up what has been reported as 75% of the relevant market between these two co-conspirators, thereby eliminating the economies of scale (competitive advantage) that comes with density. By way of example, there are several waste removal companies in the Toledo market that are restricted geographically due to the unavailability of customers in sufficient numbers in areas of the city away from their base to justify the expense of providing service and are precluded from bidding on multi-location or chain accounts.

E. Forcing the customer to boycott the lower prices, better services, and less liability exposure of a competitor or potential competitor or face costly law suits for breach of the fraudulently obtained and deceptive service agreements designed to circumvent the anti-trust laws now referred to by the co-conspirators as their "contract". The effect the service agreements have on existing competitors and potential new competitors is even more devastating. It literally prevents the formation and development of new waste hauling companies and renders existing ones uncompetitive, thereby circumventing the free enterprise system as it was intended and designed to do.

M0220315

     F.    Relieving themselves of most, if not all, the risk of providing such waste collection services to their customers and placing that burden on their unsuspecting customers, who are powerless to change and correct these unsuspecting terms and conditions..

     G.    Placing their customers at the mercy of these co-conspirators by reserving onto themselves certain rights and sole options to impose penalties for late payments, administer across-the-board automatic price increases, and enforce "hold harmless" provisions for virtually all matters.

     H.    Gouging the customer through BFI's instructions to its sales force regarding quality pricing, including written directives that state to the affect that even though a customer is at a high profit margin, the sales force is instructed to obtain increases in fuel and landfill cost and minimum price increases equal to the consumer price index (CPI) in every case, as provided for in the service agreement.

By way of example, a BFI company in Elyria who received a 10% increase at the Huron County Landfill, recently increased its prices to the customer in the amount of 24% (gauge). This is an example of what BFI calls "quality pricing". (Note Exhibit "6")

     I.    Designed to protect these co-conspirators' customer base by the clear top corporate management decision to sue customers who attempt to cancel BFI or WMNA waste collection services if they are under service agreements and sue competitors who even solicit these co-conspirators' customers.

     J.    Stabilizing prices at artificially high rates by preventing the customer from switching to a competitor and by instituting automatic risk-free price increases authorized by the hidden, inconspicuous and unconscionable fine print set forth in the service agreement of both BFI and Waste Management. These virtually identical agreements call for automatic price increases without the consent of the unsuspecting customer. Without limiting the generality of the foregoing, the service agreements contain the following:

         1.    One such clause calls for an automatic price increase up to the consumer price index (CPI).

         2.    Another clause calls for automatic price increases to cover increases in landfill fees, which BFI and Waste Management control in the Toledo market.

         3.    A third clause calls for an automatic price increase to cover increases in fuel cost.

M0220316

4. There is yet a fourth way to raise an unsuspecting customer's price without risk of losing the customer simply by waiting until the restricted cancellation period elapses, as a result of which the service agreement is automatically renewed for three (3) more years (Evergreen provision) with the co-conspirators then raising the customer's price which may result in a complaint by a helpless customer who is now beyond his cancellation right and results in increased profits through the enforcement of this unsuspecting and deceptive price increase provision.

K. In order to have their customers sign these agreements, BFI-OM, Inc., and Ohio Waste Systems, with the encouragement and authority of their parent companies, sent a fraudulent and totally misleading letter to their customers (see Exhibits 4 & 5) through the United States mail, asking them to verify non-relevant data such as contact name and address, indicating there has been no change in the status of their account, implying just a routine in-house procedure of no significance to the customer and to sign the service agreement in order to update their computer records. No mention is made that the terms and conditions of this new 3-year service agreement are altogether different, more restrictive, for a longer term, include liquidated damage clauses, place much more liability on the customer, and include automatic price increases without customer approval, etc.

When BFI increases a customer's price pursuant to the terms of the service agreement, BFI passes on an increase in price greater than its actual increase in cost resulting in a higher profit margin on that unsuspecting customer. Another example of "quality pricing" when a customer with a two yard container serviced twice per week and paying $80.00 per month requests to have its pick-ups reduced to only once per week, is given a new price disproportionate to the decrease in service. In this case, the customer's rate would likely only be reduced to $65.00 per month. "Quality pricing" is, in effect, a price increase mechanism for BFI and due to the unscrupulous service agreement, the customer has little to say about it. This, along with the automatic price increases, is referred to by BFI management as "the gouge".

M0220317

Plaintiff Yeager further alleges these so-called service agreements (illegal contracts at best) are part of BFI and WM's attempt to create a permanent consumer franchise in accordance with their national master plan and conspiracy to attempt to legitimize and further obfuscate BFI and Waste Management's true motives to unreasonably restrain trade, allocate customers between BFI and Waste Management and stabilize prices at high profit levels. This corporate "customer enforcement program" also referred to as "customer maintenance" and also "getting them safely in the fold", is used as a "tool" to exercise "property rights" over customers and at the same time to circumvent the anti-trust laws and conceal the true motive of these co-conspirators so that they may blatantly enjoy and share a monopoly between them in markets throughout the country in defiance of laws to the contrary. This "anti-trust busting" tool is, and has proven to be, so intimidating and effective, as a result of which competition in the waste collection industry is rapidly going the way of the dinosaur as BFI and Waste Management continue their accelerating pace of eliminating competition by acquiring waste hauling companies around the country and through the use of, and the enforcement of their service agreements, preventing new companies from starting up. BFI's acquisitions in fiscal year 1987 alone contributed approximately $200 million in annualized revenue; in total some 112 acquisitions were completed. BFI, already a $2 Billion company with $200 million in net profit, expects to

M0220318

be a minimum $3 Billion company during their 1990 fiscal year, and has expressed hopes that the volume will actually be $4 Billion by said fiscal year. Waste Management, on the other hand, as of year-ended 1987, has gross revenue of $2.7 Billion with a net profit of more than $327 Million. Waste Management has expressed its goal to operate in most of the top 500 markets in North America (counties with population in excess of 100,000) as of December 31, 1987, Waste Management serves more than 325 of said markets.

58. In furtherance of the conspiracy, from December, 1982 to at least April, 1985, Defendant BFI-OM, Inc., developed and used two different, separate and distinct price lists. One price list called "Time Stop Price List", containing prices greatly in excess of market prices, was developed for and used solely by BFI-OM, Inc., to quote Ohio Waste Systems' existing customers in furtherance of their agreement and conspiracy. This price list was developed by Defendant BFI-OM, Inc., as a direct result of an avalanche of phone calls from Ohio Waste Systems' customers due to a major "across-the-board" price increase by Ohio Waste Systems. Ohio Waste Systems' customers who called BFI-OM, Inc., requesting a competitive quote were screened to determine the customer's current hauler. If the customer acknowledged being a Waste Management customer, said customer was quoted from this "Time Stop Price List" with prices more than double what other competitors' customers were being quoted. Customers of other less capable competitors were not only quoted prices way below a customer of Ohio Waste Systems, but was offered two to four months free service, along with a written guarantee of these low rates for up to three (3) years as an inducement to switch waste hauling

companies. This initial low price is considered an investment that will pay dividends in the future and referred to as "getting them safely in the fold". BFI then intends to recoup their initial investment by exercising their "property rights" over said customers through price increases unrestrained by competitors and with the aid of their service agreements. The other price list initially consisted of A, B and C prices for the same type and frequency of service. "A" price was considered list (BFI's top price), yet considerably below the "Time Stop Price List" developed for OWS customers. BFI's goal was to raise all customers to "A" or above. "B" was BFI's target price for new business and "C" was below cost and used to quote new businesses in competitive situations or customers of smaller and less capable competitors in order to get them "safely in the fold". In furtherance of the conspiracy, all price quotes were made only after the sales secretary and/or the sales representative had qualified the customer to be eligible for a competitive quote (eligibility of course was predicated on the customer not being a Waste Management customer).

The salespersons were instructed that if, in fact, they received a complaint from a Waste Management customer concerning BFI's rate, they were to inform the Waste Management customer that BFI's price was high because BFI's prices were generally higher than Waste Management; BFI didn't have enough customers in this area; BFI did not have a route in this area; the route in this area was filled up, or by providing some other false excuse. This "plausible deniability" by BFI was a tactic not only used in this greater Toledo market, but also in the greater Detroit market and Plaintiff has reason to believe in markets throughout the United States where BFI and Waste Management jointly conduct their

M0220320

business, especially in geographic areas of the country where co-conspirators Ranck and Evenhouse have joint jurisdiction over their respective companies' subsidiary operations.

59. In furtherance of the conspiracy, Peckham, from December, 1982 to at least April, 1985 instructed BFI salespersons not to call on Waste Management customers.

60. In furtherance of the conspiracy, BFI-OM, Inc., through Ranck, Taddonio and other unnamed co-conspirators, developed what they called the "80/20 plan". (See Exhibit 11) The "80/20 plan" assigned different percentages to each one of BFI-OM, Inc.'s competitors. The percentage determined how much effort would be used, if any, to obtain customers from these competitors; the higher the percentage, the more effort used. Of all BFI-OM, Inc.'s competitors, only Ohio Waste Systems was given a rating of 20%, (the lowest) meaning no effort would be used to obtain their customers. As a result, the sales force was instructed not to solicit an OWS customer and that if an Ohio Waste System customer called BFI to compare prices, BFI sales personnel was instructed to quote them from a price list developed solely for Waste Management (Ohio Waste Systems) customers called the "Time Stop Price List", more specifically explained hereinbefore. A similar plan was used in Detroit by Ranck in his position as President of BFI of Michigan and Taddonio in his position as sales manager of BFI of Michigan (Detroit market) in furtherance of BFI's and Waste Management's National conspiracy and master plan to monopolize the fragmented and competitive waste removal and disposal industry in the United States.

M0220321

61. On or about August, 1983, Plaintiff Yeager entered into the waste disposal market in Toledo, Ohio operating Dunrite Equipment, L.T.D., dba Community Disposal Service (CDS).

62. Plaintiff Yeager competed directly with BFI-OM, Inc., and Ohio Waste Systems in the waste collection market in the Toledo area.

63. During the course of Plaintiff Yeager's competition, CDS solicited the business of all customers in the Toledo market, through ads in the local media, direct mail and through sales representatives, which of course included customers who were doing their business with BFI-OM, Inc., and Ohio Waste Systems. When customers of co-conspirators BFI-OM, Inc., or Ohio Waste Systems did decide to switch to Plaintiff Yeager's waste disposal company, Defendants, and co-conspirators, alone or through counsel, sent letters to these customers threatening to bring suit for breach of the long-term, self-renewing service agreements more specifically addressed hereinbefore. These letters often accompanied a sample draft of a Complaint against the customer that the Defendants proposed to file if the customer did not terminate their relationship with Plaintiff Yeager's company. In furtherance of this conspiracy to unreasonably restrain trade and allocate customers between them, Plaintiff Yeager was warned, in writing, by Waste Management's corporate counsel not to so much as solicit Waste Management customers, evidenced by Waste Management dumpsters on a customer's property or that Waste Management would sue Plaintiff Yeager. BFI-OM, Inc., on the other hand did in fact sue Yeager for soliciting and accepting business from its customers who decided of their own free will to change haulers and utilize the services of the lower price and better value alternative, who required no restrictions or hold harmless agreements, namely, CDS. Plaintiff

M0220322

Yeager has reason to believe that what BFI and Waste Management did to eliminate Yeager's company is being done by BFI and Waste Management throughout the country to eliminate competition. By way of example, BFI and Waste Management are currently Defendants in a National Class Action Lawsuit in Philadelphia, Pennsylvania and have been named Defendants in similar lawsuits in different parts of the country throughout the past decade.

64. In furtherance of the conspiracy to force Yeager (CDS) out of business and combination to restrain trade, allocate customers between them, control and monopolize the market, Defendants and co-conspirators jointly drew from their parent company's unlimited national resources in order to eliminate meaningful and potential competition. With the help of specially trained sales representatives borrowed from sister companies from other states ("Blitz teams"), Defendants and co-conspirators, often in teams of two or more, mounted an all out assault on customers of CDS and offered these customers free services for up to four months and quoted prices that were lower than their costs which were guaranteed in writing for as long as three years, along with various other inducements in order to put Yeager (CDS) out of business so as not to disrupt BFI and Waste Management's ability to allocate customers between them and to fix prices at artificially high rates.

65. In furtherance of the conspiracy, BFI-OM, Inc., actively recruited and raided Plaintiff Yeager's employees and as a result, caused Richard Joseph, Hans Thumm, Christi Clark and a number of truck drivers to leave employment with Plaintiff Yeager and commence employment with BFI-OM, Inc., severely damaging the small competitive company of

M0220323

Plaintiff and its ability to compete and cause grave hardship on the remaining employees and management of CDS.

66. In furtherance of the conspiracy, Defendants and other co-conspirators caused the cost of landfill disposal, used by Plaintiff Yeager and others to increase dramatically for the purpose and effect of reducing Plaintiff Yeager's and other competitors' ability to compete in this market. By way of example, in April, 1983, Waste Management, at its local landfill, decreased BFI's rates per yard by approximately 11% while later increasing its rates charged to the Plaintiff's company, CDS, by as much as 90% even though CDS was dumping more than twice the yards of waste into OWS landfill than BFI-OM, Inc., This over 100% disparity took place during the relevant time period. In addition and in furtherance of the conspiracy, Ohio Waste System and other co-conspirators as a condition of allowing Yeager's company to dump in OWS landfill, demanded CDS to obtain representative samples of waste material and signed "manifest" from each of its customers identifying the composition for ordinary solid waste even though such restrictions were not placed on BFI nor required of their own customers, and refused to allow CDS trucks to dump their loads until they were inspected, while their own trucks and others drove by without incident, delay or provocation, and further, delayed CDS trucks and otherwise harassed CDS at the Ohio Waste System landfill in an effort to disrupt operations and cause service delays. Further, BFI and Waste Management met with City of Toledo officials for the sole purpose of encouraging the City of Toledo to increase its landfill rates, along with BFI and Waste Management, thereby eliminating a cheaper and more convenient waste disposal for CDS.

M0220324

67. The conspiracy and combination of the activities taken by the Defendants, as alleged above, succeeded in that Plaintiff Yeager could not continue in business and subsequently was forced to liquidate his company or face financial ruin. Plaintiff Yeager was forced to sell the business to BFI-OM, Inc. at a price which was grossly less than its value. Plaintiff contacted Waste Management pertaining to the possibility of a sale of the CDS business, but Waste Management expressed no interest with full knowledge of BFI's efforts and Plaintiff has reason to believe that it was pre-arranged by BFI and Waste Management that BFI-OM, Inc. would buy CDS and retain its customers to maintain equalization of market share in the Toledo market as it had done with other local acquisitions.

68. In furtherance of Defendants' and co-conspirators' conspiracy to divide the greater Toledo market between themselves, allocate customers between them, prevent and eliminate competition, deny customers the right to shop for lower prices, (they themselves not only enjoy but insist on through corporate directives), better service and less liability (imposed on them by unsuspecting and unconscionable service agreement) and share a monopoly in this greater Toledo market, Defendants and co-conspirators, through their joint efforts, conspired to force CDS to liquidate its business or face financial ruin. Defendants and co-conspirators then pre-arranged for BFI-OM, Inc. to acquire CDS at prices substantially below its potential value, allow BFI-OM, Inc. to raise the prices of CDS's former customers ("blow them to list") by agreeing to have OWS quote even higher prices to these customers should they call Ohio Waste Systems seeking a competitive quote. It was further agreed for BFI-OM, Inc. to retain CDS's customers with the exception of the Foodtown account, with

whom Ohio Waste Systems had pre-arranged (prior to the demise of CDS) to recapture when CDS went out of business, in exchange for dropping pending litigation for breach of contract against Foodtown for switching to CDS. Plaintiff Yeager alleges this same type of reciprocity, conspiracy, anti-competitive agreement and combination of capital and effort provided for Ohio Waste Systems to acquire two other local competitors below fair market value and to raise the prices ("blow to list") of these companys' former customers. These agreements were reciprocal and intended to "even out" the market share between these two national companies which resulted in exploiting both the customers and competitors in the market for their own financial gain and is part of BFI's and Waste Management's overall master plan as they acquire competitors throughout the country.

69. In furtherance of Defendants' and co-conspirators' conspiracy and agreement to divide the greater Toledo market equally between them, Defendants and co-conspirators engaged in predatory, deceptive and other unfair and anti-competitive business practices to force local competitors (with lower operating cost) to sell out to them at bargain prices or intimidate them into not soliciting their customers by taking punitive action against them, including, but not limited to, "blitzing" their customers with offers of free service and guaranteed low prices and threatening litigation. This collusion between BFI and Waste Management and restraint of trade is evidenced by BFI-OM, Inc.'s 80/20 plan, other documents, sworn testimony and Defendants' own actions in the market.

70. As a result of the activities alleged above, BFI and Waste Management were sued by the State of Ohio in <u>State of Ohio, ex rel. Celebrezze v. Browning-Ferris Industries, Inc., et al.</u> BFI-OM, Inc., with

M0220326

the knowledge, concurrence and support of BFI, joined Plaintiff Yeager as a third party defendant, seeking contribution for any damages it was forced to pay as a result of Yeager's testimony, solely to "shut Yeager up". At that time Yeager was under subpoena to testify for and on behalf of the State of Ohio. While Yeager was contemplating whether or not to testify, in light of this suit by BFI-OM, Inc., the money BFI and Waste Management were offering the State Attorney General's office to settle their complaint was less than $350,000.00. When Yeager decided to testify, regardless of the threats and harassment, and when Yeager was scheduled for deposition, BFI and Waste Management's offer more than doubled to $700,000.00. The suit was settled for that amount without Yeager testifying.

71. On or about October 29, 1987, BFI of Ohio and Ohio Waste Systems pled guilty to criminal charges that were filed by the US Department of Justice, Cleveland, Ohio, of Section 1 of the Sherman Act (15 U.S.C. Section 1) in connection with a conspiracy to allocate customers, rig bids, and fix prices in the Toledo market. They each paid a fine of $1,000,000.00.

72. That on or about August 15, 1988, BFI-OM, Inc., and Ohio Waste Systems agreed to pay to the State of Ohio, $700,000.00 to settle a civil lawsuit for actions taken by the State of Ohio against the Defendants for the conspiracy which ran through April 5, 1985 (more than two years after Yeager left BFI) as more fully complained about hereinbefore.

M0220327

73. From December, 1982 through the present date, Defendants and other co-conspirators entered into a conspiracy and conspired to prevent, reduce and eliminate competition in the Toledo market for waste disposal and hauling services in violation of the Ohio Valentine Act (O.R.C. Section 1331.01, et seq.).

74. Plaintiff Yeager alleges that Defendants and other co-conspirators entered into a combination of capital, skill, effort, and sales and operational capabilities and political connections for the purpose of fixing prices, allocating customers, restraining trade, and intimidating witnesses as more fully set forth herein.

75. As a direct and proximate result of the combinations and conspiracies described above, Plaintiff Yeager was forced to sell his business to BFI-OM, Inc., causing him to suffer a loss of profits, expected future profits and the loss of a company potentially worth $10,000,000.00, and suffered severe emotional distress all to Plaintiff's damages as proved at trial.

WHEREFORE, Plaintiff, David M. Yeager, prays for judgment, against BFI of Toledo on the First and Second Claims for Relief in the amount of Two Million One Hundred Seventy-Five Thousand Dollars ($2,175,000.00) as and for compensatory damages and Six Million Five Hundred Twenty-Five Thousand Dollars ($6,525,000.00) as and for punitive damages; and Plaintiff, David M. Yeager, prays for judgment against BFI and BFI of Toledo, jointly and severally on the Third and Fourth Claims for Relief in the amount of Three Million Four Hundred Thirty-Five Thousand Dollars ($3,435,000.00) as and for compensatory damages and Ten Million Three Hundred Five Thousand Dollars ($10,305,000.00) as and for punitive damages

M0220328

and Plaintiff, David M. Yeager, prays for judgment against BFI, BFIOM (BFI Toledo) Bruce E. Ranck and John R. Taddonio, jointly and severally on the Fifth Claim for Relief in the amount of $2,000,000.00 compensatory damages, and for $6,000,000.00 for punitive damages. Plaintiff prays for judgment for such other relief to which he is entitled in law and in equity.

Respectfully submitted,

_____
Martin J. Holmes
Attorney for Plaintiff

### DEMAND FOR JURY

Plaintiff hereby demands a trial by jury on all issues so triable herein.

_____
Martin J. Holmes
Attorney for Plaintiff

M0220329

EXHIBIT C

M0220330



IN THE COURT OF COMMON PLEAS OF LUCAS COUNTY, OHIO

| | | |
|---|---|---|
| DAVID M. YEAGER | ) | Case No. 89-2332 |
| Plaintiff, | ) | Judge J. Ronald Bowman |
| vs. | ) | <u>ORDER OF DISMISSAL WITHOUT PREJUDICE WITH RIGHT TO REFILE WITHIN ONE YEAR</u> |
| BROWNING-FERRIS INDUSTRIES OF OHIO AND MICHIGAN, INC. et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

* * * * * * *

This cause came before the Court on Plaintiff's Motion to permit his legal counsel, Martin J. Holmes, Esq., Jeffrey J. Perkins, Esq. and the firm of Brown, Baker, Schlageter & Craig to withdraw as counsel for plaintiff, and to permit the substitution of new counsel on behalf of plaintiff at plaintiff's request. The Court, being duly advised in the premises, will grant the motion and it is therefore

ORDERED that plaintiff's counsel of record be and they hereby are permitted to withdraw as counsel of record.

Plaintiff also moves to vacate the trial date. After

discussions with counsel for defendants and with the plaintiff, the plaintiff has decided to voluntarily dismiss his complaint, and the Court, with the plaintiff's consent and over the defendants' objections, enters the following Order:

ORDERED that plaintiff's complaint be dismissed pursuant to plaintiff's notice of voluntary dismissal without prejudice with the right to refile within one (1) year of the date of this Order pursuant to Rule 41; it is further

ORDERED that pursuant to Civil Rule 41 and based upon pending motions before this Court, defendants' counterclaims be and they hereby are dismissed without prejudice with the right to refile within one (1) year from the date of this Order; this Order expressly permits each party the right to refile within one (1) year of the date of this Order and this Order does not act as an adjudication on the merits of any party's claims or counterclaims; it is further

ORDERED that all discovery taken in this proceeding be used in any new case filed by any party and that the discovery which has been conducted not be repeated or duplicated in any new case filed by any party.

IT IS SO ORDERED.

DATE: 6-21-90

J. RONALD BOWMAN,
Common Pleas Judge

M0220332

2