



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BROWNING-FERRIS INDUSTRIES, INC.,
Derivatively by SALLY M. Yeager,
and on her own behalf and on behalf of
all others similarly situated,

                    Plaintiff,

          v.

WILLIAM D. RUCKELSHAUS; GERALD GRINSTEIN; BRUCE
E. RANCK; HOWARD S. HOOVER, JR.; JOSE-
PH R. HYDE, III; MICHAEL J. VERR-
OCHI; R. JOHN STANTON, JR.; HARRY J. PHIL-
LIPS, JR.; HARRY J. PHILLIPS, SR.;
LOUIS A. WATERS; RANDAL B. McDONALD; JOHN E. DR-
URY; WILLIAM B. DUNAVANT, JR.; ROBERT M.
TEETER; HASKELL I. STOVROFF; NORMAN A. MEY-
ERS AND C. JACKSON GRAYSON, JR.,

                    Defendants,

          and

BROWNING-FERRIS INDUSTRIES, INC.,

          Nominal Defendant.

:
:    CIVIL ACTION
:    NO. ~~87-3717~~
:
:    91-CV-6251
:
:
:
:    SHAREHOLDER
:    DERIVATIVE
:    ACTION
:
H-91-3568
:
:    CLASS ACTION
:
:
:
:
:
:
:    JURY TRIAL
:    DEMANDED
:

FILED

OCT - 4 1991

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## COMPLAINT

1.  This is a shareholder's action brought by plaintiff
Sally M. Yeager as a shareholder of Browning-Ferris Industries,
Inc. ("BFI" or the "Company"), asserting claims the Company will
not assert against itself and which arise out of long-standing and
egregious criminal misconduct, waste, mismanagement and other
wrongdoing by the Individual Defendants and their subordinates
which have cost BFI over $500 million in fines, penalties,
settlements, and losses, and an even greater amount in lost
corporate opportunities, as well as to recover, on behalf of BFI,
the damages the Company has sustained therefrom and illegal

M0218720



profits realized by certain of the Individual Defendants.    No damage claims are asserted in this Complaint against the Company. This Complaint also seeks injunctive relief with respect to BFI's corporate suffrage process, which has been violated by the Individual Defendants as set forth below.

2.    The claims asserted in this Complaint arise out of the defendants' misconduct, which constitutes breaches of fiduciary duty and waste of corporate assets as particularized herein, and in addition, amounts to criminal and civil violations of the federal securities laws by defendants Stanton and Hoover.  In each instance, BFI's directors, acting in apparent bad faith and in their own self-interest, have sought to protect themselves and their subordinates from liability, even in the face of egregious criminal and other wrongdoing, gross mismanagement and waste of corporate assets.  All of such behavior on the part of BFI's Board of Directors has fostered a corporate culture that involves and/or condones criminal and other wrongdoing, waste, and mismanagement at the highest levels of the Company and, if not stopped, will ultimately lead to further misconduct, waste and mismanagement which will continue to damage BFI and its shareholders.  Such conduct, under the circumstances alleged herein, reflects the Individual Defendants' bad faith and amounts to reckless and/or intentional misconduct under the circumstances.  To the extent such misconduct, waste and mismanagement have occurred, much of its existence or scope has been concealed from plaintiff, BFI's other shareholders and the investing public generally.

M0218721

## JURISDICTION AND VENUE

3.    This Court has jurisdiction of this action pursuant to Section 27 of the Securities Exchange Act of 1934, as amended (the"Exchange Act"), 15 U.S.C. § 78aa; 28 U.S.C. § 1331 (federal question jurisdiction); and pursuant to principles of supplemental jurisdiction.

4.    BFI is registered to do business in the Commonwealth of Pennsylvania, and maintains significant operations within this judicial district.    Many of the acts complained of herein affected BFI's operations in this judicial district or impacted upon the rights of shareholders residing in this judicial district.    Venue herein is proper pursuant to 28 U.S.C. § 1391(b) and (c); Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and Section 22 of the Securities Act, 15 U.S.C. § 77v.

5.    In connection with the acts alleged in this Complaint, the defendants, directly or indirectly participated in a pattern of illicit activity and have acted in bad faith and used the means and instrumentalities of interstate commerce, including the United States mails.    BFI and its subsidiaries and divisions are engaged in interstate and foreign commerce, and the activities of the Company affect interstate commerce.

M0218722

## THE PARTIES

6.    Plaintiff Sally M. Yeager ("Yeager") is now, and was at all times relevant to this Complaint, a substantial shareholder of BFI and brings this action derivatively on behalf of and for the benefit of BFI, and on behalf of all others similarly situated. The claims asserted by plaintiff Yeager are based upon information and belief (except as to her ownership of BFI common stock), the investigation by plaintiff's counsel, and facts which have found their way into the public record.    Plaintiff seeks no monetary relief as to the Company.

7.    Nominal defendant BFI, a corporation headquartered in Houston, Texas and incorporated in the State of Delaware, is a publicly-held corporation, the subsidiaries and affiliates of which collect, transport, treat, recycle and dispose of commercial, residential and municipal solid waste, with revenues of nearly $3 billion in fiscal year 1990.

8.    Defendant William D. Ruckleshaus ("Ruckleshaus") was, at most relevant times herein, Chairman of the Board and Chief Executive Officer of BFI.   In 1989 and 1990, defendant Ruckleshaus received executive compensation of $1,166,100 and $808,100, respectively; and as of January 16, 1991, defendant Ruckleshaus owned 15,810 shares of BFI common stock, and had the right to acquire through stock options an additional 1,105,000 shares.

4

M0218723

9.    Defendant John E. Drury ("Drury") was, at most relevant times herein, President and Chief Operating Officer of BFI, and a member of its Board of Directors.   In 1989 and 1990, defendant Drury received executive compensation of $615,700 and $441,100, respectively.  As of September 30, 1989, defendant Drury owned 152,914 shares of BFI common stock, and as of January 16, 1991, had the right to acquire through stock options an additional 152,000 shares.  Although defendant Drury resigned as a BFI officer and director on January 15, 1991, he purportedly will continue as a part-time employee and receive a base salary of $442,100 per year (subject to cost-of-living adjustments) and continue to participate in all of the Company's benefit plans for five years.

10.    Defendant Norman A. Meyers ("Meyers") was, at most relevant times herein, Vice Chairman of the Board of Directors and Chief Marketing Officer of BFI.  In 1989 and 1990, defendant Meyers received executive compensation of $583,500 and $418,100, respectively; and as of January 30, 1991, defendant Meyers owned 209,117 shares of BFI common stock, and had the right to acquire through stock options an additional 262,000 shares.

11.    Defendant Bruce E. Ranck was, at most relevant times herein, Executive Vice-President of North American Solid Waste Operations and Regional Vice-President of BFI's East Central Region, and a member of the Board of Directors.  In 1990, defendant Ranck received executive compensation of $371,000; and as of

5

M0218724

January 16, 1991, defendant Ranck owned 102,829 shares of BFI common stock, and had the right to acquire through stock options an additional 80,160 shares.

12.   Defendant Howard S. Hoover, Jr. ("Hoover") was, at most relevant times herein, Senior Vice-President and General Counsel of BFI, and a member of the Board of Directors.   In 1989 and 1990, defendant Hoover received executive compensation of $431,600 and $306,100, respectively; and as of January 16, 1991, defendant Hoover owned 28,738 shares of BFI common stock, and had the right to acquire through stock options an additional 167,920 shares.

13.   Defendant R. John Stanton, Jr. ("Stanton") was, at most relevant times herein, Senior Vice-President and Chief Financial Officer of BFI, and a member of the Board of Directors. As of January 16, 1991, defendant owned 123,074 shares of BFI common stock and had the right to acquire through stock options an additional 190,000 shares.

14.   Defendant Michael J. Verrochi ("Verrochi") was, at most relevant times herein, Regional Vice-President of BFI's Northeast Region and a member of the Board of Directors. As of January 15, 1990, defendant Verrochi owned 189,108 shares of BFI common stock, and had the right to acquire through stock options at least an additional 52,960 shares.

6

M0218725

15.  Defendant Phillips, Sr. ("Phillips, Sr.") was, at most relevant times herein, Chairman of the Board and Chief Executive Officer of BFI, and currently is a member of BFI's Board of Directors.   Defendant Phillips, Sr. is also Chairman of the Executive Committee for which he receives $524,900 per year, subject to a cost-of-living adjustment.   As of January 16, 1991, defendant Phillips, Sr. owned 471,558 shares of BFI common stock, and had the right to acquire through stock options at least an additional 278,120 shares.

16.  Defendant Harry J. Phillips, Jr. ("Phillips, Jr.") was, at relevant times herein, Executive Vice-President of BFI's North American Solid Waste Operations and a member of BFI's Board of Directors.   In 1989, defendant Phillips, Jr. received executive compensation of $349,100.   Although resigning as a BFI officer and director on June 28, 1989, defendants Phillips, Jr. will continue as a part-time employee and receive a base salary of $317,355 (subject to cost-of-living adjustments) for a period of five years.

17.  Defendants Louis A. Waters ("Waters") was, at all relevant times herein, a member of BFI's Board of Directors and Chairman of its Finance Committee, for which he received executive compensation of $172,000.   As of January 16, 1991, defendant Waters owned 8,835 shares of BFI common stock.

M0218726

18. William T. Butler ("Butler"), William B. Dunavant, Jr. ("Dunavant"); C. Jackson Grayson, Jr. ("Grayson"); Joseph R. Hyde, III ("Hyde"); Gerald Grinstein ("Grinstein"); Randal B. McDonald ("McDonald"); Haskell I. Stovroff ("Stovroff"); and Robert M. Teeter ("Teeter"), were, at most relevant times herein, directors of BFI. As of January 1989 and 1990, these director defendants (along with the other director defendants named above) collectively owned 2,213,860 and 1,534,342 shares of BFI common stock, respectively, and collectively had the right to acquire an additional 3,075,442 and 3,449,292 during 1989 and 1990, respectively.

19. The individuals named as defendants in paragraphs 8 through 18 are at times collectively referred to herein as the "Individual Defendants." In addition, there were other persons, the identity of whom are presently unknown, including legal counsel, who conspired with the Individual Defendants and/or aided and abetted them in their illegal activities as described herein.

## FACTUAL BACKGROUND

### BFI's Long History of Price-Fixing and Anti-Competitive Practices

20. Founded in 1969, BFI has used predatory pricing and price-fixing schemes to establish itself as a dominant player in the nation's waste disposal industry. In fact, BFI's anti-competitive practices are reminiscent of those used by Robber

8

84

M0218727

Barons John D. Rockefeller and Andrew Carnegie, who crushed competition and then engaged in nationwide monopolistic practices to build their empires of oil and steel. Here, BFI similarly engaged in a wide array of anticompetitive practices which varied from market to market, but all of which were designed and used by BFI to gain entry into a designated market, eradicate competition, and then raise customer prices and thus BFI's profits.

21. For instance, an integral part of BFI's price-fixing scheme is control of landfills. All waste is ultimately dumped in landfills, and the number of landfills in a given metropolitan market is limited by land availability, municipal ordinance, and environmental regulation. BFI would therefore seek to gain control, directly or indirectly, of a designated market's landfills, either as owner or operator of the landfills. BFI would thereby gain control of the price non-BFI haulers must pay to dump their loads at the BFI-controlled landfills; BFI haulers, however, incur no such charge since BFI owns the landfill. BFI then simply raises the rates at its landfills and forces increased costs onto its competitors, forcing them to increase prices to at least BFI's level or incur substantial losses. In fact, BFI often slashes its collection prices in conjunction with raising disposal fees charged to its competitors -- which results in the competitors being "squeezed" out of the market. Once gone, BFI raises its prices without fear of competition.

9

M0218728

22.  If a competitor owned its own landfill, and was thus not dependent on using a BFI-controlled landfill, BFI had to alter its strategy accordingly.  The strategy, however, still operated to increase its competitor's disposal costs.  Since the upfront fixed costs of designing, constructing, and receiving the necessary regulatory approvals for operating a landfill are substantial, the landfill owner depends upon a heavy volume to reduce the fixed costs of opening and operating its landfill.  If volumes are heavy, the landfill owner can recoup its investment, meet operating expenses, and make a profit.  Here, however, BFI would slash its prices and start capturing the competitor's customers.  This would significantly reduce the volumes flowing to the competitor's landfill.  With volumes significantly reduced below anticipated levels, the competitor becomes unable to meet either his initial fixed-cost outlay or operating expenses, let alone make a profit; as planned, the competitor is then driven out of business and BFI is free again to raise its prices to monopoly levels.

23.  Another anti-competitive practice used to great effect is what BFI insiders refer to as "The Blitz."  Pursuant to The Blitz, BFI seeks entry into new markets by meeting with smaller would-be competitors and offering to purchase them at below market prices, but nevertheless offering them high salaries and potentially lucrative stock deals to operate under the BFI flag. If the competitor refuses, BFI enters the new market anyway and blitzes the competitor's customers with offers of cut-rate disposal

M0218729

fees. Unable to sustain the same degree of short-term losses as could BFI, these competitors are driven to the brink of bankruptcy. BFI then either finishes the job and drives the competitor into bankruptcy or buys them out at an even lower below market offer. Once The Blitz is accomplished, BFI again raises its prices -- gouging customers at will -- in its near (if not) monopoly environment. Moreover, given BFI's quickly earned reputation for ruthlessness and unfair business practices, BFI often only needed to threaten would-be competitors with such practices to secure their agreement to sell their operations to BFI at below market prices.

24. In those markets where BFI's competitor was of a sufficient size to incur sustained losses during BFI's blitz/price wars, or could launch a counter-attack against BFI, BFI was nevertheless successful enough to extract an agreement from the competitor to fix prices and the companies' respective market shares. Pursuant to the agreements, often entered into with co-conspirator Waste Management, Inc. (the nation's only waste-disposal firm larger than BFI), BFI and its co-conspirators would enter into unlawful agreements to allocate both existing and new customers between each other, with the customer accounts referred to as a "property rights." Under the scheme, when an existing account was allocated or new account assigned to one of the conspiracy's members, that member received exclusive "rights" to service the account or sell or trade it to another member.

11

M0218730

81

Henceforth, "competing" companies would refrain from soliciting other members' accounts; moreover, if the customer solicited a competing bid, the other haulers would collusively submit high bids to give the appearance of competition while still ensuring that the member hauler's "property rights" were protected.

25.  BFI's history of price-fixing and anti-competitive practices dates back to its inception and continues to the present. Shortly after its founding in 1969, BFI acquired the Chicago-based trash hauling firm of National Disposal Services, Inc. -- one of the largest private American refuse contractors, with 11 landfills and 375 trucks in six states. In typical fashion, National Disposal's former president, John Vanderveld, became a key executive of BFI and was permitted to continue heading National Disposal as a wholly-owned subsidiary of BFI. In 1971, however, the Illinois Attorney General brought suit against Chicago-area waste haulers who had incorporated to form the Chicago Suburban Refuse Disposal Corporation ("CSRDC"), of which National Disposal Service was a member. The suit, People of the State of Illinois v. Chicago Suburban Refuse Disposal Corporation, No. 71-1102G (Cir. Ct. Dupage County, Illinois 1971), alleged a massive customer allocation and price-fixing agreement among Chicago's waste haulers based on the system described above involving "property rights." Rather than proceed to trial, the association and its haulers (including BFI's subsidiary) entered into a consent decree whereby they agreed not to engage in anti-competitive practices for a period of ten years and pay a $50,000 fine.

M0218731

80

26. In 1980, BFI's Georgia subsidiary and its manager were indicted for conspiring (with others including Waste Management, Inc.) to fix prices, and divide, allocate, or otherwise apportion customers in the Atlanta area, between 1974 and 1979. United States v. BFI of Georgia, Inc., et al., Crim. No. 80-136a (N.D. Ga. 1980). After BFI and its manager pled nolo contendere in connection with the scheme, BFI was fined $350,000 and its manager sentenced to one-year in prison. BFI subsequently rehired the manager after his release from prison. In addition, two shareholder class actions were filed against BFI in connection with the Atlanta price-fixing scheme -- Metro Development Co. v. Browning-Ferris Industries of Georgia, Inc. et al., and Capital Fish Co. v. Browning-Ferris Industries of Georgia, Inc., et al. BFI, however, has never disclosed fully the terms and conditions of its settlement of these actions.

27. BFI's highest corporate officers not only were aware of the Atlanta price-fixing scheme, but engineered, encouraged, and directed BFI's entry into the scheme from their Houston headquarters. Specifically, defendant Meyers, BFI Vice President, and defendant Drury, then BFI Executive Vice President, effected BFI's entry into the conspiracy in an effort to stave off mounting losses at its Atlanta operation. In fact, BFI's then President, defendant Phillips, Sr., traveled with defendants Drury, Meyers and other BFI officials to Atlanta to observe the increase in profits resulting from BFI's joinder into the price-fixing conspiracy. In

13

M0218732

apparent reward for their efforts, defendant Drury was promoted to Chief Operating Officer in 1981 and President in 1982, and defendant Meyers promoted to Chief Marketing Officer in 1981 and Vice Chairman of the Board of Directors in 1982.

28. In 1981, a civil antitrust complaint seeking $319.5 million in damages was filed against BFI in Houston, alleging that BFI conspired to monopolize solid waste disposal services in Houston and its surrounding Harris County communities. The complaint, <u>Conservation Management, Inc. v. BFI, et al.</u>, Civil No. H-81-1696 (S.D. Texas 1981), alleged that as part of the conspiracy, BFI secretly paid $25,000 to Texas state Senator, Jack Ogg, for his assistance in defeating Conservation Management's landfill application. (Only one-year before, Senator Ogg and several business associates won a state permit to operate the Whispering Pines landfill in Harris County, only to immediately turn-around and sell the landfill to BFI. As part of the deal, BFI agreed to pay Senator Ogg 4% of the gate receipts from any landfill within 10 miles of Harris County or 6.6% of the gate receipts from the Whispering Pines landfill, whichever is higher, for 20 years. Under the agreement, Senator Ogg was to receive over $500,000.)

29. After several days of trial, and immediately before Senator Ogg was to testify, BFI settled the case for what it reported to be $5.2 million. Upon information and belief, the settlement was in excess of $20 million; however, defendants

14

M0218733

Phillips, Sr., Drury, Meyers, Hoover, and others sought to conceal the full amount from the SEC and the investing public generally. The concealment was achieved by BFI purchasing Conservation Management and related companies with an undisclosed amount of BFI common stock, and accounting for the acquisition as a "pooling of interests." BFI vigorously sought to seal all depositions, affidavits, and briefs in the matter, and has succeeded to this day from disclosing the true terms and conditions of its antitrust settlement with Conservation Management.

30. The pre-trial proceedings revealed, however, that BFI Vice-President defendant Meyers paid the $25,000 bribe to Senator Ogg after Conservation Management's landfill application was denied. In addition, Senator Ogg collected an additional $25,000 from landowners near the proposed site who purportedly were opposed to Conservation Management's landfill operation -- however, defendant Meyers reimbursed the landowners for these fees out of BFI funds. Despite defendant Meyer's participation in the conspiracy, BFI took no legal or disciplinary action against him; rather, as detailed above in connection with the Atlanta price-fixing scheme, he was rewarded for his efforts and promoted to Chief Marketing Officer and Vice Chairman of BFI's Board of Directors where he still sits.

M0218734

31.  Shortly thereafter, another antitrust complaint, Chambers Development Company v. BFI, et al., Civil No. 83-2384 (W.D. Pa 1983), was filed against BFI alleging it engaged in similar anti-competitive practices in Pittsburgh.  There, BFI employed several strategies, often simultaneously, but all with the desired effect of eliminating competition or securing agreements from competitors to join a price-fixing scheme.  As in the Atlanta price-fixing case discussed above, BFI's top officers, including defendants Drury and Meyers, prompted, engineered, and directed the price-fixing efforts in Pittsburgh.  These efforts included "The Blitz," whereby BFI engaged in predatory pricing tactics, stealing a competitor's customers and only offering to stop if the competitor agreed to join BFI's price-fixing conspiracy.  BFI also sought control of local landfills so it could implement a "squeeze play" against recalcitrant independents who declined to join the conspiracy.   In fact, BFI was even successful in forcing "independent" landfill operators to raise the disposal rates charged to small, truly independent haulers under threat that BFI would discontinue using the independent landfill if it failed to agree to the price increases.  Moreover, BFI acquired controlling interests in other haulers, or created stooge "competitors," making it easier to rig bids as it deceptively created the appearance of competition.  Five BFI employees were also named as defendants, John Drury (one of the defendants here), and William Curtis, Clifford Bright, Edward Benko, and William Pittman.

76

M0218735

32. Rather than proceed to trial, BFI reached a settlement with Chambers Development in 1988. BFI, however, refuses to publicly disclose the amount or terms of the settlement. Also, despite the direct participation in and/or approval of the Pittsburgh price-fixing schemes by defendants Drury, Meyers, Hoover, Phillips, Sr., and Messrs. Curtis, Bright, Benko or Pittman, BFI took no legal action against them or their subordinates.

33. Within a year, yet another antitrust complaint, <u>Kelco Disposal, Inc. and Joseph Kelly v. BFI of Vermont and BFI</u>, No. 84-180 (D. Vt. 1984), was filed against BFI alleging that BFI engaged in predatory pricing practices to drive Joseph Kelly and his Kelco Disposal Co. out of the waste removal business in Burlington, Vermont. BFI employed its standard Blitz program, slashing prices in an effort to force Kelly into bankruptcy. When Kelly resisted and continued to compete, BFI offered to buy Kelly out so as to eliminate his competition. Kelly refused BFI's $145,000 offer. BFI's Divisional Vice President, Michael Gustin, then gave explicit orders to his Burlington District Manager and salesman to cut prices and -- "Put [Kelly] out of business. Do whatever it takes. Squish him like a bug."

17

M0218736

34. As with every antitrust case filed against it before, BFI represented in its press releases, SEC filings, and Annual and Quarterly Reports to Shareholders that BFI management believed that the ultimate resolution of this matter would not have a materially adverse effect upon the business or consolidated financial position of BFI. In Kelco, however, the jury awarded Kelly $6 million in punitive damages in addition to $153,438 in compensatory damages. While BFI appealed the ruling to the United States Supreme Court, the award of over $6 million was upheld in 1989. Not surprisingly, BFI took no legal or disciplinary action against Michael Gustin or any of the other BFI employees responsible for the anti-competitive practices that led to the multi-million dollar verdict against BFI. More disturbingly, however, was that BFI actually promoted Michael "Squish him like a bug" Gustin in 1987, to Co-Regional Vice President for BFI's Northeast Region.

35. Furthermore, BFI was not above submerging itself in the underworld of organized crime if it would increase BFI's markets, profits, and control. When BFI bought out trash collection companies in New York and New Jersey, BFI followed its usual management practice (first used in Chicago) of retaining the previous owners to manage the "property rights" or customer accounts, even if the previous owners were well-known organized crime figures. In fact, when BFI "acquired" several local hauling companies in New Jersey during the mid-1970's, BFI Region

18

M0218737

President, defendant Drury, exhibited no reservation in appointing Johnny Pinto as Vice President of BFI's New Jersey Region, despite the fact that Pinto was known to have been associated with New Jersey organized crime for over twenty years. During his tenure at BFI, Johnny Pinto reported directly to defendant Drury at BFI headquarters; defendant Drury was the President of BFI's New Jersey subsidiary and defendant Meyers was one of the subsidiaries' three directors. Upon information and belief, BFI learned in 1980 or 1981 that Johnny Pinto was under investigation for bribery and price-fixing violations in connection with his operation of BFI's New Jersey subsidiary. In an apparent attempt to distance itself from Johnny Pinto and his clear ties to organized crime, BFI "persuaded" Pinto to take earlier "retirement" in 1981. BFI nevertheless kept Pinto on the BFI payroll until at least 1984, when Pinto became eligible to receive, and did receive, full BFI retirement benefits. During those four years, Pinto also was paid over $125,000 a year for purported consulting services which he never provided, and continued to participate in all of the Company's benefit plans.

36. In 1984, Johnny Pinto, along with Angelo Miele & Sons, Inc., Carmine Pucillo, L. Pucillo & Sons, Frank Stamato & Co., were indicted by a New Jersey grand jury for conspiring to fix prices between 1970 and 1984 throughout an eight county area in New Jersey. State of New Jersey v. Angelo Miele & Sons, Inc., et al., No. SGJ119-84-(1). The indictment charged that the defendants

M0218738

collusively engaged in a "property rights" system to allocate customers, rigged bids to give the appearance of competition, and used predatory pricing tactics, threats, and even physical force to secure the agreement of other haulers to join and remain in the price-fixing conspiracy. The indictment additionally alleged that Johnny Pinto bribed public officials in exchange for their assistance in eliminating competition within the waste collection business. Johnny Pinto pled guilty to the charges and paid a fine of approximately $50,000.

37. New Jersey then brought civil antitrust charges against even more entities, alleging similar practices of price-fixing, collusion, and bid-rigging. State of New Jersey v. Arace Brothers, et al., Civil no. L-069569-84 (Sup. Ct. Mercer County). Apparently recognizing the impossibility of raising even a credible defense to the antitrust charges, BFI agreed to pay New Jersey $3 million in exchange for not being named in the Arace Bros. Complaint. Despite Johnny Pinto's guilty plea, and the complicity of defendants Meyer and Drury in having directed Pinto's operations, BFI took no legal or disciplinary action against these or any other BFI employees involved with the New Jersey price-fixing schemes.

M0218739

38.   Johnny Pinto's Co-Regional Vice-President, defendant Ranck, similarly maintained ties to organized crime figures and/or others who were known to have powerful connections to organized crime figures in New York.   Specifically, defendant Ranck, on several occasions, has met with and/or conducted discussions with Louis Mongelli -- who, according to state and federal investigators, maintains extensive ties to New York's world of organized crime.   In addition, Ernest Palmieri, identified in Justice Department reports and Congressional testimony as a leader in the Genovese crime family, had been on BFI's payroll (at a New Jersey BFI subsidiary).   Again, defendant Ranck was Co-Regional Vice President whose region included, inter alia, New Jersey.

39.   In May 1986, the Ohio Attorney General brought a civil antitrust action against BFI, Waste Management, the companies' Ohio subsidiaries, and several BFI and Waste Management employees and associates.   The Complaint explained that BFI and Waste Management entered into price wars in the greater Toledo metropolitan area from 1979-1980, aggressively competing for business, including that of its respective competitor.   However, beginning in 1981, BFI and Waste Management "made peace" and entered into price-fixing agreements whereby both agreed to an allocation of customers between themselves for the Toledo area, agreed not to solicit or compete for the others' existing customers, submit non-competitive, collusive, and rigged bids to the other's customers so as to discourage the customer from

21

M0218740

changing companies and give the illusion of competitive pricing, and otherwise seek to raise, fix or maintain prices above competitive levels.

40. BFI and Waste Management's massive price-fixing conspiracy in the greater Toledo metropolitan area became the subject of a federal grand jury investigation in Toledo, Ohio, which was convened in or around 1987 to determine whether criminal charges should be brought against BFI, Waste Management, or its employees regarding their participation in the price-fixing conspiracy.

41. Since the inception of the Ohio Attorney General's suit in May 1986 and continuing to this day, BFI has maintained, despite overwhelming evidence to the contrary, that the Toledo price-fixing conspiracy was solely the result of BFI's district manager in Toledo, and represented the "aberrant behavior of a lone employee." Moreover, BFI, again in possession of overwhelming evidence to the contrary, represented in its press releases, SEC filings, and Annual and Quarterly Reports to Shareholders that BFI was cooperating with not only the Toledo federal grand jury investigation, but with similar grand jury investigations of BFI's price-fixing practices across the United States.

70                                          M0218741

42. BFI and the Individual Defendants, however, knew, as with the price-fixing conspiracies in Atlanta, Houston, Pittsburgh, Burlington, and New Jersey, that the Toledo price-fixing scheme was not the result of local-level BFI managers. Rather, they knew BFI's initiation of or entry in price-fixing conspiracies across the United States was conceived, directed, and enforced by BFI's corporate officials both in its regional offices and at BFI's Houston headquarters. In fact, in addition to BFI and Waste Management being named as defendants, the Ohio Attorney General's antitrust complaint specifically named BFI Regional Vice President Bruce E. Ranck, and BFI District Vice President John R. Taddonio as individual defendants who were responsible for spearheading BFI's entry and participation in the Toledo price-fixing scheme. See title page of Complaint at Exhibit A attached hereto. The Ohio Attorney General also named BFI Toledo Sales Manager, Jeffrey Peckham, as an uncharged co-conspirator in the Toledo price-fixing scheme. Moreover, defendant Ranck was a named "target" in the 1987 Toledo federal grand jury investigation. By letter dated September 23, 1987, the United States Department of Justice informed defendant Ranck, through his counsel, that the "grand jury has substantial evidence linking [Ranck] to the commission of a crime, and, in [DOJ's] judgment, [Ranck] is a putative defendant. The Antitrust Division is seriously considering recommending to the grand jury that [Ranck] be indicted." See Exhibit B attached hereto.

23

M0218742

43. Similarly, BFI knew that its employees were not cooperating with the federal grand juries, but that several of its top officials, including defendant Ranck, were refusing to cooperate with the authorities, citing their Fifth Amendment right against self-incrimination. In fact, upon information and belief, BFI coerced and intimidated BFI employees, including Mr. Taddonio, from cooperating with the authorities by agreeing to provide "independent" representation for the employee and to pay for the separate representation, but only so long as the employee maintained his innocence and refused to implicate either himself or his BFI superiors in the price-fixing conspiracy.

44. Within one month after being informed that Regional Vice President Ranck was to be indicted, BFI settled the federal antitrust case, agreeing to plead guilty to one felony count of price-fixing and pay the maximum criminal fine of $1 million. BFI similarly entered into a consent judgment with the Ohio Attorney General and agreed to pay a $350,000 fine arising from BFI's Toledo price-fixing conspiracy.

45. Again, BFI took no legal or disciplinary action against defendant Ranck, Taddonio, Peckham, or defendants Drury, Phillips, Sr., Meyers, and Hoover, all of which knew of, engineered, directed and enforced the Toledo price-fixing conspiracy. In fact, not only did the Board decline to take any action against defendant Ranck, Taddonio, Peckham, for their

24

M0218743

illegal conduct, but BFI promoted them. Taddonio was promoted from Toledo District Vice President to President of BFI's entire overseas operation in Italy. Peckham was promoted from Toledo Sales Manager to Regional Sales Manager of BFI's Hospital Waste operations. As for defendant Ranck, in July 1989, BFI's Board elected him Executive Vice President responsible for BFI's entire North American Solid Waste Operations. Defendant Ranck was assuming the responsibilities from defendant Phillips, Jr., who resigned in June 1989. Upon defendant Phillips, Jr.'s departure, defendants Ruckleshaus and Drury reassured shareholders that "[f]ortunately, for the company we have in Mr. Ranck a first-rate replacement." However, at no time did defendants Ruckleshaus, Drury, or any of the Individual Defendants ever alert Company shareholders, the SEC or the investing public generally that defendant Ranck (a Regional Vice President responsible for BFI's operations in portions of Michigan, Ohio, Pennsylvania, New Jersey, Maryland, District of Columbia, Virginia, West Virginia, and several Canadian provinces), maintained ties with organized crime, was targeted to be indicted in the Toledo price-fixing conspiracy, and that the imminent indictment of defendant Ranck was BFI's major motivation for BFI pleading guilty to felony counts and agreeing to pay $1.35 million to settle the federal and state antitrust charges. Moreover, the Individual Defendants failed to disclose defendant Ranck's illegal conduct to the SEC or the investing public in the Company's 1990 Proxy Materials when the Board of Directors nominated and recommended that defendant Ranck be elected to the Board where he now sits.

67                    M0218744