46. In fact, the only action BFI took in apparent response to the May 1986 Toledo price-fixing Complaint and ensuing investigation of defendant Ranck, Taddonio, Peckham, and others, was to seek immediately to amend its Restated Certificate of Incorporation and the Company's by-laws to further indemnify BFI's officers and directors from damages arising from misconduct, gross mismanagement, and breaches of their fiduciary duties owed to the Company and its shareholders.

47. Specifically, in the face of their long-standing history of price-fixing, gross mismanagement, and waste of corporate assets, the Board (through the 1987 Proxy Materials) sought, inter alia, shareholder approval for fundamental changes in the liabilities of the directors and officers to the Company and indemnification of the officers and directors for certain liabilities (the "Raincoat Provisions"), as well as other steps designed to entrench the directors holding office and/or nominated in the future by BFI management.

48. In particular, in response to amendments of the Business Corporation Law of Delaware, the Individual Defendants and other members of the Board sought shareholder approval of an amendment to the Company's Restated Certificate of Incorporation which would limit the liability of the directors to the Company or its shareholders for breaches of their duty of care, unless bad faith, intentional misconduct, knowing violations of law, personal

26

M0218745

profit or violations of the dividend statute were involved.  Each of the Individual Defendants, together with all of BFI's directors in 1987, had a direct, personal interest in the approval of the Raincoat Provisions and forcefully advocated their adoption.

49.  In addition, subject to shareholder approval of the above amendment to the Company's Restated Certificate of Incorporation, the Individual Defendants and other members of the Board amended the Company's By-Laws to accord with the expanded indemnification provisions recently available under Delaware corporation law.  The Individual Defendants and other Board members also sought shareholder approval for the use of an "Indemnity Agreement" which provided even greater indemnification protections than that mandated by Delaware law.  Under this Indemnity Agreement, BFI directors and designated officers would have the right to be indemnified from any liability to, _inter alia_, the Company, in the absence of a finding that the officer or director acted in bad faith, was deliberately dishonest, or gained a personal financial benefit to which he or she was not entitled, such as the type of conduct described herein.  BFI even sought to indemnify directors for liabilities arising under the Securities Act of 1933 (the "Act"), despite being informed by the SEC that such indemnification was against public policy as expressed in the Act and was therefore unenforceable.

27

M0218746

50. The shareholder approval sought by the Individual Defendants and other members of the BFI Board of Directors (and unlawfully extracted at BFI's March 4, 1987 Annual Meeting) came none too soon. On June 18, 1987, a Class Action complaint was filed against BFI and Waste Management alleging that both had engaged in a nationwide price-fixing conspiracy involving containerized solid waste removal and disposal services. This initial complaint was followed by numerous others filed by various victims of the on-going conspiracy; all of such cases were, ultimately, consolidated before this Court. <u>Cumberland Farms, Inc., et al. v. Browning-Ferris Industries, Inc., et al.</u>, Civil No. 87-3717 (E.D. Pa. 1987). The Consolidated Complaint alleged that, as part of the conspiracy, BFI and Waste Management had allocated customers among themselves, had refrained from soliciting or competing for the business of each other's established customers, had provided intentionally high price quotations to discourage customers from switching from one company to the other, and had refrained from submitting competitive bids to each other's customers. Despite having paid millions of dollars of fines, penalties, and awards to settle similar price-fixing allegations in Illinois, Georgia, Texas, Vermont, Pennsylvania, New Jersey, and Ohio, BFI (as did Waste Management) denied all allegations of price-fixing.

28

M0218747

51.  Discovery in this national antitrust Class Action, however, not only confirmed that BFI top corporate officers engineered, directed, and enforced price-fixing conspiracies in the above local markets, but also confirmed that BFI's top officers entered into similar conspiracies in Michigan, Missouri, New York, and BFI's former Arrowhead Region, which included Colorado, Nebraska, Iowa, Wisconsin, Minnesota, North and South Dakota, Wyoming, Montana, as well as several Canadian provinces.  Through depositions, affidavits, and BFI's own documents, the plaintiffs discredited BFI's contentions (asserted from its inception) that any antitrust or anti-competitive practices were conceived of and directed by local managers, without the knowledge or involvement of BFI's regional or corporate officials.  Rather, the discovery simply confirmed the obvious, that BFI's regional and corporate officials embraced a long-standing policy of engaging in anti-competitive practices to maintain profit margins, and that the price-fixing conspiracies were planned, orchestrated, implemented, monitored, and enforced by BFI's top management, including defendants Phillips, Sr., Drury, Meyers, Ranck, Hoover, Phillips, Jr., and present or former BFI employees Pinto, Gustin, Verrochi, Taddonio, Jeffrey Peckham, and others.

52.  When confronted with the overwhelming evidence demonstrating that BFI engaged in a nationwide price-fixing conspiracy, and in apparent recognition of certain defeat if it allowed the Class Action to proceed to trial, BFI agreed to pay

29

M0218748

$30.5 million to settle its share of the antitrust liability. Along with Waste Management's $19.5 million settlement, the total $50 million settlement represents one of the larger antitrust settlements in United States history.   Despite the record settlement of its antitrust liability, and the massive legal fees and related expenses incurred by the Company, BFI has taken no disciplinary or legal action against any of the BFI officers or their subordinates whose illicit conduct resulted in the $30.5 million settlement.   Even greater damages are expected to be incurred by the Company as a result of the Individual Defendants' criminal misconduct and other wrongdoing in connection with their nationwide price-fixing practices.   In fact, several shareholder Class Actions have already been filed against BFI, including, Leonard Eisner Profit Sharing Plan, et al. v. Browning-Ferris Industries, Inc., et al., (S.D. Tex. 1990), alleging BFI prepared, issued, and disseminated false and misleading information to the investing public regarding its liability in the national antitrust Class Action and other related actions.  Again, BFI is believed to have taken no action against the BFI officers and their subordinates responsible for issuing the false and misleading information as alleged in that complaint.

53.   The criminal misconduct by BFI's officers, including defendants' Phillips, Sr., Drury, Meyers, Ranck, Phillips, Jr., Stanton, Hoover, and others, has additionally resulted in substantial lost corporate opportunities by BFI as the felony and

M0218749

other convictions now preclude BFI from bidding on many state, city, and municipal contracts.  In fact, 14 states (Connecticut, Florida, Georgia, Illinois, Indiana, Kentucky, Maryland, Minnesota, New Jersey, New York, Pennsylvania, Utah, Virginia, and Vermont), the District of Columbia, and several major American cities recently have enacted "Bad Boy" laws, which often preclude or "debar" corporations convicted of antitrust violations from doing business with the state, city, or municipality.  In fact, in February 1989, the City of Chicago debarred both BFI and co-conspirator Waste Management from bidding on the City's nearly $50 million annual waste disposal business for a period of three years. As more and more states, cities, and municipalities enact and enforce similar "Bad Boy" laws, the Individual Defendants' criminal wrongdoing will result in even greater losses and lost corporate opportunities for BFI.

### BFI's Long-Standing Environmental Violations

54. Since its founding, BFI's officers and their subordinates held the nation's environmental laws in the same apparent contempt as they did the nation's antitrust laws. Willful, repeated and egregious misconduct again became BFI's calling card within the environmental regulatory community.

31

M0218750

55. For example, BFI quickly adopted the illegal but profitable dumping practice of "cocktailing" hazardous waste. "Cocktailing" is the illegal practice of disposing of hazardous wastes by mixing them with other types of non-hazardous waste, creating a cheap "mixed drink" that disguises the presence of the hazardous waste. For liquid hazardous wastes, "cocktailing" often becomes the disposal method of choice by disreputable waste haulers since it mixes easily with absorbent material as garbage, cement, lime, etc., and can be disposed of in traditional non-hazardous solid waste landfills. Moreover, the profits generated by "cocktailing" are enormous since the waste hauler eliminates the expense of stringent compliance procedures associated with the disposal of hazardous wastes -- while still charging its customers the much higher rates applicable to hazardous waste disposal.

56. As early as 1976, BFI was reported to have illegally disposed of cyanide and nitrobenzene by "cocktailing" them with waste oil, which BFI sold to Texas municipalities who sprayed the oil on its subdivision's dirt roads to decrease airborne dirt and dust. Often, citizens complained that the oil smelled like shoe polish and caused coughing and other respiratory ailments in the local population. The municipal authorities, however, took no action until a BFI chemist, who allegedly was forced to resign after complaining about mixing the cyanide and nitrobenzene with the road oil, reported BFI's illegal "cocktailing" practices to a local Texas newspaper. Congressional hearings were then held which

32

M0218751

revealed that BFI also sold nitrobenzene-contaminated waste oil to Louisiana companies which reprocessed the oil and sold it as fuel oil. BFI spent approximately $3.5 million cleaning and resurfacing the affected roads, and establishing a health monitoring system and veterinary referral program. In addition, BFI paid a $200,000 fine in settlement of charges brought by the Texas Department of Water Resources. Again, no legal or disciplinary action was taken against the BFI management responsible for the wrongdoing.

57. Similarly, in October 1981, a three-judge panel of the Ontario Supreme Court found that a Canadian subsidiary in BFI's Arrowhead Region was illegally dumping liquid industrial wastes in its Ridge site landfill, and ordered BFI to stop immediately. BFI, however, had already illegally buried over 5.2 million gallons of liquid industrial waste at the landfill between August 1979 and July 1981. Again, no legal or disciplinary action was taken against the BFI officials or their subordinates who were responsible for the illegal dumping.

58. On January 31, 1983, BFI acquired CECOS International, Inc. ("CECOS") of Buffalo, New York, for approximately $85 million. CECOS, the nation's third largest hazardous waste disposal company, owned and operated hazardous waste secure landfill disposal sites in Williamsburg, Ohio, and Niagara Falls, New York. These two sites doubled BFI's previous hazardous waste disposal capacity provided by its initial

33

M0218752

Livingston, Louisiana site. CECOS also operated a wastewater processing plant in Niagara Falls, and was active in hazardous waste cleanup and site remediation programs. BFI's then current chemical waste operations were transferred to CECOS, which became a fully-owned subsidiary of BFI. In BFI's 1983 Annual Report to Shareholders, defendant Phillips, Sr., opined that the CECOS acquisition resulted in "a broadly-based organization that can be brought to bear on the nation's hazardous waste disposal problems at a time when substantial growth is expected in the coming decade for this segment of the total waste services business."

59. The BFI 1984 Annual Report to Shareholders also stressed the "magnitude of potential future growth" in BFI's CECOS subsidiary and the important contributions its hazardous waste operations could make to BFI's revenues. BFI further reported that industry observers predicted that "the hazardous waste treatment and disposal business will grow at an annual rate of at least 20 percent and could reach a 40 percent rate over the next five years." BFI management opined that the hazardous waste operations were a "sound investment and one that the company expects to make important future contributions."

60. Unfortunately for BFI and its shareholders, the penchant for criminal misconduct and gross mismanagement by BFI's officers and their subordinates, condoned by the Board of Directors, proved disastrous at BFI's CECOS subsidiary.

34

M0218753

61.  In 1985, a Clermont County, Ohio grand jury brought a 96-count indictment against BFI, its CECOS subsidiary, and two CECOS employees for pumping 27,000 gallons of toxic waste-contaminated water into the drinking water supply of Williamsburg, Ohio.  The site was temporarily closed, causing BFI's chemical waste operations to post its first loss, with revenues plunging 17 percent in 1985.  While issuing denials of the allegations in press releases and SEC filings, BFI's CECOS manager was found guilty of eight felony and two misdemeanor counts, and faced a maximum jail term of 40 years and $250,000 of fines.  To settle its liability, BFI on April 5, 1990, agreed to plead guilty to a criminal violation of Ohio's hazardous waste law, permanently shut down its Williamsburg hazardous waste site, and pay $3.5 million in fines and penalties.

62.  Likewise, in April 1986, the United States Department of Justice charged BFI with committing over 1,700 federal hazardous-waste violations between November 1980 and January 1986 at its CECOS hazardous waste site in Livingston, Louisiana.  While BFI issued denials of the charges in press releases and SEC filings, it paid $2.5 million in August 1988 to settle the charges -- the highest penalty ever obtained in a hazardous waste case at that date.

35

M0218754

63.  With  criminal  indictments  and  thousands  of environmental charges pending against its three hazardous waste landfills, BFI and CECOS came under even greater scrutiny by environmental regulatory officials.  This greater scrutiny simply uncovered  even  more  environmental  violations  and  further demonstrated BFI's criminally cavalier attitude towards the disposal of hazardous waste.  In an apparent attempt to purchase credibility with regulators, BFI added defendant Ruckleshaus to the Board of Directors in June 1987, and appointed him Chairman and Chief Executive Officer in September 1988 - less than one month after paying the record $2.5 million to settle the 1,700 violations charged at its Livingston, Louisiana hazardous waste site.

64.  As two-time Administrator of the EPA, and having returned after scandals rocked the agency in 1983, defendant Ruckleshaus earned the reputation as "Mr. Clean" within the environmental community.  When leaving the EPA the second time in 1985, defendant Ruckleshaus' salary was $72,600.  Upon signing on as Chairman and CEO of BFI, defendant Ruckleshaus demanded, and received, guaranteed executive compensation totaling over $1 million annually and stock options for 1,000,000 shares of BFI common stock.  Unfortunately for BFI and its shareholders, criminal and gross mismanagement continued under Mr. Clean's "watch."

36

M0218755

65.  In March 1990, New York denied CECOS' request to expand its Niagara Falls toxic-waste landfill.  The reasons given for denying the expansion permit included, _inter alia_, CECOS' long string of violations throughout the United States at similar facilities.  Since the landfill had no space remaining in its existing landfill, New York environmental officials ordered CECOS to permanently close the facility.  In addition, New York fined the BFI subsidiary $350,000 for operating violations at the Niagara Falls landfill, and ordered it to undertake a $1 million clean-up program to correct existing violations.  The environmental violations were deemed very serious, and included CECOS' failure to adequately maintain ground water monitoring wells, failure to follow specific testing protocols for underground transfer lines, and failure to label hazardous waste drums.  The New York officials also noted that the above violations occurred after the recent changes in management (_i.e._, after defendant Ruckleshaus became Chairman and CEO of BFI in September 1988).

66.  In the same month (March 1990), facing over 1,400 additional violations at CECOS' Whispering Springs, Louisiana hazardous waste landfill, BFI agreed to pay another $1.55 million in fines and penalties to the United States and the State of Louisiana.  On April 5, 1990, BFI also paid $3.5 million to settle the criminal and civil environmental charges arising at its Williamsburg, Ohio hazardous waste landfill, which BFI was also forced to permanently close.  With the CECOS Niagara Falls site

37

M0218756

also permanently closed by regulators, Louisiana remained the only BFI/CECOS hazardous site still receiving hazardous waste. However, given the $4.05 million in fines paid for violations at the Louisiana site from 1988 to 1990, the future viability of the Louisiana site was in considerable doubt.

67. BFI's willful, repeated, and egregious criminal and civil environmental violations, along with gross mismanagement of its entire hazardous waste operations, resulted in ruinous losses from 1985 onwards. In recognition that their criminal misconduct and gross mismanagement prevented them for ever capitalizing on the otherwise lucrative hazardous waste business, the Individual Defendants through defendant Ruckleshaus announced on April 5, 1990, that BFI was abandoning the hazardous waste business. Pursuant thereto, BFI took a $452 million pre-tax charge against earnings to cover the cost of discontinuing its hazard waste operations.

68. BFI's environmental violations, however, did not stop after it jettisoned its hazardous waste operations. In March 1991, the EPA preliminarily assessed $14.2 million of fines against BFI for illegally dumping PCB-contaminated wastes received from General Motors ("GM"). The PCB-contaminated wastes initially had concentration levels exceeding 500 parts-per-million, and therefore were required by law to be incinerated. Incineration, however, can cost 10 times as much as sending the PCB-contaminated waste to a

38

54

M0218757

landfill.  Accordingly, GM diluted the liquid waste below the 500 parts-per-million level, and then used sand and crushed limestone to solidify the waste for landfill disposal.  BFI accepted the PCB-contaminated waste without challenge or inquiry to GM officials, and was therefore fined as an active participant in circumventing the nation's environmental laws.

69.  Nor were BFI's environmental violations limited to its hazardous waste operations.  Rather, with regulators now refocused on BFI's core business of solid waste disposal, festering problems at its "sanitary" landfills surfaced at an alarming rate. In Eden Prairie, Minnesota, BFI operated the Flying Cloud Landfill which it promised to voluntary shutdown in or around 1980. Instead, in 1982, BFI sought to expand the landfill and entered into a bitter and protracted battle with Eden Prairie's regulatory officials.  In fact, BFI continued to operate the landfill despite the fact that permitted capacity had been reached, and even after its most recent permit expired in February 1988.  In September 1990, BFI finally was forced to abandon its 8 and 1/2 year effort to expand the landfill when regulators learned that BFI officials concealed internal reports documenting that explosive methane gas was still leaking from the dump.  The withdrawal of its expansion application meant a loss of over $150 million in otherwise realizable disposal fees from an expanded Flying Cloud landfill operation.  In addition, the closing of the Flying Cloud landfill accounted for much of the $36.5 million special pre-tax charge in 1990 to cover closure costs at BFI's landfills.

M0218758

70. On January 14, 1991, a California appellate court rejected BFI's attempt to expand its Azula, California landfill operation without undertaking the required environmental impact studies. BFI already invested two years in its fight to win expansion approval without the environmental studies. BFI must now go back and conduct the required impact-studies, which are expected to delay the approval process for another three to five years. Moreover, if BFI's expansion attempt is defeated -- as with the Flying Cloud, Niagara Falls, Williamsburg and other landfills -- BFI will lose its $100 million investment to date, and otherwise realizable disposal fees of $840 million.

71. BFI's reckless attempt to avoid compliance with environmental reporting and regulatory requirements at its Azula, California landfill was in no way an isolated occurrence, but a long-standing policy of wrongdoing and mismanagement by BFI officials. In fact, when Massachusetts' Department of Environmental Quality Engineering ("DEQE") fined BFI $150,000 in July 1988 for consistently dumping more trash than permitted at a Boston-area BFI landfill, DEQE officials declared that BFI ran the landfill "with what appears to be obvious disregard for the public process pertaining to environmental impact and review." In fact, BFI had been fined $25,000 the previous year for illegally expanding the dump.

40

M0218759

72. In 1989, BFI similarly was fined $125,000 by the Ohio Environmental Protection Agency for repeatedly exceeding the maximum daily volume limit at BFI's Ottawa County, Ohio landfill. BFI also consented to the entry of a permanent injunction prohibiting BFI from exceeding its permitted volume levels in the future. In 1989, BFI also paid $280,000 to settle state environmental violations at one of its New Orleans' landfills, and a $110,000 to settle charges that BFI violated the federal Water Pollution Control Act by discharging pollutants into the municipal sewage treatment system of Bristol, Connecticut.

73. In 1991, BFI has paid, or is in the process of paying, additional fines and penalties for environmental violations at its landfills throughout the United States. The Company recently entered into a consent decree with the EPA, agreeing to pay a $104,800 fine for failing to renew a surface water discharge permit at a Houston, Texas facility. In addition, BFI is expected to settle environmental violations at its South Brunswick, New Jersey landfill by paying an estimated fine of $600,000 and agreeing to install stainless steel groundwater monitoring wells at the closed facility. BFI is also litigating the proposed denial of landfill permits at several landfill sites throughout the United States.

41

M0218760

74.   BFI has also been named by the EPA as a "Potentially Responsible Party" ("PRP") at 56 Superfund clean-up sites, and may be named as a PRP at an additional 51 sites. Under Superfund laws, BFI can be strictly liable for hazardous waste violations at the sites, and is jointly and severally liable with the other PRPs for the sites' clean-up costs.   Therefore, beyond the staggering liability that BFI may be required to bear for its violations, BFI acknowledges in its SEC filings that BFI could be required to bear an even greater share of the Superfund liability if it is unable to obtain appropriate contributions from the other PRPs.   BFI nevertheless maintains, as it did right up until its record $452 million write-off of its entire hazardous waste operations, that BFI's Superfund liability "will not have a materially adverse effect upon the liquidity, capital resources or consolidated financial position of the Company."

## Insider Trading By BFI Officers and Directors

75.   On September 3, 1991, BFI shocked the investment community by announcing that profits for the 1991 third and fourth quarter would be 15 to 25 percent below those of the same period last year, and that 1992 profits would be down another 12 to 15 percent from 1991's decreased levels.   BFI's surprising disclosure of decreased profits and investors' reaction to such news, resulted in its common stock price tumbling over 15 percent the day of disclosure, and another 5% (closing at $20.50 per share) the day

42

M0218761

the disclosure was reported in the nation's financial papers.
BFI's market value thus plunged nearly $1 billion immediately
following the announcement.    BFI's Chief Financial officer,
defendant Stanton, however, avoided much of the loss, having sold
60,000 shares of BFI common stock -- half his BFI holdings -- three
weeks earlier at $27.61 a share.    Defendant Stanton therefore
received over $7 per share (or $426,600 total) more by selling his
holdings before BFI disclosed to the investing public the drastic
decline in earnings estimates and the Company's belief that profits
would continue to decline into 1993.

   76.   Eleven days prior to BFI's September 3, 1991 public
disclosure of drastically declining profits, BFI's general counsel,
defendant Hoover, also sold half his BFI holdings.    Specifically,
on August 23, 1991, defendant Hoover sold 15,000 shares of BFI
common stock for $27 per share, thus receiving nearly $100,000 more
than he would have had he waited until after BFI's announcement of
the profit decline was reported in the nation's financial papers.

   77.   This spate of insider trading by BFI officials,
pursuant to which they abused valuable proprietary information
belonging to the Company and not yet disclosed to the investing
public, was not an isolated occurrence, but the most recent
manifestation of a long-standing practice by BFI insiders who sell
off their BFI holdings immediately prior to BFI's disclosure of
negative company developments.    On April 7, 1987, defendant Drury

43

M0218762

unloaded $1.5 million of his BFI stock, just shortly before the EPA charged BFI with 2,800 federal environmental violations at BFI's CECOS hazardous waste landfill in Livingston, Louisiana. BFI stock fell approximately 10% after the charges were reported in the nation's financial press. In addition, shortly before BFI announced the record $452 billion write-off from BFI's discontinuance of its hazardous waste operations, BFI Vice President Bruce I. Hendrickson sold 59% of his BFI common stock, receiving approximately $1.7 million from the stock sale. BFI never undertook any investigation of these or other insider trades to determine whether the Company insiders had traded on non-public information, and as to the appropriate corporate response thereto.

78. The SEC, however, on or before September 23, 1991, initiated an investigation of the insider trading of defendants Hoover and Stanton, and requested BFI to provide information regarding the insiders' stock sales. When the SEC investigation was reported, BFI announced it was undertaking a purportedly "independent" investigation into the securities transactions of defendants Stanton and Hoover. Although the purportedly "independent" investigation of the insider trading of defendants Stanton and Hoover has been completed, BFI has refused to publicly disclose the investigation's findings. However, in the wake of the ongoing SEC investigation and the intense media scrutiny of these most recent insider trades, BFI "fired" defendants Stanton and Hoover on or before September 26, 1991.

44

48

M0218763

## COUNT I

### VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 PROMULGATED THEREUNDER IN CONNECTION WITH THE ISSUANCE OF ALL PROXY MATERIALS

79.  Plaintiff realleges and incorporates by reference paragraphs 1 through 78 above as if set forth fully herein.

80.  Plaintiff Yeager brings the claims asserted in Count I hereof as a Class Action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons who presently own BFI common stock and who owned shares of BFI's common stock on any of the record dates for (and were eligible to vote at) the 1988, 1989, 1990, and 1991 Annual Meetings of BFI shareholders (the "Proxy Class"). Excluded from the Class are the defendants, their present subsidiaries, affiliates and entities they control, and members of the immediate families of the Individual Defendants.

81.  Members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. While the exact number of Class members is unknown at the present time, there are approximately 20,000 shareholders of record. The exact number of Class members can easily be determined from the transfer records of the Company. BFI's common stock -- over 152 million shares outstanding -- are publicly traded in an open and efficient market on the New York Stock Exchange.

45

47

M0218764

82. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

83. Plaintiff's claims are typical of the claims of the members of the Class as plaintiff and all Class members have sustained damages arising out of defendants' wrongful conduct in violation of federal and state laws as complained of herein.

84. A Class Action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the injury suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.

85. There are questions of law and fact common to the Class which predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the defendants participated in the common courses of misconduct, waste, and mismanagement complained of herein;

46

M0218765

(b)   whether Section 14(a) of the Exchange Act and Rule 14a-9 were violated by defendants' acts as alleged herein; and

(c)   whether the members of the Class have sustained injury, and, if so, what is the proper means to address the alleged wrongdoing and provide redress to the injury sustained by members of the Class.

86.   Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a Class Action.

87.   Count I is brought by plaintiff Yeager on behalf of the Proxy Class in connection with the false and misleading Proxy Materials in 1988 and thereafter (collectively referred to herein as "Proxy Materials") against the Individual Defendants arising out of such defendants' violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated by the SEC thereunder and as control persons, pursuant to Section 20 of the Exchange Act, for the actions committed in the name of BFI.  The Individual Defendants are named herein to the extent they were directors or senior officers of the Company at the time of the dissemination of the Proxy Materials and thus possessed material information bearing upon and directly relevant to their election as directors and other matters upon which shareholder votes were sought, which information the Company's shareholders needed and/or might regard as important in connection therewith.

45

M0218766

88.   The Proxy Materials issued and disseminated to BFI shareholders were and are false and misleading in that they contained material misrepresentations of fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, all in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, as more fully set forth herein, including inter alia, all of the material facts about the backgrounds of the Individual Defendants and their "management" of the Company as set forth above, all of which is material to their qualifications to serve as directors of BFI.

89.   The SEC has promulgated "Regulation S-K: Standard Instructions For Filing Forms Under The Securities Act of 1933, Securities Exchange Act of 1934," 17 C.F.R. §§ 229.10 et seq., which inter alia, requires that certain information be disclosed in proxy materials, in an attempt to ensure that the proxy materials are not false and misleading. Specifically, Item 103 of Regulation S-K and the Instructions thereto, requires that proxy materials disclose and describe pending legal proceedings, and include, inter alia, the names of the principal parties thereto. 17 C.F.R. § 229.103.

90.   In addition, Item 401 of Regulation S-K and the Instructions thereto, require that a director's or officer's involvement in certain legal proceedings be disclosed in the proxy

M0218767

44

materials if it occurred within the past five years and is
"material to an evaluation of the ability or integrity of any
director, person nominated to become a director or executive
officer." 17 C.F.R. § 229.401(f). Legal proceedings specifically
identified as being required to be disclosed include, <u>inter alia</u>,
those where "[s]uch person was convicted in a criminal proceeding
<u>or is a named subject of a pending criminal proceeding</u> (excluding
traffic violations and other minor offenses)." 17 C.F.R. §
229.401(f)(2) (emphasis added).

91. Here, the Proxy Materials never disclosed that
Regional Vice President Ranck was named as a defendant, along with
BFI District Vice President John Taddonio in the anti-trust/price-
fixing action, <u>State of Ohio v. Browning-Ferris Industries, Inc.,</u>
<u>Browning-Ferris Industries of Ohio and Michigan, Inc., Bruce E.</u>
<u>Ranck, and John R. Taddonio, et al.</u>, Civil No. 86-7387 (N.D. Ohio
1986), brought by the Ohio Attorney General in May 1986. In
addition, BFI never disclosed in its SEC filings or to the
investing public generally that defendant Ranck received a "target"
letter in connection with a federal grand jury investigation of
BFI's price-fixing activities in the greater-Toledo metropolitan
area. This, despite the fact that the target letter specifically
stated that the "grand jury had substantial evidence linking
[defendant Ranck] to the commission of a crime," and that the
United States Department of Justice was "seriously considering
recommending to the grand jury that [defendant Ranck] be indicted."

49

M0218768

BFI also never disclosed that its decision to settle the state and federal Toledo price-fixing actions by pleading guilty to criminal charges and paying $1.35 million in fines and penalties was prompted, in large measure, to protect defendant Ranck and prevent him from testifying before the grand jury and thereby naming or implicating other BFI officials as participants in the price-fixing conspiracy, including defendants Phillips Sr., Drury, Meyers, Phillips Jr., Stanton, Hoover, and others.

92. The purpose and effect of the Proxy Materials and the other illegal activities of the defendants described herein was to cause the overwhelming majority of the shareholders of the Company to vote in favor of certain of the Individual Defendants continuing to serve and be re-elected as directors of BFI, all of which was contrary to the best interests of plaintiff and the other members of the Proxy Class. The Proxy Materials were an essential link in the accomplishment of the election and re-election of directors to the Company's Board of Directors and the continued stewardship and "oversight" practices of such persons.

93. In order to conceal their gross and self-aggrandizing mismanagement as alleged above from BFI shareholders, the Individual Defendants failed to disclose defendant Ranck's and their own participation in the nationwide price-fixing conspiracy. The purpose of such concealment was, _inter alia_, to permit defendants Phillips Sr., Drury, Meyers, Phillips Jr., Ranck,

50

M0218769

42