## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TOLEDO MACK SALES & SERVICE, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 2:02-CV-04373-RLB |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| MACK TRUCKS, INC. | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| MACK TRUCKS, INC., | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| TOLEDO MACK SALES & SERVICE, INC., | : | |
| | : | |
| Counterclaim Defendant. | : | |

## ORDER

And now, on this ___ day of ____, 2006, upon consideration of Defendant/Counterclaim Plaintiff Mack Trucks, Inc.'s Motion for Judgment as Matter of Law, it is hereby **ORDERED** that the Motion is **GRANTED**, and judgment is entered in favor of Mack Trucks, Inc., and against Toledo Mack Sales & Service, Inc., on all of Toledo Mack Sales & Service, Inc.'s claims.

By: _____
            Buckwalter, R., U.S.D.J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TOLEDO MACK SALES & SERVICE, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 2:02-CV-04373-RLB |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| MACK TRUCKS, INC. | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| MACK TRUCKS, INC., | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| TOLEDO MACK SALES & SERVICE, INC., | : | |
| | : | |
| Counterclaim Defendant. | : | |
| | : | |

## DEFENDANT/COUNTERCLAIM PLAINTIFF MACK TRUCKS, INC.'S MOTION FOR JUDGMENT AS MATTER OF LAW

Pursuant to Federal Rule of Civil Procedure 50, Defendant/Counterclaim Plaintiff

Mack Trucks, Inc. respectfully moves this Court for judgment as a matter of law, as to all of

Toledo Mack Sales & Service, Inc.'s claims and, for the reasons set forth in the accompanying

Memorandum of Law, respectfully requests that the Court enter judgment in its favor, and

against Toledo Mack Sales & Service, Inc.

Respectfully submitted,

Barbara W. Mather
Jeremy Heep
Barak A. Bassman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4000

Dated: September 26, 2006

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TOLEDO MACK SALES & SERVICE, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 2:02-CV-04373-RLB |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| MACK TRUCKS, INC. | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| MACK TRUCKS, INC., | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| TOLEDO MACK SALES & SERVICE, INC., | : | |
| | : | |
| Counterclaim Defendant. | : | |

**DEFENDANT/COUNTERCLAIM PLAINTIFF MACK TRUCKS, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT AS
MATTER OF LAW**

**I.    INTRODUCTION**

After more than two weeks of trial, Plaintiff/Counterclaim Defendant Toledo

Mack Sales & Service, Inc. ("Toledo Mack") has rested its affirmative case. Despite the length

of plaintiff's case, however, Toledo Mack has failed to present sufficient evidence from which a

reasonable jury could render a verdict in its favor under any of its purported causes of action.

Defendant/Counterclaim Plaintiff Mack Trucks, Inc. ("Mack") accordingly now moves for

judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 as to all of Toledo Mack's claims and respectfully requests that the Court enter judgment in its favor.

## II.    ARGUMENT

### A.    Standard of Review

The Third Circuit has held that a "motion for judgment as a matter of law under Federal Rule 50(a) should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." McGreevy v. Stroup, 413 F.3d 359, 364 (3d Cir. 2005) (quoting Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996)); see also Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (quoting Fed. R. Civ. P. 50(a)(1)) ("Judgment as a matter of law is only appropriate where, viewing all reasonable inferences in the light most favorable to the non-moving party, 'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. . .'"). Moreover, "[i]n determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." Austin v. Norfolk Southern Corp., No: 04-1568, 2005 U.S. App. LEXIS 27298, *4-5 (3d Cir. Dec. 14, 2005) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)).

B.   **Toledo Mack's Claims Are Time Barred**

    1.   Toledo Mack's "Dealer Conspiracy" Claim Under Section 1 of the
         Sherman Act Is Barred by the Statute of Limitations

        a.   **There Is No Basis to Invoke Fraudulent Concealment**

Toledo Mack's claim under Section 1 of the Sherman Act is based on the theory that Mack and the National Distributor Advisory Council (the "Dealer Council") allegedly "conspired" in May 1989 to issue Policy Bulletin No. 38-89, which restricted sales assistance only to sales within a distributor's Area of Responsibility ("AOR"). Mack rescinded the bulletin five months later in October 1989 by issuing Bulletin No. 38-89A. Toledo Mack, however, did not file this lawsuit until July 2002, see 9/15/06 Tr. at 5:20-5:21 (D. Yeager), i.e., ***thirteen years later***. This claim is clearly barred by the Clayton Act's four-year statute of limitations. See 15 U.S.C. § 15b.

Toledo Mack contends that it can toll the statute of limitations based on Mack's supposed fraudulent concealment of the 1989 conspiracy. This contention is meritless. The Third Circuit has explained that an antitrust plaintiff bears the burden of proving three elements to toll the statute of limitations based on fraudulent concealment: "(1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action." In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1178-79 (3d Cir. 1993). Toledo Mack has not met its burden of proving any of these three elements.

Most notably, there is no evidence that Toledo Mack exercised due diligence in pursuing any claim alleging a 1989 dealer conspiracy. The Third Circuit has explained that "any fact that should excite [the plaintiff's] ***suspicion*** is the same as actual knowledge of the entire claim.'" Id. at 1179 (emphasis added; citation omitted). Of course, if Toledo Mack knew

of the existence of its claim before the limitations period, then it cannot invoke the doctrine of fraudulent concealment. See id. at 1178-79 (affirming summary judgment for defendant as to fraudulent concealment where plaintiff's actual knowledge of rate-making decisions should have alerted plaintiff to existence of claim); Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975) (fraudulent concealment requires proof of "failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period"); In re Milk Prods. Antitrust Litig., 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997) (same), aff'd 195 F.3d 430 (8th Cir. 1999).

Toledo Mack's owner, David Yeager, testified explicitly that he was "*suspicious*" of the existence of a conspiracy as far back as 1989 itself:

> Q   Mr. Yeager, I'd like to turn to the subject of the conspiracy that you're claiming in this case. And, as I understand it, the theory is that the dealers got together in the dealer council in 1989 and caused Mack to adopt a restrictive-territory policy for sales assistance, is that your theory?
>
> A   *Well, I've been suspicious of that all along, starting probably back there . . .*

9/15/06 Tr. at 101:3-101:10 (D. Yeager) (emphasis added).

Even if Mr. Yeager's express admission of a lack of due diligence were not sufficient by itself, the following facts establish that no reasonable jury could conclude that Toledo Mack exercised due diligence in pursuing its 1989 dealer conspiracy claims:

- Toledo Mack's supposed evidence that Mack allegedly conspired with the Dealer Council are the transcripts of two telephone conversations between Mr. Yeager and Mack executives *in 1989* that Mr. Yeager secretly recorded and played to the jury. See 9/14/06 Tr. at 129:3-130:5, 134:6-135:17; Toledo Mack Trial Exhibits 718, 719. Less than a year later, in March 1990, Mr. Yeager personally hired a court reporter to transcribe these two taped conversations. 9/18/06 Tr. at 41:2-43:19.

- In October 1990, Mr. Yeager sent a memorandum to Mack employee Holly Clayson urging that Mack settle Toledo Mack's then alleged claims

against the company.  See 9/15/06 Tr. at 117:16-119:14 (D. Yeager);
Mack Trial Exhibit 58.  In that memorandum, Mr. Yeager complained
about alleged territorial restrictions in the sales assistance program and –
incredibly – attached a series of documents that he offers now in this case,
*sixteen years later*, as proof of an alleged conspiracy.  See 9/15/06 Tr. at
120:19-127:8 (D. Yeager); Mack Trial Exhibit 58.  Mr. Yeager testified
that he sent the memorandum because "I wanted him to understand what
my *suspicions* was so he would resolve the current issue at hand."  See
9/15/06 Tr. at 127:2-127:3 (emphasis added).  Mr. Yeager conceded that
his "*suspicions*" in 1990 "have a remarkable similarity with the suspicions
and the documents that [he has] been submitting before this Court."  Id. at
127:4-127:8.

- Mr. Yeager in fact took action on his suspicions short of suing in the early
  1990's.  He hired the law firm of Baker & Hostetler to represent Toledo
  Mack in disputes regarding Mack's sales assistance program in the late
  1980's and early 1990's.  Id. at 110:5-110:15.  Toledo Mack's attorneys
  sent Mack's in house counsel a slew of letters from 1988 to 1990
  challenging the legality of the sales assistance system and alleging that
  Mack used sales assistance to allocate territories.  See id. at 110:16-
  117:15; Mack Trial Exhibits 57, 605, and 607.  Rather than sue, Mr.
  Yeager settled with Mack in 1991.  See Mack Trial Exhibit 60.

Similarly, Toledo Mack has proffered no evidence that Mack engaged in
affirmative acts of concealment.  Toledo Mack's theory of concealment appears to be that when
Mr. Yeager confronted Mack with his ever-present "suspicions," Mack denied any wrongdoing.
See 9/13/06 Tr. at 34:15-34:18 (Opening Statement of Counsel for Toledo Mack).  Denying
wrongdoing is *not* fraudulent concealment: "Simply denying the existence of an antitrust
violation does not constitute fraudulent concealment, and to hold otherwise 'would effectively
nullify the statute of limitations in these cases.'"  In re Milk Prods., 84 F. Supp. 2d at 1023
(citations omitted); see also Pocahontas Supreme Coal Co., Inc. v. Bethlehem Steel Corp., 828
F.2d 211, 218-19 (4th Cir. 1987) (argument that mere denial constitutes fraudulent concealment
"borders on sophistry").

b.    **There Is No Evidence of a Continuing Conspiracy After 1989**

As a fallback, Toledo Mack argues that the 1989 conspiracy "continued" into the limitations period, i.e., July 1, 1998 forward, so that it may recover damages during that limited time, albeit not earlier. See In re Lower Lake Erie, 998 F.2d at 1171-73 (continuing conspiracy permits recovery of damages incurred during the limitations period, but not before). This argument is likewise meritless, as there is no evidence of a conspiracy after 1989.

An antitrust conspiracy is not presumed to run indefinitely, and "[t]he party bringing the antitrust action must therefore show that the conspiracy continued into the limitations period." United States v. Therm-All, Inc., 373 F.3d 625, 633 (5th Cir. 2004); cf. In re Lower Lake Erie, 998 F.2d at 1173 (approving District Judge Fullam's instruction to the jury that "'the plaintiffs would have to establish that the conspiracy was still in effect'" during the limitations period to recover under a continuing conspiracy theory).

Here, there is no evidence of a "continuing conspiracy" after 1989. The only evidence that Toledo Mack proffers of anything other than Mack's unilateral conduct were the two 1989 telephone conversations. However, "[u]nilateral activity, no matter what its motivation, cannot give rise to a § 1 violation." Rossi v. Standard Roofing, Inc., 156 F.3d 452, 465 (3d Cir. 1998). In fact, contrary to the territorially restrictive (and short lived) 1989 policy, Toledo Mack has regularly sold outside of its AOR after 1989. See 9/18/06 Tr. at 25:18-32:14 (D. Yeager); Toledo Mack Trial Exhibit 493. There is thus no "continuing conspiracy" to stop out of AOR sales.

Attempting to fill this seventeen-year gap in the evidence, Toledo Mack has offered the deposition testimony of a woman named Hallie Giuliano. Ms. Giuliano has never worked for Mack or any Mack distributor, but instead was a low level employee at a consulting firm that Mack retained to study its competitors' dealer development programs. Ms. Giuliano

testified that her notes of a 1999 meeting between her consulting firm and Mack Director of Dealer Development Ron Gerhard contain the notation "Competitive environment for dealers, quotes, 'Gentleman's agreement,' unquotes, that you sell in your area only, but some go into others' territory." Giuliano Dep. at 34:3-34:8. Ms. Giuliano testified that this note was based on a statement from Mr. Gerhard. Id. at 34:9-34:14.

Nowhere does Ms. Giuliano testify that anyone at *Mack*, though, either joined or enforced any alleged "gentlemen's agreement." In fact, Ms. Giuliano's testimony shows the opposite – that Mack was aware that some dealers sold out of AOR in 1999 – *ten years after* the time when Toledo Mack alleges that Mack entered into a "conspiracy" to stop all out of AOR sales. Ms. Giuliano does not testify that anyone at Mack tried to stop these out of AOR sales. Ms. Giuliano's testimony is thus not sufficient to show that Mack itself continued to participate in any alleged conspiracy after 1989.

Toledo Mack also attempts to fill this glaring evidentiary gap by pointing to evidence that, during the limitations period, Mack had policies that (1) restricted direct parts shipments from Mack's warehouses to customers out of AOR and (2) restricted "net net billing" (i.e., billing net of the distributor holdback at the time of sale) to in AOR sales. However, there is no evidence that these policies were anything but unilaterally made by Mack. Moreover, neither policy relates to the subject matter of the alleged 1989 "conspiracy," the restriction of sales assistance by territory.

Toledo Mack also relies on Mr. Lusty's testimony that Mr. Yelles said to him that Toledo Mack does not "play by the rules," from which Toledo Mack deduces that the word "rules" must somehow refer back to the supposed 1989 conspiracy. There is no evidence in the record at all, though, as to what "rules" Mr. Yelles was referring to, nor is there any evidence

that any such "rules," whatever they were, were the product of anything but unilateral Mack conduct.

Finally, Toledo Mack relies on a handful of deals in the limitations period where Mack allegedly delayed providing it with sales assistance for out of AOR sales and/or allegedly requested a letter from the customer before releasing a discount. There is no evidence, however, that anyone other than Mack had any input into these decisions. At most, this is evidence that Mack unilaterally hindered out of AOR sales, and not evidence of any continuing conspiracy.

> 2.    <u>Toledo Mack's Damages For Its Remaining Claims Should Be Confined to the Limitations Period</u>

As noted above, Mr. Yeager has known of Toledo Mack's alleged claims since at least 1989. Thus, not only should the 1989 conspiracy be dismissed entirely as time barred, but, as there is no basis to invoke the doctrine of fraudulent concealment, Toledo Mack's state law damages claims should be confined to the relevant limitations periods, as follows: (1) for any claims asserted under the Ohio Motor Vehicle Dealer Law or the Michigan Franchise Investment Law, damages should be limited to the period from July 1, 1996 forward, <u>see</u> Ohio Rev. Code Ann. § 2305.07 and Mich. Comp. Laws Ann. § 600.5813; (2) any damages arising from Toledo Mack's claim for tortious interference with prospective business relations should be limited to July 1, 1998 forward, <u>see</u> Ohio Rev. Code Ann. § 2305.09; and (3) any damages arising from Toledo Mack's claims for breach of contract and breach of the duty of good faith and fair dealing should be limited to the period July 1, 1998 forward, <u>see</u> 42 Pa. C.S. § 5525(a)(8).

**C.    Toledo Mack's Claims Under Section 1 of the Sherman Act Fail**

Regardless of the running of the statute of limitations, Toledo Mack's claims under Section 1 of the Sherman Act fail as a matter of law. There are four elements to a claim under Section 1 of the Sherman Act:

> (1) that the defendants contracted, combined, or conspired among
> each other; (2) that the combination or conspiracy produced
> adverse, anti-competitive effects within the relevant product and
> geographic markets; (3) that the objects of and the conduct
> pursuant to that contract or conspiracy were illegal; and (4) that the
> plaintiffs were injured as a proximate result of that conspiracy.

Rossi. 156 F.3d at 464-65 (citation omitted). Here, Toledo Mack has failed to proffer sufficient

evidence regarding any element.

       1.     There Is No Evidence of a Conspiracy

      In over two weeks of testimony, the proverbial elephant in the room has been the

absence of any evidence that Mack acted as part of any alleged conspiracy.  While Toledo Mack

has elicited extensive testimony regarding how *Mack* acted, it has proffered no evidence that

Mack acted in concert with some other third parties.  As a result, Toledo Mack's Section 1 claim

fails: "Unilateral activity, no matter what its motivation, cannot give rise to a § 1 violation . . ."

Rossi, 156 F.3d at 465.

      In his Opening Statement, Toledo Mack's counsel outlined his client's theory of

conspiracy as follows:

> The case involves evidence of a conspiracy between executives of
> the Mack Truck Company, the largest manufacturer of garbage
> trucks in America, and certain of the company's dealers who
> wanted to gauge customers and prevent competition.  The dealers
> and the company wanted to keep prices high for the trucks they
> were selling, so they established a set of unwritten but very illegal
> rules under which they would not compete with each other in
> selling trucks.  You see, when people don't compete, prices stay
> high and the customer gets hurt, that happens not just with trucks
> but with any product you might buy in your daily lives.  We will
> prove the dealers went to the manufacturer to complain about the
> low prices that Toledo Mack was giving to customers.  The Mack
> Truck Company agreed to help stop Toledo from competing
> against them.  You see, Mack Truck also wanted to keep prices
> high on trucks, so it worked with the dealers to create a rule that
> prevented Toledo from getting discounts when it sold in
> competition with other dealers.  Mack Truck also made it difficult

for Toledo Mack to sell trucks by delaying giving it discounts and otherwise interfering with Toledo's attempts to sell at low prices.

9/13/06 Tr. at 7:23-8:18.

On its face, Mack's participation in this alleged "conspiracy" makes no economic sense. Mack's supposed interest is to keep its wholesale prices high to Mack distributors, including Toledo Mack. But Mack does not need to enter into a conspiracy with anyone to do this; it can just unilaterally raise its prices. The Supreme Court has made clear that there is a heightened burden of proof when an antitrust plaintiff, as here, asserts a facially implausible claim "[I]f the factual context renders [the plaintiff's] claim implausible – if the claim is one that simply makes no economic sense – [a plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Thus, "if [the defendant] had no rational economic motive to conspire, and if [its] conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." Id. at 596-97.

Toledo Mack has not met its burden in this case. Toledo Mack alleges that Mack conspired with the Dealer Council in 1989 to issue Policy Bulletin 38-89, which, until its rescission five months later, restricted sales assistance to in AOR transactions. Despite this policy's rescission, the alleged conspiracy to deny out of AOR discounts purportedly continues uninterrupted to today. However, the **only** evidence put forward that Mack joined any alleged conspiracy are two secretly taped phone conversations between Mr. Yeager and then-Mack executives Richard Murphy and Gary Johnson in Summer of 1989. To be clear, with the purported exception of these two phone conversations, there is no evidence that Mack's policies were set in concert with anyone, or that anyone other than Mack employees had any input into Mack's pricing decisions. Hence, the entirety of Toledo Mack's Section 1 claim hinges on

-10-

whether these two conversations can prove that Mack, with no rational motive to do so, "conspired" with the Dealer Council to alter its pricing policies.

Viewed in the light most favorable to Toledo Mack, these conversations could possibly establish two facts: (1) that Mack received input from the Dealer Council when formulating Bulletin 38-89 and/or (2) that Mack issued 38-89 in response to complaints from other distributors that Toledo Mack was selling at low prices. Neither suffices to prove the existence of a conspiracy.

In the seminal case of <u>Monsanto Co. v. Spray-Rite Serv. Corp.</u>, 465 U.S. 752 (1984), the Supreme Court set forth the standard for proving whether a manufacturer acts in concert with its distributors. There, the Court expressly stated that evidence that a manufacturer either consults its distributors or acts in response to their complaints is not sufficient to show the existence of a conspiracy:

> Permitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about "in response to" complaints, could deter or penalize perfectly legitimate conduct. As Monsanto points out, complaints about price-cutters "are natural – and from the manufacturer's perspective, unavoidable – reactions by distributors to the activities of their rivals." Such complaints . . . "arise in the normal course of business and do not indicate illegal concerted action." Moreover, distributors are an important source of information for manufacturers. In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently. To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market. In sum, "to permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of independent business judgment and emasculate the terms of the statute."
>
> ***Thus, something more than evidence of complaints is needed.***
> ***There must be evidence that tends to exclude the possibility that***

-11-

*the manufacturer and the nonterminated distributors were acting independently.*

Id. at 763-64 (emphasis added; citations omitted).

This case presents a straightforward application of Monsanto. Toledo Mack has failed to present evidence of "something more" than Mack consulting with its distributors and acting in response to their complaints. Thus, Mack is entitled to judgment as a matter of law as to Toledo Mack's claim under Section 1 of the Sherman Act. See also Rossi, 156 F.3d at 482-83 (affirming summary judgment in favor of defendant-manufacturer Wood Fiber because only evidence of conspiracy were dealer complaints and manufacturer response); Lovett v. Gen'l Motors Corp., 998 F.2d 575, 578 (8th Cir. 1993) ("evidence that a manufacturer took adverse action against a dealer following, or in response to, price-related complaints from other dealers is not enough to support an inference of conspiracy"); The Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1157-58 (9th Cir. 1988) (same); Nat'l Marine Elec. Distribs., Inc. v. Raytheon Co., 778 F.2d 190, 192-93 (4th Cir. 1985) (same).

### a.   There Is No Evidence Of An Unreasonable Restraint of Trade

#### (1)   This Claim Is Subject to the Rule of Reason

While Toledo Mack purports to assert a claim for per se liability under the Sherman Act, its claim is in fact subject to the rule of reason, thereby requiring Toledo Mack to show that the alleged conspiracy resulted in actual injury to interbrand competition between Mack and other truck chassis manufacturers. The alleged conspiracy is between Mack and its distributors to prefer in territory sales. It is black letter law that vertical agreements between a manufacturer and its distributors restricting distributor territories are subject to the rule of reason, and not per se illegal, thus requiring Toledo Mack to prove that Mack exercised market power in a relevant market to the detriment of interbrand competition. See Bus. Elec. Corp. v Sharp Elec.

Corp., 485 U.S. 717, 720 (1988); Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36 (1977);

Eastern Scientific Co. v. Heerbrugg Instruments, Inc., 572 F.2d 883 (1st Cir. 1978).

(2)    Toledo Mack Has Failed to Prove a Relevant Market

Anti-competitive conduct does not occur in a vacuum; instead, the antitrust laws

only prohibit activity that adversely affects an actual market. Toledo Mack bears the burden of

"defining the relevant market." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430,

436 (3d Cir. 1997). To define the relevant market, Toledo Mack must identify both a product

market and a geographic market. See, generally Tunis Bros. Co., Inc. v. Ford Motor Co., 952

F.2d 715, 722-27 (3d Cir. 1991). In its case in chief, Toledo Mack has failed to carry its burden

of submitting sufficient evidence to show the existence of the alleged relevant market, and

therefore Mack is entitled to judgment as a matter of law as to Toledo Mack's claims under the

Sherman Act. Specifically, Toledo Mack has failed to proffer sufficient evidence that it has

included all proper product substitutes in its alleged product market and it has failed to prove that

each of its alleged geographic submarkets properly encompass the area within which consumers

will seek substitute suppliers in the event of a price increase. See generally Queen City Pizza,

124 F.3d at 436; Tunis Bros., 952 F.2d at 726. In addition, Mack hereby incorporates by

reference all of its arguments set forth in its Motion in Limine to Exclude the Testimony of Frank

Gollop into this Memorandum, and respectfully requests that the Court reconsider its denial of

Mack's earlier motion and strike Dr. Gollop's testimony.

(3)    Toledo Mack Has Failed to Show that Mack Has Market
         Power

In order to show that the alleged "conspiracy" actually injured competition,

Toledo Mack must prove that Mack possessed, and exercised, market power in a properly

defined market. See Chicago Prof'l Sports, L.P. v. Nat'l Basketball Ass'n, 95 F.3d 593 (7th Cir.

1996); Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic, 65 F.3d 1406 (7th Cir.
1995). Toledo Mack, however, has not proffered any evidence from which a reasonable jury
could conclude that Mack has market power.

Toledo Mack alleges that Mack has market power in two alleged markets: the
supposed market for Class 8 vocational trucks with engines of greater than 10 liters and the
supposed market for Class 8 LCOE trucks with engines of greater than 10 liters. As a threshold
matter, neither alleged market is properly defined, and thus Toledo Mack's proof of market
power fails.

Moreover, even assuming for the sake of argument that these were properly
defined markets, Mack lacks market power within them. As to the first alleged market, even
Toledo Mack concedes that Mack's market share never exceeded roughly 30%, i.e., two-thirds of
all vocational trucks are sold by *other* manufacturers. This market share is far too small to
constitute market power. See Yeager's Fuel Inc. v. Pennsylvania Power & Light Co., 953 F.
Supp. 617, 658 (E.D. Pa. 1997). Nor has Toledo Mack presented evidence of any additional
facts that would show that, despite its market share, Mack possesses market power.

Similarly, Mack lacks market power in the alleged Class 8 LCOE market. While
Mack has a large share of this narrow (and misdefined) alleged "market," it is hornbook law that
market power cannot be established solely from a substantial market share. See Ball Memorial
Hospital, Inc. v. Mutual Hospital Ins., Inc., 784 F.2d 1325, 1336 (7th Cir. 1986). Rather, there
must be other factors present demonstrating that Mack's market share would not erode if it
attempted to raise prices to supra-competitive levels, such as significant barriers to entry. Id.
Here, there is no such evidence. There is no evidence of any barriers for other Class 8 truck
manufacturers to increase their production of competing LCOE models, or for Navistar to enter

the LCOE segment. Furthermore, from 1989-2001, i.e., most of the alleged damages period, Volvo was a fierce competitor in the LCOE segment, with market shares exceeding 30%. There is also significant buyer concentration and buyer power in the alleged LCOE market, which prevents Mack from being able to exercise market power.

(4)    Toledo Mack Has Failed to Show Anti-Competitive Effects

Toledo Mack's claim fails under the rule of reason for the additional reason that there is simply no evidence of harm to competition. Toledo Mack has put forward no evidence of actual adverse anticompetitive effects in interbrand competition, such as supra-competitive prices, decreased output, or reduced product quality, and therefore has failed to set forth a legally viable rule of reason case.

**b.    There Is No Evidence of Actual Injury or Damages**

Toledo Mack has also not satisfied its burden of proving actual injury and damages caused by the alleged dealer conspiracy. Toledo Mack's principal injury and damages evidence is the testimony of its proffered expert, Dr. Donald Nichols. As Mack explained in its Motion *in Limine* to Exclude Dr. Nichols' testimony, Dr. Nichols computes damages with an unreliable methodology, and his testimony should therefore have been excluded. Mack hereby incorporates by reference all of its arguments set forth in the Nichols Motion *in Limine* into this Memorandum, and respectfully requests that the Court reconsider its denial of Mack's earlier motion and strike Dr. Nichols' testimony. Among other points, Mack reiterates that Dr. Nichols' inclusion of prejudgment interest calculations in excess of $11 million in his damages model is wholly improper, as the Clayton Act explicitly prohibits any award of prejudgment interest. See 15 U.S.C. § 15(a).

Without Dr. Nichols' testimony, there is no evidence of injury or damages. Notably, Toledo Mack has no evidence of specific lost sales because it did not receive sales

assistance to sell outside of its AOR. Not a single customer has testified on Toledo Mack's behalf, and thus its only "evidence" of lost sales are its owner's hearsay statements and speculation that customers, not present for cross-examination, supposedly told him at some time that they did not buy from Toledo Mack because another Mack distributor offered a better price. Such hearsay and speculation is insufficient to show lost sales. See Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1274-76 (3d Cir. 1995).

Moreover, even if Nichols' testimony were somehow admissible, it still fails to satisfy the requirements of Section 4 of the Clayton Act to show the existence of actual injury. The Third Circuit has made clear that in an antitrust action grounded in price discrimination – which this is – plaintiff can only show that alleged price discrimination caused actual injury through expert testimony if the expert's damages model accounts for all "other business complications" that could have affected sales volumes. Id. at 1275. Here, Nichols failed to account for several factors, including at least two key events in the early 1990's that crippled Toledo Mack's first sales.

First, Nichols does not account for the fact that Toledo Mack's star salesman, Jeff Savage, was convicted of dealing in stolen property and that, shortly thereafter, Mr. Savage left Toledo Mack. Mr. Savage was not replaced, and Toledo Mack did not begin to rebuild its sales force until 2002. This dearth of sales representatives clearly impacted upon Toledo Mack's sales.

Second, Nichols fails to account for the fact that Toledo Mack's principal, David Yeager, was distracted by extensive litigation in the late 1980's and early 1990's arising out of his earlier work in the refuse industry, leading to Mr. Yeager suffering a mental and emotional

breakdown in the very early 1990's. Mr. Yeager's lack of focus on his business and deteriorating mental health both obviously impacted Toledo Mack's sales.

Nichols' antitrust damages model also fails for another basic, and powerful, reason as a matter of law: the damages he estimates are based upon Toledo Mack's ability to profit from an alleged conspiracy of other Mack distributors, not because of its ability to compete in a market free from anticompetitive conduct. This is patently improper under the antitrust laws, in which damages are only cognizable based on the competition-reducing aspect of a practice. See generally Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) ("[antitrust] injury should reflect the anticompetitive effect" of violation). As a consequence, Toledo Mack cannot assert a damages claim for profits lost because it could no longer benefit from an anticompetitive conspiracy. See Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League, 791 F.2d 1356, 1367 (9th Cir. 1986) ("the benefits realized by the plaintiff from the restraint should be deducted from plaintiff's gross antitrust damages in order to arrive at the amount representing the extent of plaintiff's actual (net) injury from the illegal restraint").

Nichols' damage model is based on the assumption that, but for the alleged conspiracy, Toledo Mack would have performed as well after 1989 as it did from 1985-1988, i.e., to restore the status quo ante 1989. The problem is that this "before" benchmark was *not* a period in which there were no alleged antitrust violations. Rather, according to Toledo Mack, there were anticompetitive conspiracies not to compete for customers between Mack distributors. See, e.g., 9/14/06 Tr. at 97:6-100:14 (D. Yeager). Toledo Mack's explosive growth was due to its ability to exploit the supra-competitive price structure that these alleged conspiracies created. What allegedly changed in 1989, the event for which Nichols purports to measure damages, is that in 1989, Mack supposedly joined the already present Mack dealer conspiracy.

Thus, Nichols' "before and after" model does **not** compare Toledo Mack's sales from before the alleged existence of an anticompetitive conspiracy to a period in which there is alleged unlawful conduct. Instead, he compares a period when the alleged conspiracy consisted of only Mack distributors, from which Toledo Mack profited by being able to undercut the alleged conspirators' supra-competitive prices, to a period after which Mack allegedly joined the conspiracy. The status quo ante that Nichols wants restored is one where Toledo Mack profited handsomely from the **absence** of competition. This attempt to profit from the wrongdoing of others is invalid under the law and the damages model is thus legally invalid. See generally Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 377 (1927), see also Minpeco, S.A. v. Conticommodity Servs., Inc., 676 F.Supp. 486, 487-95 (S.D.N.Y. 1987). Moreover, profits lost because of an inability to profit from the anticompetitive conduct of others is not a proper antitrust injury under Section 4 of the Clayton Act for which Toledo Mack may recover. See generally Brunswick Corp., supra.

**c.**      <u>**This Claim Is Barred by the Defense of Release**</u>

In March 1991, Mack and Toledo Mack settled claims asserted by Toledo Mack for alleged improprieties in the sales assistance program and in warranty claim processing. Pursuant to the parties' settlement agreement, Mack paid Toledo Mack money and Toledo Mack released, inter alia, all claims relating to Mack's sales assistance policies. See Mack Trial Exhibit 60; 9/15/06 Tr. at 127:9-128:2. This release clearly encompassed any challenge to Mack's sales assistance policy in 1989 – the basis of the Sherman Act claim in this case. Accordingly, Mack is entitled to judgment as a matter of law as to Toledo Mack's "dealer conspiracy" claim based upon the release in the 1991 settlement agreement.

### d.    Mack Withdrew From Any Alleged Conspiracy in October 1989

Even if the evidence were sufficient to prove a conspiracy to create the 1989 policy, it is undisputed that Mack withdrew from such "conspiracy" on October 20, 1989 by issuing a policy bulletin to all distributors announcing that sales assistance would be made available on out-of-AOR sales.  Thus, any claim is time-barred.  To withdraw from a conspiracy, Mack must show (1) that it engaged in "[a]ffirmative acts inconsistent with the object of the conspiracy" and (2) "communicated [its withdrawal] in a manner reasonably calculated to reach co-conspirators."  United States v. United States Gypsum Co., 438 U.S. 422, 464  (1978).  Mack's October 20, 1989 policy bulletin satisfies both prongs, as it communicated Mack's intent to withdraw and it was sent to all distributors, including the alleged co-conspirators.  Mack's actions since October 20, 1989 have likewise been inconsistent with the supposed conspiracy.  It is undisputed that since October 20, 1989 Toledo Mack regularly received sales assistance for out-of-AOR truck sales and sold outside of its AOR.

### 2.    The Alleged Body Builder Conspiracy

### a.    There Is No Evidence of Concerted Action

Toledo Mack has at times advanced an alternate theory of liability under Section 1 of the Sherman Act, that there is an alleged conspiracy between Mack and body builders McNeilus and Heil (1) that McNeilus and Heil will not sell trucks containing Mack chassis to established Mack dealer customers and (2) that McNeilus and Heil will not sell trucks containing Mack chassis to independent wholesalers RDK and Trucks and Parts of Tampa.  The alleged "body builder conspiracy" is a phantom of Toledo Mack's imagination.  The evidence shows, at best, that Mack insisted on these resale restrictions as terms of sale, and the body builders complied.  The fact that Mack unilaterally set resale restrictions with which the body builders

complied is insufficient to show the existence of a conspiracy. See <u>Monsanto</u>, 465 U.S. at 761, citing <u>United States v. Colgate</u>, 250 U.S. 300 (1919).

        **b.**      <u>**There Is No Evidence of an Unreasonable Restraint of Trade**</u>

Moreover, there is no evidence that the "body builder conspiracy" unreasonably restrained trade. As a threshold matter, Toledo Mack is once again alleging only a vertical nonprice restraint, which is subject to the rule of reason. See <u>Bus. Elec. Corp.</u>, <u>supra</u>. Toledo Mack relies on the same theories as to market definition and market power for its claim regarding the alleged "body builder conspiracy" as it does for its claim regarding the alleged "dealer conspiracy." Mack has already explained that those theories lack evidentiary support, and Mack respectfully refers the Court to its argument set forth above at Section II.C.1. As with the alleged dealer conspiracy, no evidence has been presented that the alleged body builder conspiracy caused actual, adverse effects upon interbrand competition.

        **c.**      <u>**There Is No Evidence of Actual Injury or Damages**</u>

Finally, there is no evidence that the alleged body builder conspiracy caused Toledo Mack to suffer any injury. In order to bring a private cause of action under the Clayton Act, Toledo Mack must set forth evidence showing that the challenged restraint was the cause of some injury to it. See <u>City of Pittsburgh v. West Penn Power Co.</u>, 147 F.3d 256, 265-69 (3d Cir. 1998) (antitrust plaintiff must show causal connection between injury and antitrust violation). Under the alleged body builder conspiracy, however, Toledo Mack would not have been injured at all.

As to alleged agreements that the body builders would stay away from established Mack distributors' customers, Toledo Mack would face less competition as a result. Likewise, any agreement not to sell to independent third party distributors would decrease competition for Mack dealers attempting to sell to such third party distributors. In fact, the two third party

distributors at issue – RDK and Trucks and Parts of Tampa – are Toledo Mack's customers. 9/15/06 Tr. at 95:25-96:13, 100:25-101:2 (D. Yeager).

Moreover, to the extent that Toledo Mack relies on Dr. Nichols' testimony to show damages and injury based on the alleged body builder conspiracy, Mack hereby incorporates by reference all of its arguments set forth in the Nichols Motion *in Limine* into this Memorandum, and respectfully requests that the Court reconsider its denial of Mack's earlier motion and strike Dr. Nichols' testimony.

### D.    Toledo Mack's Claims Under the Michigan Franchise Investment Law Fail

1.    Toledo Mack Is Not Located in Michigan

Toledo Mack's claims under the Michigan Franchise Investment Law clearly fail for lack of standing. By its terms, the Michigan statute "shall have no application to distributors located outside the state of Michigan." Mich. Comp. Laws Ann. § 445.1582. Toledo Mack is *physically* located in Toledo, Ohio and does not maintain a physical presence in Michigan. While Toledo Mack's AOR includes one county in Michigan, Toledo Mack does not maintain a facility in Michigan or even any authorized subdistributors or service distributors there, as its Distributor Agreement would permit. Nor has Toledo Mack had a salesperson based in Michigan.

2.    Toledo Mack Has Not Lost A Sale to a Retail Customer in Michigan

Even if it were located in Michigan, Toledo Mack's claims under the Michigan statute fail as a matter of law. That statute prohibits a manufacturer from "[s]ell[ing] any new motor vehicle directly to a *retail customer* other than through its franchised dealers, unless the retail customer is a nonprofit organization or a federal, state, or local government or agency." Mich. Comp. Laws Ann. § 445.1574(i) (emphasis added). However, the only alleged instance

where Toledo Mack lost a sale to a Mack direct customer in Michigan was for the body builder McClain. See 9/15/06 Tr. at 29:10-29:14 (D. Yeager).

McClain is not a "retail customer." McClain purchased MACK chassis for resale with its bodies mounted upon them, and not for McClain's own use. See 9/15/06 Tr. at 26:7-26:17 (D. Yeager). As the term "retail customer" is not defined in the Michigan statute, this Court should apply the plain meaning of the term in ordinary usage. Koontz v. Ameritech Servs., Inc., 645 N.W.2d 34, 39 (Mich. 2002). "Black's Law Dictionary defines 'retail' as 'a sale for final consumption . . . a sale to the ultimate consumer.'" Erdmann v. Preferred Research, Inc. of Ga., 852 F.2d 788, 791 (4th Cir. 1988). As a reseller, McClain was not the ultimate consumer.

Mack also repeats and incorporates by reference the arguments that it raised in support of its Motion in Limine to Preclude the Testimony of Dr. Nichols to the extent that they relate to Toledo Mack's alleged damages under the Michigan statute based on Mack's direct sales program. Among the many errors in Dr. Nichols' analysis, the following are the most glaring and significant:

- Toledo Mack has presented no testimony or other evidence of the amount of damages that it allegedly suffered as a result of Mack's National Accounts program.

- Nichols projects damages based on Mack's direct sales to government entities, even though such sales are exempted from the Michigan statute. See Mich. Comp. Law Ann. § 445.1574(i) (manufacturer cannot "Sell any new motor vehicle directly to a retail customer other than through its franchised dealers, *unless the retail customer is a nonprofit organization or a federal, state, or local government or agency*" (emphasis added)). This is a significant error, because many of Mack's National Accounts are municipalities and other government buyers. See 9/20/06 Tr. at 57:3-57:15 (K. Flaherty).

- Nichols improperly projects damages on a nationwide basis, even though the Michigan statute cannot Constitutionally regulate commerce that occurs wholly outside of the state's borders. Cf. Healy v. The Beer

Institute, 491 U.S. 324, 332-42 (1989) ("a state law that has the 'practical effect' of regulating commerce occurring wholly outside that state's borders is invalid under the Commerce Clause").

• Nichols includes non-retail buyers in his damages model, including body builders and leasing companies, even though the Michigan statute only prohibits direct sales to retail customers.

• Nichols improperly adds prejudgment interest to Toledo Mack's damages under the Michigan statute. See Fitzpatrick v. Ritzenhein, 116 N.W. 2d 894 (1962).

3.    Toledo Mack's Other Alleged Claims Under the Michigan Statute Fail

According to its proposed jury instructions, Toledo Mack purports to assert two additional claims under the Michigan statute, neither of which is supported in the record. First, Toledo Mack alleges that Mack violated Mich. Comp. Laws Ann. § 445.1574(e), which provides that Mack may not "[o]ffer any refunds or other types of inducements to any dealer for the purchase of new motor vehicles of a certain line make *to be sold to this state or any political subdivision of this state* without making the same offer available upon request to all other new motor vehicle dealers of the same line make." As there is no evidence that Toledo Mack attempted to sell to any Michigan state government agency (much less that Mack engaged in some discrimination in connection with the non-existent transaction), this claim is frivolous.

Second, Toledo Mack alleges that Mack violated Mich. Comp. Laws Ann. § 445.1574(a), which provides that Mack may not "[a]dopt, change, establish, or implement a plan or system for the allocation and distribution of new motor vehicles to new motor vehicle dealers that is arbitrary or capricious, or modify an existing plan or system that causes the plan or system to be arbitrary or capricious." There is no evidence in the record that Mack ever adopted any plan for allocating vehicles, nor could it, as most of Mack's truck chassis, unlike cars, are customized built to order products that cannot be "allocated" among various dealers.

E.    **Toledo Mack's Claims Under the Ohio Motor Vehicle Dealer Law Fail**

Toledo Mack has also asserted three claims against Mack under the Ohio Motor Vehicle Dealer Law. Once more, there is not sufficient evidence in the record to support a verdict in Toledo Mack's favor.

1.    <u>Mack Did Not Unfairly Compete With Toledo Mack</u>

Toledo Mack's first claim under the Ohio Motor Vehicle Dealer Law is that Mack violated Ohio Rev. Code Ann. § 4517.59(E), which provides that a manufacturer such as Mack shall not "[s]ell, lease, or rent goods or motor vehicles, or render any service normally performed and required of franchisees under the franchise agreement with the franchisor, ***in unfair competition with*** the franchisee . . .". Here, there is no evidence that Toledo Mack and Mack competed head to head to sell to the same customer in Ohio, much less that the competition was "unfair." Critically, the Ohio statute does not flatly prohibit all direct sales by a manufacturer, but only direct sales where (1) the manufacturer and the dealer are in competition and (2) the manufacturer competes "unfairly."

While Toledo Mack has presented evidence that Mack would not provide it with sales assistance to sell to Mack National Accounts, there is no evidence that any National Account ever considered buying from Toledo Mack. Notably, there is no testimony from a single National Account customer that it actually considered buying from Toledo Mack, thus reducing Toledo Mack's "evidence" of competition for this business to, at best, Mr. Yeager's speculation and hearsay. <u>See</u> <u>Stelwagon Mfg. Co.</u>, 63 F.3d at 1274-76 (hearsay insufficient to establish the fact of lost sales).

If anything, the evidence is undisputed that Toledo Mack could not handle a National Account sale. Mr. Yeager conceded that the capacity to take in trades of vehicles is important for selling to National Accounts, yet Toledo Mack has never handled a trade deal of

more than six trucks nor has it ever guaranteed a trade-in price up front for trucks. See 9/15/06 Tr. at 138:7-140:1 (D. Yeager). However, National Account customers often buy hundreds, sometimes thousands, of trucks per year. See 9/20/06 Tr. at 55:3-55:25 (K. Flaherty). There is no evidence that a small distributor like Toledo Mack could handle such a significant volume of trades.

Moreover, the only "unfairness" that Toledo Mack identifies is that Mack will not provide sales assistance to Toledo Mack to sell to National Accounts. It is unclear exactly what Toledo Mack's argument is, as simply providing the same price to Toledo Mack at which Mack sells to a National Account will not permit Toledo Mack to be competitive. For example, if Mack sells directly to Customer A for $80,000.00, and then grants Toledo Mack sales assistance such that Toledo Mack can buy the same truck for $80,000.00, Toledo Mack cannot be price competitive because it must mark up the price of the truck when it resells to Customer A (or else sell at a loss, in which case Toledo Mack has no damages). The absurdity of this theory was displayed starkly in the testimony of Toledo Mack's expert accountant, William Harris, who opined that "the comparisons all indicate that Mack gave itself higher discounts than it gave Toledo Mack." 9/20/06 Tr. at 173:8-173:10 (W. Harris). Mack does not "give itself" discounts; it sets a selling price for the truck chassis that it manufactures.

While there is no on point case law under the Ohio statute, in analogous circumstances under the federal price discrimination provisions of the Robinson Patman Act, federal courts have repeatedly held that a manufacturer is not required to equalize its dealers on prices that the manufacturer charges to direct sales accounts. See Lycon, Inc. v. Juenke, 250 F.3d 285 (5th Cir. 2001); Conoco, Inc. v. Inman Oil Co., Inc., 774 F.2d 895, 904 (8th Cir. 1985); O'Byrne v. Cheker Oil Co., 727 F.2d 159, 164-65 (7th Cir. 1984); Universal Lite Distribs., Inc.

v. Northwest Indus., Inc., 452 F. Supp. 1206, 1215 (D. Md. 1978), rev'd on other grounds 602 F.2d 1173 (4th Cir. 1979); Secatore's, Inc. v. Esso Standard Oil Co., 171 F.Supp. 665, 667-68 (D. Mass. 1959).  As the term "unfair competition" is not defined in the Ohio statute, Ohio courts would look to case law under analogous federal law to construe it:

> Initially, we note that there is a dearth of case law in Ohio concerning deceptive trade practices.  Consequently, where claims are made under Ohio common law and the deceptive trade practices statutes, courts are to apply essentially the same analysis as that applied in assessing unfair competition under the federal statutes.  ***We therefore look to federal law for guidance on those issues not clearly addressed by Ohio case law.***

Cesare v. Work, 520 N.E.2d 586, 590 (Oh. Ct. App. 1987) (emphasis added; citations omitted); see also Chandler and Assoc., Inc. v. America's Healthcare Alliance, Inc., 709 N.E.2d 190, 195 (Oh. Ct. App. 1997) ("When adjudicating claims arising under the Ohio Deceptive Trade Practices Act, Ohio courts shall apply the same analysis applicable to claims commenced under analogous federal law").

    2.    Mack Did Not Engage in Predatory or Discriminatory Conduct

Toledo Mack's second claim under the Ohio statute is that Mack violated Ohio Rev. Code Ann. § 4517.59(M), which provides that manufacturers shall not "[e]ngage in any predatory practice or discriminate against any new motor vehicle dealer."  According to Paragraph 39(b) of its Complaint, Toledo Mack asserts that Mack engaged in alleged price discrimination against Toledo Mack in violation of this section.  See Mack Trial Exhibit 1223.

The Ohio Motor Vehicle Dealer Law does not define the terms "predatory practice or discriminate."  Thus, Ohio courts look to analogous federal law, which, as to price discrimination, is the Robinson-Patman Act.  See Cesare, supra.  This Court has already held that there is no evidence in this case of a violation of the Robinson Patman Act.  See Memorandum

Opinion dated August 16, 2006.  Accordingly, Toledo Mack's price discrimination claim under the Ohio Motor Vehicle Dealer Law fails as a matter of law.

Nor has Toledo Mack proffered any evidence that Mack has engaged in any "predatory practice."  In <u>Dave Greytak Enterprises, Inc. v. Mazda Motors of America, Inc.</u>, 622 A.2d 14 (Del. Ch. Ct. 1992), <u>aff'd</u> 609 A.2d 668 (Del. 1992), the court construed Delaware's identically-phrased motor vehicle dealer law's prohibition on "predatory practices."  Following the same procedure as an Ohio court, the Delaware Court of Chancery looked to analogous federal antitrust law to determine the meaning of "predatory," concluding that "[t]he type of conduct contemplated by that phrase is the sacrificing of present revenue with the aim of driving a competitor out of the market, expecting to recoup the losses through subsequent higher prices after the competition is eliminated."  <u>Id.</u> at 20-21.  There is no evidence that Mack has sacrificed any profits in the hopes of some future recoupment.  Furthermore, any claim that Mack improperly attempted to drive Toledo Mack out of business through some purported "predatory" conduct is foreclosed by the Ohio Court of Appeals' holding that Mack had good cause to terminate Toledo Mack's distributorship.  <u>See</u> <u>Mack Trucks, Inc. v. Motor Vehicle Dealers Bd.</u>, No. 05AP-768, 2006 WL 1495122 (Oh. Ct. App. June 1, 2006).

### 3.   Mack Acted in Good Faith

Toledo Mack also alleges that Mack failed to comply with Ohio Rev. Code Ann. § 4517.59(A), which mandates that Mack act in "good faith" when "acting or purporting to act under the terms, provisions, or conditions of a franchise."  The standard for determining whether Mack acted in "good faith" under the statute is whether Mack's actions were "commercially justifiable."  <u>See</u> <u>Jim White Agency Co. v. Nissan Motor Corp.</u>, 126 F.3d 832, 834 (6th Cir. 1997).  Moreover, Mack cannot be held to violate the "good faith" requirement if its actions were

an exercise of Mack's rights under the Distributor Agreement.  See Bill Call Ford, Inc. v. Ford

Motor Co., 48 F.3d 201, 206-7 (6th Cir. 1995).

In Paragraph 39(c) of its Complaint, Toledo Mack sets forth the following alleged

instances where Mack failed to act in good faith:

> [Mack failed] to act in good faith or in the observance of
> reasonable commercial standards of fair dealing in the trade in the
> implementation of the Distributor Agreement, including but not
> limited to
>
> (i) the creation and perpetuation by [Mack] of a nationwide
> network of non-franchised Mack dealers which competes directly
> with Toledo Mack and other franchised Mack dealers, and
>
> (ii) the making of direct sales by [Mack] to potential customers of
> Toledo Mack and other franchised Mack dealers.

See Mack Trial Exhibit 1223.  Point (ii), as a matter of law, cannot violate the "good faith"

provision of the Ohio statute because Section 7 of the Distributor Agreement contemplates and

authorizes Mack to make direct sales.  See Mack Trial Exhibit 2.

Point (i) appears to be a reference to Mack's sales to so-called reselling National

Accounts, including leasing companies and body builders.  As to leasing companies, the claim is

unsupported by any evidence:  Toledo Mack has presented no evidence that it ever competed

against a National Account leasing company to secure a customer's business and, moreover, the

evidence is undisputed that Toledo Mack failed to take participate in the Mack Leasing System,

Mack's dealer leasing program.  See 9/18/06 Tr. at 22:10-22:23 (D. Yeager).

Nor did Mack violate the statutory duty of good faith by selling to body builders,

as there is no evidence that such sales were commercially unjustifiable.  To the contrary, the

evidence is undisputed that, if Mack did not sell to the body builders, these companies would

have purchased from other manufacturers, such as Kenworth.  See 9/20/06 Tr. at 131:18-133:7

(K. Flaherty).  As the body builders were going to buy chassis and resell them as part of

complete ready trucks no matter what, no reasonable jury could conclude that Mack was not commercially justified in selling to the body builders to protect its market share and to secure after market parts and service business for its distributors on complete ready trucks sold by body builders. Id.

Moreover, there is no evidence that Toledo Mack competes with body builders. As Mr. Yeager conceded, the body builders sell completed ready trucks out of inventory, with a chassis mounted on a body, that can be delivered immediately to the customer. See 9/18/06 Tr. at 35:4-36:19 (D. Yeager). Toledo Mack, though, has not stocked a ready truck since 1996. Id. at 36:20-36:23.

Furthermore, to the extent that, contrary to its Complaint, Toledo Mack seeks to bootstrap its other claims into the "good faith" prong, its action would still fail as a matter of law:

- Toledo Mack claims that Mack has acted improperly by supposedly suppressing its ability to sell out of AOR. But the evidence is undisputed that any encouragement by Mack to have distributors concentrate in their AOR's is entirely commercially justifiable, as it promotes financially healthy distributorships that can provide necessary after market service and as it promotes important local business relationships. 9/20/06 Tr. at 134:21-135:18 (K. Flaherty). For these very reasons, the United States Supreme Court has held that restrictions on distributor territories are usually pro-competitive. See, generally Cont'l T.V., Inc., supra. Notably, Ohio courts follow analogous federal precedent. See Cesare, supra.

- Based on the testimony of its alleged expert accountant Mr. Harris, Toledo Mack appears to allege that Mack acted improperly by varying discounts by sales transaction, thereby resulting in some distributors in some years having higher "average approved discounts" than Toledo Mack. But there is no evidence that transaction-specific discounts are commercially unjustifiable, as there are numerous factors that affect pricing in each deal, including the amount of competition from other manufacturers, specifications and model of the vehicle, trade terms, and quantity, to name but a few. In addition, the United States Supreme Court has approved of transaction-specific discounting as proper and pro-competitive. See,

generally <u>Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc.</u>, ___ U.S. ___, 126 S. Ct. 860 (2006).

- Toledo Mack also appears to allege that Mack acted improperly in 2000 by offering to sell truck chassis to certain large distributors on terms that Mack did not then voluntarily present to Toledo Mack. However, the evidence is undisputed that Mack faced an inventory crisis in 2000, which required Mack to make arrangements with large distributors, with sufficiently large lines of credit and storage facilities, to relieve the inventory backlog and prevent a factory shutdown. <u>See</u> 9/18/06 Tr. at 189:12-189:20 (J. Yelles); 9/21/06 Tr. at 196:15-198:5 (J. McCafferty). This is certainly commercially justifiable behavior.

4.    <u>Toledo Mack's Evidence of Damages Is Insufficient</u>

Finally, Toledo Mack's evidence of damages is insufficient to sustain a verdict in its favor under the Ohio statute. Toledo Mack has presented no testimony or other evidence of the amount of damages that it allegedly suffered as a result of Mack's National Accounts program.

Toledo Mack relies on the testimony of its purported expert, Dr. Nichols, to establish the amount of alleged damages. Mack also incorporates by reference the arguments that it raised in support of its Motion *in Limine* to Preclude the Testimony of Dr. Nichols and respectfully requests that the Court to reconsider its earlier denial of that motion and to strike Dr. Nichols' testimony from the record.

Among the many deficiencies in Dr. Nichols' testimony are the following:

- He does not limit damages to any specific transactions where Mack allegedly competed unfairly with Toledo Mack, where Mack allegedly discriminated against Toledo Mack, or in which Mack failed to act in good faith. There is therefore no causal connection between any facts allegedly showing liability under the Ohio Motor Vehicle Dealer Law and any of Nichols' damages models.

- Nichols' direct sales damages estimates include government and municipal sales by Mack, even though these sales are exempt from the prohibition on unfair competition. <u>See</u> Ohio Rev. Code Ann. § 4517.59(E) ("this division does not apply to a sale, lease, or rental to, or service performed for, an agency of federal, state, or local government").

- Nichols improperly projects damages on a nationwide basis, even though the Ohio statute cannot Constitutionally regulate commerce that occurs wholly outside of the state's borders. Cf. Healy v. The Beer Institute, 491 U.S. 324, 332-42 (1989) ("a state law that has the 'practical effect' of regulating commerce occurring wholly outside that state's borders is invalid under the Commerce Clause").

- Nichols improperly includes prejudgment interest in his damages models, even though Toledo Mack cannot recover prejudgment interest for any violation of the Ohio Motor Vehicle Dealer Law. See Ohio Rev. Code Ann. § 1343.03(A) and (C).

**F.    Toledo Mack's Claims for Tortious Interference with Prospective Business Relations Fail**

1.    Toledo Mack Has Failed to Show the Existence of a Reasonably Certain Prospective Business Relation

Toledo Mack has insufficient evidence in support of its claim that Mack tortiously interfered with a prospective business relationship. With respect "to a prospective contractual relation, there must be an objectively reasonable probability that a contract will come into existence. It must be something more than a 'mere hope.' . . . [M]erely pointing to an existing business relationship or past dealings does not reach the level of 'reasonable probability.'" Allstate Transp. Co., Inc. v. Southeastern Pa. Transp. Auth., No. 97-1482, 1998 U.S. Dist. LEXIS 1740, *12 (E.D. Pa. Feb. 17, 1998) (citations omitted). A conclusory allegation is "not enough to satisfy the burden of showing that there was a reasonable likelihood of an uninterrupted and prospective relationship." Id. (dismissing tortious interference claim, where plaintiff's conclusory allegation that "based on Allstate's previous contracts with such essential subcontractors and other ParaTransit business relationships, future contractual relationships were reasonably probable" was insufficient to satisfy its burden of pleading); see also Reali, Giampetro & Scott v. Society Nat'l Bank, 729 N.E.2d 1259, 1266 (Oh. Ct. App. 1999) ("Merely because the parties had done business on an annual basis in the past under express agreements did not mean that any business relationship continued indefinitely into the future. In the absence

of an ongoing business relationship, it could not be shown that appellee purposefully caused DePizzo 'not to enter into or continue a business relation.'"); <u>General Sound Tel. Co, Inc. v. AT&T Commc'n, Inc.,</u> 654 F. Supp. 1562, 1565-66 (E.D. Pa. 1987) (granting summary judgment on plaintiff's tortious interference claim after noting fact that plaintiff had obtained contracts from third party in past, did not prove that plaintiff would have obtained contract through bidding process but for defendant's actions).

       Here, Toledo Mack has submitted no evidence that it had an "objectively reasonable probability that a contract will come into existence" with any particular customer. In particular, Toledo Mack has not presented the testimony of even one prospective customer. <u>See Aamco Transmissions, Inc. v. Marino,</u> Nos. 88-5522, 88-6197, 1991 U.S. Dist. LEXIS 18380, *11-12 (E.D. Pa. Jan. 2, 1992) (dismissing franchisee's tortious interference claim where franchisee had "not produced a single customer who stated that he or she avoided any franchisee as a result of the publicity in question. . . . By its nature, a claim for interference with a prospective contractual relation is somewhat speculative. Under Pennsylvania law, however, some evidence as to the reasonable likelihood or probability of a prospective relationship is required.").

       2.    <u>Mack's Actions Were Proper Attempts to Protect Its Legitimate Business Interests</u>

       Furthermore, Mack's alleged acts of interference were privileged. Mack is entitled to interfere with Toledo Mack's prospective business relations to protect Mack's legitimate business interests. <u>See Windsor Sec., Inc. v. Hartford Life Ins. Co.,</u> 986 F.2d 655, 665-66 (3d Cir. 1993); <u>Nathanson v. Medical Coll. of Pa.,</u> 926 F.2d 1368, 1388-90 (3d Cir. 1991). Here, at most, Mack is alleged to have interfered with Toledo Mack's prospective contracts of sale by (1) discouraging out of AOR sales, (2) requiring a letter from the customer

before Mack would release a discount, and/or (3) alleged delays in responding to sales assistance requests. As to the first point, Mack merely protected its legitimate interests in ensuring that it had a financially sound distributor network capable of investing in future marketing and after market support. As to the second and third points, Mack merely made sure that it was releasing discounts to legitimate customers.

3.    There Is No Evidence of Injury or Damages

Finally, there is no evidence to support an award of damages for the tortious interference claim. Dr. Nichols did not testify as to the profits that Toledo Mack would have made on any specific transaction with which Mack supposedly interfered, nor is there any other evidence on point.

**G.    Toledo Mack's Claim for Breach of Contract Fails**

Toledo Mack has not produced any evidence in support of its breach of contract claim.[1] Toledo Mack's breach of contract claim is based on allegations that "Mack has made, and continues to make, sales of Mack trucks to body manufacturers and other National accounts which are not end-users and which do not place such trucks in initial service, but rather resell and lease them in competition with Toledo Mack." Mack Trial Exhibit 1223, Compl. ¶ 82. There are no provisions under the Agreement which prohibit Mack from making such sales, and therefore the breach of contract claim fails as a matter of law. See Juliano v. Sun Refining & Mktg. Co., No. 93-3632, 1997 U.S. Dist. LEXIS 24140, *45-46 (E.D. Pa. Feb. 28, 1997) (dismissing breach of contract claim based on alleged unfulfilled promises where "a review of the express terms of the franchise agreement does not reveal these promises."); Gazarov v.

---

[1] The Distributor Agreement at issue contains a choice of law clause stating the parties' intention that Pennsylvania govern all questions of contract interpretation. See Mack Trial Exhibit. 2, Distributor Agreement, ¶ 37. "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions executed by them." Synesiou v. Designtomarket, Inc., No. 01-5358, 2002 U.S. Dist. LEXIS 5687, *11 n.3 (E.D. Pa. Apr. 3. 2002) (quoting Kruzits v. Okuma Machine Tool, Inc., 40 F.3d 52, 55 (3d Cir. 1994)).

Diocese of Erie, No. 02-3680, 2003 U.S. App. LEXIS 23037, *13-14 (3d Cir. Oct. 21, 2003) (affirming summary judgment, because plaintiffs failed to make out prima facie case for breach of contract where disciplinary policy plainly allowed defendant's conduct against plaintiff).

Toledo Mack's breach of contract claim is also based on Mack's alleged violation of a specific provision of the Agreement which requires Mack to "pay or credit to the Distributor a commission, in accordance with the terms of the Company's current standard Direct Sales Commissions Policy in effect at the time of sale, for each Mack Vehicle sold by the Company directly to a customer and placed in initial service in the Territory, provided *that the Company shall have determined that the Distributor has engaged in activities which contributed to the sale.*" Mack Trial Exhibit 2, Distributor Agreement ¶ 7 (emphasis added).  There is no evidence of Toledo Mack contributing to any sales by Mack directly to a customer where such trucks were placed in initial service in Toledo Mack's territory.

Finally, to the extent that Toledo Mack's claim for breach of contract seeks prejudgment interest on any alleged damages, that claim for prejudgment interest fails as a matter of law.  Prejudgment interest is unavailable under Pennsylvania law in a breach of contract case for unliquidated damages, such as asserted here by Toledo Mack.  See Black Gold Coal Corp. v. Shawville Coal Co., 730 F.2d 941, 943 (3d Cir. 1984).

**H.    Toledo Mack's Claim for Breach of the Duty of Good Faith and Fair Dealing Fails**

      1.    Toledo Mack's Claim Is Barred by the Terms of the Distributor Agreement

In its proposed jury instructions Toledo Mack explains that its claim for breach of the duty of good faith and fair dealing is based on the fact that Mack sells directly to certain customers.  See Toledo Mack Pretrial Memorandum at Exhibit D, page 66.  However, the Distributor Agreement expressly authorizes direct sales by Mack.  See Mack Trial Exhibit 2, § 7.

As it is black letter law that the duty of good faith and fair dealing cannot vary the terms of the underlying contract, see Amoco Oil Co. v. Burns, 437 A.2d 381 (Pa. 1981), Toledo Mack's claim fails as a matter of law.

Moreover, to the extent that Toledo Mack's claim for breach of duty of good faith and fair dealing seeks prejudgment interest on any alleged damages, that claim for prejudgment interest fails as a matter of law. Prejudgment interest is unavailable under Pennsylvania law in a breach of contract case for unliquidated damages, such as asserted here by Toledo Mack. See Black Gold Coal Corp. v. Shawville Coal Co., 730 F.2d 941, 943 (3d Cir. 1984).

### 2. This Claim Is Improperly Duplicative

There is no claim for breach of the duty of good faith and fair dealing where a plaintiff has recourse to an independent cause of action to vindicate the same rights. See Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91-92 (3d Cir. 2000) ("[A] party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.'") (citation omitted). As Toledo Mack has brought claims challenging Mack's direct sales program under both the Ohio and Michigan statutes, its claim for breach of the duty of good faith and fair dealing fails as improperly duplicative.

### 3. Mack Did Not Arbitrarily Terminate Toledo Mack's Franchise

Finally, under Pennsylvania law, Toledo Mack may only bring a claim of breach of the duty of good faith and fair dealing to challenge the manner in which Mack terminated its distributorship. See Witmer v. Exxon Corp., 434 A.2d 1222 (Pa. 1981); Valencia v. Aloette Cosmetics, Inc., No. 94-2076, 1995 U.S. Dist. LEXIS 3021 (E.D. Pa. Mar. 10, 1995); O'Keefe v. Aamco Transmissions, Inc., No. 91-2506, 1992 U.S. Dist. LEXIS 2295 (E.D. Pa. Feb. 24, 1992). As the Ohio Court of Appeals has already held that Mack had good cause to terminate, see Mack

-35-

Trucks, Inc. v. Motor Vehicle Dealers Bd., No. 05AP-768, 2006 WL 1495122 (Oh. Ct. App. June 1, 2006), any such claim fails as a matter of law.

## III.    CONCLUSION

For the reasons set forth herein, this Court should enter judgment in Mack's favor as a matter of law as to all Toledo Mack's claims in this action.

Respectfully submitted,

Barbara Mather
Jeremy Heep
Barak A. Bassman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4000

Attorneys for Defendant/Counterclaim Plaintiff
Mack Trucks, Inc.

Dated: September 26, 2006

## CERTIFICATE OF SERVICE

I, Barak A. Bassman, hereby certify that on September 26, 2006 a true and correct copy of the foregoing Defendant/Counterclaim Plaintiff Mack Trucks, Inc.'s Motion for Judgment as Matter of Law, and supporting memorandum of law, was served via hand delivery upon the following:

Wayne Mack
J. Manly Parks
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103

Barak A. Bassman