**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TOLEDO MACK SALES & SERVICE, INC.,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No. 2:02-CV-04373-RLB** |
| | : | |
| **v.** | : | |
| | : | |
| **MACK TRUCKS, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

| | | |
|---|---|---|
| **MACK TRUCKS, INC.,** | : | |
| | : | |
| **Counterclaim Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TOLEDO MACK SALES & SERVICE, INC. and** | : | |
| | : | |
| **Counterclaim Defendant.** | : | |

## MOTION FOR RECONSIDERATION

Plaintiff, Toledo Mack Sales & Service, Inc., hereby moves for reconsideration of the Court's Judgment as a Matter of Law on Plaintiff's cause of action under Section 1 of the Sherman Act.

For the reasons expressed in the accompanying Memorandum of Law, which is incorporated by reference as if fully set forth herein, Plaintiff respectfully requests that the Court

grant its Motion for Reconsideration and deny Defendant's Motion for Judgment as a Matter of Law.

Respectfully Submitted,

DUANE MORRIS LLP

Date:  September 28, 2006

By: /s/ Wayne A. Mack
Wayne A. Mack
J. Manly Parks
James H. Steigerwald
David A. Degnan
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA  19103-4196
215.979.1000

Attorneys for Plaintiff/Counterclaim
Defendant Toledo Mack Sales & Service,
Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TOLEDO MACK SALES & SERVICE, INC., | : | |
| | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 2:02-CV-04373-RLB |
| | : | |
| v. | : | |
| | : | |
| MACK TRUCKS, INC., | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| MACK TRUCKS, INC., | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| TOLEDO MACK SALES & SERVICE, INC. and | : | |
| | : | |
| Counterclaim Defendant. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT AS A MATTER OF LAW AND IN SUPPORT OF
PLAINTIFF'S MOTION FOR RECONSIDERATION**

I.    <u>INTRODUCTION</u>

In its Motion for Judgment as a Matter of Law, Mack Trucks, Inc. ("Mack") argues that

Toledo Mack Sales & Service, Inc. ("Toledo Mack") did not produce sufficient evidence of

concerted action between Mack and its dealers to prevail on its cause of action under Section 1

of the Sherman Act, 15 U.S.C. §1 ("Section 1").  Mack further argues that Toledo Mack's

Section 1 claim is barred by the statute of limitations.  The Court has indicated that it will grant

Mack's motion with respect to Toledo Mack's Section 1 claim based on the statute of limitations.

Toledo Mack respectfully submits this Memorandum in Opposition to Mack's Motion for Judgment as a Matter of Law and in Support of Toledo Mack's Motion for Reconsideration.[1]

In particular, the following key principles must be applied to Mack's motion for judgment as a matter of law:

- "Each time a plaintiff is injured by a continuing conspiracy to violate the antitrust laws a new cause of action for damages accrues." Pennsylvania Dental Ass'n v. Med. Serv. Ass'n, 815 F.2d 270, 278 (3d Cir. 1987). In other words, even if the Court finds that Toledo Mack knew about Mack's conspiracy in 1989, Toledo Mack is still entitled to pursue a claim for damages arising from 1998-present as part of the same conspiracy. Only Toledo Mack's claim for damages from 1989-July 1, 1998, would be barred under such circumstances.

- To prove a continuing conspiracy, a plaintiff only needs to present evidence that a conspiracy beginning outside the statutory period of limitations was continued inside the statutory period of limitations. A plaintiff may do so by introducing evidence of a single overt act in furtherance of the conspiracy within the statutory period. See In re Lower Lake Erie Iron Ore Litig., 998 F.2d 1144, 1173 (3d Cir. 1993); Pennsylvania Dental, 815 F.2d at 278. A plaintiff need not prove the conspiracy began during the statutory period.

- While a manufacturer does not violate Section 1 where it acts unilaterally or in response to distributor complaints, a manufacturer does violate Section 1 where, instead of simply announcing an anticompetitive policy, it takes measures to secure the agreement of others to follow it. Monsanto v. Spray-Rite Serv. Corp, 465 U.S. 752 (1984); Rossi v. Standard Roofing, Inc., 156 F.3d 452 (3d Cir. 1998). This conduct may take many different forms including coercion or harassment.

- A plaintiff need only introduce more than a "mere scintilla" of evidence that conspirators engaged in concerted action in order to create an issue of fact for the jury. Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1363 (3d Cir. 1992). Circumstantial evidence generally indicative of concerted action in violation of Section 1 includes: complaints, threats, monitoring, actions against

---

[1] The Court has indicated that Toledo Mack's remaining claims will proceed to the jury for determination. Accordingly, Toledo Mack has not addressed Mack's remaining arguments in this brief. Toledo Mack respectfully requests the opportunity to respond to any such issues if they are raised for further consideration. Toledo Mack also incorporates by reference as if fully set forth herein all briefs submitted by Toledo Mack in opposition to Mack's Motion for Summary Judgment.

corporate policies, pretextual reasons, efforts to conceal a conspiracy, and actions that would be against a party's economic interests but for the existence of a conspiracy. Toledo Mack has produced evidence of all of these factors supporting an inference of concerted action.

## II.    LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 50(a)(1), "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party . . . ." A motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (quoting Macleary v. Hines, 817 F.2d 1081, 1083 (3d Cir. 1987)); see also Mosley v. Wilson, 102 F.3d 85, 89 (3d Cir. 1996) ("[T]he district court must view the evidence in the light most favorable to the non-moving party."). In reviewing a motion for judgment as a matter of law,

> courts may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence. Rather, courts must defer to the credibility assessments that may have been made by the jury and any reasonable factual inferences drawn by the jury.

9 Moore's Federal Practice, § 50.64[2], at 50-98, 50-99 (Matthew Bender 3d ed.) (emphasis added). In light of the demanding standard for granting judgment as a matter of law, the Third Circuit has cautioned that "[j]udgment as a matter of law is to be granted sparingly." Fair Hous. Council v. Main Line Times, 141 F.3d 439, 442 (3d Cir. 1998).

## III.    THE CONTINUING CONSPIRACY RULE

The statutory period of limitations for the filing of an antitrust cause of action is four years. See 15 U.S.C § 15b. Toledo Mack filed its Complaint in this litigation on July 1, 2002. At trial, Toledo Mack presented evidence of a conspiracy between Mack and its dealers dating

3

back to 1989 to prevent competition between the dealers in order to maintain high profit margins.[2]  As detailed below, see infra § IV, Toledo Mack has presented evidence of overt acts occurring as part of this conspiracy from 1989 through 2006.

Mack argues that Toledo Mack was aware of its cause of action under Section 1 in 1989 and that any claim should have been filed within four years of that date.[3]  However, pursuant to the well-settled precedent of the United States Supreme Court and the Third Circuit Court of Appeals, even if Toledo Mack was aware of its claims in 1989, Toledo Mack would still be entitled to recover damages suffered as a result of the continuing conspiracy that occurred within the statutory period of limitations.  In this case, if the Court finds that Toledo Mack could have, or should have brought suit, in 1989, then only Toledo Mack's damages claim from 1990-July 1998 should be barred.  Because there is evidence that the conspiracy continued past 1998, Toledo Mack should be entitled to recover all damages suffered after July 1, 1998, four years prior to the filing of its Complaint in July 2002.

"The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is 'commenced within four years after the cause of action accrued.'"  Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971) (quoting 15 U.S.C. § 15b).  "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."  Id.  The Supreme Court has made it clear that

---

[2]    Toledo Mack also presented evidence of an agreement between Mack and certain body builders in violation of Section 1.  (See Polzer Dep. at 212-13; N.T., 9/21/06, at 110-11).

[3]    Toledo Mack has argued that the statute of limitations was tolled pursuant to the doctrine of fraudulent concealment and that it is entitled to recover damages from 1990-present.  While Toledo Mack maintains this position, for purposes of this motion for reconsideration, Toledo Mack focuses solely upon the continuing conspiracy doctrine, which would allow Toledo Mack to recover damages for conduct occurring (and damages suffered) within the statutory period of limitations.

> "[i]n the context of a continuing conspiracy to violate the antitrust laws, . . ., this has usually been understood to mean that *each time a plaintiff is injured by an act of the defendants a cause of action accrues to him* to recover the damages caused by that act and that, as to those damages, *the statute of limitations runs from the commission of the act*."

Id. (emphasis added).

Similarly, in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (U.S. 1968), the plaintiff filed suit for damages in 1955 based on a policy implemented in violation of the antitrust laws in 1912. The plaintiff was permitted to maintain its cause of action for all damages suffered within the statutory period of limitations because the defendant continued to receive lease payments pursuant to its unlawful policy from 1912 through 1955. As the Court asserted, "we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on Hanover. Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955." Id. at 502 n.15. Thus, in Hanover Shoe, the plaintiff was able to sue more than forty years after the alleged conspiracy had begun but was limited to damages suffered within the statutory period of limitations. Id. at 502.

Several decisions by the Third Circuit Court of Appeals, including the case relied upon by Mack, have applied the continuing conspiracy rule discussed in Zenith Radio and Hanover Shoe. For example, in Pennsylvania Dental Assoc. v. Medical Service Assoc., 815 F.2d 270 (3d Cir. 1987), cert. denied, 484 U.S. 851 (1987), the defendants, dental associations, agreed with competing dentists to refuse to contract with Blue Shield to provide dental service to its subscribers in violation of Section 1 of the Sherman Act. Id. at 271. The defendants argued that because these arrangements were made more than four years before the litigation was filed, the

plaintiff's antitrust claims were barred by the statute of limitations.  Id. at 278.  The Third Circuit

soundly rejected this argument and explained that "each time a plaintiff is injured by a

continuing conspiracy to violate the antitrust laws a new cause of action for damages accrues."

Id.  The court then held:

> The summary judgment record as it now stands would permit a
> factfinder to conclude that the conspiracy charged by Blue Shield
> is a continuing one and that its effects continued well into the four-
> year period preceding the March, 1982 filing of the counterclaim.
> Most of the offending resolutions have never been rescinded.  Blue
> Shield continues to encounter resistance to its participation
> contract traceable to the organized dentists' earlier actions.
> *Additionally, there is evidence of overt acts in furtherance of the
> conspiracy occurring within the limitations period.*  Plainly,
> therefore, even if the four-year statute of limitations were deemed
> to be applicable to the claim for injunctive relief, that claim would
> not be time-barred.  Furthermore, section 4 damages caused by any
> overt act taking place from March of 1978 forward may also be
> recovered.

Id. (citing Hanover Shoe, 392 U.S. at 495-502) (emphasis added).  Thus, in Pennsylvania Dental,

the plaintiff was permitted to pursue damages claims based on an agreement entered into more

than four years before the plaintiff filed suit because the defendants continued their refusal to

contract with the plaintiff, Blue Shield, and because the plaintiff continued to suffer damages

from this anticompetitive agreement.

The Third Circuit once again applied the continuing conspiracy rule in In re Lower Lake

Erie Iron Ore Antitrust Litig., 998 F.2d 1144 (3d Cir. 1993), which is the primary case relied

upon by Mack.  In that case, the plaintiffs brought suit based on a conspiracy by the defendants

to exclude certain companies from the iron ore transportation market on Lake Erie.  The

conspiracy dated back more than 25 years prior to the filing of the complaints by the various

plaintiffs in Iron Ore.  Indeed, many of the plaintiffs had knowledge of the conspiracy

approximately 10 years before suit was filed and several years outside the statutory period of

6

limitations.  After a jury verdict was returned in favor of the plaintiffs, the defendant appealed and argued that the claims of several plaintiffs were barred by the statute of limitations.  The Third Circuit rejected this argument and affirmed the entry of judgment, in pertinent part, based on the jury's verdict.

The <u>Iron Ore</u> court cited <u>Hanover Shoe</u> and *rejected* "the argument that, in the context of a defendant's continuing violation of the Sherman Act, the statute of limitations runs from the violation's earliest impact on a plaintiff."  <u>Iron Ore</u>, 998 F.2d at 1171.  Instead, the court held that the plaintiffs were entitled to recover all damages resulting from the conspiracy during the period of limitations.  <u>Id.</u> at  1171-73.  In other words, while certain plaintiffs could not recover for damages dating back to the beginning of the conspiracy or to the time they first knew of the conspiracy, the plaintiffs were permitted to recover all damages suffered during the statutory period of limitations.  <u>Id.</u>

Significantly, the court in <u>Iron Ore</u> did not hold that the plaintiff was required to prove that the conspiracy began during the statutory period of limitations or that only acts occurring during the period of limitations were relevant to determining whether a violation of Section 1 occurred and there is no authority for such an argument.  Instead, the court in <u>Iron Ore</u> reaffirmed the well-settled rule that a plaintiff may recover all damages caused by a conspiracy formed before the statutory period of limitations as long as the plaintiff produces evidence that the conspiracy continued into the statutory period.  This is generally accomplished by showing at least one overt act in furtherance of the conspiracy.  Indeed, the jury instruction approved by the court merely required the jury to find that the conspiracy was "still in effect" and that at least "one of the co-conspirators took some overt action in furtherance of the conspiracy" after the statutory period of limitations began.  <u>Id.</u> at 1173.

In this case, even if the Court finds that Toledo Mack had knowledge of its antitrust claims back in 1989, Toledo Mack should still be permitted to pursue its antitrust claim for all damages caused by the conspiracy after July 1, 1998, because Toledo Mack presented evidence of multiple overt acts in furtherance of the conspiracy. Toledo Mack presented evidence that Mack continuously and repeatedly discriminated against Toledo Mack and that Mack enforced a number of "unwritten" and "unofficial" policies designed to keep Toledo Mack "in its box."

## IV.    TOLEDO MACK PRODUCED EVIDENCE OF "CONCERTED ACTION" CREATING AN ISSUE OF FACT FOR THE JURY

### A.    Where A Plaintiff Presents More Than A "Mere Scintilla" Of Evidence Supporting An Inference Of Concerted Action, There Is An Issue Of Fact For The Jury To Determine

Section 1 of the Sherman Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. A plaintiff must present evidence of "concerted action" in order to prevail on a claim under Section 1 of the Sherman Act.

A manufacturer does not violate Section 1 where it independently announces and implements a policy. See United States v. Colgate & Co., 250 U.S. 300 (1919). However, where a manufacturer goes beyond merely announcing a policy, and instead takes measures to obtain the agreement of other parties to abide by that policy, concerted action may be found. For example, in United States v. Parke, Davis & Co., 362 U.S. 29 (1960), the Court held that "when [a] manufacturer's actions go beyond a simple refusal to deal, and [it] employs other means which effect adherence to [its] resale prices . . . [it] has put together a combination in violation of the Sherman Act." Id. at 44. In that case, a pharmaceutical manufacturer announced a "unilateral" policy that it would refuse to sell to wholesalers who sold to retailers at discounted rates. However, the manufacturer did more than simply announce this policy. It individually

contacted distributors and sought assurances of compliance with the policy.  In other words, the manufacturer sought agreements from its dealers to abide by the policy not to sell at discounted rates.  The Supreme Court held that the manufacturer had therefore engaged in concerted action in violation of Section 1.  Id. at 46-47.

The Third Circuit "has been relatively hospitable to the efforts of plaintiffs to prove concerted action."  Rossi v. Standard Roofing Inc., 156 F.3d 452, 466 (3d Cir. 1998).  More specifically, the Third Circuit has explained:

> [I]n practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.

Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1363 (3d Cir. 1992).

### B.    Toledo Mack Presented To The Jury Evidence From Before And After 1998, Including Key Admissions By Mack Executives, That There Was An Agreement Between Mack And Its Dealers To Restrict Competition Between Dealers To Maintain Higher Profit Margins

As discussed above, in order to prevail on its cause of action under Section 1 of the Sherman Act, Toledo Mack need only prove that there was a conspiracy, agreement, or other form of concerted action between Mack and its dealers and that such a conspiracy continued after 1998.  Thus, evidence related to the conspiracy in 1989 is relevant to Toledo Mack's claim for damages from July 1, 1998-present even if Toledo Mack's claim for damages prior to July 1, 1998, is barred by the applicable statute of limitations.  According to the continuing conspiracy rule, Toledo Mack may recover damages it suffered after July 1, 1998 if it proves that a conspiracy began before July 1, 1998 but continued (by virtue of at least one overt act by one co-conspirator) after July 1, 1998.  See Iron Ore, 998 F.2d at 1172-73; Pennsylvania Dental, 815 F.2d at 278.  Indeed, even in cases that did not involve a continuing conspiracy, the Third Circuit

has held that evidence of prior and unrelated conspiracies is relevant to a determination of whether concerted action exists.  See Rossi, 156 F.3d at 469; Big Apple BMW, 974 F.2d at 1360-61.  Thus, the evidence of Mack's agreement with the dealers between 1989-July 1, 1998 would be relevant even if the continuing conspiracy rule did not apply.

> **1.    Toledo Mack Introduced Evidence Of A Conspiracy Between Mack And Its Dealers Dating Back To 1989**

There are no restrictions on the area in which a Mack dealer, such as Toledo Mack, may sell trucks or parts pursuant to its agreement with Mack. (N.T. 9/14/06 at 44) (Yeager test.); (N.T. 9/20/06 at 6-7) (Flaherty Test.).  Accordingly, Mack has taken the official position that dealers may sell wherever they want.

It is undisputed that Toledo Mack pursued a low-price, "we will not be undersold" sales strategy.  (N.T. 9/14/06, at 63) (Yeager Test.).  Further, Toledo Mack pursued this strategy through aggressive advertisements and direct marketing that emphasized and listed the low prices offered by Toledo  Mack on truck sales and parts.  (N.T. 9/14/06, at 68, 76) (Yeager Test.); (P-265).  Toledo Mack directed its sales efforts both inside and outside of its area of primary responsibility.

Mack dealers were upset that Toledo Mack's low price approach was disturbing their high, established profit structures.  Many of these dealers complained directly to Dave Yeager about Toledo Mack's low price sales efforts.  (N.T. 9/14/06, at 91) (Yeager Test.).  Other dealers complained to Mack about Toledo Mack's low price sales strategy.[4]  (Lusty Dep., 11/14/03, at

---

[4]    This evidence of complaints about Toledo Mack's low-price sales, which was submitted to and within Mack, is not, without more, sufficient to establish concerted action. However, these complaints are evidence that, with other indicators of a conspiracy, may support a finding of concerted action.  See Rossi, 156 F.3d at 475; Big Apple BMW, 974 F.2d at 1367.

26-27, 30); <u>see also</u> (N.T. 9/14/06, at 63) (Yeager Test.).  Mack executives were also upset by,

and complained about, Toledo Mack's out of area, low-cost sales.  (Lusty Dep., 11/13/03, at 25-

26, 28-29); (<u>see also</u> Ex. P-77 (Flaherty to Johnson memo complaining about Toledo Mack price

advertisements).

At trial, Toledo Mack presented evidence that the reason its low-price sales strategy upset

other dealers was because these other dealers had "gentlemen's agreements" not to compete

against each other and to maintain established profit structures.  For example, Dave Yeager

testified that he spoke with two influential Mack Dealers, Messrs. Jones and Cambria at a

National Sales Meeting about Toledo Mack's sales efforts outside of the Toledo area.  Mr. Jones

was a member of the Distributor Council and Mr. Cambria was an alternate member of the

Distributor Council.[5]  These powerful dealers advised Dave Yeager that "*we don't compete on

price* . . . .  And if you want to sell down here, *put $7,000 profit in your quote* and then we don't

have a problem with that."  (N.T. 9/14/06, at 98-99) (Yeager Test.) (emphasis added).  This

$7,000 profit would have been a huge increase over the prices offered by Toledo Mack.  (N.T.

9/14/06, at 99) (Yeager Test.).

Mack's Parts Promotion Manager, Dennis Wurzelbacher, confirmed that Mack both

knew about and supported these gentlemen's agreements.  In a tape-recorded phone conversation

played at trial, Wurzelbacher asserted that there was a problem with dealers selling in other

dealer's "backyards."  He further explained that, while perhaps not an "official policy," "there is

a policy that would say, hey, you're only supposed to sell in your territory."  (<u>See</u> Ex. P-715, at

4-5).

---

[5]     The Distributor Council was a body of Mack executives and influential Mack dealers that
considered and voted on important distribution issues for the Mack Trucks system.

In the late 1980s, when Toledo Mack was achieving great success by selling trucks at low prices out of its area, Mack changed the process by which it sold trucks. Dealers no longer knew the prices at which they would be able to purchase Mack trucks. Instead, dealers were required to apply for sales assistance for each specific truck. This process restricted the ability of Toledo Mack to advertise its low prices as it had done so successfully. (N.T. 9/14/06, at 114, 117) (Yeager Test.).

More specifically, in 1989, Mack implemented Bulletin 38-89 which provided that "with few expressed exceptions sales assistance will be available to a distributor only with respect to purchases by retail customers located within the distributor's geographic area of sales and service responsibility territory." This policy blatantly discriminated between dealers depending upon where a customer was located. The policy effectively eliminated competition between Mack dealers and provided that customers would have only one option to buy a Mack truck. (N.T. 9/14/06, at 115-17) (Yeager Test.). Mack even admitted that the true purpose of Bulletin 38-89 was to restrict price competition. Specifically, Mack's Bulletin 38-89 stated "the new policy offers opportunities for *increased profit margins* for Mack distributors as well as the Mack Company." (Ex. P-1276) (emphasis added).

While Mack now contends that it implemented Bulletin 38-89 unilaterally, the evidence at trial demonstrated just the opposite. Toledo Mack introduced a transcript and tape of a July 6, 1989 phone conversation between Dave Yeager and MTI Vice President of Sales, Dick Murphy, in which Murphy indicated that the restrictions MTI imposed on out of area sales were "distributor-driven" and were "unanimously" approved of by the Distributor Council. Further, Murphy suggested that the Distributor Council would have to consider any problems or revisions to the policy. (See Ex. P-718, at 7, 10, 14-15).

Mack's Vice President of Distributor Sales, Gary Johnson, also confirmed that the Distributor Council was behind the implementation of Bulletin 38-89.  Toledo Mack introduced a tape and transcript of a phone conversation between Dave Yeager and Johnson regarding the implementation of the 1989 sales assistance policy.  In that conversation, Johnson stated: "Looking at the dates of events.  I guess – the one thing I could tell you that would be fair and legitimate advice is that I think this policy came about to a large degree because of the voice of the distributor organization. . . . And if it's probably ever gonna be changed or modified, it will come about as a result of the voice of dealer organizations."  (See Ex. P-719 at 15).    At the very least, these contemporaneous tapes discussing Mack's implementation of Bulletin 38-89 create an issue of fact as to whether or not Mack's policy was developed unilaterally.

In 1989 Mack amended Bulletin 38-89.  However, the testimony at trial established that little changed after this "official" revision.  (N.T. 9/14/06 at 139).  While Mack now argues that after Bulletin 38-89 was amended dealers were able to receive sales assistance anywhere, a tape transcript of a June 13, 1991 phone conversation between Dave Yeager and Vice President of Sales, Kevin Flaherty, revealed otherwise.  In that conversation, Flaherty stated "our policy has not changed.  And you know, that we, you know, obviously we're looking to protect our distributors.  We've always – that's always been the backbone of the Mack is to protect the distributors."  (See Ex. P 728).  This transcript is direct evidence that MTI did not withdraw from or terminate the conspiracy in 1989 as it has suggested at trial.[6]

---

[6]    Mack has argued in the past that it withdrew from or terminated the conspiracy when it revised Bulletin 38-89 in late 1989.  However, it is defendant's burden to prove withdrawal from a conspiracy.  U.S. v. Gypsum Co., 438 U.S. 422, 464-65 (1978). "Mere cessation of activity is not enough to start the running of the statute. . . .There must also be affirmative action, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-

(Continued…)

In a 1991 conversation with Yeager, Flaherty further stated that Mack's policy would not change unless the dealers wanted it changed.  (N.T. 9/14/06, at 152; see also Ex. P-729, at 11-12).  Again, this evidence suggests that Mack's distribution policies, which strongly restricted competition between dealers, were the product of an agreement between Mack dealers to maintain high profit structures.

In 1996, yet another Mack Vice President confirmed that Mack "protected" its dealers from competition with each other.  Bob Grussing, a Vice President of Mack parts sales, acknowledged in a tape recorded conversation that every day Mack dealers called him "to protect the dealers from each other."  (N.T. 9/14/06, at 162) (Ex. P-731 at 13).  Grussing agreed that all these dealers complaining about Toledo Mack's sales efforts were asking Mack to help them maintain their profit margins.  (Ex. P-731 at 16).  In a particularly telling admission, Grussing then asserted:

> I mean nothing bad could happen to Mack, but again it gets back to the dealers and *the dealers constantly want Mack to get involved in these territorial disputes between the dealers - - amongst the dealers and to protect them from one another.  And right or wrong we do that, you know*.

---

(Continued…)

conspirators."  United States v. Lowell, 649 F.2d 950, 955 & n.7 (3d Cir. 1981).  Determining whether there has been a withdrawal from a conspiracy is ordinarily a question of fact for the jury to determine.  Chiropractic Cooperative Assoc. of Michigan v. American Med. Assoc., 867 F.2d 270, 275 (6th Cir. 1989).

Even where a defendant presents evidence of an affirmative act of withdrawal, which is not the case here, the plaintiff may rebut such evidence with evidence of a subsequent act in furtherance of the conspiracy.  See e.g. U.S. v. Jannotti, 729 F.2d 213, 221 (3d Cir. 1984).  In this case, there is no affirmative act of withdrawal by Mack.  Moreover, Toledo Mack has introduced evidence of repeated acts in furtherance of the conspiracy all the way from 1989 through 2006.

It's a long-standing tradition, that's right. . . . and I don't
know if I can break that.

(Ex. P-731 at 18) (emphasis added).

At trial, Toledo Mack also introduced substantial evidence that Mack policed the dealers'
horizontal agreement to restrict competition and to maintain high profit margins.  The efforts of
Mack and its dealers to convince Dave Yeager to abide by the gentlemen's agreements and to
avoid competition with other dealers provide a strong inference of concerted action.  Indeed,
many courts have considered such attempts to convince other to "play by the rules" to be
evidence of concerted action.  See Yentsch v. Texaco, Inc., 630 F.2d 46, 53 (2d Cir. 1980);
Bowen v. New York News, Inc., 522 F.2d 1242 (2d Cir. 1975); Greene v. General Foods Corp.,
517 F.2d 635, 644 n.5 (5th Cir. 1975); Lehrman v. Gulf Oil Corp., 464 F.2d 26, 32-33 (5th Cir.
1972).

Specifically, other dealers threatened Dave Yeager because of Toledo Mack's low-price
sales strategy.  (N.T. 9/14/06, at 90) (Yeager Test.).  At least one of these was a physical threat
by a dealer after Toledo Mack sold a truck in Puerto Rico.  (N.T. 9/14/06, at 91) (Yeager Test.).
Mack dealers also threatened, or actually refused, to perform warranty repair work for customers
that had purchased trucks from Toledo Mack.  (N.T. 9/14/06, at 100-104) (Yeager Test.).  This
breached the obligations of those Mack dealers under their dealership agreements.  (N.T.
9/14/06, at 102) (Yeager Test.).  Although Toledo Mack alerted Mack that its other dealers were
breaching their agreements and creating significant problems for Mack customers, there is no
evidence in the record that Mack took any action to address the problem.

Dick Tracht, the Mack district manager responsible for the area in which Toledo Mack
was located, visited Toledo Mack and "discussed in length Mr. Yeager's question [about] . . . .
*what Mack in Allentown's opinion of his selling and delivering trucks in all areas of the*

*country*." (Ex. P-665) (Mack contact report). By his own admission in the Mack document he created, Tracht "indicated to Mr. Yeager that *Mack Trucks did not like his policy* as he was selling the majority of trucks to already established Mack customers and doing so was *breaking established profit structures* which in turn made the Mack dealers in all the areas look bad in the customers' eyes, causing a lot of concern between customers and dealers." (Ex. P-665).

Mr. Tracht followed his meeting with Toledo Mack by forwarding a cartoon to the Regional Vice President of Mack and to all dealers in Toledo Mack's district which suggested that all dealers would be headed for the "poor house" if they did not stop competing against each other. (N.T. 9/14/06, at 108-09) (Yeager Test.); (Ex. P-263).

Mack harassed Toledo Mack about its out of area sales efforts. Mack Vice President, Gary Johnson, was "very upset" about Toledo Mack's sales. Johnson told Yeager he "did not like [Toledo Mack] interfering in [the East Coast] market. He even suggested Toledo Mack's out of area sales were "against Mack's policy" and that Toledo Mack should "keep [its] nose out of Puerto Rico." (N.T. 9/14/06, at 146) (Yeager Test.).

After Mack revised its Bulletin 38-89, Mack continued to enforce the same policies against out of territory sales for the same reasons: to restrict competition among dealers and to inflate prices to end-users. For example, in 1991, Mack District Manager Tracht once again expressed to Yeager that Mack did not like Toledo Mack's out of area sales efforts. Tracht even admitted that Mack's problem was that Toledo Mack "w*as breaking established profit structures*." (N.T. 9/14/06, at 150) (Yeager Test.).

16

**2.     Toledo Mack Introduced Evidence At Trial That The Conspiracy
Continued Past July 1, 1998**

Toledo Mack also presented substantial evidence that the conspiracy between Mack and

its dealers continued past July 1, 1998.  Indeed, this evidence also supports a finding of a

conspiracy irrespective of the evidence of conduct predating 1998.

For example, Jack Lusty, the Mack District Manager responsible for Toledo Mack and

the Lakes District from 1998-2003, testified that there were "gentlemen's agreements" between

dealers not to compete or, if they did provide a quote to a customer, to maintain certain profit

levels.  Hallie Giuliano, a former consultant for Mack in 1999, also testified that Mack

Executives indicated there were "gentlemen's agreements" that included dealers.  (Giuliano

Dep., 3/18/05, at 34-39).  The testimony also reflected that Mack used sales assistance to protect

Mack dealers from competition from other Mack dealers in their AORs.  (Lusty Dep., 1/14/05, at

401-02).  The jury may reasonably infer that Mack used its sales assistance policies to enforce

the agreement between the dealers, to restrict competition, and to maintain higher profit margins.

In addition to the above direct evidence of a conspiracy after 1998, Toledo Mack also

introduced substantial evidence of Mack's efforts to enforce the unlawful agreement.  Indeed, it

is telling that although Mack's official policy provides that dealers may sell trucks anywhere,

Mack has continued to discourage its dealers from selling outside of their areas of responsibility

in competition with other Mack dealers.  (See N.T. 11/18/03, at 109).

Mack's efforts to police and enforce the dealers' agreement to maintain existing profit

structures and not to compete with each other continued from 1989 through 2006.  For example,

on May 7, 2001, Jack Lusty was instructed to, and did, advise Dave Yeager that Toledo Mack

was to cease its "predatory approach to customer prospecting" and to instead focus on its own

area of primary responsibility.  (Lusty Dep., 11/14/03, at 33-34).  Thus, only a year before this

litigation was filed, Mack was still attempting to secure Toledo Mack's agreement to stay in its territory and to maintain higher profit margins.

Although Mack maintains that it has no policy prohibiting Mack dealers from selling trucks out of their areas of primary responsibility, Mack carefully monitors whether or not a dealer is selling inside or outside of its area of responsibility. Monitoring distributors' compliance with policies designed to maintain price levels or to restrict competition is additional evidence of concerted action, particularly where (as in this case) such conduct is accompanied by attempts to secure a distributor's compliance with such policies. United States v. Parke, Davis & Co., 362 U.S. 29, 44 (1959).

At trial, Mack's Vice President Flaherty admitted discouraging dealers from selling outside of their areas of responsibility even though Mack had no "official" policy restricting such out of area competition. (Flaherty Dep., 11/18/03, at 109). Mack's Regional Vice President Yelles admitted there was an unwritten understanding that Mack sometimes tells its dealers to "back off" on out of area sales efforts. (N.T., 9/18/06, at 138-41) (Yelles Testimony).

One of the more revealing episodes demonstrating Mack's hostility towards those who competed based on price occurred on December 11, 2002. Yelles learned from a Mack District Manager, Jack Lusty, that Toledo Mack was seeking sales assistance to sell to a truck customer outside its local area. Yelles stated that Toledo Mack was not "play[ing] by the rules" and that someone "should take this guy out." (Lusty Dep., 11/14/03, at 88-89). Mack claims that its "official" policy permits dealers to sell anywhere. Therefore, Yelles' statement in 2002 that there were "rules" prohibiting a dealer from competing with other dealers clearly was not a reference to a Mack policy, but to the conspiracy with the dealers that had begun in the late 1980s and continued through the time of trial.

Mack's efforts to quash competition between dealers took more subtle forms as well. Mack designed its sales assistance process in a manner calculated to monitor the out of area sales made by its dealer network. Specifically, dealers are required to alert Mack as to whether they were applying for sales assistance for a customer located inside or outside of their area of primary responsibility. If Mack were truly just equalizing all dealers on the same transactions, there would be no need to determine whether the customer was located inside a dealer's territory. (N.T. 9/14/06, at 153-56 (Yeager Test.); (see also Exs. P-1153, P-1292).

Mack's efforts to restrict out of area sales and competition were not limited to monitoring sales and discouraging competition. Mack also took action to enforce the dealers' "gentlemen's agreements" by making it virtually impossible for low-price dealers to compete for sales nationally. This enforcement activity is more highly probative evidence of concerted action. See Rossi, 156 F.3d at 476-77.

For example, Jack Lusty testified that Mack "use[d] sales assistance to protect certain Mack dealers from competition from other Mack dealers in their AORs." (Lusty Dep., 1/14/05, at 402). Lusty further testified that Mack withheld sales assistance to exert control over its dealers. (Lusty Dep., 1/14/05, at 397-98). The following evidence demonstrated a few of the many ways in which Mack manipulated its sales assistance program to restrict Toledo Mack's ability to compete nationally based on price.

- Although Mack's policy was to respond to requests for sales assistance within 24 hours, Mack consistently delayed its responses to Toledo Mack, particularly where Toledo Mack sought sales assistance outside of its territory or in competition with another dealer. (N.T. 9/14/06, at 159-60, 170-71) (Yeager Test.). Toledo Mack detailed numerous specific examples of this general pattern of delays for Toledo Mack's sales assistance requests outside of its area of primary responsibility after 1998. (See N.T. 9/14/06, at 170-189); (see also Exs. P-1277, P-1278, P-124, P-617, P-250, P-253, P-1103, P-1207, P-1193, P-1194, P-1185).

19

- Jack Lusty testified that it was "common practice" within Mack from 1999-2003 to delay responses to requests for sales assistance. (Lusty Dep., 1/14/05, at 384, 393). Lusty also agreed that the sales assistance process was manipulated by Mack employees to steer deals away from certain Mack dealers and to other Mack dealers. (Lusty Dep., 1/14/05, at 380).

- Mack used "verbals," or oral assurances of sales assistance to provide dealers selling inside their areas of responsibility with advantages over other dealers. (Lusty Dep., 1/14/05, at 385-88). Thus, while the local dealer knew what sales assistance would ultimately be granted, and based its quote on that orally approved sales assistance, the out of area dealer had no knowledge of what, if any, sales assistance would be granted. This provided the local dealer with key information on which to base its quote while denying such information to the out of area dealer until it was too late. (Id.). This manipulation of the sales assistance process "happened a lot" from 1999 through 2003. (Id. at 387).

- Mack alerted dealers if Toledo Mack was attempting to quote a customer inside the other dealer's area of primary responsibility. (N.T. 9/14/06, at 160-61) (Yeager Test.). Indeed, in a tape recorded conversation, Mack's Vice President, Flaherty, snidely remarked to Yeager, "and you expect me to give you sales assistance without alerting the dealer who's already been selling him . . . . Interesting concept." (Ex. P-1043, at 4); (see also Lusty Dep. 1/14/05, at 400) (agreeing that the sales assistance process served as an "early warning system" for dealers that other dealers were quoting customers in their area of primary responsibility).[7]

Mack also enforced the price agreement among dealers by discriminating against low-price sales dealers such as Toledo Mack. Mack allocated certain customers to certain Mack dealers using discounts and other means after 1998. (Lusty Dep. 1/14/05, at 424, 433). Mack provided special billing arrangements and other terms, such as "net-net" billing, to provide certain dealers with unfair advantages over out of territory dealers after 1998. (Lusty Dep., 1/14/05, at 407-09).[8]

---

[7]    Professor Gollop also testified that Mack's conduct would make no economic sense but for the existence of the alleged conspiracy with its dealers.

[8]    Mack's restrictions on competition were not limited to truck sales. John Buhager, a Mack consultant, indicated that Mack's parts-shipping policy, which discriminated against sales made by a dealer out of its area of primary

(Continued…)

Toledo Mack also presented substantial evidence at trial that it was penalized by Mack for its non-adherence to the agreement to restrict competition among Mack dealers and to maintain high profit margins.  This evidence also supports a finding of concerted action.  See e.g. Isaksen v. Vermont Castings, Inc., 825 F.2d 1158 (7th Cir. 1987).

In April 2001, Mack's Regional Vice President, Jeff Yelles, referring to Dave Yeager of Toledo Mack, stated to Mack employees that "this guy has to go."  (Lusty Dep., 11/13/03, at 145).  Yelles then targeted Toledo Mack for consolidation under Mack's Network 2000 strategy. (Lusty Dep., 1/14/05, at 412).  Yelles manipulated the sales assistance policy to further this goal. (Id. at 416).  Mack also systematically offered better discounts to dealers other than Toledo Mack.  The expert analysis of William Harris addressed such discrimination occurring during the statutory period of limitations.  (See Harris Test.).  All of this conduct continued after 1998.

Mack also knew its actions were wrong and Mack took measures to conceal the conspiracy.  For example, Mack's district manager, Dave Barletta, referring to this litigation, told Jeff Yelles "the feds have nice prisons.  You will be going to jail."  (Lusty Dep., 11/13/03, at 96). Mack's Executive Vice President of Marketing, Tom Kelly, instructed Mack employees "we might be breaking some law, but we need to start respecting AORs.  (Lusty Dep., 1/14/05, at 409-10).

Yelles told Lusty not to reduce to writing Mack's attempts to thwart Toledo Mack's out of area, low price sales.  (Lusty Dep., 11/13/03, at 146-47).  Instead, Lusty was directed only to

---

(Continued…)

> responsibility, was the result of complaints by other Mack dealers.  (See Ex. P-717, at 3, 5); see also (N.T. 9/14/06 at 208-09; N.T. 9/15/06 at 4; Exs. P-715, P-717) (describing Mack's glider kit policies which favored dealers selling locally to the disadvantage of competing dealers from other areas).

document any problems he had with Toledo Mack's sales performance. (Id.). Yelles also engaged in substantial efforts to persuade Jack Lusty to provide false testimony under oath in the Toledo Mack litigation. (Lusty, 1/14/05, at 465). On November 13, 2003, despite Yelles's efforts to sway his testimony, Lusty testified about Mack's unlawful conduct and its hostility towards Toledo Mack. Mack subsequently fired Jack Lusty after he provided his testimony, which was unfavorable for Mack, during this litigation (Lusty Dep. 1/14/05, at 468).

The above evidence in this case establishes that, despite its official policies, Mack continued to enforce the gentlemen's agreements that restricted competition between dealers and maintained higher profit margins. In other words, Mack continued to act in accordance with the conspiracy which dated back to 1989. This significant evidence is more than enough to create an issue of fact for the jury as to whether or not the conspiracy continued past 1998.

In discussions in chambers, Mack argued that the above conduct should be characterized as "unilateral." Of course, Mack is free to make this argument to the jury. However, where there is evidence of an agreement between competitors not to compete, and evidence that a mutual supplier is enforcing that agreement and attempting to get others to abide by it, the jury is also free to conclude that there is concerted action.

C. **It Is Now The Role Of The Jury To Determine Whether Mack Engaged In Concerted Action In Violation of Section 1**

Under the controlling case law in this Circuit, Toledo Mack has presented more than a "mere scintilla" of evidence of concerted action and it is now the role of the jury to determine whether Mack engaged in concerted action in violation of Section 1 of the Sherman Act. According to admissions by Mack employees, there were "gentlemen's agreements" between dealers not to compete out of their areas or based on price. Further, the evidence and fair inferences therefrom established that Mack enforced these agreements and "protected" the

22

dealers from competition with each other. Mack changed its policies to prohibit sales assistance for sales by a dealer outside of its territory. Mack's employees suggested that its policies came about because of the "unanimous" voice of the distributors. Mack then even directed Mr. Yeager to the Distributor Council, which included Mack dealers and Mack employees, if he wanted to change Mack's policies.

Mack employees grew hostile and retaliated and threatened to retaliate when a dealer, such as Toledo Mack, did not "play by the rules." Mack further monitored dealer sales by implementing the cross-check procedure. Mack then manipulated its sales assistance process by, among other things, (1) delaying sales assistance; (2) discriminating in the sales assistance it granted; (3) refusing and rejecting sales assistance; (4) requiring Toledo Mack to secure letters in order to even apply for sales assistance (contrary to the rest of the dealer population); (5) providing special and secret deals and billing terms to certain dealers without offering the same to smaller dealers who competed on price. All of this conduct violated Mack's official policy to "equalize" dealers on every deal and to permit the sale of Mack trucks by dealers outside their areas of responsibility.

Further, Mack advanced pretextual reasons to justify its policies and practices. For example, Mack suggested that its customers wanted the letter requirement imposed on Toledo Mack. Mack further suggested that these delays in sales assistance were caused by complex market considerations. Mack even took the remarkable position that customers did not want competition among dealers.

In Iron Ore, the Third Circuit held that a plaintiff established that a conspiracy continued where the plaintiff produced evidence that (1) the defendant continued to refuse to deal with certain parties; (2) there was evidence that the defendant used coercion to prevent independent

competition; and (3) the rates charged by the defendant remained inflated.  Iron Ore, 998 F.2d at

1172.  All of this conduct in Iron Ore could also have been characterized as "unilateral."

However, that was a determination for the jury.

In Rossi, the Third Circuit reviewed the sufficiency of circumstantial evidence of

concerted action related to an alleged conspiracy between the plaintiff's horizontal competitors,

who were other dealers, and their common supplier, to eliminate the plaintiff from the market for

price cutting.  With respect to the Section 1 claim against the manufacturer, the court reversed

summary judgment granted to the manufacturer, finding the following circumstantial evidence

supported a reasonable inference that the manufacturer was acting in concert with its dealers to

boycott the plaintiff:  (1) the manufacturer received and responded to complaints from dealers

regarding the plaintiff's price cutting practices; (2) the manufacturer monitored the sales of its

products to the plaintiff and took enforcement measures against those buying from the

manufacturer and reselling to the plaintiff; (3) the manufacturer's refusal to deal with the

plaintiff appeared to contradict its own policies; and (4) the plaintiff adduced evidence that at

least two arguments by the manufacturer to support its policy were pretextual.  Rossi, 156 F.3d at

478.

In Alvord-Polk, the Third Circuit reviewed the sufficiency of circumstantial evidence of

concerted action between a wallpaper manufacturer and a trade association consisting of

conventional wallpaper dealers (whose sales were primarily local) to force out of business

wallpaper dealers whose sales were made through 800-number phone orders (allowing them to

sell nationally) in violation of Section 1.  In reversing summary judgment, the court found the

following evidence supported an inference of concerted action between the manufacturer and the

trade association:   (1) the manufacturer "undoubtedly" heard the complaints of conventional

dealers regarding the 800-dealers; (2) the manufacturer implemented a surcharge policy against the 800-number dealers that would "signal" to the conventional dealers that the manufacturer was trying to help them; (3) the manufacturer eventually implemented a "local trading policy" prohibiting dealers from selling its products outside of their "local trading areas" – this program would adversely affect the 800-number dealers who sold nationally.  Alvord-Polk, 37 F.3d at 1003-05.

Two additional points, relevant to Toledo Mack's case, supported the court's conclusion in Alvord-Polk that there was sufficient evidence of concerted action between the manufacturer and the trade association.  First, the court rejected the manufacturer's argument that its policies were designed to eliminate free-riding because the manufacturer's internal meeting notes could allow a jury to infer that the elimination of free-riding was merely a pretextual reason for implementing the policies.  Id. at 1012.  Second, the court concluded that because of the seemingly arbitrary nature of the surcharge policy – it was not based on any market research – a jury could infer that it was the product of concerted action whether or not it made economic sense.  Id. at 1012-13.  Thus, the court held:

> because there is some evidence from which a rational jury could infer that [the manufacturer] advanced pretextual reasons for its policies, and might in turn infer that [the manufacturer] had acted in concert with [the trade association] in deciding to implement policies designed to injure the 800-number dealers, we will reverse the district court's grant of summary judgment at Count II.

Id. at 1013.

In Big Apple BMW, the Third Circuit evaluated the sufficiency of circumstantial evidence of concerted action between an automobile manufacturer and its dealers to exclude the plaintiffs, in violation of Section 1, from becoming dealers.  The manufacturer contended that its refusal to grant the plaintiffs dealerships was a unilateral decision.  The court concluded,

however, that the plaintiffs' circumstantial "evidence of concerted action spanning several years and three locations" was sufficient to allow a reasonable jury to infer that the manufacturer acted in concert with its dealers and thus reversed summary judgment to the manufacturer.  According to the court, the plaintiffs produced "consistent evidence that [the manufacturer] encouraged the [plaintiffs] to acquire BMW dealerships, that the New York and Philadelphia dealers subsequently complained to [the manufacturer] about the [plaintiffs], and that [the manufacturer] later denied the [plaintiffs] franchises giving allegedly pretextual reasons."  Big Apple BMW, 974 F.2d at 1365.

Finally, in Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564 (3d Cir. 1986), the Third Circuit evaluated a plaintiff's evidence that a manufacturer conspired with its dealers in refusing to grant the plaintiff a dealership.  The Third Circuit found the evidence of concerted action between the manufacturers and its dealers sufficient to create an issue of material fact and thus reversed the grant of summary judgment to the manufacturer.  The Court's decision rested on internal memoranda of the manufacturer documenting complaints by an association of dealers regarding the manufacturer's decision to grant the plaintiff a franchise, and the manufacturer's response to those complaints.  According to the court:

> Reviewing this evidence and drawing the inferences from the underlying facts in the light most favorable to [the plaintiff] as the party opposing the summary judgment motion, we must infer that the Better Buy Buick Association's conduct contributed to [the defendant's] decision not to award [the plaintiff] the Buick franchise.  [The defendant's] position concerning the award of a Buick franchise to [the plaintiff] changed, it seems, only after it learned of the Association's April 3, 1980 meeting, where the Pittsburgh Buick dealers indicated their disapproval of the placement of an additional Buick franchise in the Canonsburg-Houston market and their intent not to cooperate with [the defendant] if the franchise was awarded.  Until the April 3, 1980 meeting of the Association, [the plaintiff] apparently was considered to be a potential Buick franchise point… [The

plaintiff], as a Section 1 plaintiff under the Sherman Act, has produced evidence 'that tends to exclude the possibility that [the defendant] acted independently' when it declined to award [the plaintiff] the Buick franchise. Of course, at trial [the defendant] may be able to convince the fact finder that the evidence does not support plaintiff's allegations. It could perhaps show that its decision to deny [the plaintiff] the franchise was the result of its own marketing strategy, notwithstanding the conduct of the Better Buy Buick Association. At present, however, in reviewing the grant of summary judgment we must assume the facts and inferences therefrom otherwise, given the applicable standard which we must apply on appeal. Accordingly, we find it necessary to reverse the district court's order on this issue.

786 F.2d at 573-74.

As detailed above, Toledo Mack has actually presented far more evidence of concerted action than the evidence found sufficient to create an issue of fact in Rossi, Alvord-Polk, Big Apple BMW, and Arnold-Pontiac-GMC.[9] In this case, there is substantial evidence from several different sources that there were "gentlemen's agreements" restricting competition among Mack dealers in order to maintain existing profit structures. Toledo Mack also presented direct evidence and admissions regarding Mack's agreement with body builders to allocate customers. Respectfully, nothing more is required to create an issue of fact for the jury. Nevertheless, Toledo Mack has also produced compelling evidence that Mack: (1) received complaints; (2) threatened Toledo Mack; (3) attempted to harass and berate Toledo Mack into complying with the unlawful agreement; (4) monitored dealers' compliance with the agreement; (5) established mechanisms to enforce the agreement through sales assistance; (6) acted against its own

---

[9]    Decisions reviewing the sufficiency of evidence of concerted action on summary judgment are relevant to the same determination pursuant to Rule 50. In either context, the fundamental question is whether an issue of material fact exists for determination by the jury. See Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1362 (3d Cir. 1992) (the summary judgment standard has been likened to the "reasonable jury" directed verdict standard).

corporate policies; and (7) acted in a manner inconsistent with its economic interests but for the existence of a conspiracy.  In light of this evidence, Toledo Mack's Section 1 claim should be submitted to the jury.

Respectfully Submitted,

DUANE MORRIS LLP

Date:  September 28, 2006                    By:/s/Wayne A. Mack
                                                   Wayne A. Mack
                                                   J. Manly Parks
                                                   James H. Steigerwald
                                                   David A. Degnan
                                                   30 South 17th Street
                                                   Philadelphia, PA  19103-4196
                                                   215.979.1000

                                                   Attorneys for Plaintiff/Counterclaim
                                                   Defendant Toledo Mack Sales & Service,
                                                   Inc.

## <u>CERTIFICATE OF SERVICE</u>

I, James H. Steigerwald, hereby certify that a true and correct copy of the foregoing Motion for Reconsideration and Memorandum of Law in support thereof was served this 28th day of September, 2006, by hand delivery upon counsel of record as follows:

> Jeremy Heep, Esquire
> Pepper Hamilton LLP
> Two Logan Square, Suite 3000
> Eighteenth and Arch Streets
> Philadelphia, PA  19103

/s/ James H. Steigerwald_____
James H. Steigerwald

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TOLEDO MACK SALES &** | : | |
| **SERVICE, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No. 2:02-CV-04373-RLB** |
| | : | |
| **v.** | : | |
| | : | |
| **MACK TRUCKS, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

| | | |
|---|---|---|
| **MACK TRUCKS, INC.,** | : | |
| | : | |
| **Counterclaim** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TOLEDO MACK SALES &** | : | |
| **SERVICE, INC. and** | : | |
| | : | |
| **Counterclaim** | : | |
| **Defendant.** | : | |

**ORDER**

AND NOW, this _____ day of _____, 2006, upon

consideration of Motion for Reconsideration of Plaintiff Toledo Mack Sales & Service, Inc., and

any response thereto, it is hereby ORDERED that the Motion is GRANTED.  It is further

ORDERED that the Motion for Judgment as a Matter of Law of Defendant, Mack Trucks, Inc., is

hereby DENIED.

BY THE COURT:

_____
Buckwalter, S.J.