Clips used with Jeffrey Yelles

September 18, 2006
JURY TRIAL - DAY FOUR

PG. 134 (Yelles 12/04 @ PG. 18)

```
03      Q.  Are there any dealers in the central
04  region who sell outside their AOR on more than a
05  limited basis?
06      A.  I don't think so.
```

PG.135  (Flaherty 11/03 @ PG. 119)

```
        15                      when we broke we were talking
        16  about Mack dealers selling outside their area of
        17  responsibility.  And you testified, sir, I believe,
        18  that that was something that you discouraged; is
        19  that correct?
        20      A.  Discourage or did not encourage.
        21      Q.  Okay.
        22      A.  Correct.
        23      Q.  And you gave me some reasons why you did
        24  not encourage that.  Have you ever attempted to
00120:01  suggest, sir, to a Mack dealer that he should not
        02  sell outside his area of responsibility?
        03      A.  Well, I am sure over the last few years
        04  that I have discouraged a number of dealers from
        05  selling outside of their territory and taking care
        06  of their own.
        07      Q.  Now, there is nothing in the Mack
        08  distributor agreement that prohibits a dealer from
        09  selling outside his territory; is there?
        10      A.  No, there is nothing that prohibits.
        11      Q.  And Mack does not have any written
        12  policies for its dealer that prohibit them from
        13  selling outside their territory, does it?
        14      A.  No.
        15      Q.  And do you, sir, instruct your regional
        16  vice presidents that they should discourage their
        17  dealers from selling outside their territories?
        18      A.  I would say our regional vice presidents
        19  have been instructed to or guided that we should not
        20  encourage outside the AOR.
        21      Q.  And they have been instructed and guided
        22  by you in that respect?
        23      A.  I think -- not only I.  I think it's been
        24  a consistent message over a number of years.
00121:01      Q.  Now, there is nothing in the distributor's
        02  agreement that gives a dealer an exclusive
        03  territory, is there?
        04      A.  I don't believe there is.  I don't think
        05  the wording refers to exclusive, no.
        06      Q.  And there is nothing in the distributor
        07  agreement that gives a dealer the right to prevent
        08  another dealer from selling in his area of
        09  responsibility; is there?
        10      A.  I pause on that to think that if a -- if a
        11  dealer -- if a dealer has a history of selling a
        12  large account the regional vice president would
        13  probably make some inquiry as to what -- conceivably
        14  make some inquiry as to what has brought this about.
        15      Q.  Okay.  My question to you, though, sir was
```

Page 1

```
         16  about the distributor agreement and whether there
         17  was anything in the distributor agreement, to your
         18  knowledge, that gave a dealer the right to keep
         19  other dealers from selling within his territory?
         20       A.   That is correct.  You are correct.
         21       Q.   There is nothing in the agreement?
         22       A.   There is nothing in the agreement.
         23       Q.   And, in fact, the agreement talks about
         24  areas of responsibility, correct?
00122:01       A.   Yes.  I think it's already in there on
     02  AORs, yes.
     03       Q.   And if each dealer stayed within his or
     04  her AOR, as you encourage them to do, there would
     05  never be a situation where one Mack dealer was
     06  competing against another Mack dealer for a
     07  particular sale, correct?
     08       A.   As I stated before, we do not encourage --
     09  we do not encourage that activity.  But at the end
     10  of the day if the dealer wants sales assistance, we
     11  will provide the sales assistance.
     12       Q.   My question to you was, sir, if each
     13  dealer stayed within his area of responsibility and
     14  did not sell outside his area of responsibility,
     15  there would never be a situation where one Mack
     16  dealer was competing against another Mack dealer?
     17       A.   As you lay it out that way, that would be
     18  correct.
     19       Q.   Because the areas of responsibility don't
     20  overlap, do they?
     21       A.   No, they do not overlap.
     22       Q.   And do you believe, sir, that if each
     23  dealer stayed within his or her area of
     24  responsibility, as you've encouraged them to do, the
00123:01  dealers would be more profitable?
     02       A.   Would they be more profitable?
     03  Conceptually we can make a case that they could be
     04  more profitable.
     05       Q.   And how would you make that conceptual
     06  case?
     07       A.   Because if the -- if the dealer in that
     08  AOR was taking care of his market place and
     09  encouraging both sales, truck sales, and parts,
     10  service, which is critical to the Mack dealers that
     11  they run on both those -- all three of those areas,
     12  we would have a -- we would have a customer base
     13  that would prefer to do business with Mack -- with
     14  Mack dealers knowing they are getting the support
     15  and the -- so much of the profitability for the
     16  dealer is coming from the parts and service, so he
     17  is taking care of his area of responsibility.  There
     18  is -- we would make the case that it would be better
     19  for the dealer.
     20       Q.   Now, there are situations, are there not,
     21  Mr. Flaherty, where Mack dealers end up competing
     22  against each other for the same business?
     23       A.   Yes.
     24       Q.   And in those situations one of the ways
00124:01  that those dealers competed against each other
     02  frequently is on price, is it not?
     03       A.   Yes.
     04       Q.   And if each dealer stayed within his area
     05  of responsibility we wouldn't have that competition
     06  on price, would we?
```

Page 2

```
07      A.   Hypothetically, yes.
08      Q.   And do you view that as a benefit from
09 staying within your area of responsibility?
10      A.   I suppose -- I suppose in a perfect world
11 that could be a case.  That's not our business.
12      Q.   That's not your business.  Because even
13 though you discourage it your dealers are not
14 prohibited from --
15      A.   Correct.
16      Q.   -- competing against other Mack dealers,
17 correct?
18      A.   That is correct.
```

PG. 146 (Yelles 11/03 @ PG. 92)

```
12      Q.   You can't receive net net billing
13 unless you are selling to a customer in your own
14 AOR?
15      A.   Yes.
```

PG. 164 (Yelles 11/03 @ PG. 370)

```
01      Q.   Did you, in fact, give Mr. Yeager,
02 Toledo Mack, parody or did you equalize Toledo
03 Mack with Hiel or McClain or McNeilus or
04 whichever was the competitor on the deal?
07      Q.   Whichever was -- Mr. Yeager
08 indicated was the competitor on the deal?
09      A.   No, we would either equalize with
10 the dealer that had an existing discount or we
11 would establish a discount.
12      Q.   Whatever discount you established,
13 you would not refer to any discount offered by
14 Mack to any of those three entities when Mack
15 sells trucks to them; correct?
21      Q.   You would not make reference to
22 that, correct, in establishing the discount?
23      A.   No.
```

PG. 165 (Yelles 11/03 @ PG. 148)

```
07      Q.   Did you ask anybody to approach
08 Toledo Mack and ask them to adjust their
09 advertising?
10      A.   No, I think it's pretty common
11 knowledge, no, I didn't -- but I didn't
12 specifically go to somebody and say -- and voice
13 a complaint, no.
```

PG. 178 (Yelles 11/03 @ PG. 270)

```
14      Q.   Did you have any understanding as to
15 whether Chicago Mack Sales and Service had been
16 assigned any fleet accounts that would be handled
17 directly by that distributorship?
18      A.   The two fleet accounts listed,
19 Transport Service and Bulkmatic.
```

PG. 182 (Yelles 11/03 @ PG. 288)

```
17      Q.   Were those volume discounts made --
18 were any other dealers, besides Central Indiana
19 and Chicago, made aware of the availability of
```

Page 3

```
     20   volume discounts like those offered to Central
     21   Indiana and Chicago?
     22         A.   I can't be sure, but I don't think
     23   so.  We are talking about approximately 900
     24   trucks here.
```

PG. 191 (Yelles 11/03 @ PG. 309)

```
     13         Q.   As part of any program made
     14   available by Mack to all Mack dealers, were any
     15   other Mack dealers offered established pricing
     16   matrix discount levels like those -- equal to
     17   those in this letter for the period of time that
     18   these discount levels were being offered by Mack
     19   in this letter?
     20         A.   Not that I'm aware of.  I don't
     21   know.
```

PG. 195 (Yelles 11/03 @ PG. 88)

```
     22         Q.   So is it your belief that a dealer
     23   trying to bid on a deal does not need to be
     24   equalized with respect to the issue of free floor
00089:01   plan with the other dealer bidding on a deal?
     02         A.   I don't believe so, no.
```

PG. 202 (Yelles 11/03 @ PG. 83)

```
     12         Q.   On those deals for particular end
     13   users where the vocational chassis surcharge was
     14   waived in part, how many deals are you aware of
     15   where that happened?
     16   A.   I can't -- I would be guessing to
     17   give you a number.  I can't give you a number.
     18         Q.   Was it more than one?
     19         A.   There again, I would be guessing.
     20         Q.   Do you remember the dealers
     21   involved -- dealer or dealers involved in any
     22   deal or deals where that happened?
     23         A.   I believe the Milwuakee and the Nuss
     24   group, two of their customers.
00084:01         Q.   Which two customers?
     02         A.   Putzmeister and Schwing.
     03         Q.   You said that those -- strike that.
     04              So they were two separate
     05   deals, correct, the Putzmeister deal and the
     06   Schwing deal, at least, correct?
     07         A.   Yes.
     08         Q.   And there may have been multiple
     09   sales to each end user; correct?
     10         A.   Yes.
     11         Q.   Where there was a partial waiver of
     12   this vocational chassis surcharge?
     13         A.   Yes.
```

September 19, 2006
JURY TRIAL - DAY FIVE

PG. 30 (Gerhard 01/05 @ PG. 103)

```
     16         Q.   You mentioned another thing you consider
     17   when evaluating a sales assistance request in the
     18   specs.  What information about specs do you have
```

Page 4

```
         19  available to you, when you are evaluating a sales
         20  assistance request?
         21       A.   Okay.  I have the ability to see the
         22  entire spec of the vehicle, if I elect to do so,
         23  everything that is on that truck.  Generally
         24  speaking, in our system, there is the major
00104:01  components.  There is a screen in the system that
     02  lets you view the major components between what is
     03  called a control number, or you can go back and
     04  refer to a general sales order number and find that
     05  spec, as well, and compare those major components
     06  fairly quickly.
     07            If you want to review the entire
     08  specification, which is what we'll do when we do a
     09  margin analysis, that takes a lot of time.
     10       Q.   Other than reviewing the entire spec for a
     11  margin analysis, do you generally just look at the
     12  major component specs, as opposed to looking at the
     13  full spec?
     14       A.   Generally speaking, just the major
     15  component specifications.
     16       Q.   Okay.  What information do you have
     17  available to you when you review a sales assistance
     18  request and you're evaluating it with respect to the
     19  competitive environment?
     20       A.   In the comments that the dealer or the
     21  regional field teams put in, there is generally
     22  comments about the competitive environment and why
     23  they are requesting the discount that they're
     24  requesting, in the comments.
00105:01            In addition, in what is known as
     02  the F4 screen, it has information as to who the
     03  competitors are, the model of the equipment and, in
     04  certain instances, they even put a price in there of
     05  what the competitor's price is.  I have no way of
     06  knowing if it's factual or not.  But that
     07  information is in that screen.
     08       Q.   How many -- can you evaluate for me,
     09  generally speaking, how many instances, during the
     10  time you have been director of commercial
     11  administration at Mack, you have reviewed a sales
     12  assistance request that had an actual specific price
     13  for a competitive offer on a deal?
     14            Let me put it this way.  Is that
     15  rare?  Is that commonplace?  Does that happen every
     16  single time?
     17       A.   It does not happen every single time.  I
     18  would not say it's rare, but I would not say it's
     19  commonplace.
     20       Q.   Is there a word you would use to quantify
     21  it or categorize it?  Occasional?
     22       A.   It's less than commonplace.  It's
     23  occasionally there, yes. =
```