**39. PAGE 89:21 TO 90:04 (RUNNING 00:00:19.400)**

```
      21        Q.    Did you view these remarks as a
      22 threat against Mr. Yeager?
      23        A.    Yes, I did.
      24        Q.    When Mr. Yelles said to you, some
00090:01 motherfucker should take this guy out, did you
      02 believe that Mr. Yelles was threatening
      03 Mr. Yeager with physical harm?
      04        A.    I believe that could be a threat.
```

**40. PAGE 90:05 TO 91:17 (RUNNING 00:01:30.900)**

```
      05        Q.    Mr. Lusty, did you do anything --
      06 did you talk to anybody about this?
      07        A.    I talked to my older brother about
      08 it.
      09 Q.    Why did you talk to your older
      10 brother about it?
      11        A.    Because we are very close and he is
      12 a couple years older and he has experienced some
      13 things in his life and we share experiences.  And
      14 I think he has a pretty sound mind.  He is a
      15 professional person and I think he can look at
      16 this thing objectively.  And I ran that by him as
      17 to what I should do.
      18               I was very concerned that if I
      19 know something like that and I didn't do anything
      20 about it, where's my involvement in this.  And I
      21 took that seriously.
      22        Q.    I don't want to pry into your
      23 personal conversation with your brother.  I am
      24 not trying to intrude there.  I am just trying
00091:01 to --
      02        A.    I understand that.
      03        Q.    I am just trying to find out what,
      04 if anything, you did after Mr. Yelles said this
      05 to you?
      06        A.    I asked him if he thought I should
      07 go to the authorities.  And I told him that I was
      08 going to meet with our legal team, which was
      09 Jeremy and the guys in Chicago.  And that was not
      10 long after that, I believe.  And he said you
      11 probably ought to wait and let them know what is
      12 going and just hope to hell nothing happens to
      13 Mr. Yeager in the meantime.
      14 Q.    Is that -- I don't want to ask you
      15 about your conversations with Mr. Heep, but is
      16 that what you did?
      17        A.    Yes.
```

**41. PAGE 91:18 TO 92:09 (RUNNING 00:00:46.500)**

```
      18        Q.    Now what was it that I see a
      19 reference to John McCafferty at the top and --
      20 did Mr. Yelles indicate to you what was it that
      21 had him so upset with Mr. Yeager during this
      22 call?
      23        A.    Well, there was another deal here.
      24 There was a Strauss roll-off deal that I had done
00092:01 a cross check on and I guess -- I sent the cross
      02 check to John McCafferty and evidently, according
      03 to Jeff, he must have been pretty upset about it
      04 or excited about that cross check.
```

```
05        Q.    Was this a customer that Mr. Yeager
06  was trying to sell?
07        A.    Yes.
08        Q.    Was it outside his territory?
09        A.    Yes.
```

**42. PAGE 92:21 TO 93:20 (RUNNING 00:01:06.700)**

```
21        Q.    Mr. Lusty, let's switch to a
22  different subject.
23              Have you ever spoken with
24  Mr. Yelles about the costs that Mr. Yeager would
00093:01  incur in defending the termination case against
02  him?
03        MR. HEEP:  I am sorry.  Has he ever talked
04  with Mr. Yelles about the cost that Mack would
05  incur?
06        MR. MACK:  No, Mr. Yeager would incur.
07        MR. HEEP:  Okay.
08  BY THE WITNESS:
09        A.    Not in dollars and cents.
10  BY MR. MACK:
11        Q.    But just that general subject?
12        A.    There was a statement along the way
13  somewhere that was made.  I don't know if it was
14  removed.
15        Q.    What do you recall about that
16  statement?
17        A.    Something about that we are going to
18  file a suit and stir the pot and it'll cost him
19  some money, something like that.  I don't recall
20  the total statement.
```

**43. PAGE 94:01 TO 95:06 (RUNNING 00:01:29.500)**

```
00094:01       Q.    Are these some more notes you took
02  regarding a conversation pertaining to Toledo
03  Mack?
04        A.    Yes.
05        Q.    Who is B.S.?
06        A.    Barry Smith.
07        Q.    Who does Barry Smith work for?
08  A.    Barry Smith is a district manager in
09  the eastern region of Mack Trucks.
10        Q.    There is a reference there to Mike
11  McNally.
12              Is Mike McNally a regional
13  vice president for the eastern region?
14        A.    Yeah, that's correct.
15        Q.    I see three times there, a reference
16  to writing.  You see that?
17        A.    Yes.
18        Q.    What did Mr. Smith say to you about
19  writing?
20        A.    I asked Barry to send me an e-mail
21  with response -- I asked him to send me a
22  response to a cross check for the discount to
23  Pitt, Ohio Express out of Pittsburgh.
24  Q.    Is that a deal Mr. Yeager was
00095:01  attempting to get?
02        A.    Yes.
03        Q.    What did Mr. Smith tell you?
04        A.    He told me he didn't want to send me
```

05    an e-mail.  He was told Mike McNally not to put
06    anything in writing.

**44. PAGE 95:07 TO 95:13  (RUNNING 00:00:15.300)**

07          Q.    He verbally told you the discount,
08    but he wouldn't put it in writing; is that right?
09          A.    Eventually we got it on a sales
10    assistance approval that came back, but yeah,
11    that in the process.
12          Q.    He said Mike McNally told him that?
13          A.    Yes.

**45. PAGE 95:14 TO 96:24  (RUNNING 00:02:38.300)**

14          Q.    If you turn forward to Page -- to
15    August 2002, Page M0164545?
16    A.    164  -- what was the last one?
17          Q.    545.
18                    It says August 2002 in the top
19    right.
20          A.    Okay.
21          Q.    Top right-hand column.
22                    Were you in a meeting with
23    Mr. Barletta and Mr. Yelles when the subject of
24    this litigation came up?
00096:01          A.    Yes.
02          Q.    Was that meeting in August 2002?
03    A.    Yes.
04          Q.    Do you remember where that meeting
05    was?
06          A.    Yes.  That was at the McGraw
07    Wildlife Foundation.  I think it's in Dundee,
08    Illinois.
09          Q.    Who brought up the subject of the
10    lawsuit?
11          A.    Dave Barletta.
12          Q.    What did Mr. Barletta tell
13    Mr. Yelles about the lawsuit?
14          A.    He told Jeff that the feds have nice
15    prisons.  You will be going to jail.
16          Q.    Have you discussed with Mr. Barletta
17    the issue of whether or not the Mack sales
18    assistance system is corrupt?
19    A.    I had a phone call from Dave
20    Barletta regarding a specific deal when he made
21    that statement something similar to that.
22          Q.    You used the word, "corrupt" or
23    something like?
24          A.    Yes.

**46. PAGE 99:08 TO 101:10  (RUNNING 00:02:13.300)**

08          Q.    Further down at that same meeting,
09    did you have a conversation with Mr. Yelles where
10    you told him that you had spoken to three
11    attorneys?  The same box, down at the bottom?
12          A.    Yes.
13          Q.    That was at McGraw?
14          A.    That was on a phone conversation.
15          Q.    What three attorneys have you spoken
16    with?
17          A.    To --  by name?
18          Q.    Yes?

CONFIDENTIAL                                                        page 23

```
       19        A.    Thayer Dolan, who is our corporate
       20 attorney, to Jeremy and to Barak Bassman.
       21        Q.    I don't want to ask you what was
       22 said between you and the lawyers, but where was
       23 the meeting?
       24        A.    It was a telephone conversation.
00100:01 Q.    In August of 2002?
       02        A.    Yes.
       03        Q.    The conversation related to the
       04 Toledo lawsuit?
       05        A.    Yes.
       06        Q.    You were reporting that back to
       07 Mr. Yelles.
       08              What did Mr. Yelles say to you
       09 about that?
       10        MR. HEEP:  Let me just interject.
       11              I am going to let him answer
       12 the question, and I just want to make clear that
       13 we are not waiving privilege for you to go
       14 further into this.  Let's see what he says.
       15 BY MR. MACK:
       16        Q.    Do you need the question repeated?
       17        A.    Yes.  Would you ask that again?
       18        Q.    Yes, sure.  You told Mr. Yelles that
       19 you had spoken to three distinguished
       20 attorneys -- are my words -- attorneys.
       21              What did Mr. Yelles say to
       22 you?
       23        A.    He said -- Jeff said he did, too.
       24 They just want to make sure our stories are
00101:01 straight or the same.  I am sorry -- the same.
       02        Q.    That's what you wrote down here in
       03 your diary?
       04 A.    Yes.
       05        Q.    Why did you decide to write that
       06 down?
       07        A.    That was a conscious decision.  That
       08 was -- I just felt that there was a message
       09 within a message there, that's all.  I was not
       10 comfortable with that statement.
```

**47. PAGE 101:19 TO 103:06  (RUNNING 00:01:42.900)**

```
       19        Q.    Back to Exhibit 1, I want to talk to
       20 you about the subject of special deals for
       21 certain dealers, okay?
       22 Have you seen, in your
       23 experience as a district manager, Mr. Lusty,
       24 situations where there were special deals for
00102:01 certain dealers that weren't available to other
       02 dealers?
       03        MR. HEEP:  Objection; vague.
       04 BY THE WITNESS:
       05        A.    Through the years I have.
       06 BY MR. MACK:
       07        Q.    Do you recall, sir, having a
       08 discussion with someone by the name of Cal Mock
       09 about that subject?
       10        A.    Yes.
       11        Q.    Who is Cal Mock?
       12        A.    Cal Mock is in sales billing.
       13        Q.    For Mack?
```

14      A.    Yes.
15          Q.    What is his position in sales
16  billing?
17          A.    I don't know if they call them
18  managers or whatever.
19          Q.    What office is he in?
20          A.    World headquarters is in Allentown.
21          Q.    What interaction would you have, if
22  any, with Mr. Mock?
23  A.    If I had to verify -- if a dealer
24  had a problem with an invoice they may have
00103:01  received or they didn't get the appropriate
02  discount or it was billed at the wrong price code
03  or something, we would research that it
04  ultimately would end up back in sales billing.
05  They would reserve that for us.  They do the
06  invoicing there.

**48.  PAGE 103:17 TO 104:12  (RUNNING 00:01:00.300)**

17          Q.    Are these some notes, sir, of a
18  conversation you had with Mr. Mock in March 20,
19  of 2001?
20          A.    Yes.
21          Q.    What did Mr. Mock tell you about the
22  Mack sales assistance system?
23          A.    Well, the first part, he was
24  answering a question that I had when we did a
00104:01  maintenance on a deal.
02          Q.    What is a maintenance?
03          A.    Well, in other words, if a deal is
04  done and there was a discrepancy, whether it's a
05  price code or a discount or whatever, once that
06  truck's retail delivered notice -- that's what an
07  RDN is -- there is no way of getting that
08  information to Allentown to sales billing so that
09  the dealer gets the proper credit.  And evidently
10  I don't do that much.  I really forgot what the
11  procedure was, and that's what precipitated the
12  phone call to him.

**49.  PAGE 104:13 TO 104:24  (RUNNING 00:00:34.100)**

13  Q.    What did he tell you about sales
14  assistance?
15          A.    Well, he sounded a little irritated
16  because there was -- I don't know what the deal
17  was or the money was involved here.
18                  But he went on to say that
19  Mack Trucks gives away millions of dollars in
20  sales assistance and French auditors were in and
21  they were astonished and said that they would
22  look into it and look at it.  And they said that
23  the same dealer seemed to abuse the system.  And
24  others all get more dollars.

**50.  PAGE 105:01 TO 105:21  (RUNNING 00:00:37.500)**

00105:01          Q.    The French auditors were Mack's
02  auditors?
03          A.    Renault owned us, maybe at that
04  time.  I can't think -- maybe at that time they
05  owned us.  That's who would come in and audit the
06  company.

CONFIDENTIAL

```
07          Q.    Mr. Mock told you that some dealers
08   abused the system and he identified Chicago Mack;
09   correct?
10          A.    That's correct.
11   Q.    Did you identify -- what's the other
12   dealer you have listed there?
13          A.    Central Indy.
14          Q.    Is that the Shelby Howard
15   dealership?
16          A.    Yes.
17          Q.    He specifically identified those as
18   being dealers that get more money?
19          A.    That was the conversation.
20          Q.    Is that what he said?
21          A.    Yes.
```

**51. PAGE 106:02 TO 108:03  (RUNNING 00:01:56.100)**

```
02                 Did you have a conversation on
03   June the 7th of 2001 with Mr. Yelles,
04   Mr. McCafferty and Mr. Barletta?  Right down
05   here, sir.
06   A.    Yes.
07          Q.    Mr. Yelles was speaking here I
08   assume?  That was a statement that was made at
09   the meeting.
10                 During that meeting,
11   Mr. Yelles referenced special side deals?
12          A.    Yes.
13          Q.    He used those words?
14          A.    Yes.
15          Q.    He said there was a master list of
16   free floor plan units that couldn't be
17   released -- that Mr. Polzer wouldn't release
18   because of all special side deals?
19          MR. HEEP:  Objection to form.
20   BY MR. MACK:
21          Q.    Is that right?
22          A.    Yes.
23          Q.    Do you know what he was referring to
24   there by the master list of free floor plan
00107:01  units?
02          A.    Yes.
03          Q.    What was he referring to?
04          A.    I had raised a question.
05                 We had free floor plan units,
06   and naturally that has an impact on the company's
07   bottom line.
08                 I had asked the question, why
09   don't -- if, a concern, because we were all
10   getting beat up pretty good about getting these
11   free floor plan units, off dealers free floor
12   plan and getting them retailed and cut the cost
13   to the company.
14                 I had made a suggestion at
15   that meeting that if that's the case, then why
16   don't you give us a list of the free floor plan
17   units rather than have us search for all these
18   things, and let's make it easy.  We can get to
19   the bottom of this and cut the cost and move on.
20   And that was the response to that question.
21   Q.    That he couldn't give you that list
```

CONFIDENTIAL

```
        22  because of all the special side deals?
        23       A.   Yes.
        24       Q.   You took that to mean special side
00108:01  deals with dealers that had the free floor plan
      02  units?
      03       A.   Yes.
```

**52. PAGE 108:04 TO 108:09 (RUNNING 00:00:11.600)**

```
      04       Q.   How would releasing the free
      05  floor -- the list of the free floor plan units
      06  or -- strike that.
      07                What was the relationship
      08  between releasing the list of the free floor plan
      09  units and these side deals?
```

**53. PAGE 108:12 TO 108:13 (RUNNING 00:00:06.200)**

```
      12       A.   It may identify who had trucks on
      13  free floor plan or special side deals.
```

**54. PAGE 108:20 TO 108:23 (RUNNING 00:00:09.300)**

```
      20                Did you view this as an
      21  attempt to prevent other dealers from finding out
      22  what side deals were in place for dealers that
      23  had free floor plan units?
```

**55. PAGE 109:02 TO 109:02 (RUNNING 00:00:04.000)**

```
      02       A.   I would have to think, yes.
```

**56. PAGE 109:03 TO 109:11 (RUNNING 00:00:13.200)**

```
      03  BY MR. MACK:
      04       Q.   You thought it was a good idea to
      05  get that list out there?
      06       MR. HEEP:  Objection; asked and answered.
      07       MR. MACK:  You can answer.
      08  BY THE WITNESS:
      09       A.   I thought it would be an effective
      10  tool to reduce the floor plan expense to the
      11  company.
```

**57. PAGE 109:13 TO 111:14 (RUNNING 00:02:28.100)**

```
      13       Q.   This subject -- turn the page and
      14  let me ask you.  Page M0164582, June the 27th,
      15  the note at the bottom.
      16                Is this a conversation between
      17  you and -- does this refer to a conversation
      18  between you and Mr. Yelles?
      19       A.   Yes.
      20       Q.   Does this also relate to Toledo
      21  Mack?
      22       A.   Yes.
      23  Q.   What was this conversation about?
      24       A.   That was a group of trucks that we
00110:01  had that was a cancellation because of some
      02  financial arrangements that didn't pan out
      03  through a finance company.  There 30 or 35 units
      04  total.  So we made space at the factory to build
      05  these trucks, and then the deal fell through.
      06                It was sort of my personal
      07  responsibility to move these units to some other
      08  dealers.
      09                The original deal was, I
```

```
10  believe, five plus 13, for a total of 18.  And I
11  was going to -- I was able to offer those trucks
12  to my dealers at that discount with 90 days free
13  floor plan if they sold those units in their own
14  AOR.  So I canvassed my dealers.  I sold a few of
15  them.  I know that R.W. Sidley bought a couple of
16  them.  I can't remember the other dealer.
17              I phoned Toledo Mack, and Dave
18  thought that was a good deal and agreed with the
19  floor plan terms and he committed to me the five
20  units.  So I called Jeff and told him that we
21  were down to the last five or eight units,
22  whatever it was.  And that must have been the
23  last five.  But Jeff told me at that time he just
24  sold them, they were all sold.  The trucks
00111:01  weren't available to me.
02  Q.    So Mr. Yeager wasn't able to get
03  those free floor plan units?
04       A.    That's correct.
05       Q.    Now the deal was that if a dealer
06  wanted to get the free floor plan units, he had
07  to sell the trucks in his own AOR?
08       A.    That's correct.
09       Q.    He couldn't sell them -- if a dealer
10  wanted to get those units and sell them outside
11  his area of responsibility, he would not receive
12  a free floor plan?
13       A.    That was my understanding.  That's
14  what Jeff Yelles told me.
```

**58. PAGE 111:22 TO 113:14  (RUNNING 00:01:42.200)**

```
22       Q.    Yes, sir.  Is this a conversation
23  you had with Mr. Yelles?
24       A.    Yes.
00112:01  Q.    Regarding Mr. Yeager?
02       A.    Yes.
03       Q.    Could you tell us what this was
04  about?
05       A.    Yes.  At that time Jeff was telling
06  me -- I was having evidently, if I recall on my
07  cross checks.  I was not getting a response on
08  cross checks.  So Jeff told me, moving forward,
09  evidently, we had resolved an issue, and he told
10  me that moving forward, I need to call the DMs,
11  that this is not acceptable, Yeager has a
12  legitimate complaint, if we are not getting back
13  to him in time and I should have followed up with
14  my call even with the e-mails that I sent.
15       Q.    Does Mack have a general policy that
16  cross checks are supposed to be responded to
17  within 24 hours?
18  MR. HEEP:  Objection to form.
19  BY THE WITNESS:
20       A.    That was a regional policy more than
21  corporate policy.
22  BY MR. MACK:
23       Q.    Fair enough.
24              Was that a policy for the
00113:01  central region?
02       A.    Yes.
03       Q.    You were submitting cross checks for
```

```
04    Mr. Yeager that weren't being responded to in,
05    what you viewed, as a timely fashion; is that
06    right?
07          A.    Yes.  That's correct.
08          Q.    This was in -- strike that.
09                You raised this issue with
10    Mr. Yelles; right?
11          A.    Correct.
12          Q.    Now, this happened on a number of
13    occasions?
14          A.    Yes.
```

**59. PAGE 113:15 TO 113:17  (RUNNING 00:00:08.800)**

```
15          Q.    What is the effect on a dealer, the
16    general effect on a dealer if there is a delay
      in
17    processing the cross check?
```

**60. PAGE 113:20 TO 114:15  (RUNNING 00:00:51.500)**

```
20          Q.    Is there an effect on a dealer if
21    there is a delay in processing a cross check?
22          A.    Yes.
23          Q.    What is it?
24          A.    I can simplify that and I have
00114:01    always used this term in explaining that to
02    anybody in sales, new salesmen following up with
03    customer.  The best time to sell something is
04    when somebody wants to buy.  So an immediate
05    response is always the best response because you
06    are back to them when they are in the buying
07    mode.  A delay in establishing discounts or
08    transmitting discounts or forwarding discounts
09    can lead possibly to a lost sale.
10          Q.    Until the cross check is complete,
11    you can't establish the discount at Mack; right?
12          A.    That's correct.
13          Q.    If Mr. Yeager doesn't know the
14    discount, it is difficult for him to quote a
15    price to a customer; right?
```

**61. PAGE 114:18 TO 114:18  (RUNNING 00:00:01.000)**

```
18          Q.    Is it difficult?
```

**62. PAGE 114:22 TO 114:22  (RUNNING 00:00:01.500)**

```
22          A.    Yes.
```

**63. PAGE 114:23 TO 115:10  (RUNNING 00:00:30.200)**

```
23    BY MR. MACK:
24          Q.    You were raising this issue with
00115:01    Mr. Yelles, and Mr. Yelles told you that Yeager
02    had a legitimate complaint; is that right?
03          A.    Yes.
04          MR. HEEP:  Objection to the suggestion
05    that this is anything more than a
06    characterization of one deal, one time.
07    BY MR. MACK:
08          Q.    Were you raising with Mr. Yelles the
09    fact that this happened on a number of occasions?
10          A.    Yes.
```

**64. PAGE 115:11 TO 115:17  (RUNNING 00:00:18.000)**

```
11        Q.    What did Mr. Yelles say?
12        A.    Depending on the situation the
13 response may have been different.
14        Q.    What did he say to you in this call?
15        A.    That I need to follow up with a
16 phone call to these DMs, even with the e-mails
17 that I have sent.
```

**65. PAGE 123:02 TO 123:13  (RUNNING 00:00:33.800)**

```
02 Q.    Do you have any recollection, sir,
03 of specifically discussing the free floor plan or
04 Two-for-One deal with Mr. Yeager?
05        A.    At one time, I discussed that with
06 all of my dealers with a phone call to them.
07 This was an unwritten program.  So we had to
08 verbally communicate that and it was via phone.
09        Q.    Do you have specific recollection of
10 calling either Mr. Yeager or someone at Toledo
11 Mack to say that, to them?
12        A.    I think I did, but I can't give you
13 a date that I did, but I think I did.
```

**66. PAGE 125:23 TO 128:19  (RUNNING 00:02:46.000)**

```
23        Q.    Is this note another conversation
24 between you and Mr. Yelles?
00126:01 A.    Yes.
02        Q.    This relates, does it not, to the
03 Pittsburgh, Ohio deal?
04        A.    Pit, Ohio express, yes.
05        Q.    Mr. Yelles was telling you that --
06 strike that.
07              You told Mr. Yelles that
08 Mr. Yeager was concerned he wasn't equalized on
09 that deal?
10        A.    Yes.
11        Q.    Then down at the bottom, you wrote,
12 Pit, Ohio, Yeager knows, and correct me if I am
13 reading this wrong, difference in list price
14 equals difference in price level?
15        A.    That's correct.
16        Q.    What does that refer to?
17        A.    Well, if there is an older price
18 level, the list price and it competes to the net
19 price, is different then -- and I will make this
20 up.  If they were using an '03 D price level and
21 '04 A or B come out, there may have been a price
22 increase.  So a dealer may be quoting an existing
23 customer that purchased last year then they got
24 an extension on a price code, which allowed them
00127:01 to continue the old price to that customer along
02 with the discount.
03 Q.    Even if the dealers were given the
04 same percent in that situation, even if the
05 dealers were given the same percentage discount.
06 Let's say, they were both given 15 percent off,
07 there would be the net difference in price;
08 right?
09        A.    There could be.
10        Q.    The dealer quoting off the old,
11 lower price list would be in a better position
```

```
12  even though, theoretically they got the same
13  discount, is that right?
14        A.    That could be.
15        Q.    Is that the concern Mr. Yeager was
16  raising here?
17        A.    I think that was part of it.
18        Q.    What else is part of it?
19        A.    Yes.
20        MR. HEEP:  Objection to foundation.  Go
21  ahead.
22  BY THE WITNESS:
23        A.    It was questionable when this deal
24  had started and Toledo Mack had come in for sales
00128:01  assistance whether they were equalized from the
02  get go on this deal.
03  BY MR. MACK:
04        Q.    Do you have reservations about the
05  way this Toledo Mack sales assistance request on
06  this deal was handled?
07        MR. HEEP:  Objection to form and
08  foundation.
09  BY THE WITNESS:
10        A.    Yes.
11  BY MR. MACK:
12        Q.    What are those reservations, sir?
13        A.    I was also concerned that he may not
14  have been getting the discounts at the time we
15  needed the discount, meaning Toledo Mack, and the
16  fact when I talked to Barry Smith, I was not able
17  to get anything in writing from him.  That was a
18  concern of mine, only because I have to answer to
19  my dealer.
```

**67. PAGE 129:02 TO 130:09  (RUNNING 00:01:23.200)**

```
02                    Is this a fax that Mr. Yeager
03  sent to you this October of 2002?
04  A.    Yes.
05        Q.    Mr. Yeager states that response to
06  request for sales assistance have been slow in
07  coming and he cites a Kann Manufacturing deal and
08  Beelman deal?
09        A.    Yes.
10        Q.    Were Mr. Yeager's requests for sales
11  assistance on the Kann Manufacturing deal
12  delayed?
13        MR. HEEP:  Objection to foundation and
14  form.
15   BY THE WITNESS:
16        A.    Yes.
17  BY MR. MACK:
18        Q.    And he says 12 days as of October
19  23, 2002; is that right?
20        MR. HEEP:  Same objection.
21  BY THE WITNESS:
22        A.    I would have to assume that.
23  BY MR. MACK:
24        Q.    When you got this e-mail, did you
00130:01  write back to him and say -- when you got this
02  fax, did you write back to Mr. Yeager and say,
03  you know, you are wrong?
04  A.    No. That's correct.
```

```
05          Q.    Kann and Beelman were out there as
06  of October 23, 2002 out there.  I mean, sales
07  assistance hasn't been approved yet; right, for
08  Mr. Yeager?
09          A.    That's right.
```

**68.  PAGE 130:11 TO 130:20  (RUNNING 00:00:25.800)**

```
11  BY MR. MACK:
12          Q.    You said Beelman was 15 days and
13  asked you to look into why it was taking so long
14  or what is taking so long?
15          A.    Yes.
16          Q.    Did you do that?
17          A.    I believe I did.
18          Q.    And did you ever get a satisfactory
19  explanation for why Mr. Yeager's request on Kann
20  Manufacturing and Beelman were delayed?
```

**69.  PAGE 130:24 TO 131:15  (RUNNING 00:00:34.800)**

```
24          A.    Yes.
00131:01  BY MR. MACK:
02          Q.    What did you learn?
03          A.    That Kann Manufacturing, for lack of
04  a better word, is being debated whether they get
05  a discount or they didn't get a discount and
06  because they were a Body Builder.
07                In fact, after a number of
08  days I guess, 12 days, it was determined that one
09  of the district managers did give them the
10  discount.
11                And, I, in turn received a
12  discount and forwarded that and processed the
13  sales assistance request.  That's why the delay
14  in that.  If that's the specific deal that we
15  were talking about and I believe it is.
```

**70.  PAGE 132:15 TO 133:12  (RUNNING 00:00:51.500)**

```
15          Q.    Is this an e-mail that was sent to
16  you by Mr. McCafferty?
17          A.    Yes.
18          Q.    Did you write on the right side,
19  "Parrish?"
20          A.    Yes.
21          Q.    Does this relate to Parrish Leasing?
22          A.    Yes.
23          Q.    Was Mr. Yeager attempting to sell to
24  Parrish Leasing?
00133:01        A.    Yes.
02          Q.    Was the sales assistance request on
03  Parrish Leasing delayed?
04          A.    Yes.
05          MR. HEEP:  Objection to form.
06  BY MR. MACK:
07          Q.    Did you look into that issue?
08          A.    Yes.
09          Q.    Mr. McCafferty says sales assistance
10  had been pending with Steve Polzner for three
11  days?
12          A.    That's correct.
```

**71. PAGE 134:05 TO 135:08  (RUNNING 00:01:17.400)**

```
        05          Q.    Let's put this to the side and let
        06  me ask you about sales assistance for Mr. Yeager
        07  on a deal for Parrish Leasing being delayed over
        08  a weekend.  What do you recall that?
        09          A.    Yes, sir.
        10          Q.    What happened next?
        11          A.    Toledo Mack had come in for sales
        12  assistance on Parrish Leasing.
        13                I did a cross check with John
        14  McCafferty, and it got volleyed back between John
        15  and Jeff.  And then Jeff said to call Steve,
        16  meaning Steve Polzer, and this went on for well
        17  over a week and then after trying to get the
        18  discount, I finally, I left Jeff a voice mail and
        19  he told me that he was on vacation, that I needed
        20  to call Steve Polzer.
        21                I said, fine.  So I sent Steve
        22  an e-mail and then I followed up with a phone
        23  call to Steve and Steve Polzer told me that he
        24  had -- I remember him answering the phone.  It
00135:01  was, "Yes, Jack."
        02                He said that he had spoken to
        03  Jeff Yelles earlier that morning and Jeff told
        04  him not to give me the discount until Monday
        05  because the other dealer was going to go in and
        06  close the deal on Saturday.
        07  Q.    That's what Mr. Polzer told you?
        08          A.    Yes.
```

**72. PAGE 135:21 TO 139:20  (RUNNING 00:04:58.500)**

```
        21                Let me ask you, do you recall,
        22  sir, attending a meeting with a -- dealer meeting
        23  at which Mr. Flaherty spoke about the Network
        24  2000 program to the dealers?
00136:01  A.    Yes.
        02          Q.    During the course of that meeting,
        03  did Mr. Flaherty discuss the issue of
        04  consolidation of the dealerships?
        05          A.    Yes.
        06          Q.    Did he say to the dealers, look
        07  around the room; words to that effect?
        08          A.    Yes.
        09          Q.    What do you recall about that?
        10          A.    Well, it's not a quote, but in
        11  generalities, I think when he made the statement
        12  he said, look around the room and I don't know if
        13  he said next year or in the very new future, some
        14  of you won't be here.  He quantified that.
        15          Q.    He quantified it, didn't he?
        16          A.    Yes, he did and I am not sure
        17  what -- I forget that.
        18          Q.    Now, did you also, sir, attend a
        19  dinner with the then president of Mack, Michele
        20  Gigou, G-i-g-o-u?
        21  A.    Gigou.
        22          Q.    At which the subject of Mr. -- of
        23  Toledo Mack came up?
        24          A.    Yes.
00137:01          Q.    When was that?
        02          A.    I know where it was and it was
```

```
03  during the Network 2000.  It was in Allentown,
04  and I believe it was the Brookside Country Club.
05  It was a round-table meeting.
06          Q.    What is a round-table meeting?
07          A.    It's where we get together and we
08  sort of brainstorm and talk about the industry
09  and there is some presentations by the
10  engineering group and product development and
11  that kind of stuff.
12          Q.    Mr. Gigou, at the time, was the
13  Frenchman who was the president of Mack; right?
14          A.    That's correct.
15          Q.    You happened to be seated at his
16  table?
17          A.    Yes.
18          Q.    Did Mr. Gigou, say during that
19  dinner that, to you, that Network 2000 will take
20  care of Toledo Mack?
21  A.    No.
22          Q.    What did he say?
23          A.    There was a number of conversations,
24  but maybe we can push him a little.
00138:01        Q.    Was he talking about getting
02  Mr. Yeager out of the system?
03          A.    Yes.
04          MR. HEEP:  Objection to foundation.
05  BY MR. MACK:
06          Q.    Did another person at the table say
07  Network 2002 will take care of Toledo Mack?
08          A.    Yes.
09          Q.    A Mr. Riordan?
10          A.    Yes.
11          Q.    Mr. Riordan worked for Mack; is that
12  right?
13          A.    That's correct.
14          Q.    He was involved in dealer
15  development?
16  A.    Yes.
17          Q.    Dealer development was the group
18  that was handling Network 2000?
19          A.    Yes.
20          Q.    What did he say?
21          A.    He had brought up about dealer
22  performance and made mention of Toledo Mack and I
23  can't remember whether they had delivered zero or
24  one trucks, year to date.  And I was a little
00139:01  embarrassed that that was happening.  I am
02  sitting with the president of the company and he
03  brought that up.
04                  And I remember sort of
05  apologizing and telling him that I was doing my
06  best and I would continue to pursue business
07  through Toledo Mack and he had made the statement
08  that Network 2000 will take care of him.
09          Q.    That was Mr. Riordan?
10          A.    Yes.
11          Q.    And then after that, Mr. Gigou said
12  well, maybe we can push him a little bit?
13          A.    He made the comment, maybe we can
14  push him a little.
15          Q.    How did you react to that comment?
16  A.    I guess I was shocked to hear that.
```

```
17        Q.    You were trying to do everything you
18   could to help Mr. Yeager develop his business;
19   right?
20        A.    I think I was.
```

### 73. PAGE 140:09 TO 140:15  (RUNNING 00:00:16.200)

```
09        Q.    You were doing everything you could
10   to help Mr. Yeager and here was the president of
11   the company saying maybe we could push him a
12   little bit; right?
13        A.    Yes.
14        Q.    And push him, did you understand
15   that to mean push him out of the company?
```

### 74. PAGE 140:19 TO 140:24  (RUNNING 00:00:07.100)

```
19        A.    That was a response to the comment
20   made from Mike Riordan.
21   BY MR. MACK:
22        Q.    Which was Network 2000 taking care
23   of that?
24        A.    It will take care of that.
```

### 75. PAGE 141:01 TO 141:03  (RUNNING 00:00:04.700)

```
00141:01        Q.    That would be Network 2000 was the
       02   consultation program?
       03   A.    That's correct.
```

### 76. PAGE 141:16 TO 142:10  (RUNNING 00:00:57.700)

```
16        Q.    Now, these are notes of a
17   conversation between whom and whom?
18        A.    Well, this was between Bob McCoskey,
19   who was our regional business development manager
20   and me.
21        Q.    In March of 2001?
22        A.    That's correct.
23        Q.    Business development manager, was
24   that part of Network 2000?
00142:01        A.    That's something that we have had
       02   for a long time, business development managers.
       03   Regional business -- they were called regional
       04   business managers.  Then they became business
       05   development managers.
       06        Q.    What do they do?
       07        A.    They visit the others and they will
       08   go in and do a total business analysis,
       09   department by department for dealers and guide
       10   them in how to improve business processes.
```

### 77. PAGE 143:10 TO 143:15  (RUNNING 00:00:20.000)

```
10        Q.    Was Mr. Gerhardt part of Network
11   2000?
12        A.    The regional business manager slash
13   the business development managers were
14   transitioning into that time when Network 2000
15   was in play.
```

### 78. PAGE 143:16 TO 143:23  (RUNNING 00:00:32.600)

```
16   Q.    During this conversation, did
17   Mr. McCoskey report to you that Mr. Gerhardt
18   wanted to get rid of Toledo Mack?
19        A.    Yes.
```

CONFIDENTIAL

```
20        Q.    Specifically identified Toledo Mack
21  as one of the several stores or several dealers
22  that Gerhardt wanted to get rid of; right?
23        A.    One of several.
```

**79. PAGE 143:24 TO 144:22  (RUNNING 00:01:07.500)**

```
   24        Q.    You flip ahead to the next page,
00144:01  April 17th, we are now about a month later and on
   02  the right-hand side of the document, you had --
   03  on April 16, excuse me.
   04              Did Mr. Yelles say to you, in
   05  reference to Mr. Yeager, that guy has to go?
   06  MR. HEEP:  Where are you in the document?
   07        MR. MACK:  On the right-hand side.  Got
   08  it?
   09        MR. HEEP:  The question is whether Jeff
   10  said on 4, that guy has to go, 16, that guy has
   11  to go?  Okay.
   12  BY THE WITNESS:
   13        A.    That's correct.
   14  BY MR. MACK:
   15        Q.    That was a conversation about
   16  Mr. Yeager; right?
   17        A.    Yes, sir.
   18        Q.    Did you say to Mr. Yelles that
   19  Mr. Yeager was not for sale?
   20        A.    Yes.
   21        Q.    How did Mr. Yelles respond?
   22        A.    "Fuck him.  He's got to go."
```

**80. PAGE 144:23 TO 147:06  (RUNNING 00:02:46.400)**

```
   23        Q.    Now, if you turn to Page -- 3 days
   24  later on April 19th, down at the bottom do you
00145:01  see an entry for April 24th and right above
   02  that's an entry for April 19th.
   03        A.    Yes.
   04        Q.    Says Yelles, this guy has to go?
   05        A.    Yes.
   06        Q.    Is that another comment that
   07  Mr. Yelles made to you about Mr. Yeager on April
   08  19th?
   09        A.    Yes.
   10        Q.    2001?
   11        A.    That's correct.
   12        Q.    Did he also tell you that you needed
   13  to turn up the heat on the dealers?
   14        A.    Yes.
   15        Q.    He said -- did he say, make the
   16  dealers call Allentown.  They will be told by
   17  senior management?
   18        A.    That's what he said.
   19        Q.    And then down at the bottom of the
   20  document, what do you recall that he said to you
   21  about putting things in writing?
   22        MR. HEEP:  Do you want to --
   23        MR. MACK:  Let me rephrase it.
   24        MR. HEEP:  Okay.
00146:01  BY MR. MACK:
   02        Q.    Did Mr. Yelles say anything to you
   03  about whether or not you should put any -- what
   04  you could put in writing?
```

CONFIDENTIAL

```
05          MR. HEEP:  I just want to clarify you
06 moved to a different date.
07          MR. MACK:  Yes.  Thank you.  4/25.
08 BY THE WITNESS:
09          A.    Oh, okay on 4/25.  I was confused
10 there 4/25.  I phoned Dave Yeager and explained
11 the conversation with Jeff Yelles of 4/19?  And I
12 evidently turned up the heat.
13                    I informed Dave Yeager that
14 this has got to stop per Jeff Yelles and that's
15 the advertising and calling Mack customers.  And
16 Dave Yeager told me that he will respond with a
17 letter.  And Jeff Yelles told me, don't put
18 anything in writing, but keep the heat on.  Okay
19 to write about dealer performance.
20 BY MR. MACK:
21          Q.    What did you understand Mr. Yelles
22 to be telling you about what you could put in
23 writing and what you shouldn't put in writing?
24          A.    That it was okay to write about the
00147:01 dealers' poor performance and but not anything
02 else.
03          Q.    You shouldn't be writing about
04 Mr. Yeager's advertising and calling Mack
05 customers?
06          A.    That's correct.
```

**81. PAGE 147:18 TO 148:21  (RUNNING 00:01:15.200)**

```
18          Q.    Do you recognize this document, sir?
19          A.    Yes.
20          Q.    Does this relate to an attempt by
21 Toledo Mack to sell trucks at Beelman Truck
22 Company?
23          A.    Yes.
24          Q.    Had Mr. Yeager requested parity with
00148:01 established discount structure for the customer?
02 A.    Yes.
03          Q.    You had submitted to whom, the
04 request?
05          A.    I had sent it to Jeff Yelles, and
06 Jeff told me to call Steve Polzer.  I called
07 Steve Polzer and that's in my comments.  I said
08 see above, Jeff.  I talk to Steve and he said it
09 was okay to pull it.
10          Q.    Then down at the bottom, there is
11 some notes.  Did you have a conversation with
12 Mr. Polzer?
13          A.    Yes.
14          Q.    Did Mr. Polzer bring up this
15 requirement of Mr. Yeager having a letter from
16 the customer you were just talking about?
17          A.    Yes.
18          Q.    What did Mr. Polzer say?
19          A.    He said, did he have a letter from
20 the customer.  I guess that's the restriction we
21 are putting on him when he is out of his box.
```

**82. PAGE 148:22 TO 149:19  (RUNNING 00:01:01.600)**

```
22          Q.    Now, did Mr. Yeager attempt to sell
23 Kimball Mixer?
24 A.    Yes.
```

```
00149:01        Q.   Was he requested to get a letter on
      02  that deal?
      03        A.   Yes.
      04        Q.   Did he, indeed, come up with a
      05  letter on Kimball Mixer?
      06        A.   Yes.
      07        Q.   Did you see that letter?
      08        A.   Yes, I think I did.
      09        Q.   Was it forwarded on to Mr. Yelles?
      10        A.   I think it was forwarded to John
      11  McCafferty and then maybe to Mr. Yelles.  I am
      12  not sure of the sequence there, but both of them
      13  saw it.
      14        Q.   The letter was not acceptable to
      15  Mr. McCafferty, was it?
      16        A.   That's correct.
      17        Q.   And Mr. Yeager wasn't able to get
      18  the discount to quote that customer, was he?
      19        A.   That's correct.
```

**83. PAGE 152:13 TO 152:15 (RUNNING 00:00:09.300)**

```
      13        Q.   Mr. Lusty, if Mr. Yeager would have
      14  received more sales assistance from Mack, would
      15  he have been able to sell more trucks?
```

**84. PAGE 152:20 TO 152:20 (RUNNING 00:00:02.000)**

```
      20        A.   It's a real possibility, yes.
```

**85. PAGE 153:07 TO 154:09 (RUNNING 00:00:53.300)**

```
      07        Q.   One of the things that you do in
      08  setting up the business plan for the company is
      09  trying to determine how many trucks the dealer
      10  can reasonably sell under the current market
      11  conditions including competition, including
      12  pricing, things like that; right?
      13  A.   Yes.
      14        Q.   Based on your years with the company
      15  and your experience as a district manager, you
      16  have a pretty good feel, don't you, for what
      17  factors go into whether or not a dealer is going
      18  to be successful in selling a truck?
      19        A.   Yes.
      20        Q.   One of those factors is sales
      21  assistance; right?
      22        A.   Right.
      23        Q.   If a dealer gets more sales
      24  assistance, doesn't that help him sell more
00154:01  trucks?
      02        MR. HEEP:  Objection to form.
      03  BY THE WITNESS:
      04        A.   If that sales assistance is passed
      05  onto the end user, to the customer, yes.
      06  BY MR. MACK:
      07        Q.   Mr. Yeager has always been a low
      08  cost pricer; right?
      09        A.   Correct.
```

**86. PAGE 154:20 TO 155:15 (RUNNING 00:00:39.100)**

```
      20        Q.   Now, if free floor plan -- what
      21  benefit is that to a dealer?
      22        A.   That ultimately lowers -- it affects
```

```
     23  the bottom line of the dealership.  It can if you
     24  apply that to each individual truck, you can
00155:01  lower the cost of the truck.  There is no
     02  carrying charge on that truck.
     03            So ultimately, when you sell
     04  the truck, you don't have to add your floor plan
     05  charges incurred to the selling price of the
     06  truck to the end user.
     07       Q.    So theoretically, you could sell
     08  that truck if you wanted to at a lower cost?
     09       MR. HEEP:  Objection to form.
     10  BY THE WITNESS:
     11       A.    That's possible, yes.
     12  BY MR. MACK:
     13       Q.    The other possibility is the dealer
     14  could put that money in his pocket; right?
     15       A.    Yes.
```

**87. PAGE 155:16 TO 155:19  (RUNNING 00:00:12.700)**

```
     16       Q.    If Mr. Yeager would have received
     17  free floor planning on trucks he purchased from
     18  Mack and passed that on to the customer, would he
     19  have been able to sell more trucks?
```

**88. PAGE 155:23 TO 156:01  (RUNNING 00:00:04.000)**

```
     23       A.    That would have lowered the selling
     24  cost so it's possible that could have happened,
00156:01  yes.
```

**89. PAGE 156:15 TO 156:18  (RUNNING 00:00:12.500)**

```
     15       Q.    If Mack had encouraged rather than
     16  discouraged Mr. Yeager to sell outside of his
     17  AOR, would Mr. Yeager have been able to sell more
     18  trucks?
```

**90. PAGE 156:22 TO 157:02  (RUNNING 00:00:08.200)**

```
     22       A.    That's possible, yes.
     23  BY MR. MACK:
     24       Q.    Do you think it's reasonably
00157:01  possible, sir, based on your experience?
     02       A.    Yes.
```

**91. PAGE 167:06 TO 168:24  (RUNNING 00:02:13.400)**

```
     06       Q.    Is this an e-mail with your notes
     07  from Mr. Schriffert to you on a deal involving
     08  Bolus Freight System?
     09       A.    That's correct.
     10       Q.    Mr. Yeager was trying to quote Bolus
     11  Freight System?
     12       A.    Yes, sir.
     13       Q.    You had asked some information from
     14  Mr. Schriffert regarding the number of issues on
     15  the deal; right?
     16       A.    Yes, sir.
     17       Q.    What price level the deal was going
     18  offered at; correct?
     19       A.    Yes, sir.
     20       Q.    Surcharge warranty; correct?
     21       A.    I am just looking for the warranty
     22  here.  I just want to make sure I am answering
     23  this correctly.  Yes.
```

```
        24  Q.    You had some questions about the
00168:01  response you received?
        02        A.    Yes.
        03        Q.    What were those questions?
        04        A.    "Were these units protected under
        05  the asset first experience program?  My
        06  understanding, instruction, the fleet deals over
        07  three percent sales assisted did not qualify for
        08  the asset highway first experience warranties,
        09  per Jeff Yelles.  And are you charging or waiving
        10  the EPA 02 surcharges."  And some of that was
        11  answered here.
        12        Q.    Did you talk to Mr. Yelles about
        13  what level of sales assistance you should start
        14  giving Mr. Yeager on this account?
        15        A.    Yes.
        16        Q.    Did Mr. Yelles tell you to start at
        17  two-and-a-half percent?
        18  A.    Yes.
        19        Q.    Did he use some profanity when he
        20  said that?
        21        A.    Yes.
        22        Q.    What did he say?
        23        A.    "Fuck him.  Let him start at
        24  two-and-a-half percent."
```

**92. PAGE 169:15 TO 169:21  (RUNNING 00:00:18.600)**

```
        15        Q.    Did you ever get a satisfactory
        16  answer to all the questions you were raising
        17  about the -- on this Bolus account?
        18        MR. HEEP:  Objection to the form of the
        19  question.
        20  BY THE WITNESS:
        21        A.    I think I did.
```

**93. PAGE 169:23 TO 170:01  (RUNNING 00:00:06.000)**

```
        23        Q.    Was Mr. Yeager able to sell to
        24  Bolus?
00170:01  A.    No.
```

**94. PAGE 170:10 TO 170:12  (RUNNING 00:00:04.900)**

```
        10        Q.    It took some time for Mr. Yeager to
        11  get the discount; right?
        12        A.    Yes.
```

**95. PAGE 184:11 TO 185:18  (RUNNING 00:01:21.800)**

```
        11        Q.    Is this a sales assistance request
        12  that you put in on behalf of Toledo Mack?
        13        A.    Yes.
        14        Q.    Toledo Mack was attempting to thwart
        15  capital waste?
        16        A.    Yes.
        17        Q.    Is that a body builder?
        18        A.    No.
        19        Q.    What -- do they buy vocational
        20  trucks?
        21        A.    Yes.
        22        Q.    What did you write at the bottom of
        23  this document?
        24        A.    My handwriting there, you mean?
00185:01  Q.    Yes, sir.
```

CONFIDENTIAL

```
02       A.    "This account is purchased from
03  McClain Weigand Mack is also quoted and has not
04  been successful do to McClain pricing."
05       Q.    What did you mean by that?
06       A.    Well, I was making a note.  I was
07  going to have to talk to Jeff about this deal and
08  explain to him why I was coming with the sales
09  assistance.  Capital waste and I know this
10  account personally.
11  He has purchased trucks from
12  some dealers but he also gets prices from the
13  body builders and I know that Weigand Mack has
14  also quoted him and has not been successful in
15  selling this account.
16       Q.    Is this an instance where Mack
17  dealers were competing with McClain for the
18  business of capital waste?
```

**96. PAGE 185:21 TO 185:21  (RUNNING 00:00:01.000)**

```
21       A.    Yes.
```

**97. PAGE 189:16 TO 190:23  (RUNNING 00:01:32.500)**

```
16       Q.    Do you recognize this, sir?
17       A.    Yes.
18       Q.    October 1st of 2002, sales
19  assistance e-mail sent to Mr. Yelles; is that
20  right?
21       A.    Yes.
22       Q.    You have some notes written down?
23       A.    Yes.
24       Q.    One of the issues -- strike that.
00190:01            This deals with three sales
02  assistance requests that you had pending at the
03  time; right?
04       A.    Correct.
05       Q.    None of those requests had been
06  responded to within 24 hours; right?
07  MR. HEEP:  The same thing.  If you know
08  the answer, you can answer it.  If you don't,
09  then don't guess.
10  BY THE WITNESS:
11       A.    I can't remember.
12  BY MR. MACK:
13       Q.    Well, the first sales assistance
14  request you say coincide with the fax dated 9/25.
15            You say the second one was
16  dated 9/25; right?
17       A.    That's correct.
18       Q.    Your e-mail is written on October
19  the 1st; right?
20       A.    Correct.
21       Q.    The third one deals with a sales
22  assistance request on a company called McClain?
23       A.    Correct.
```

> **TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 01:41:02.500)**

CONFIDENTIAL