**Lusty, John (Vol. 01) - 01/14/2005**                                    **1 CLIP  (RUNNING 01:58:34.734)**

JURY TRIAL - DAY 5    SEPTEMBER 19, 2006

LUSTY2                          **105 SEGMENTS  (RUNNING 01:58:34.734)**

**1. PAGE 5:19 TO 5:23  (RUNNING 00:00:14.900)**

```
19        Q.   In May of 2004 you filed a lawsuit
20   against Mack Trucks.
21        A.   Yes.  I think it was May.  I'm not
22   sure of the date.
23        Q.   Okay.
```

**2. PAGE 7:05 TO 9:08  (RUNNING 00:02:28.000)**

```
05        Q.   Okay.  And other than you said
06   you've never seen the first page, other than
07   that, do you recognize this as a copy of the
08   complaint that you filed against Mack Trucks in
09   May of 2004?
10        A.   Yes.
11        Q.   And -- and it was filed by your
12   lawyer, Mr. Rex Elliott, whose offices we're in
13   today.
14        A.   Correct.
15        Q.   Okay.  When did you first hire
16   Mr. Elliott to represent you for that lawsuit?
17        A.   I don't have that exact date,
18   Jeremy.  I don't remember those dates.  I mean,
19   it was -- I was dismissed on January 15, 14th or
20   15th, I believe, the 14th or 15th.
21        Q.   Okay.  Do you remember --
22        A.   I just don't remember the dates.  I
23   mean, Rex would have a record of that.  I don't.
24        Q.   Do you remember, do you have any
00008:01   ball-park figure of how close -- how close it
02   was to this lawsuit that you hired him?  Was it
03   like a month before, two months before?
04        A.   I can't remember that, when I met
05   with him, I can't, you know, when I talked to
06   Rex.
07        Q.   Okay.  Do you -- you remember
08   testifying in the termination hearing for Toledo
09   Mack?
10        A.   Yeah.
11        Q.   Okay.  That was February 6, 2004;
12   right?
13        A.   It was October -- repeat that
14   question because I'm just -- I'm not thinking
15   Toledo here right now.
16        Q.   I'm talking about the trial or the
17   hearing.
18        A.   Oh, okay, the hearing in Columbus.
19        Q.   In Columbus, yes.
20        A.   Was that February?  I don't recall
21   that, but if it was, I testified at that
22   hearing.  I don't remember the date of that
23   hearing, I don't.
24        Q.   And by that point were you being
```

```
00009:01    represented by Mr. Elliott?
     02         A.   It was sometime around there that I
     03    talked to Rex, and I don't have that exact
     04    date.  I don't know that.
     05         Q.   Would it be fair to say that you
     06    hired Rex to represent you in this lawsuit
     07    against Mack Trucks after that hearing?
     08         A.   I think it was after the hearing.
```

### 3. PAGE 16:08 TO 17:01 (RUNNING 00:01:40.000)

```
     08         Q.   Okay.  I'm showing you Exhibit 2.
     09    Do you -- do you recognize this document as your
     10    initial disclosures in the lawsuit that you
     11    filed against Mack Trucks?
     12         A.   I think it was called -- yeah, I
     13    did.
     14         Q.   Do you recall you reviewed this
     15    document and believe the information in here is
     16    accurate?
     17         A.   Yes.
     18         Q.   Now, in Items, 5, 6, 7 and 8, you
     19    describe, or Mr. Elliott describes on your
     20    behalf, areas in which Mack's attorneys have
     21    knowledge; is that right?
     22         A.    If that's the formal procedure, I
     23    guess yeah.  I mean, I'm not aware of a formal
     24    legal procedure, but if this is what it is, I
00017:01    recognize that I read it, yes.
```

### 4. PAGE 17:18 TO 17:19 (RUNNING 00:00:05.600)

```
     18         Q.   What did you mean by "lost
     19    compensation due to Mack's illegal practices"?
```

### 5. PAGE 18:11 TO 20:23 (RUNNING 00:02:55.300)

```
     11         A.   I mean, that's attorney's words, not
     12    mine.  I thought, you know, that's a formal
     13    procedure.  That's how you plead your case, I
     14    guess, and that's what I -- I took this to be
     15    the formal document in the procedure that you
     16    guys do.
     17         Q.   Did you, in fact, understand
     18    yourself to be claiming lost compensation due to
     19    Mack's illegal practices?
     20         A.   Well, I wasn't working, so I lost
     21    compensation.  I lost compensation, I felt, from
     22    bonuses and incentives that I could have earned.
     23         Q.   And what do you mean by the bonuses
     24    and incentives?
00019:01         A.   Well, we were paid on commissions
     02    and incentives, on quotas and objectives and
     03    dealer performance and different criteria.  When
     04    I say "dealer performance," dealers, meaning
     05    their objectives added to the aggregate number
     06    against our objectives that were assigned to us
     07    per year.
     08         Q.   Okay.  And how does that relate to
     09    lost compensation?
     10         A.   Well, I did -- if my dealer was not
     11    getting the sales assistance he deserved to make
     12    a deal or to be competitive or to be put on a
     13    level playing field, that would affect his
```

```
14    ability to make a deal, to sell trucks and
15    ultimately meet his quota or objective, which,
16    in turn, had an effect on my income.
17        Q.   Okay.  So basically every time you
18    could prove an illegal practice that affected
19    one of your dealers, you believe that you were
20    entitled to lost compensation.
21        A.   Well, I never was on a campaign to
22    prove an illegal practice for a dealer or on any
23    given specific deal.  It's -- we're here today
24    because somebody filed a lawsuit.  I mean,
00020:01    that's -- that's why we're here.
02        Q.   But you filed this lawsuit.
03        A.   Yes, I did.
04        Q.   Okay.  And part of the damages you
05    were claiming were that you felt that -- were
06    lost compensation in the form of bonuses and
07    incentives due to what you thought were Mack's
08    illegal practices; right?
09        A.   Yes.
10        Q.   Now, as part of these initial
11    disclosures, you turned over some documents to
12    Mr. Elliott.
13        A.   Yes.
14        Q.   Okay.  In order -- you understood
15    that in order to be provided to Mack Trucks.
16        A.   Yes.
17        Q.   Okay.  And did you take any care to
18    determine whether any of those documents were
19    attorney-client communications?
20        A.   Not any extraordinary care.  I mean,
21    I didn't mark anything "attorney-client
22    privilege."  I mean, I didn't know what would be
23    attorney-client privilege, so, no.
```

**6. PAGE 26:10 TO 26:12 (RUNNING 00:00:05.800)**

```
10        Q.   Do you remember turning over a file
11    called Toledo Mack Legal File Book 1?
12        A.   Yes.
```

**7. PAGE 41:02 TO 41:21 (RUNNING 00:00:46.000)**

```
02             MR. ELLIOTT:  I guess the question
03    is does he know how Mr. Yeager learned about his
04    termination.
05             MR. HEEP:  That's a good question.
06        A.   At one point I told Dave Yeager that
07    I was terminated.
08        Q.   And did you call him immediately
09    after your termination?
10        A.   Probably in a day or so.  I can't
11    remember if it was the same day or within a day
12    or so.
13        Q.   Did you call all you're dealers to
14    tell them you were terminated?
15        A.   No.
16        Q.   Why did you choose Mr. Yeager to
17    call?
18        A.   Because I was involved with Dave
19    Yeager as a dealer, and this was all about him,
20    and I felt I got terminated because of
21    testifying truthfully under oath in his case.
```

**8.  PAGE 43:07 TO 43:23  (RUNNING 00:00:48.700)**

```
07          Q.    Did you, in fact, meet with Rex
08    Elliott on 1-23-04 to discuss your testimony for
09    Toledo Mack?
10          A.    I met with Rex, but was it the
11    23rd?  I don't know.  I don't have notes of
12    that, I mean, it could -- if he's got in notes
13    that I met with him, then I must have met with
14    him on that day.  I'm just not recalling the
15    dates, Jeremy; that's all.
16          Q.    Somewhere within a week or so after
17    your termination you met with him.
18          A.    Yeah.  I called him, and I met with
19    him shortly after that.  I -- whether it was the
20    23rd, I know that a couple days had passed, and
21    I was just coming out of the shock, and, you
22    know, there's some things you go through
23    emotionally, and -- go ahead.
```

**9.  PAGE 44:04 TO 45:01  (RUNNING 00:00:44.600)**

```
04          Q.    Okay.  Was there a time when you
05    first called Mr. Elliott, as you just testified.
06          A.    Yeah.
07          Q.    Okay.  And when was that?
08          A.    It was after -- it was shortly
09    after.  I mean, it could have been a week or two
10    weeks, I'm not sure.  It was shortly -- it was
11    within a month of when I was canned.  I mean, it
12    was sometime after that.  I -- I didn't keep a
13    log of my calls to Rex.
14          Q.    And then sometime around January 23
15    you actually met with him in person; right?
16          A.    I came down here, and I would say,
17    the 14th, a week or two maybe.
18          Q.    You drove here?
19          A.    Yeah.
20          Q.    How far of a drive is it?
21          A.    130, 140 miles, something like that,
22    yes.
23          Q.    Three hours?
24          A.    No.  It's two and a half, well, two,
00045:01    two to three, I guess, depending on traffic.
```

**10.  PAGE 45:08 TO 48:08  (RUNNING 00:03:33.900)**

```
08          Q.    Do you remember how long your
09    meeting is -- was with Rex?
10          A.    It wasn't a whole long one, I don't
11    believe.  I don't know.  Jeremy, I'd tell you
12    the truth if I knew it, but I don't remember how
13    long it was.
14          MR. ELLIOTT:  Well, I just want to
15    make sure the record is clear, too, because you
16    haven't asked the questions, but the -- your
17    assumption in these questions is that it was one
18    on one, Mr. Lusty and myself, and that would be
19    an inaccurate portrayal of that meeting.
20          Q.    Okay.  Who else was at the meeting?
21          A.    I met Chip that day.  I think David
22    popped his head in, if I'm not mistaken, or
23    maybe David was here.
24          Q.    David Brown?
```

```
00046:01     A.   And Chip.  David Brown, and I think
     02   Chip popped in.  I met Lori and Tammy, and I
     03   don't think there was anyone else here.
     04        Q.   Mr. Yeager wasn't here?
     05        A.   I don't believe he was that day.
     06        Q.   If you don't remember.
     07             MR. ELLIOTT:  If you don't remember,
     08   just --
     09        A.   I don't remember whether he was or
     10   he wasn't.  I know I met those guys.
     11        Q.   Okay.  Now, we've established there
     12   were more people.  How long did you spend in
     13   sort of sum total with all of these folks?
     14        A.   I don't think that was a long
     15   meeting.  I can't -- I can't -- I can't tell
     16   you.
     17        Q.   Did you take any notes?
     18        A.   No.
     19        Q.   What did you discuss?
     20        A.   That I had been terminated with Mack
     21   Trucks and that I felt I was wrongfully
     22   terminated, and I wanted to talk about what my
     23   options were.
     24        Q.   Did you discuss the testimony you
00047:01   were going to be giving in the Toledo Mack
     02   termination hearing in Columbus?
     03        A.   No.  That was when I came here for
     04   -- Jeremy, I don't remember what took place the
     05   day I came here to talk to Rex about my
     06   termination.  If I could remember it, I'd tell
     07   you what I remember, but I don't.
     08        Q.   Did you -- do you remember at any
     09   time talking to Rex about the testimony you
     10   would have been giving in the Toledo Mack
     11   termination hearing?
     12        A.   We talked about that somewhat along
     13   the line, and, yeah.  I mean, I don't remember
     14   the details of that; I don't.
     15        Q.   Do you remember how many times you
     16   talked to him about the testimony you would
     17   give?
     18        A.   No.  I'm sure I talked to him a
     19   couple of times, but I don't remember the exact
     20   number.
     21        Q.   Were the other times in person or by
     22   phone?
     23        A.   I was here another time, and I may
     24   have had some phone calls with Rex.
00048:01        Q.   Did you review documents that you
     02   would testify about?
     03        A.   I don't know when I gave Rex my
     04   documents.  I'm not sure what I had.  I just --
     05   I can't remember.  I'm trying to separate who,
     06   what, why, when, and where, and what I did, and
     07   I just don't remember all of those meetings,
     08   Jeremy.
```

**11. PAGE 50:11 TO 53:04 (RUNNING 00:03:05.900)**

```
     11        Q.   In the time between when you were
     12   dismissed from Mack Trucks and the time you
     13   testified in February of 2004, did you talk to
```

```
14    Mr. Yeager by telephone about the testimony that
15    you were going to give in the hearing?
16          A.    Dave called me a couple times.  I
17    don't think we discussed testimony.  Dave and I
18    talked about a lot of things, but I -- I mean,
19    that was -- Dave was very tight-lipped, close to
20    the vest about his personal involvement in all
21    of this.
22          Dave was here one day, but I can't
23    remember -- I mean, we talked about a lot of
24    things, but what we talked about -- Jeremy, I'm
00051:01    not trying to avoid the question or answering
02    the question.  I just don't recall.  I mean,
03    it's just been a ton of stuff, you know, that
04    was talked about over the last two years, three
05    years.  That's all.
06          Q.    Can you remember a single thing that
07    you talked about between the time -- with
08    Mr. Yeager between the time that you were
09    terminated from Mack Trucks and the time you
10    testified in the termination hearing?
11          A.    Yeah.  I talked about my emotions on
12    many times, many occasions.  It was an emotional
13    event for me.
14          Q.    What do you remember saying to him?
15          A.    I'm sorry?
16          Q.    What do you remember saying to him?
17          A.    "I just can't believe this" and,
18    "Yeah, it's troubling."  I was concerned, and,
19    you know, that it wouldn't change what I did and
20    what I had to do.  You know, I told the truth,
21    and that's just the way it is.  I'll live with
22    that.
23          Q.    When you say it wouldn't change what
24    you had to do, what did you mean by that?
00052:01          A.    Well, it didn't change what I had to
02    do.  I'm sorry I used that word "what I did."
03    By telling the truth, you know, I wouldn't
04    change what had happened.  I'm not going to
05    compromise that.
06          Q.    Do you remember telling him anything
07    else?
08          A.    No.  He felt bad that was I canned,
09    and I was just -- that was -- you know, he took
10    that to heart.
11          Q.    Do you remember --
12          A.    Go ahead.
13          Q.    Do you remember what he said?
14          A.    "Oh, I'm really sorry," or something
15    like that.  I -- not the exact words.
16          Q.    And just to be clear, you have no
17    recollection at all during that time period that
18    we're discussing of talking about what -- the
19    testimony that you would be giving in the -- in
20    the termination hearing.
21          A.    We talked about that here, and I was
22    involved in the termination of myself and the
23    upcoming deposition or the upcoming hearing, and
24    I just -- it's just running together, Jeremy,
00053:01    you know, what we talked about.  We talk about a
02    lot of things, but, I mean, it was just
03    questions like you're asking me, but I can't
```

        04      remember the exact questions.

**12. PAGE 54:20 TO 57:02  (RUNNING 00:03:30.500)**

        20            Q.    (By Mr. Heep)  Okay.  The question
        21      is, do you recall whether you gave materials
        22      directly to Mr. Brown or anyone at Cooper &
        23      Elliott.
        24            MR. ELLIOTT:  Prior to --
00055:01              Q.    Up until this date here, January 25,
        02      '04.
        03            A.    I don't recall that I gave them my
        04      stuff at that time.  I talked to David, and I'm
        05      not saying that I talked to him because I'm
        06      reading it here.  David was here.  It was David
        07      that was here, and Chip popped his head in, and
        08      I remember talking to Dave, and we went over
        09      some -- whatever documents, and I can't remember
        10      what they were.
        11            Q.    Prior to the termination hearing
        12      that you testified at in February, had you ever
        13      talked to Manly Parks or anyone at his firm?
        14            MR. ELLIOTT:  You mean outside of
        15      counsel for Mack, because obviously we were in
        16      deposition together on at least one occasion
        17      prior to that time.
        18            Q.    Outside of depositions.
        19            A.    I believe I spoke to Manly once.
        20            Q.    And when -- when was that?
        21            A.    Sometime in that time frame,
        22      Jeremy.  I don't have a date.  I don't know.
        23            Q.    Do you -- do you remember what you
        24      talked about?
00056:01              A.    I don't.
        02            Q.    Do you remember any other
        03      discussions that you've ever had at any time
        04      with Mr. Parks or anyone at the Duane Morris law
        05      firm?
        06            A.    I talked to a secretary once that I
        07      can't remember her name.  Other than that, yeah,
        08      there was some other guy, and I can't remember
        09      -- only -- I can't remember his name, but there
        10      was another attorney.  I assume he was an
        11      attorney; maybe he wasn't.  Maybe he worked in
        12      the office.  I have no idea.
        13            I filed an affidavit and somebody
        14      called me about something on that, and I can't
        15      remember what he talked about, but it was --
        16            Q.    You don't remember who it was?
        17            A.    No.  He didn't -- I don't know if
        18      his name was on the affidavit.  I'm not sure.  I
        19      -- I spoke to your secretary, and I wouldn't
        20      remember her name.
        21            Q.    Mr. Elliott's June billing records
        22      reflect -- which I haven't showed you yet --
        23      reflect "conference with Mr. Yeager, Mr. Lusty
        24      and Mr. Parks" in June of '04.  Do you remember
00057:01      meeting with Mr. Parks in June of '04?
        02            A.    Yes.

**13. PAGE 57:06 TO 57:15  (RUNNING 00:00:28.500)**

        06            A.    Yes.

```
07          Q.   And what was that about?
08          A.   I -- I guess questioning.  I can't
09     remember what -- what was taking place after
10     June.  Was there an upcoming event?  I don't
11     recall.  I don't have a list of when the
12     termination hearing was and those dates.  I
13     don't have those in my mind, Jeremy, but it was
14     about the Toledo case, I'm sure, about the
15     Toledo information.
```

**14. PAGE 61:17 TO 63:05 (RUNNING 00:02:13.700)**

```
17          Q.   Did you understand Mack to have a
18     plan to eliminate small dealers?
19          A.   I understood Mack had a Network 2000
20     that was -- I think was designed as a strategy
21     to consolidate dealers in markets, and -- yeah.
22     Yes.
23          Q.   Have you ever told any Mack dealer
24     or employee of a Mack dealer that Mack has a
00062:01     plan to eliminate small dealers?
02          A.   I -- I discussed the Mack Network
03     2000 with dealers because we were instructed to
04     do so.  As a matter of fact, I was told that I
05     needed to get Network 2000 moving in my district
06     by Jeff Yelles, and I was told by Jeff Yelles
07     that certain dealers had to go.
08          Q.   Did you ever specifically tell any
09     Mack dealer or employee of a Mack dealer that
10     Mack had a plan to eliminate small dealers?
11          A.   I discussed Network 2000.  I never
12     -- I never come out and said:  Mack's going to
13     get rid of you because you're a small dealer.  I
14     can never remember saying that.  That isn't
15     something I would have said.
16          Q.   Have you ever told any Mack dealer
17     that you thought Mack's practices were wrong or
18     unfair?
19          A.   I may have said that in some sales
20     assistance dealings, "it's unfair, I couldn't
21     get you an answer," something like that, but
22     never went and broadcast that Mack Trucks was
23     unfair in their pricing policies or sales
24     assistance policies.
00063:01              Answering a dealer's objection, it's
02     unfair or unfortunate that I can't get you an
03     answer, and most of them, a lot of those dealers
04     brought that to my attention rather than me
05     bringing it to their attention.
```

**15. PAGE 64:15 TO 66:08 (RUNNING 00:01:44.800)**

```
15          Q.   Whether we use the word "unfair" or
16     "unfortunate," were there any other dealers,
17     other than Flag City, who you told that Mack's
18     practices were either unfair or unfortunate?
19          A.   In response to their question, I
20     would say it was unfortunate.  They would insist
21     it was unfair.  They needed a response, and I
22     would say:  Yeah, it is, but I'll get you a
23     response.  And that's -- I didn't go there and
24     say:  Mack is unfair in their pricing policies
00065:01     and that's why you don't have an answer.  That
```

```
02   is not what I said.
03           I think there's a play on words
04   here, and I'm not buying into that.  That isn't
05   what I said.  I defended Mack's position that we
06   have a cross-check procedure and followed it,
07   and it didn't work.
08           Dan Ralich from Youngstown
09   complained.  Dan Ralich from Akron complained.
10   Dave Hubbard complained.  Tim Watson complained
11   from Northern Ohio Truck Center.  Jim Hoffman on
12   occasions called Jeff Yelles and complained.
13   The guy from Buffalo, the salespeople there, a
14   lot of salespeople complained because it was
15   they had customers hanging that wanted to buy
16   trucks, and they didn't get responses or what
17   they thought they needed.
18       Q.   And for each of the -- for the two
19   Dan Raliches, Tim Watson, Jim Hoffman and
20   Buffalo Mack, did you tell all of them or at
21   least agree with them that you thought Mack's
22   practices were unfair or unfortunate?
23       A.   No; that's not the case.  I would
24   always defend the situation that:  I'm trying to
00066:01  get an answer.  I did what I needed to do.  It's
02   at this level.  It's at that position in the
03   system.  I forwarded it to the region or I
04   forwarded a cross-check.  We don't have a
05   response yet.
06           But there were some people that
07   complained, and I -- I couldn't disagree that
08   the response time was terrible in many cases.
```

**16.  PAGE 144:23 TO 145:14  (RUNNING 00:00:37.200)**

```
23       Q.   Would you agree with me that Wiegand
24   primarily tried to sell trucks inside Michigan?
00145:01     A.   Yeah, I think that's true.
02       Q.   And do other dealers sell into
03   Wiegand's AOR in your experience?
04       A.   Yes.
05       Q.   Okay.
06       A.   They attempt to sell in Wiegand's
07   AOR.  Are they successful?  I don't track every
08   deal to the end, so I don't know.
09       Q.   Okay.  But you know that at least
10   some do successfully sometimes.
11       A.   Yeah.
12       Q.   Okay.  And would you say that it's
13   fairly frequent that other dealers sell into
14   Wiegand's AOR?
```

**17.  PAGE 145:16 TO 146:13  (RUNNING 00:00:48.000)**

```
16       A.   Well, when D & H sold Mack trucks, I
17   mean, due to the close proximity, they were --
18   they were always going back and forth to each
19   other's territory.  Dermody may have sold some
20   trucks -- well, Dermody did sell some trucks
21   over there, and Wiegand also sold some trucks
22   over there, and Cecil Warren once in a while
23   would get involved in that, so, yeah.
24       Q.   Okay.  Can you think of, do you know
00146:01  any other dealers that would do that, that you
```

02    know of?  Like Mr. Elliott would tell you, we
03    don't want you to guess, just what you can
04    remember.
05            A.    Off the top of my head, no.
06            Q.    And in your experience, other
07    dealers sell into Toledo Mack's AOR as well.
08            A.    Yes.
09            Q.    Okay.  And in your experience Toledo
10    Mack also regularly sold outside of its AOR.
11            A.    Yes.
12            Q.    In fact, many dealers frequently
13    sell outside of their AORs; right?

## 18. PAGE 146:15 TO 146:23  (RUNNING 00:00:15.000)

15            A.    Yeah.
16            Q.    And that creates some tension
17    between dealers sometimes.
18            A.    Sure.
19            Q.    Okay.
20            A.    Yes.
21            Q.    And also created some tension within
22    the Mack organization sometimes.
23            A.    Yes.

## 19. PAGE 149:02 TO 149:04  (RUNNING 00:00:15.600)

02            Q.    Okay.  And a -- and did you agree
03    that the competition from Kenworth, Peterbilt
04    and other OEMs was fierce?

## 20. PAGE 149:06 TO 151:08  (RUNNING 00:01:45.400)

06            Q.    In the vocational business.
07            A.    "Fierce" is a word we use when we
08    submitted for sales assistance so that someone
09    in Allentown would wake somebody up and realize
10    that we needed some more money to make this
11    deal, so.
12                 But was it fierce?  Mack Trucks was
13    reporting it was going to be a blood bath
14    because everyone was vying for market share --
15            Q.    Uh-huh.
16            A.    -- and they were -- it was going to
17    be fierce that year, so I guess I would
18    reiterate what they said, it was going to be
19    fierce.
20            Q.    You agree with that, it was going to
21    be fierce and there was a blood bath that was
22    coming in terms of competition.
23            A.    I thought it would be a competitive
24    year.  I mean, everyone wanted market share,
00150:01    and, you know, they wanted to knock Mack out of
02    the box.
03            Q.    Okay.
04            A.    And this was in 1 of '97.  I got to
05    believe -- I can't remember when I started in
06    that region, so I may not have had a real good
07    handle on it, but, I mean, they were telling us
08    that's what was going to happen, but -- you
09    know, I believe that every day of my life in
10    that district was fierce.
11            Q.    And up until the time you left in
12    2004, competition from other OEMs was fierce.

```
13          A.   Every deal is fierce, Jeremy,
14    honestly, yeah.  I mean, yeah.
15          Q.   And -- and including both in
16    vocational and open-road trucks.
17          A.   Yes.
18          Q.   Okay.  Now, at the bottom of the
19    page you say, "must continue to push dealer
20    sales reps to get on this business and stay on
21    top of it."
22          A.   Where?
23          Q.   The bottom of the first page.
24          A.   Okay.
00151:01          Q.   Do you see that?
02          A.   "Must continue."  We were told that
03    we had to get our dealers sales rep on the
04    business and out there selling trucks.
05          Q.   And you agreed with that.
06          A.   That's what sales is all about; you
07    have to be in front of the customer.  You have
08    to contact customers.
```

**21. PAGE 152:22 TO 153:16  (RUNNING 00:00:55.200)**

```
22          Q.   Okay.  I'm showing you Exhibit 13,
23    and it -- is this another one of those monthly
24    reports, this time dated March 1997?
00153:01          A.   Yes.
02          Q.   And just focusing you under
03    Competitive Activities, that second box, you
04    say, "price..price..price is a major obstacle in
05    securing new business."
06          A.   Yes.
07          Q.   And then you go on through that
08    paragraph and talk about focusing on Ford
09    accounts and what other manufacturers were
10    doing.  "Pete, Kenworth aggressively pursuing
11    Mack vocational business."  Were those -- were
12    Ford, Pete, Kenworth, were they meaningful price
13    competition to Mack products?
14          A.   Yes.
15          Q.   And, again, that continued up until
16    the end of your tenure at Mack Trucks.
```

**22. PAGE 153:20 TO 154:02  (RUNNING 00:00:14.200)**

```
20          Q.   Okay.  With the exception of Ford
21    not being there at the end of your tenure.
22          A.   Pete and Kenworth were competitors,
23    yes.
24          Q.   And were -- and continued to be
00154:01    significant price competition until that time.
02          A.   Yes.
```

**23. PAGE 156:23 TO 157:03  (RUNNING 00:00:13.400)**

```
23          Q.   And you understand that happens
24    sometimes, that a customer will choose one
00157:01    product over another, even though it's more
02    expensive than the other product.
03          A.   Yes.
```

**24. PAGE 158:08 TO 159:01  (RUNNING 00:00:36.767)**

```
08          Q.   (By Mr. Heep)  All right.  Why don't
09    we start with this example, okay, this, you
```

```
10    know, Kenworth/Freightliner, and we'll take the
11    example of there -- there being two different
12    products involved.  Okay, one is Kenworth; one's
13    Freightliner.
14         A.    Uh-huh.
15         Q.    And there -- and they're different
16    prices.  And here it looks like they're a little
17    bit close.  The customer here actually decided,
18    according to this letter -- we don't know what
19    actually happened -- but according to this
20    letter the customer -- looks like the customer
21    decided to buy the more expensive truck.
22              And I'm just asking, based on your
23    experience, what are the kinds of things that a
24    customer thinks about in making a purchase like
00159:01    this?
```

**25. PAGE 159:05 TO 160:19  (RUNNING 00:01:48.600)**

```
05         A.    Color of the truck, specs.  I mean,
06    in trucks that -- the color can be an issue;
07    interior package, but that goes along with
08    specifications.  That covers a waterfront of
09    things; availability; the perception in the
10    marketplace of maybe quality.
11         Q.    Can you think of anything else?
12         A.    I don't know what's going to go
13    through every customer, buyers, but, I mean,
14    those are the ones that come off the top of my
15    head.
16         Q.    Okay.  Maybe the reputation of the
17    product, would that be one?
18         A.    Perception in the marketplace,
19    that's what I meant.
20         Q.    Okay.  How about reputation of the
21    dealer itself?
22         A.    Possibly.
23         Q.    Okay.  How about the proximity of
24    the dealer to the customer?
00160:01        A.    Possibly.
02         Q.    You say "possibly," but we don't
03    know --
04         A.    It could.  It's up to the individual
05    buyer, but to me, I'm a price buyer and I buy --
06    I purchased cars when I traveled.  I mean, I'm
07    not a loyal dealer guy, you know, that I deal
08    with one specific dealer in my own preference,
09    or a Sears, Kaufman's, Gimbel's --
10         Q.    Right.
11         A.    -- Horn's, I mean, that's not it.
12         Q.    That's how you are.
13         A.    Right.
14         Q.    But in your experience, customers,
15    one customer, might say:  I want to buy from the
16    guy down the street; and another guy might say:
17    I want to buy on price.  Another guy might say:
18    I want to buy Freightliner over Kenworth because
19    of the quality.  Is that right?
```

**26. PAGE 160:21 TO 161:01  (RUNNING 00:00:07.000)**

```
21         Q.    Okay.  And it could be a matter of
22    relationship, couldn't it?
```

```
  23                 MR. PARKS:  What could be?
  24                 MR. HEEP:  The decision which truck
00161:01   to buy.
```

**27. PAGE 161:03 TO 161:08  (RUNNING 00:00:10.900)**

```
  03            A.   I guess yes.
  04            Q.   I mean, if you have a history, a
  05   long history, of dealing with one, you might
  06   just like that dealer and the customer service
  07   that they've provided.
  08            A.   That could be part of it.
```

**28. PAGE 168:21 TO 169:01  (RUNNING 00:00:07.900)**

```
  21   questions each in turn then.  The perception of
  22   reliability in the marketplace is often, in your
  23   experience, an important criteria for
  24   customers.
00169:01            A.   I wouldn't say often.
```

**29. PAGE 169:03 TO 170:14  (RUNNING 00:01:13.800)**

```
  03            A.   I'd say it could be.
  04            Q.   And -- and the product's reputation
  05   in the marketplace is also often an important
  06   criteria to a purchaser; isn't it?
  07                 MR. PARKS:  Objection to "also."  He
  08   just said to your last question, "no, not
  09   often," and then you put "also" in your next
  10   question.
  11            Q.   Okay.  Taking the word "also" out,
  12   that reputation of the product in the
  13   marketplace, in your experience, is a very
  14   important criteria, isn't it?
  15            A.   It's possible.
  16            Q.   You say it's possible, but isn't it,
  17   in your experience, isn't the reputation of the
  18   product important?
  19            A.   It's always important to me.
  20            Q.   But isn't it -- in your experience
  21   isn't it important?  Haven't you understood it
  22   to be important to customers?
  23            A.   If it was -- if it was -- Mack
  24   Trucks has suffered severe product problems
00170:01   through the years, and some of those customers
  02   stuck with them, and they didn't speak very
  03   highly of them.  So I can't -- I can't answer
  04   that.
  05            Q.   You can't answer.  Sometimes --
  06   sometimes they might stick with a particular
  07   brand because they like that brand, and
  08   sometimes they might dump it because they think
  09   quality's gone bad; is that right?
  10            A.   It's possible.
  11            Q.   Okay.  And then Manly also mentioned
  12   the reputation of the dealer.  Is -- in your
  13   experience is the reputation of a dealer an
  14   important factor to customers?
```

**30. PAGE 170:16 TO 173:02  (RUNNING 00:02:17.800)**

```
  16            A.   It's possible.
  17            Q.   And in your experience, is the -- is
  18   the proximity of the dealer to the customer, to
```

19 use your words, possibly or sometimes an
20 important criteria to a purchaser?
21   A. Could be a factor.
22   Q. Okay.  So amongst all the factors --
23 and you also mentioned price.  Amongst all those
24 factors, the only way you can know why a
00171:01 customer has bought a truck from a particular
02 dealer is by asking that customer, isn't it?
03   A. Possibly.  I mean, I'm not sure.
04 There's probably market surveys out there.  I
05 can't answer that, Jeremy.  I mean, you're
06 asking me something that -- I didn't sell the
07 trucks, so I don't know.  If you think you have
08 to ask the customer that question, then I guess
09 you do, but I'm not saying that.  I don't know
10 that.
11   Q. But of all these factors, without
12 asking the customer, you don't know whether they
13 purchased because of price, reputation,
14 proximity, availability, product or anything
15 else; right?
16   A. I -- I wouldn't know that, whether
17 you talk to the dealer or the customer.  The
18 dealer might even know why he did it, not
19 necessarily me.
20   Q. Well, how would the dealer know?
21   A. Well, he would have -- he would have
22 a relationship or structured a deal or something
23 with the customer.
24   Q. He would know because the customer
00172:01 would tell him; right?
02   A. The customer or the guy in the shop
03 or somebody, I mean, yeah.  I mean, if he had
04 communications with somebody, who that is or
05 what they said, I don't know that.
06   Q. Well, even if it's a guy in the
07 shop, he's going to get that information from
08 the customer.  I mean, ultimately you got to ask
09 the customer, right, why did he buy the truck.
10   A. Yeah.
11   Q. Okay.  And if a dealer doesn't sell
12 a truck, if you wanted to figure out why the
13 dealer didn't sell the truck, you'd have to ask
14 the customer, wouldn't you, why he didn't buy it
15 from that particular dealer?
16   A. If the dealer wanted to know that, I
17 mean, he's not going to ask me why he didn't buy
18 it, so he'd have to talk to his customer or
19 whoever.
20   Q. He'd have to talk to -- if he wanted
21 to know whether the reason was any of those
22 reasons, whether it was color, specs,
23 availability, perception of reliability,
24 perception of product, perception of the dealer,
00173:01 proximity or price, I mean, you would have to
02 ask the customer, wouldn't you?

**31. PAGE 173:04 TO 173:06  (RUNNING 00:00:06.200)**

04   A. You have to ask the buyer or -- I'm
05 not in the head of every customer, obviously.  I
06 don't know that.

CONFIDENTIAL                      

**32. PAGE 202:05 TO 202:18 (RUNNING 00:00:58.000)**

```
05          Q.   I am showing you Exhibit 15.
06          MR. PARKS:  16.
07          Q.   Excuse me.  I am showing you Exhibit
08     16.
09          A.   Uh-huh.
10          Q.   Without going into any detail at
11     this point, would you just page through this and
12     identify these documents, all but the last two
13     pages, as your handwriting in addition to, you
14     know, whatever is typed.  I understand the typed
15     portions are not your handwriting.
16          A.   Yeah, page 1, page 2 is mine.  Yeah,
17     page 3, page 4.  Let me see, back up.  Page 4,
18     5, yeah.
```

**33. PAGE 308:09 TO 308:15 (RUNNING 00:00:47.200)**

```
09          Q.   Showing you Exhibit 25, do you
10     recognize this document?
11               Try to move it along.  Do you
12     recognize this as the affidavit or declaration
13     that you submitted in the antitrust litigation
14     in Pennsylvania on May 7, 2004?
15          A.   Yes.
```

**34. PAGE 313:08 TO 317:14 (RUNNING 00:05:03.200)**

```
08          Q.   Well, did you ever talk to Manly
09     before you were terminated from Mack Trucks?
10          A.   I don't think I did.
11          Q.   Okay.  Or anyone from Duane Morris
12     or from Cooper & Elliott?
13          A.   No.
14          Q.   And we're excluding depositions;
15     right?
16          A.   Yeah.
17          Q.   Okay.  So the one or two times
18     since that, since your employment with Mack
19     Trucks --
20          A.   Yes.
21          Q.   -- what did you discuss with Manly?
22          A.   I can't remember all the -- I've
23     been through so much, I can't remember it.  I
24     just don't recall it.
00314:01    Q.   Were they in person or by phone?
02          A.   I'm sorry?
03          Q.   In person or by phone?
04          A.   I don't know if he was here or not.
05     I was here talking to Rex, and I can't recall if
06     Manly was there or if it was by phone.  I just
07     don't recall that, and I mean I --
08          Q.   How long did each -- how long did
09     each meeting with Manly last?
10          A.   I didn't log the time so I don't
11     know.  I can't remember.  I mean, it's -- I
12     didn't take notes, and I didn't log it.
13          Q.   Other than those meetings with --
14     those one or two meetings with Manly, have you
15     ever met with anyone else at the Duane Morris
16     law firm at any time?
17          A.   No.
18          Q.   Okay.  And so did you at any time
```

19    mark up or make corrections to this declaration
20    before it became finalized?
21        A.   I don't -- I don't recall that.  I
22    think I read it.  I don't think I did.
23        Q.   You just read it and said everything
24    looks okay and you signed it.
00315:01      A.   Jeremy, I don't even remember
02    reading it now.  I mean, I did.  I had it.  I
03    faxed it back, but I just don't even remember
04    reading it.  I mean, I did read it.  I -- I
05    don't have a copy.  If you have a copy of
06    something, I mean, I don't have a copy of it.
07           So I may have a copy of the final
08    thing, but I don't recall making corrections,
09    and maybe that's when I talked to whatever his
10    name was.  I wish I could remember his name, but
11    I don't recall guy's name.
12        Q.   Did -- did you --
13        A.   I don't even know if he was an
14    attorney.  I mean, he may have been a clerk.  I
15    don't know that.
16        Q.   Did you -- did you get your version
17    of this by e-mail or fax or some other way?
18        A.   Version of this?  By, I believe it
19    was, fax.  Jeremy, I just can't recall.
20        Q.   Do you have any -- any version of
21    this on your computer?
22        A.   No.
23        Q.   And have you kept in your files any
24    previous version of this?
00316:01      A.   No.  I have, I believe, this copy
02    somewhere.
03        Q.   Okay.  Let's turn to page 2.  You
04    say under point 4, "In my experience, the
05    following has been true about the Class 8 truck
06    industry:  (a) The single biggest difference in
07    Mack trucks of the same model is the model
08    year."
09        A.   I believe that to be true.  It's the
10    same model, same specs.  It's the model year.
11        Q.   Right.
12        A.   Discounting color or something like
13    that.
14        Q.   You would -- you would agree with me
15    that you really couldn't compare a -- when we're
16    talking about pricing trucks, you couldn't --
17    you couldn't compare a model year '04 with a
18    model year '05.
19        A.   No, that's not necessarily true.  It
20    depends on the price code.  We have had '05
21    model years that were at '04 price level.
22        Q.   Uh-huh.
23        A.   I'm using those as an example.
24        Q.   Sure.
00317:01      A.   We had an '03 that if -- once in a
02    while there would have been a window where we
03    need an order, and the dealers can order an '02,
04    an '02 model year truck at -- or '03 model year
05    at the last '02 price level.
06        Q.   Uh-huh.  So sometimes -- so
07    sometimes you're able to order a new model year
08    at the old model year price level and sometimes

CONFIDENTIAL

```
09      you're not.
10              A.    That's fair.
11              Q.    Okay.  And as a general matter, you
12      would expect -- you would understand a customer
13      to expect to pay a little bit more for a newer
14      model year than an older model year.
```

### 35. PAGE 317:16 TO 319:14 (RUNNING 00:01:44.900)

```
16              A.    You would expect the customer to pay
17      more for a newer model year?
18              Q.    You understand the customer to
19      expect to pay a little bit more for a newer
20      model year, like an '05 than an older model year
21      than an '04, just as a general matter.
22              A.    That -- that might be what we
23      expect.  The customers don't always expect that.
24              Q.    Okay.  Sometimes they might;
00318:01   sometimes they might not.
02              A.    It's a possibility.
03              Q.    Sometimes they'll try to get the
04      same price for a newer model year.
05              A.    Right.
06              Q.    Now, you mentioned price -- price
07      books or price codes.
08              A.    Uh-huh.
09              Q.    In any one year there might be three
10      or four price books; is that right?
11              A.    Price codes, there could be price
12      increases.  You know, there could be '05A, '05B,
13      '05C.  That could happen.
14              Q.    Okay.  So, for example, from B to C
15      there might be a price increase.
16              A.    Could be.  And it might be a spec
17      change.
18              Q.    Or a spec change.  And the spec
19      change, I take it, could cause the price
20      increase; right?
21              A.    Or a decrease.
22              Q.    Or a decrease if this spec change
23      made it a less expensive --
24              A.    Well, I'm not trying to be wise.
00319:01   That's true; it can be a decrease.
02              Q.    Sure.  No, I -- I understand.
03                    If -- let's suppose there weren't a
04      spec change, but there's a price increase from
05      book B to book C.
06              A.    Uh-huh.
07              Q.    And one dealer quotes before the
08      price change under book B and the second dealer
09      quotes under book C, okay action but the trucks
10      are otherwise the same.
11                    Do you agree with me in order to
12      equalize them on sales assistance, you would
13      have to give them different percentages of
14      discount?
```

### 36. PAGE 319:16 TO 321:04 (RUNNING 00:01:43.100)

```
16              A.    That's a possibility, I guess.  I
17      mean, probably, Jeremy, but, I mean, you're
18      asking me a hypothetical situation.  I -- I --
19              Q.    Not really.  It's not just a
```

```
20    possibility.  It's the truth; right?  If you
21    wanted to equalize your prices from B to C and
22    it was otherwise the same truck but was a higher
23    price book, then you would have to give
24    different amounts of sales assistance, wouldn't
00320:01    you?
02         A.   Right.  I agree with that.
03         Q.   Okay.  Now, in 4(b) you say, "Most
04    alterations to Mack trucks to meet customer
05    specifications are generally minor."
06         Now, but a minute ago you mentioned
07    there might be spec changes that affect price;
08    right?
09         A.   Uh-huh.
10         Q.   Okay.  So sometimes a spec change is
11    going to cause the vehicle to be more expensive,
12    and then as you pointed out to me, it might
13    actually cause it to be less expensive; right?
14         A.   Correct.
15         Q.   And are those -- are those kind of
16    spec changes that you're -- that are causing a
17    difference in price, are you calling those
18    minor?
19         A.   Yeah.  I mean, first of all,
20    especially if it's on a factory order truck,
21    they're minor.  I mean, it's a matter of a minor
22    change in the computer.  Even a transmission
23    change after the fact is really a minor change.
24    A wheel base change is a minor change.  Dealers
00321:01    do it every day.
02         Q.   Okay.  So you're calling them minor
03    changes, but they -- but they will or can often
04    impact the final selling price; right?
```

**37.  PAGE 321:08 TO 324:15  (RUNNING 00:03:00.300)**

```
08         A.   Yeah, it can.
09         Q.   Okay.  And would -- and you're
10    calling an engine change a minor change?
11         A.   I didn't say that.
12         Q.   Oh, okay.  Would you agree that an
13    engine change, a change in engine is not a minor
14    change?
15         A.   If you're going to do it after the
16    truck is built, it's different.  That requires
17    removing the hood, pulling the engine out,
18    blocking the engine out.  There's some
19    electronics involved in that, but that would be
20    more than minor as compared to a transmission
21    change, I believe.
22         Q.   Okay.  And then I guess especially
23    with EPA '02 engines.
24         A.   Well, there are some things you're
00322:01    restricted you probably couldn't do.
02         Q.   Uh-huh.
03         A.   Have one model, a vocational truck
04    to an over-the-road truck, they just don't do
05    that anyway.
06         Q.   A sleeper versus a day cab, that
07    would be a pretty significant change, wouldn't
08    it?
09         MR. PARKS:  Objection.  What change,
```

```
10    like to convert a sleeper into a day cab?
11            MR. HEEP:  Well, I'm trying to
12    figure out what Mr. Lusty's saying here in 4(b).
13         Q.   Where it says, "Most alterations to
14    Mack trucks to meet customer specifications are
15    generally minor," and I'm -- I'm asking if the
16    difference between a sleeper and a day cab is a
17    specification that's generally minor.
18         A.   Actually, we built that truck to
19    make it a minor specification change.  When you
20    take a sleeper off, you remove an air bag
21    suspension, put a little cross member in there,
22    and they've got a back panel that's already
23    prefabbed, and you spot weld that in and paint
24    it and you're done.  That's really a relatively
00323:01    minor change.
02         Q.   And the -- it would cause a
03    difference in price, wouldn't it, for a dealer?
04         A.   For a dealer to do that?  I mean,
05    are you talking about a new truck or something
06    on a dealer's lot?
07         Q.   Well, I mean, let's talk about new
08    class 8 trucks.
09         A.   Okay, new class 8 trucks.  Sitting
10    on a dealer lot or a factory order truck?
11         Q.   Well, either way.
12         A.   Well, it's nothing -- it's nothing
13    to change the spec in a computer when you're
14    ordering it.  I mean, it's either going to have
15    a sleeper or it's not.
16         Q.   Right.
17         A.   It could be a vocational truck.  You
18    could have two fuel tanks.  You could have a
19    clear frame rail, different transmissions.
20    That's pretty -- it's minor to change in the
21    computer.  It's minor to build the truck from an
22    order like that.  I mean, people do that.  We
23    had -- there were periods of time when you could
24    change an order, you know, a window of
00324:01    opportunity to change orders.
02         Q.   Right.  But as you said earlier,
03    those specifications changes, even though you're
04    describing them as minor, will certainly cause
05    price changes; right?
06         A.   They could.
07            MR. PARKS:  Objection.
08         Q.   How about central tire inflation,
09    would you call that a minor specification?
10         A.   I'm not really familiar with that
11    spec and even what it costs.  I've never quoted
12    a truck with that on it.
13         Q.   How about brakes, changes in the
14    break system?
15         A.   Depends on what change.
```

**38.  PAGE 324:17 TO 325:01  (RUNNING 00:00:29.000)**

```
17         Q.   You agree, though, that having a
18    different brake system would also cause the
19    truck to be priced differently.
20         A.   It could.  I mean, depending on the
21    spec, I guess.  It depends on what you're
```

CONFIDENTIAL

```
        22    talking about.  It could.
        23            Q.   In general, you agree with the
        24    general statement that changes to specifications
00325:01    cause the truck to be priced differently.
```

**39. PAGE 325:04 TO 325:04  (RUNNING 00:00:01.100)**

```
        04            A.   It could.
```

**40. PAGE 329:12 TO 330:24  (RUNNING 00:01:48.200)**

```
        12            Q.   Look at page 8 under Bolus Trucking,
        13    Paragraph 49.
        14            A.   Okay.
        15            Q.   You say -- you explain the whole
        16    situation.  You've given testimony about this
        17    before, too.  And you say in the last sentence,
        18    "By that time, however, Triple Cities Mack had
        19    secured the deal."
        20            Do you see at least where I am?
        21            A.   Uh-huh.  Yeah.
        22            Q.   Okay.  And your point is not that
        23    Toledo Mack was not equalized, right; your point
        24    is that there was a delay in equalization; is
00330:01    that right?
        02            A.   No.  My point there was Toledo Mack
        03    was not equalized at every step of the deal.
        04    There was a delay.  There was a: "Fuck him, let
        05    him start at two and a half percent."  And then
        06    it -- and then there was a question in that
        07    deal -- now, it's coming back.
        08            There was a question of the
        09    surcharge, and I never could get all of the
        10    ingredients of that deal at one time from Frank
        11    Schriffert to give Dave Yeager all of the
        12    discount, terms, conditions up front so he could
        13    intelligently and professionally quote a deal to
        14    the customer.  I did not have all the
        15    ingredients of the deal at any one given time.
        16            Q.   Well, you say at the end that he
        17    finally did reach the 8 percent plus $2,400
        18    concessions level that had been in place for
        19    Triple Mack -- Triple Cities Mack from the
        20    outset; right?
        21            A.   Yes.
        22            Q.   So you're saying that it was -- that
        23    he did finally reach the level that Triple
        24    Cities Mack had; right?
```

**41. PAGE 334:07 TO 337:04  (RUNNING 00:02:17.100)**

```
        07            A.   Eventually they finally reached --
        08    it was my understanding with the information I
        09    had, they had reached the 8 percent plus the
        10    $2,400 in concession level that had been in
        11    place for Triple Cities.
        12            Q.   (By Mr. Heep)  Okay.  And then you
        13    say, "By that time, however, Triple Cities Mack
        14    had secured the deal"; right?
        15            A.   Yes.
        16            Q.   Okay.  So you're not saying --
        17    you're saying that Toledo Mack was equalized,
        18    but by the time it was, Triple Cities Mack had
        19    already secured the deal; right?
```

```
 20         A.   Yes.
 21         Q.   Okay.  And how do you know that
 22   Triple Cities Mack had secured the deal?
 23         A.   Frank Schriffert told me that Triple
 24   Cities Mack secured the deal.
00335:01    Q.   Okay.  And -- and when did he tell
 02   you that?
 03         A.   Oh, I can't remember that.
 04         Q.   Did he?
 05         A.   Did he -- how do I know that Triple
 06   Cities Mack secured the deal?
 07         Q.   How do you know that Triple Cities
 08   Mack secured the deal before Toledo Mack had an
 09   opportunity to quote?
 10         A.   If I had all those documents, I
 11   could walk you through that whole deal from the
 12   beginning to the end and show you the delays, me
 13   trying and going to get the discount.
 14              If I don't -- if you're not
 15   equalized on day one, you're at a disadvantage.
 16   The first time you apply for our sales
 17   assistance and you're not equalized, you're at a
 18   disadvantage.
 19              First of all, your credibility as a
 20   Mack dealer, I believe, is at stake.  That's my
 21   opinion.  And this went on, and it was back and
 22   forth and it was piecemeal.  The discount was
 23   given X percent here and "Well, we don't know
 24   about the surcharge because of these factors.
00336:01         "  I can't remember, but it's in a
 02   lot of notes in there, and I haven't looked at
 03   this stuff for a long time, and so it's not
 04   fresh in my mind, but when I gave my deposition,
 05   I could talk about that.
 06         Q.   Okay.  My only question is, how did
 07   you know that Triple Cities Mack secured the
 08   deal before Toledo Mack was equalized?
 09         A.   Frank Schriffert told me they
 10   secured the deal.
 11         Q.   Before Toledo Mack got its sales
 12   assistance?
 13         A.   I would have to look at my other
 14   notes on that, Jeremy.  I can't recall that.
 15         Q.   Okay.  Sitting here you don't know?
 16         A.   What's that?
 17         Q.   Sitting here, without looking at the
 18   notes, you don't know.
 19         A.   Yeah, I can't recall that.
 20         Q.   And did you ever talk to anyone
 21   about Bolus -- at Bolus about this?
 22         A.   Did I ever speak to Bolus?  No, I
 23   never spoke to Bolus.
 24         Q.   Do you have any idea how Toledo
00337:01   Mack's pricing even before it was equalized
 02   compared with Triple Mack's pricing, the price
 03   that it offered Bolus?
 04         A.   I never saw the actual quotes.
```

**42. PAGE 337:07 TO 339:13 (RUNNING 00:02:45.000)**

```
 07              In paragraph 51 you say that:  At a
 08   "fly-in" meeting of MTI district managers and
```

09    executives, I attended a lunch with Steve
10    Polzer.  At the lunch during a conversation
11    between Steve and myself, the subject of Toledo
12    Mack's lawsuit against MTI came up.  Steve told
13    me that he thought that MTI should just admit
14    its guilt and move on.
15              My first question is, when was this
16    fly-in meeting?
17         A.   That fly-in was in Texas.  It was in
18    Dallas at wherever the Sports World is.  I can't
19    remember the complex.  I think it was a
20    Radisson.  It wasn't a Cabella's but it was -- I
21    think it's called Sports World in Dallas.
22              And Steve Polzer -- I just happened
23    to walk in --
24              MR. EPSTEIN:  The question was when
00338:01    was this meeting.
02              THE WITNESS:  Okay.
03         A.   Yeah, I can't -- I don't know the
04    exact date, but it was -- it was my last --
05    whatever my record shows the last time I was in
06    Dallas with Mack Trucks at the sports deal.
07         Q.   Was anyone else present when you say
08    that Steve Polzer made this statement?
09         A.   Steve Polzer and I were standing up,
10    and Jeff Yelles was sitting -- actually, when we
11    ate, Jeff Yelles was sitting there, and there
12    was one other guy over there.  I think it was
13    Bill Everly.  But he wasn't involved in the
14    conversation.
15         Q.   Do you have any understanding what
16    Steve meant when he said "admit its guilt and
17    move on"?
18         A.   Yeah; about the Toledo Mack lawsuit,
19    price discrimination, the whole lawsuit, we
20    should just admit our guilt and move on and get
21    this thing behind us.
22         Q.   Did -- did he say those words, or
23    did he just say "admit its guilt and move on"?
24         A.   Admit its guilt and move on, and
00339:01    then another section there he says, "We need to
02    put this behind us."  That is what I remember
03    him telling me at that very moment.
04         Q.   Do you -- did you have a sense when
05    you were hearing these words of Steve he was
06    joking or being serious?
07         A.   Oh, dead serious.
08         Q.   Did you make any notes of this
09    conversation?
10         A.   They're in one of my notes
11    somewhere.
12         Q.   Sorry?
13         A.   Those are in some of my notes.

**43.  PAGE 360:22 TO 361:15  (RUNNING 00:01:03.100)**

22         Q.   (By Mr. Heep)  You're aware that
23    you've had many -- I'm sorry, not many -- you've
24    had at least four or five conversations that
00361:01    we're now aware of that Mr. Yeager recorded
02    telephonic conversations between you and him.
03         A.   I'm aware that has taken place.

```
04          Q.   Okay.  Do you remember in the 2001
05     time period Mr. Yeager telling you that he's
06     been spending all of his time in parts and that
07     he's now switching gears and getting into the
08     truck aspect of things?
09          A.   He told me something to that effect.
10          Q.   Okay.  When he told you that he has
11     been spending all of his time in parts and he's
12     now switching gears and getting into the truck
13     aspect of things, what did you understand him to
14     mean?
15          A.   You mean the day --
```

**44. PAGE 361:22 TO 363:01  (RUNNING 00:01:11.800)**

```
22          Q.   What did you understand Mr. Yeager
23     to mean?
24          A.   That Dave was involved in the part
00362:01 department physically and that he -- I mean, he
02     was riding herd back there.  He was building the
03     parts business.  He was himself there.  Mark was
04     out front with trucks, and then David was going
05     to get in and shake the truck sales up.
06          Q.   Okay.  You understood that as of
07     this time period around 2001 that Dave Yeager
08     started to engage himself personally, switched
09     gears personally and personally getting involved
10     in selling trucks at that point; is that right?
11              MR. PARKS:  Objection, foundation.
12              MR. EPSTEIN:  Join.
13          A.   To personally sell trucks, yeah.
14          Q.   Okay.  And tell me, just to be
15     clear, he was switching gears to do that, to use
16     his words.
17          A.   I don't know if I'd use "switching
18     gears."  If it's in there, I mean, he spent some
19     time in the parts department.  He built a parts
20     business, a deep discount truck warehouse
21     business, and he got that running smoothly.  It
22     was where he wanted it to be, and he was going
23     to get involved personally and guide and direct
24     truck sales along with Mark, who had been doing
00363:01 it.
```

**45. PAGE 380:01 TO 380:04  (RUNNING 00:00:09.600)**

```
00380:01          Q.   Was the Mack sales assistance
02     process manipulated by Mack employees in order
03     to steer deals away from certain Mack dealers
04     and to other Mack dealers?
```

**46. PAGE 380:09 TO 380:09  (RUNNING 00:00:01.000)**

```
09          A.   Yes.
```

**47. PAGE 381:05 TO 381:09  (RUNNING 00:00:10.700)**

```
05               Was one of the ways the sales
06     assistance process at Mack was manipulated by
07     Mack employees through delay in response to
08     requests for sales assistance?
09          A.   Yes.
```

**48. PAGE 381:16 TO 381:20  (RUNNING 00:00:11.000)**

```
16          Q.   Was one of the ways the sales
```

CONFIDENTIAL