**Polzer, Stephen (Vol. 01) - 11/19/2003**                              **1 CLIP  (RUNNING 03:07:25.233)**

JURY TRIAL - DAY 7     SEPTEMBER 21, 2006

**POLZER1**                              **82 SEGMENTS  (RUNNING 03:07:25.233)**

**1. PAGE 9:06 TO 9:11  (RUNNING 00:00:12.900)**

```
06      Q.   What is your position at Mack Trucks, sir?
07      A.   I am the director of commercial
08 administration.
09      Q.   And how long have you worked at Mack
10 Trucks?
11      A.   Twenty-five years three months.
```

**2. PAGE 10:24 TO 11:06  (RUNNING 00:00:23.000)**

```
24        Q.   To whom do you report?
00011:01  A.   Kevin Flaherty.  Senior vice president of
02 sales.
03        Q.   Are you in a particular department or
04 group at Mack?
05        A.   I am part of the sales organization.  We
06 have a little department, commercial administration.
```

**3. PAGE 11:07 TO 12:04  (RUNNING 00:01:05.000)**

```
07        Q.   Are you an accountant, sir?
08        A.   I passed the test.
09        Q.   Which test?
10        A.   Am I -- CPA test.  Am I practicing?  I do
11 not really use it.  But I did take the test and yes,
12 I passed it.
13        Q.   And when was that?
14        A.   I'm going to say it was around 1984, '85.
15        Q.   And where did you go to college?
16        A.   Bloomsburg University.
17        Q.   And what is your degree in?
18        A.   BS in accounting.
19        Q.   Do you have any postgraduate degrees?
20        A.   Yes, I do have a -- I did do -- finance.
21 I can't even think of what -- from Villanova
22 University, Master's Degree in finance from
23 Villanova University.
24        Q.   Anything else?
00012:01  A.   No, that is it.
02        Q.   When did you get your Master's at
03 Villanova?
04        A.   I completed that, I believe, in 1998.
```

**4. PAGE 13:16 TO 16:07  (RUNNING 00:03:33.000)**

```
16        Q.   Are you responsible or is your department
17 responsible, sir, for list pricing and net pricing
18 on sales to Mack?
19        A.   Yes.
20        Q.   And are you also responsible for list
21 pricing and net pricing on sales to Mack dealers?
22        A.   Yes.  But I -- can I clarify just a little
23 bit?
24        Q.   Sure.
00014:01  A.   There are limits as to what I in my
```

02 particular role can approve or not approve.  I can
03 approve to a certain level and then we do need the
04 approval -- once it gets over a certain level we do
05 need the head of finance and Kevin Flaherty to agree
06 or not to agree to try and quote different deals.
07      Q.   What are the limits of what you and your
08 department can approve?
09      A.   Currently -- and this probably just came
10 into place starting this -- I mean, more formalized
11 this year is, I believe you are aware that the
12 district manager has a certain amount of sales
13 assistance percentage that they can issue.  It then
14 goes to the regional vice president.  They have
15 another limit that they amy do without my knowledge
16 or without me ever seeing -- seeing the deal.  And
17 then if it -- if they are recommended something
18 beyond their limit, they will send it to me and I
19 have the ability to approve without any other
20 further review any deal that I feel will -- that
21 where the brand's gross profit will be zero or
22 better.
23                    Anything beyond zero, I need to
24 prepare -- anything where we are proposing that we
00015:01 may take actually a financial gross margin loss on a
02 deal, we will -- our group will prepare a financial
03 analysis of that deal, and we will forward that to
04 Stand Janis or Kevin Flaherty, who will make the
05 determination if we can proceed or if we need to
06 adjust it, amend, it or whatever.
07      Q.   And you said that's been formalized within
08 the last year?
09      A.   Correct.
10      Q.   What was the limits, if any, on your
11 authority prior to the last year?
12      A.   I would say I -- I would say I had the --
13 or I was approving deals that may have been at a
14 loss without having to go through their approval.
15 But on the very big deals where I knew that it was
16 going to be a judgment call, I needed more judgment
17 than myself to make that determination, in that we
18 had that process in place.
19      Q.   But there were no set guidelines?  It was
20 just something you determined based on your own
21 judgment that was something you should seek -- go
22 higher up on?
23      A.   I would say there were informal
24 guidelines.
00016:01      Q.   Tell me what those informal guidelines
02 were?
03      A.   I would say that if at the end of the day
04 there was a deal taken and there is visibility to
05 the profit and loss in that deal, and it was more
06 than somebody at a level higher than me did not
07 like, I would -- I would be questioned on it.

## 5. PAGE 22:13 TO 22:19  (RUNNING 00:00:20.000)

13 Because I am not an accountant.  On the -- you said
14 that the sales to the dealers are treated as
15 wholesale transactions; is that correct?
16      A.   Correct.
17      Q.   Are the sales to national accounts treated

```
        18  as retail transactions?
        19        A.   That is correct.
```

**6. PAGE 24:22 TO 25:08 (RUNNING 00:00:39.000)**

```
        22        Q.   And that allocation is handled by people
        23  on the finance end; is that right?
        24        A.   We have -- since Volvo has owned this we
00025:01  changed a little bit of the reporting structure.  It
        02  is my understanding that there is a -- the
        03  manufacturing division has it own accounting staff
        04  that would determine those calculations.
        05        Q.   And prior to Volvo, who made that
        06  determination?
        07        A.   I believe the plant accounting reported to
        08  the finance department.
```

**7. PAGE 26:11 TO 28:16 (RUNNING 00:02:36.500)**

```
        11        Q.   Okay.  Now, let's talk about sales
        12  assistance.  And let's focus for now on the sales
        13  assistance granted to dealers?
        14        A.   Excuse me.  Can you repeat that?
        15        Q.   Sales assistance granted to dealers?
        16        A.   Okay.
        17        Q.   We're on the dealer side and then we'll
        18  move hopefully at some point in this deposition to
        19  the other side, the national accounts side.  But I
        20  want to focus on dealers.
        21        A.   Okay.
        22        Q.   You said that -- you described your
        23  authority.  And you said that the district manager's
        24  and the regional vice presidents have authority?
00027:01        A.   Correct.
        02        Q.   Now, as I understand it, the -- in
        03  addition to the 35 percent discount there is
        04  standard sales assistance of 12 percent; is that
        05  right?
        06        A.   That's correct.
        07        Q.   Okay.  You are smiling?
        08        A.   I'm smiling because I am guessing you have
        09  gotten an education into this more than you probably
        10  care to have had.
        11        Q.   It's a shame I will never have a need to
        12  buy a truck.  Because I think I understand a little
        13  bit more than probably a lot of people.
        14        A.   Probably more than our DMs.
        15        Q.   So we have 35 percent which is an across
        16  the board discount?
        17        A.   That is actually in the dealer agreement,
        18  so we are contractually obligated to grant that to a
        19  dealer.
        20        Q.   And then there is standard sales
        21  assistance which is 12 percent, right?
        22        A.   Correct.
        23        Q.   Now, is that standard sales assistance
        24  available to a dealer on any deal?
00028:01        A.   Yes, it is.
        02        Q.   Now, in addition -- do you call that
        03  standard sales assistance or RSA?  Or what do you
        04  call it?  Let me ask it that way?
        05        A.   I would say it can go by three names,
        06  standard assistance, RSA, and our DMs will recognize
```

```
07  it as FD.  Factory discount.
08       Q.   FD?
09       A.   Yes.
10       Q.   Okay.  Now, for how long has that standard
11  sales assistance been 12 percent?
12       A.   With the introduction of the O3B price
13  book.
14       Q.   And prior to the O3B price book, what was
15  the standard sales assistance?
16       A.   It varied by model.
```

**8. PAGE 29:12 TO 30:22  (RUNNING 00:01:40.000)**

```
12       Q.   Okay.  Now, in addition to standard sales
13  assistance there is additional assistance available,
14  correct?
15       A.   Correct.
16       Q.   And the district managers have authority
17  to grant additional sales assistance, correct?
18       A.   Correct.
19       Q.   And what do you call that additional sales
20  assistance?
21       A.   The most common term is ESA.
22       Q.   Extra sales assistance?
23       A.   Exactly.  Yes.
24       Q.   Are there any other names used for it or
00030:01  initials?
02       A.   Additional sales assistance, I sometimes
03  because trying to uncomplicate the fact that our
04  current list pricing structure means we need three
05  levels, I will call it the negotiable sales
06  assistance.
07       Q.   Okay.
08       A.   But I just probably refer to that myself
09  as that.  That's how I try to explain it when
10  somebody does ask.
11       Q.   Now the district managers, what is their
12  authority with respect to this additional sales
13  assistance?
14       A.   Currently it is 2.5 percent, which would
15  be above the 35 and above the 12.
16       Q.   And the regional vice president, is it
17  5 percent?
18       A.   Currently it's 5 percent.
19       Q.   Five percent on top of the two and a half?
20       A.   No, no, no.  5 percent -- I'm sorry.  Two
21  and a half more on top of the two and a half.
22  5 percent on top of the 35 and the 12.
```

**9. PAGE 36:22 TO 37:11  (RUNNING 00:00:46.000)**

```
22       Q.   Was one of the reasons you came up with
23  this new sales system because regional vice
24  presidents had authorized deals that you did not, at
00037:01  levels that did you not approve of?
02       A.   No.
03       Q.   It was just a matter of the -- your list
04  price being out of line with the market?
05       A.   I would say that was definitely the
06  overriding consideration.
07       Q.   Now, the --
08       A.   Excuse me.  And the ease of administration
09  of getting everything on one playing field would
```

```
       10  make it a lot easier for the salesmen to quote
       11  trucks.
```

**10. PAGE 37:12 TO 39:24  (RUNNING 00:03:04.000)**

```
       12      Q.   Mr. Polzer, let me just -- before I ask
       13  you about this document let me follow-up with you on
       14  one thing that we were just talking about.
       15              You've testified that in your
       16  view Mack's list price was out of line with the
       17  market?
       18              MR. HEEP:  Objection to form.
       19                  - - -
       20  BY MR. MACK:
       21      Q.   You can answer.
       22      A.   It was out of line.  Yes.  I mean, market
       23  is considered the other trucking manufacturers, yes.
       24      Q.   Okay.  By that, do you mean Mack's list
00038:01  prices were higher than its competitors?
       02      A.   Yes.
       03      Q.   And why did you consider that difference
       04  between list prices to be out of line?
       05      A.   I guess maybe it was a personal preference
       06  that we were list pricing trucks of $200,000 of list
       07  price when we knew that the on-the-street price to
       08  sell that truck needed to be -- I am throwing a
       09  number out -- to be 70 or $75,000 and it became --
       10  it just didn't make sense to me.
       11      Q.   Was it because the list prices were out of
       12  line with the market, was it basically the case that
       13  sales assistance was being requested on every deal?
       14      A.   That was an end product of where our list
       15  prices were.  But I would not say that that was a
       16  determining factor.
       17      Q.   Okay.  That was certainly a consequence?
       18              MR. HEEP:  Objection to form.
       19              THE WITNESS:  If I believe I
       20          understand your question, yes.  It was
       21          more deals being routed to my machine
       22          given our current -- that would be a
       23          correct statement.
       24                  - - -
00039:01  BY MR. MACK:
       02      Q.   And by being routed to your machine, you
       03  mean you were getting faced with situations where
       04  dealers were requesting more and more sales
       05  assistance?
       06              MR. HEEP:  Objection to form.
       07              THE WITNESS:  No, I would not
       08          agree to that statement.
       09                  - - -
       10  BY MR. MACK:
       11      Q.   You were seeing an increasing number of
       12  request for sales assistance?
       13              MR. HEEP:  Objection to form.
       14              THE WITNESS:  I would say, I
       15          don't know that the total number of sales
       16          assistance requests was changing.  We were
       17          selling so many deals.  But possibly the
       18          percentage of those sales assistance
       19          requests that would now acquire my
       20          approval level would be have been higher.
```

```
21              That is what I would be agreeing to.
22                      - - -
23  BY MR. MACK:
24      Q.  Okay.  Fair enough.
```

**11. PAGE 40:10 TO 40:12  (RUNNING 00:00:06.000)**

```
10      Q.  No consideration at all of sales
11  assistance, as you understand it, is given when Mack
12  prepares its budget?
```

**12. PAGE 41:04 TO 42:01  (RUNNING 00:01:09.000)**

```
04  BY MR. MACK:
05      Q.  You can answer.
06              MR. HEEP:  You can answer as
07          long as you are not guessing.
08              THE WITNESS:  I am not guessing?
09          Our budgets are determined based off of a
10          projected expected sales plus minus cost
11          of sales or a gross margin.
12              Sales assistance just happens to
13          be the process that is in place that
14          arrives at the sale -- the selling price
15          component of the sale in the cost and sale
16          equation.  So there is no specific dollar
17          amount or significance, in my opinion, of
18          the sales assistance dollar.  Each deal is
19          on its own and as trucks sell.  I mean --
20          I am sorry.
21                      - - -
22  BY MR. MACK:
23      Q.  Well, the budget is based on the net net
24  price?
00042:01    A.  Correct.
```

**13. PAGE 42:22 TO 44:01  (RUNNING 00:01:29.000)**

```
22      Q.  Sure.  What do you mean by net net
23  pricing?
24      A.  In my frame of reference, I feel I need to
00043:01 explain.  There is net pricing and then there is net
02  net pricing.
03              To me, net pricing would be
04  invoicing the truck with that negotiable extra sales
05  assistance amount that has been approved and firmed
06  up, and we could get into that process if you want.
07  That the dealer accepts our, you know, our whatever
08  we have said is the approved sales assistance, and
09  invoicing the sales assistance at the time of
10  invoice.  That would arrive you to a net price of
11  the truck.
12              Net net pricing would be the
13  request we get from various dealers to please
14  include the volume bonus, the 2 percent that we
15  would normally withhold, please deduct my invoice up
16  front for that.  That to me is net net pricing.  And
17  yes, that is the price that determines our
18  accounting sales price and invoice sales price.
19      Q.  Now the 2 percent is called a volume
20  bonus.  But the dealer gets that 2 percent on any
21  volume of trucks he sells?
22      A.  That's correct.  That is correct.
23      Q.  He is not -- it's not tied to selling a
```

```
    24  minimum level of trucks, correct?
00044:01     A.   That is correct.
```

**14. PAGE 54:24 TO 55:14 (RUNNING 00:00:41.600)**

```
    24       Q.   Do you recognize Exhibit-2, sir?
00055:01     A.   Yes, I do.
    02       Q.   Is this a memo that you sent to the dealer
    03  principals?
    04       A.   Yes.
    05       Q.   By principals that would be the owner of
    06  the dealership or the distributorship?
    07       A.   The memo was actually sent by our
    08  marketing department which is the communication
    09  program.  I can't speak for them, who they address
    10  all of these to.  Was it meant for the dealer
    11  principals at a minimum?  Yes, it was.
    12       Q.   And this memo is dated July 28, 2000,
    13  correct?
    14       A.   Correct.
```

**15. PAGE 57:05 TO 62:04 (RUNNING 00:06:24.200)**

```
    05       Q.   Now, there -- when we go down to the
    06  different models besides each model are listed two
    07  numbers?
    08       A.   Correct.
    09       Q.   And on the CH model I see 5-plus
    10  10 percent?
    11       A.   Correct.
    12       Q.   Does this mean that any dealer selling a
    13  CH would receive a 15 percent discount?
    14       A.   At a minimum, yes, that's what it says.
    15       Q.   And why did you break the numbers out 5
    16  plus 10 percent?
    17       A.   The left-hand side represents what the
    18  standard discount was known to the dealers for that
    19  particular price book they were dealing with.
    20               The right-hand side numbers was
    21  a recognition that the minimum price of a truck
    22  should be something lower, one, to lower the
    23  dealer's floor plan cost and the -- I will stop
    24  there.
00058:01     Q.   So on a CH you would get 35 plus 15,
    02  correct?
    03       A.   Correct.
    04       Q.   And if we do a similar exercise we could
    05  come up with a number for each of the other models
    06  listed there, right?
    07       A.   Correct.
    08       Q.   And in all events the dealer was to
    09  receive the discounts listed on this Polzer-2?
    10       A.   Correct.
    11       Q.   Now, how long did this billing structure
    12  remain in place?
    13       A.   Until we got to a price book where we just
    14  combined both of those numbers and made them the
    15  standard discount.
    16       Q.   And that is when it became 12 percent?
    17       A.   No.  That is -- this would still be under
    18  the old system.  This is when we had a system where
    19  a CH was 15.  Under the old system an RD was 14.
    20  And as you can see, an MR/LE was 12 and a half.
```

21    Q.    Does this memo say anything about extra
22 sales assistance or additional sales assistance?
23    A.    The memo does not say that.
24    Q.    Okay.
00059:01    A.    But there is an understanding that you
02 could still apply for extra sales assistance beyond
03 that.
04    Q.    This was not an attempt by you to do away
05 with the additional sales assistance program?
06    A.    It may have been an attempt to reduce the
07 need for the number of sales assistance requests
08 that we would see.
09    Q.    You say at the last paragraph, we're
10 confident you will appreciate the added benefits to
11 this one net-price system.  What did you mean by one
12 net-price there?
13    A.    I believe what I -- shall I know what I
14 meant by that was this was a point in time where
15 absolutely every single deal was going to have to
16 have a request for extra sales assistance.
17                There was a recognition that the
18 five -- the left-hand side numbers, the five, the
19 four and a half, which was at that time what was the
20 given invoice-able discount to the dealer was just
21 way to high.  And at that time we recognized every
22 deal would require additional sales assistance.  And
23 the amounts of additional sales assistance requested
24 were creeping up into the numbers you saw on the
00060:01 right-hand side there.
02                So what we thought we were doing
03 was, for instance, maybe in certain instances we
04 thought we were setting the minimum price on certain
05 truck sales that a dealer should not have to come
06 back for additional sales assistance.
07    Q.    What instances, sir?
08    A.    Excuse me?
09    Q.    What models?
10    A.    Excuse me?
11    Q.    What models did you believe you were
12 setting the minimum price?
13    A.    I believe all of them.
14    Q.    So it was your hope that these discounts
15 would do away with the need for dealers to come back
16 for additional sales assistance?
17                MR. HEEP:  Objection to form.
18          Go ahead.
19                THE WITNESS:  In certain
20          instances.  I mean, we knew that was not
21          going to stop the request.  The dealers
22          are entitled to apply on every single
23          truck.
24                    - - -
00061:01 BY MR. MACK:
02    Q.    Why is that?
03    A.    I believe that it is just a system that is
04 unique to Mack from any other OEM.  We do allow a
05 dealer to request sales assistance on every single
06 truck that they have in inventory or that they want
07 to order.
08    Q.    Now, have you ever participated in any
09 discussions at Mack regarding whether Mack should
10 switch to the system used by the other OEMs?

```
11                    MR. HEEP:  Objection.  Vague.
12                    THE WITNESS:  What system?
13                        - - -
14 BY MR. MACK:
15       Q.   You said the system Mack had was unique.
16 In what respect is it unique?
17       A.   It was my understanding that in other OEMs
18 when you ordered trucks you got them at a price --
19 and I have no specific knowledge as to how they
20 arrive at it -- but this is your price.  Don't come
21 back to us for any additional price unless it's
22 truly an extenuating circumstance, is my
23 understanding of how the other OEMs work.
24                    Mack I believe was unique in
00062:01 that we would allow a dealer to at least request on
02 every single truck.
03       Q.   Right.
04       A.   That was the unique system.
```

**16.  PAGE 71:14 TO 74:07  (RUNNING 00:03:25.400)**

```
14       Q.   This is another one of those sale
15 assistance forms, correct?
16       A.   Correct.
17       Q.   Now, the date where you entered your
18 comments is April 14th, 2003?
19       A.   Correct.
20       Q.   And this is for distributor -- sales
21 assistance request for distributor F273; is that
22 right?
23       A.   Correct.
24       Q.   Do you know what distributor that is?
00072:01      A.   That is Dallas Mack.  I do recognize that
02 code.
03       Q.   All right.  And in Dallas Mack -- the
04 district manager here requested equalization to
05 factory pricing, right?
06       A.   Correct.
07       Q.   And do you know what -- this was for
08 McNeilus; is that right?
09       A.   Actually I remember this.  Yes.  That is
10 correct.
11       Q.   Dallas Mack was attempting to quote
12 McNeilus?
13       A.   Yes.
14       Q.   And they were attempting to quote them on
15 50 stock boost-a-load chassis and also looking at 50
16 DM mixer chassis?
17       A.   That's what it says.
18       Q.   What's a stock boost-a-load chassis?
19       A.   I was hopping you were not going to ask
20 that.  I am not a truck spec guy.
21       Q.   You don't know what that model is?
22       A.   I would be guessing.
23       Q.   And the request came in to equalize
24 factory pricing.  Did you understand that to be a
00073:01 request by the dealer to be given the same pricing
02 that Mack gave to McNeilus?
03       A.   That is what I understood the request to
04 be.
05       Q.   And how did you respond to that request?
06       A.   I said McNeilus is a recognized national
```

```
      07  account to be counted by S100.
      08       Q.   And why did you write that, sir?
      09       A.   It was my opinion they were a designated
      10  national account.
      11       Q.   And as a result, the dealer did not
      12  receive the S100 pricing, right?
      13       A.   In fact, I believe this request is
      14  probably denied, sent back to him.
      15       Q.   Because only McNeilus was entitled to that
      16  first S100 pricing, right?
      17       A.   No.  I would disagree with that statement.
      18  I would agree to the statement that we were not --
      19  national accounts was the only entity that could
      20  sell to McNeilus.
      21       Q.   And what do you base that on?
      22       A.   Just my understanding is that -- or my
      23  belief that Mack was entitled to sell directly to
      24  certain accounts and it was -- I'm going on my own
00074:01  personal conviction -- it was Mack's -- conviction
      02  is too strong of a word -- belief that a dealer
      03  could not sell to that.  We were the seller of
      04  trucks to that account.
      05       Q.   That was your understanding as of
      06  April 14th, 2003, correct?
      07       A.   Correct.
```

**17.  PAGE 79:10 TO 81:03  (RUNNING 00:01:51.000)**

```
      10       Q.   You said that the dealers perceived that
      11  there was competition, right?
      12                 MR. HEEP:  Objection.  He didn't
      13            say that.
      14                 MR. MACK:  Yes, he did.  But go
      15            ahead.
      16                      - - -
      17  BY MR. MACK:
      18       Q.   Did the dealers perceive competition?
      19       A.   If you -- if you read the comments we get
      20  on the sales assistance requests, I would -- I would
      21  have to take the opinion they perceive that there is
      22  competition.
      23       Q.   Competition with McNeilus, right?
      24       A.   Correct.
00080:01       Q.   And the -- has your policy -- strike that.
      02  Has your understanding with respect to dealers
      03  receiving S100 pricing when quoting against McNeilus
      04  changed since April 14th, 2003?
      05                 MR. HEEP:  I'm sorry.  Can you
      06            read it back.  I sort of missed it.
      07                      - - -
      08  BY MR. MACK:
      09       Q.   Has your understanding, sir, regarding the
      10  issue you addressed here in your comment in
      11  Exhibit-4 changed since April 14th of 2003?
      12                 MR. HEEP:  Objection.  Vague.
      13                 THE WITNESS:  As I understand
      14            the question, no, it has not.
      15                      - - -
      16  BY MR. MACK:
      17       Q.   And if a dealer requested today, November
      18  the 19th, put in a request to be equalized to
      19  factory pricing for a sale to McNeilus, would that
```

```
    20   dealer receive S100 pricing?
    21                   MR. HEEP:  Objection to form.
    22                   THE WITNESS:  A sale to
    23             McNeilus, correct?
    24                      - - -
00081:01  BY MR. MACK:
    02        Q.   Yes, sir.
    03        A.   I would say the answer would be the same.
```

**18. PAGE 86:17 TO 90:17  (RUNNING 00:05:43.900)**

```
    17        Q.   Sure.  Is S100 pricing available to a
    18   dealer who puts in a sales assistance request and
    19   indicates on that request that he is competing
    20   against McNeilus?
    21        A.   What is the purpose -- what -- can you
    22   expand on who he is designated a customer?  Is he
    23   designating a customer or he is looking for a stock?
    24        Q.   Well, let's deal first with a situation
00087:01  where he designates a customer and says my
    02   competition for this customer is McNeilus.  I want
    03   the same pricing that McNeilus gets.  Would he get
    04   it?
    05        A.   It is my position that -- or how we are
    06   dealing with the sale assistance is that while there
    07   is a perception they feel they are competing, I do
    08   not have that same perception.  I do not feel it is
    09   direct competition, so they probably will not get --
    10   have not got -- it depends on a lot of other
    11   factors.  That is only one factor used in a sales
    12   assistance determination.
    13        Q.   If that is all the person says, I am
    14   competing against McNeilus, give me the same pricing
    15   that you give McNeilus, will you give that pricing
    16   to the to the dealer?
    17        A.   It will depend on the other factors
    18   involved in that situation.
    19        Q.   What are the other factors?
    20        A.   Quantity of trucks involved.
    21        Q.   Okay.
    22        A.   The fleet size of the customer.  Very
    23   possibly, potentially the geographic region of the
    24   customer.  It is just one of a lot of factors.
00088:01       Q.   Are any of those factors put in writing
    02   anywhere?
    03        A.   No, they are not.
    04        Q.   Have you ever -- to your knowledge, has
    05   anyone at Mack ever told the dealers you can receive
    06   the same pricing as McNeilus if you meet the
    07   following terms?
    08        A.   I'm not aware of that.
    09        Q.   Are you aware, sir, in any instances in
    10   which a dealer has received the same pricing as Mack
    11   gives McNeilus on a deal in which he indicates is
    12   competition with McNeilus?
    13        A.   I believe -- I mean, I am going to say --
    14   I want Jeremy to listen.  I believe it needs a
    15   clarification what we mean by equalizing now?
    16        Q.   Let's start first with same pricing?
    17        A.   Are you talking about -- when you talk
    18   equalization are you asking for a sales assistance
    19   percentage or are you looking for a net net price?
```

```
20      Q.   The old net net price?
21      A.   Have there been instances?  I would have
22  to say that there when taking in some of these other
23  factors that there probably have been some instances
24  that were unique to that particular situation that
00089:01  warranted it, that.
02      Q.   Can you give me any specific deals where a
03  dealer was given the same net net pricing as
04  McNeilus?
05      A.   The one I can remember was up in Pacific
06  Northwest for our Seattle Mack.  The customer was
07  Miles Sand & Gravel.
08      Q.   Any others that you can remember?
09      A.   I am sure there were.  Just not offhand.
10      Q.   How many truck on Miles Sand & Gravel?
11      A.   I believe it was for four.
12      Q.   Four trucks?
13      A.   Correct.
14      Q.   And what dealer is that?
15      A.   Excuse me?
16      Q.   What dealer?
17      A.   Dealer?  Seattle Mack.
18      Q.   And the dealer complained to Mack, did he
19  not, that he was competing against McNeilus and
20  McNeilus was beating him on price?
21              MR. HEEP:  Objection to the form
22          of the question.
23              THE WITNESS:  I did get an email
24          from the district manager related to that,
00090:01          yes.
02                   - - -
03  BY MR. MACK:
04      Q.   Who made the decision to give the dealer
05  the same net net pricing as McNeilus?
06      A.   If I remember, it was very close, very
07  close.
08      Q.   Who made the decision?
09      A.   Oh.  I did.  It would have been approved
10  by me.
11      Q.   Did you talk to anyone else about it?
12      A.   No, I did not.
13      Q.   Now, did you give the dealer the same
14  payment terms as McNeilus?
15      A.   That would not have come up.
16      Q.   McNeilus pays on how many days?
17      A.   Their terms are 120 days.  Are we getting
```

**19. PAGE 91:06 TO 91:10 (RUNNING 00:00:08.700)**

```
06      Q.   Did you give those pricing terms to the
07  dealer?
08      A.   No, we did not.
09      Q.   Or payment terms?
10      A.   No, we did not.
```

**20. PAGE 93:10 TO 94:06 (RUNNING 00:00:57.000)**

```
10      Q.   Okay.  Do you know, sir, why you turned
11  down this request for sales assistance?
12      A.   I don't know who it is.  I do knot know
13  who the customer is.
14      Q.   But at least according to your comments,
15  you weren't prepared to equalize with S100 pricing
```

```
16  in this instance if the truck was purchased through
17  the dealer?
18                    MR. HEEP:  Objection.  Asked and
19        answered.
20                    - - -
21  BY MR. MACK:
22        Q.   You can answer.
23        A.   Judging by the time frame if it was the
24  same customer as what we discussed three or four
00094:01  exhibits ago, that would have been the reason.
02        Q.   No, sir.  You can look at Exhibit-3.  It's
03  a different dealer.
04        A.   Do you know what?  It does not mean it was
05  not the same customer.  It still could have been the
06  same customer.
```

**21. PAGE 94:18 TO 95:12  (RUNNING 00:01:16.000)**

```
18        Q.   As we sit here today, can you tell me any
19  customers, national account customers of Mack where
20  you do not have that understanding?
21        A.   Repeat the understanding.
22        Q.   The understanding that they will only
23  receive S100 pricing if they purchase through Mack?
24        A.   I feel that question is misleading.  I am
00095:01  not aware of another situation with this particular
02  customer.  But I am also not aware that we wouldn't
03  be asking questions if somebody wanted to sell to an
04  established national account before we considered
05  giving sales assistance or not.
06        Q.   Why would you ask those questions, sir?
07  Why wouldn't you just process it like another sales
08  assistance request?
09        A.   Because it is a national account, and
10  there is a perception on my part that I should ask a
11  question if in fact somebody else can try and sell
12  to that account.
```

**22. PAGE 96:11 TO 98:08  (RUNNING 00:02:43.000)**

```
11        Q.   Is it your opinion, sir that Mack is not
12  obligated to equalize a dealer sales assistance
13  request with a national account Body Builder
14  discount?
15        A.   Yes, that is my opinion.
16        Q.   And have you had that opinion throughout
17  your entire -- the entire period of time that you
18  have been in the commercial administration
19  department?
20        A.   Yes.
21        Q.   And have you based your decisions
22  regarding the granting of sales assistance to
23  dealers requesting national account Body Builder
24  discounts on that opinion?
00097:01  A.   That has been one of the factors that goes
02  in -- that goes into -- it's one of the factors in
03  making a final approval to termination.
04        Q.   Can you think of any situation, sir, other
05  than this situation you've told us about in Seattle
06  where you have equalized a dealer sales assistance
07  request with a national account Body Builder
08  discount?
09        A.   I cannot think of a specific.  I am
```

CONFIDENTIAL

```
10    probably sure that there have been instances where
11    the other factors warranted doing something like
12    that or equalizing to whatever that level is.
13         Q.   Isn't it fair to say, Mr. Polzer, that in
14    most instances you have denied those requests for
15    equalization where a dealer is requesting the same
16    sales assistance as the national account Body
17    Builder discount?
18                    MR. HEEP:  Objection to form.
19                    THE WITNESS:  I would say I did
20              not deny an amount.  I did not deny in the
21              sense that I did not return any approval
22              of the negotiable sales assistance.
23                    I would say, in most cases I
24              approved an amount less than the net net
00098:01        price sales assistance discount.  And,
02              again, clarifying we're dealing with when
03              you talk about McNeilus as a national
04              account, the sales assistance discount is
05              that the dealer perceives it may be is not
06              the same as what it actually -- as to a
07              what a dealer equivalent discount would
08              be.
```

**23. PAGE 98:11 TO 99:20  (RUNNING 00:01:57.000)**

```
11         Q.   The percentages would be different, is
12    that what you are saying?
13         A.   I am telling you that the percentages that
14    Joe Favia thinks he uses for McNeilus is not
15    equivalent to what I would have to give a dealer to
16    be -- to theoretically equalize a dealer.
17         Q.   Well, I am confused now.  Because you said
18    before the percent a dealer thinks he gets.  And
19    then you lapsed into talking about Joe Favia.  What
20    does one have to do with the other?
21         A.   I just --
22         Q.   Mr. Favia is not a dealer?
23         A.   Mr. Favia also gave a deposition.  I am
24    aware of that.  And I am sure -- well.
00099:01        Q.   Have you reviewed --
02         A.   All I am saying --
03         Q.   Have you reviewed his testimony, sir?
04         A.   No, I have not.  What I am saying is when
05    Mr. Favia submits a sales assistance request and he
06    asks for a certain percentage, that percentage is
07    not, in my opinion, the percentage that I would have
08    to give a dealer in a theoretical situation where I
09    was equalizing, is what I am trying to say.
10         Q.   And why is there a difference?
11         A.   Because the way we invoice McNeilus.
12    McNeilus, we negotiate the final price, the net net
13    price, and the equivalent of is the final retail
14    price.  And there are -- there are sums of money
15    that they do not -- are not aware of that are added
16    beyond the sales assistance request that Joe Favia
17    would submit that go into the final price that, in
18    my opinion, if we need to equalize the dealer to
19    that final price that equalized discount would be
20    lower than what Joe Favia would be approved for him.
```

24. **PAGE 100:07 TO 102:02  (RUNNING 00:02:06.000)**

```
07        Q.   All right.  My question to you is whether
08   you have authority to approve net net pricing for a
09   dealer?
10        A.   I have the authority in those cases where
11   the gross profit will be zero or better, when I've
12   done the mathematical calculation at what the sales
13   assistance will be to get to the net net price you
14   are asking about, to approve that, if it falls in
15   the parameters that I'm allowed to approve.
16        Q.   Now, when I -- net net billing is the
17   exception rather than the rule, right?
18        A.   Yes.
19        Q.   I think there is -- I saw one memo from
20   you that said that it's -- that analyzed in what
21   percentage of the cases does Mack grant net net
22   billing?  Do you recall doing that analysis?
23        A.   I don't know that I did an official
24   analysis.  It was a, you know, above in the air cast
```
```
00101:01   as to how many invoices dealers were requested to
02   have there volume bonus credited to them at the time
03   of invoice, which is the net net part.
04        Q.   And then didn't you determine that in
05   70 percent of the cases dealers did not do that?
06                    MR. HEEP:  Objection to form and
07             foundation.
08                        - - -
09   BY MR. MACK:
10        Q.   You can answer.
11        A.   It could be around there.  Yes.  It's more
12   do not than do.
13        Q.   And did you determine what percentage of
14   the cases does Mack agree to that?
15                    MR. HEEP:  Objection.  Vague.
16                        - - -
17   BY MR. MACK:
18        Q.   Agree to net net billing?
19        A.   I can't give you an exact number.  But
20   like I said, it was a general assumption just
21   judging by the request for net net billing across my
22   desk.
23        Q.   Net net billing is advantageous to the
24   dealer, correct?
```
```
00102:01        A.   From a cash flow perspective, yes, it
02   would be.
```

25. **PAGE 102:08 TO 105:24  (RUNNING 00:05:20.200)**

```
08        Q.   Is Polzer Exhibit-7 an email that you sent
09   to Mr. Lusty in March of this year?
10        A.   Yes, I recognize it.
11        Q.   And this related to a sales assistance
12   request by Mr. Ralich who was asking for the same
13   discount and same terms given to Body Builders,
14   right?
15        A.   Correct.
16        Q.   And you, sir, did not equalize Mr. Ralich
17   with the Body Builders, did you?
18        A.   That is correct.
19        Q.   And in the email that you wrote to Mr.
20   Lusty, you said it's my opinion that we are not
21   obligated to equalize a dealer sales assistance
```

```
  22    request with a national account Body Builder
  23    discount, right?
  24         A.    Correct.
00103:01         Q.    And then you said, if it is another dealer
  02    Body Builder, i.e, Kimble, RDK, Schwing, Putzmeister
  03    involved, yes.  But not the national account Body
  04    Builder.  And you said McNeilus, Heil, and McClain?
  05         A.    Correct.
  06         Q.    Now, do I understand that to mean that if
  07    a dealer is requesting equalization with the pricing
  08    given by Mack on a transaction involving Kimble,
  09    RDK, Schwing, or Putzmeister, that dealer should be
  10    equalized?
  11                   MR. HEEP:  Objection.  Vague and
  12              compound.
  13                   THE WITNESS:  Yes.  I believe
  14              what I was intending to write there that
  15              if a dealer was submitting a sales
  16              assistance to sell directly to Kimble,
  17              RDK, Schwing, or Putzmeister, we were
  18              obligated to equalize to those discounts
  19              that had been given to the current dealers
  20              who were selling to that account.  That is
  21              what I meant by that statement.
  22                        - - -
  23    BY MR. MACK:
  24         Q.    And then you -- in the next sentence you
00104:01    talked about the quantity issue; is that right?
  02         A.    Correct.
  03         Q.    And then you said, I believe that is why
  04    we used to come up with Body Builder programs to try
  05    and get the dealers close to the McNeilus discount.
  06    What are you referring to there by the Body Builder
  07    programs?
  08         A.    When I first took over, which would have
  09    been August of 1998 in the current capacity, we did
  10    have a program that was available to all dealers
  11    where we guaranteed -- guarantee -- where we said if
  12    you met certain criteria you would have this
  13    additional discount.
  14                   And the intent of the program,
  15    and I believe the key word is to get close, to the
  16    McNeilus discounting that was in effect, at that
  17    particular point in time.
  18         Q.    Why is close the key word?
  19         A.    I believe close is the key word because I
  20    don't believe -- because it is part of my
  21    understanding we never had to -- we -- a little too
  22    strong.  Never say never.  We did not have to
  23    equalize.
  24         Q.    You were not -- you didn't have to
00105:01    equalize, but you were trying to get the dealers
  02    close to the McNeilus discount?
  03         A.    That was the intent of the program back
  04    then.
  05         Q.    Now, this talks -- you talked about the
  06    McNeilus discount, not the McNeilus net net price
  07    here, right?
  08         A.    I would have -- in my opinion they are the
  09    same.  If I say discount, it is the dealer equalized
  10    discount that gets to the net net price.
  11         Q.    And the McNeilus net net price was
```

```
12  better -- strike that.
13              The Body Builder programs got
14  the dealer close to the McNeilus net net price but
15  they didn't fully equalize the dealers with the
16  McNeilus in the net price?
17      A.   I would say that is -- I am sorry.  That
18  is a fair assumption.
19      Q.   And we have been sort of talking about
20  this.  But the McNeilus net net price is then --
21  would then be lower than the price the dealers were
22  getting under the Body Builder program than the net
23  net price to the dealer?
24      A.   I believe that is correct.
```

**26. PAGE 106:01 TO 106:03 (RUNNING 00:00:19.300)**

```
00106:01    Q.   And if the -- does McNeilus get the best
02  net net price on the models that it purchases of any
03  Mack customer purchasing those models?
```

**27. PAGE 106:18 TO 107:06 (RUNNING 00:00:36.600)**

```
18      A.   Actually, the answer probably would be no.
19      Q.   Okay.  Who has a better net net price than
20  McNeilus?  Ryder?
21      A.   Totally different market.
22      Q.   They don't buy the same models?
23      A.   No.
24      Q.   What market is McNeilus is?
00107:01    A.   Vocational.  Refuse predominantly, mixer.
02  I am sorry.  Mixer pretty much too.  But from Mack
03  they buy predominantly more refuse product vehicles
04  than they do mixer type vehicles.
05      Q.   Who gets a cheaper price than McNeilus as
06  a national account?
```

**28. PAGE 107:12 TO 107:12 (RUNNING 00:00:01.000)**

```
12      Q.   Waste Management?
```

**29. PAGE 107:19 TO 108:01 (RUNNING 00:00:11.600)**

```
19              THE WITNESS:  Okay.  I would say
20          it is Waste Management and there are a
21          couple large municipalities.
22              - - -
23  BY MR. MACK:
24      Q.   Like New York City?
00108:01    A.   Yes.
```

**30. PAGE 108:02 TO 108:13 (RUNNING 00:00:29.900)**

```
02      Q.   Now, in the last line of your email here
03  you said, obviously we will find out in the near
04  future if this is a valid pricing division, as this
05  is one of main contentions of the Toledo Mac
06  lawsuit.
07              That is a reference to the
08  lawsuit that we're here, today about, right?
09      A.   Correct.
10      Q.   And what when you said this is one of the
11  main contentions, what were you referring to?
12      A.   Obviously it was a poor attempt at trying
13  to play lawyer.
```

**31. PAGE 109:10 TO 110:18 (RUNNING 00:01:46.200)**

```
      10      Q.   Now, have you, sir, ever received any
      11  training or instruction at Mack regarding the
      12  Robinson Patman laws and how they may or may impact
      13  on the pricing decisions you made?
      14      A.   No, I did not.
      15      Q.   Have you ever received any training at
      16  Mack regarding the and antitrust laws in general?
      17      A.   I would have to answer probably not.
      18      Q.   Have you ever received any training at
      19  Mack regarding the applicability of any laws to the
      20  pricing decisions that you make?
      21      A.   I'm sorry.  Can you repeat that?
      22      Q.   Have you ever received any training at
      23  Mack regarding -- I am going to switch the question
      24  on you -- the applicability on any state dealer laws
00110:01  on the pricing decisions that you make?
      02              MR. HEEP:  When you say training
      03          in all these questions it is like a formal
      04          training program?
      05              MR. MACK:  Formal or informal.
      06              MR. HEEP:  Or would it also
      07          include whether he has gotten any advice
      08          from his counsel's office?
      09              MR. MACK:  Sure.  We will do
      10          them both.  Not in connection with this
      11          lawsuit?
      12              MR. HEEP:  Outside of the
      13          lawsuit.
      14              THE WITNESS:  I would have to
      15          answer formal training, no.  But as
      16          certain programs were developed, they were
      17          at times run up the legal flag pole,
      18          so-to-speak.
```

**32. PAGE 116:07 TO 125:04 (RUNNING 00:11:03.500)**

```
      07              Now, in your email Exhibit-7 you
      08  talk about the reason -- you say the reasoning is
      09  how do you rationalize a one truck order discount
      10  who uses the magic word McNeilus to a given 400
      11  quantity customer like McNeilus.  What did you mean
      12  by that?
      13      A.   It means that over -- over the course of
      14  five years I have probably looked at well over ten
      15  thousand sales assistance requests.  And what I have
      16  found is that dealers are not truthful on many of
      17  them.
      18              As an example, they
      19  intentionally, and we have documented proof of that,
      20  low-ball what they say the customer's selling price
      21  is to try and get us to make a sales assistance
      22  decision that we'll give them more discount than
      23  they probably truly need to effect that truck sale.
      24  That obviously hurts Mack's profitability.  It
00117:01  probably helps the dealers.
      02              It is my opinion that -- and I
      03  believe this was the case with Toledo Mac -- every
      04  single request for a vocational truck said use the
      05  word I'm up against McNeilus, I'm up against Heil, I
      06  am up against McClain, it is my opinion that could
      07  not possibly be the case every single time.  So that
```

08  is why it is one of the factors that I will look at
09  and try and make a rationalized decision that it --
10  are they really, really competing or are they not?
11                    And dealers who -- and
12  dealers -- they are smart.  They sometimes know if
13  they use concern buzz words they are going to try to
14  get us to make a decision that we otherwise may not
15  have to make.
16        Q.  Did you ever look at a situation and say,
17  do you know what, the dealer is not lying to me
18  here?
19        A.  I would say that Mile Sand & Gravel,
20  definitely based on the correspondence I received,
21  that that was probably a legitimate type of a
22  situation.
23        Q.  Okay.  One out of ten thousand?
24        A.  Do I believe -- again, we're now talking
00118:01  about a dealer perceiving that he is in direct
02  competition with McNeilus.  I -- I don't subscribe
03  to that theory that there is that.
04        Q.  Well, was it in this situation in Seattle,
05  was the dealer competing against McNeilus?
06        A.  In that case, the district manager did
07  some follow-up work and you have seen the email
08  where he verified that that was the case.
09        Q.  Is that the only situation you are aware
10  of, sir, in your entire history at the company where
11  you concluded or someone else working with you
12  concluded that there was actually competition
13  between the dealer and McNeilus?
14        A.  No.
15        Q.  There is other situations, you just can't
16  identify them?
17        A.  Yes.  I cannot remember anything specific,
18  but I do know that the DM or RVP will at some time
19  because if I -- I mean, if we get to the approval
20  process, there is a process for maintenance or
21  reconsideration of the sales assistance request.
22                    And there have been times, and I
23  know there have been times in that instance where I
24  have given back a sales assistance that didn't --
00119:01  maybe did not equalize to the net net.  But it was
02  asked to be reconsidered and the DM or RVP would
03  make a clarifying comment as to that factor.
04        Q.  When is the last time you sold a truck,
05  sir?
06                    MR. HEEP:  Objection.  Vague.
07                         - - -
08  BY MR. MACK:
09        Q.  If at all?
10                    MR. HEEP:  The last time that he
11              approved --
12                    MR. MACK:  Personally.
13                    MR. HEEP:  That he personally
14              sold a truck?
15                    MR. MACK:  Yes.
16                    MR. HEEP:  Okay.
17                    THE WITNESS:  I had never sold a
18              truck.
19                         - - -
20  BY MR. MACK:
21        Q.  When was the last time you worked in a

```
        22  dealership?
        23       A.   As an employee or as a representative of,
        24  say, an internal audit department that went to a
00120:01    dealership and --
        02       Q.   I will take either one, sir?
        03       A.   Actually that would be 1996.  Because our
        04  Mack Canada corporate offices were in the same
        05  building as Toronto branch.
        06       Q.   How about in an audit capacity?
        07       A.   '87.
        08       Q.   Wouldn't a dealer, sir, who was out in the
        09  field earning his living every day by selling trucks
        10  have a better idea than you regarding who he was
        11  competing with?
        12                   MR. HEEP:  Objection to form and
        13           foundation.
        14                   THE WITNESS:  Probably.
        15                      - - -
        16  BY MR. MACK:
        17       Q.   And you certainly have heard, haven't you
        18  Mr. Polzer, that the dealers very much perceive that
        19  McNeilus, McClain, and Heil are competing against
        20  them?
        21                   MR. HEEP:  Vague.  Is the
        22           question that all dealers perceive that?
        23                   MR. MACK:  No.  The dealers.
        24           The large number of dealers perceive that?
00121:01                   THE WITNESS:  Definitely certain
        02           number of dealers perceive that.
        03                      - - -
        04  BY MR. MACK:
        05       Q.   And you've received sales assistance
        06  requests over the years that say Heil, McClain,
        07  McNeilus are competing against me?
        08       A.   Correct.
        09       Q.   Many sales assistance requests that say
        10  that?
        11       A.   Absolutely.
        12       Q.   And, in fact, when you wrote this email to
        13  Mr. Lusty, you said it's almost become a magic word,
        14  in your view, right?
        15       A.   Correct.
        16       Q.   I guess you wouldn't have used magic word
        17  if it wasn't a word that was used a lot, right?
        18       A.   Yes.
        19                   MR. HEEP:  Objection to form.
        20                   THE WITNESS:  Absolutely.
        21                      - - -
        22  BY MR. MACK:
        23       Q.   And have you ever, sir, investigated
        24  whether any of those times that Mr. Yeager put in a
00122:01    sales assistance request that said I'm competing
        02  against McNeilus, McClain, and Heil, have you ever
        03  investigated whether or not he was telling the
        04  truth?
        05       A.   No, I did not.
        06       Q.   You just assumed he wasn't because he did
        07  it so often?
        08                   MR. HEEP:  Objection to form.
        09                      - - -
        10  BY MR. MACK:
        11       Q.   Is that correct?
```

```
       12        A.   I am not going to say I made that
       13   assumption.  I would say that term McNeilus,
       14   whatever you want to call it, the perceived
       15   competition of McNeilus is one of the factors that
       16   will go into the decision on the sales assistance.
       17        Q.   But when Mr. Yeager is saying it in his
       18   request, did he assume he was telling the truth?
       19        A.   I believe I said earlier when every single
       20   one said that there came a point in time where I had
       21   a doubt.
       22        Q.   Did you consider, sir, the possibility
       23   that Mr. Yeager was targeting specifically the
       24   vocational business more so perhaps than other
00123:01   dealers?
       02        A.   I would have then relied on the district
       03   manager and the regional vice president to give me
       04   that -- some other feedback.
       05        Q.   Well, you did talk to Mr. Lusty, didn't
       06   you?
       07        A.   I don't talk to Mr. Lusty, one of the DMs
       08   that does not call that often.
       09        Q.   Did you talk to Mr. Lusty about whether
       10   Mr. Yeager was experiencing competition from
       11   McNeilus, McClain, and Heil?
       12        A.   I believe in some of the conversations
       13   with Jack -- as Jack was looking, you know, for
       14   things to happen in his district, I'm sure he
       15   brought that up.  I can't recall a specific
       16   conversation.
       17        Q.   Fair.  Did he ever tell you, sir, Mr.
       18   Yeager is putting in sales assistance requests that
       19   are not true, he is not competing against McNeilus,
       20   McClain, and Heil on these deals?
       21        A.   I do not recall that he ever contradicted
       22   one way or the other.  If anything, he may have
       23   supported.  I don't recall specific.
       24        Q.   On those instances where Mr. Yeager put in
00124:01   sales assistance request indicated he was competing
       02   against McNeilus, McClain, or Heil, did you equalize
       03   Mr. Yeager with the net net pricing given to
       04   McNeilus?
       05                    MR. HEEP:  The question pertains
       06             to all?  Has he ever equalized or has he
       07             equalized all of them?
       08                    MR. MACK:  All of them.
       09                    MR. HEEP:  Have you equalized
       10             all of Mr. Yeager's sales assistance
       11             request in the situations where he said
       12             the competition is McClain not McNeilus?
       13                    MR. MACK:  Yes, sir.
       14                    THE WITNESS:  My recollection is
       15             probably not.
       16                         - - -
       17   BY MR. MACK:
       18        Q.   Can you, sir, identify for me one instance
       19   in which you have equalized Toledo Mac with the net
       20   net pricing given to McNeilus, McClain, or Heil?
       21        A.   No, I cannot.  If you are asking for
       22   specific recollection, no, I cannot.
       23        Q.   Do you have, sir, any recollection at all
       24   of ever having given Mr. Yeager and Toledo Mac
00125:01   net -- the same net pricing that McNeilus, McClain
```