```
02  or Heil received on a deal?
03       A.   No.  Nothing specific, no.  I would have
04  to look at the log book.  But offhand, no, I cannot.
```

### 33. PAGE 127:08 TO 127:13 (RUNNING 00:00:14.300)

```
08       Q.   Now, the dealer says if McNeilus does not
09  get the same pricing on this unit as they do when
10  they buy from you then they will just sell Autocars.
11  Do you see that?
12       A.   I see that.
13       Q.   Do you know what that refers to?
```

### 34. PAGE 127:16 TO 127:18 (RUNNING 00:00:05.300)

```
16                    THE WITNESS:  To be honest with
17              you, I honestly don't know what he was
18              trying to drive at here.
```

### 35. PAGE 136:11 TO 137:01 (RUNNING 00:00:37.400)

```
11                    McNeilus purchases a certain
12  number of trucks from Mack each year, right?
13       A.   Correct.
14       Q.   Does it order all those trucks at once or
15  are they ordered over the course of a year?
16       A.   They order over a staggering -- staggered
17  period of time.
18       Q.   And are the -- is it monthly or quarterly?
19  Is there some periodic basis on which they order?
20       A.   I am not as privy to the order pattern as,
21  say, Joe Favia who handles the account would be.
22       Q.   But you do know that it comes in not all
23  at once?
24       A.   It's definitely not all at once.  I am
00137:01  aware of that.
```

### 36. PAGE 140:14 TO 140:22 (RUNNING 00:00:23.100)

```
14       Q.   Is Exhibit-12 an email, sir, that you
15  wrote?
16       A.   Correct.
17       Q.   August 21, 2002?
18       A.   Correct.
19       Q.   And the legal situation you are
20  referencing there in the email is the -- this
21  lawsuit, right?
22       A.   Correct.
```

### 37. PAGE 145:04 TO 145:13 (RUNNING 00:00:37.100)

```
04       Q.   Okay.  Then you went on to say -- you were
05  trying to figure out whether Mr. Mack would try to
06  sell the truck to BFI at a reduced price than normal
07  BFI discount would suggest, right?
08       A.   That's what I wrote.
09       Q.   Would that be wrong?
10       A.   I believe that would have a negative
11  impact on the pricing for that customer, yes.
12       Q.   It would result in the customer getting a
13  lower price, right?
```

### 38. PAGE 145:18 TO 149:04 (RUNNING 00:04:21.000)

```
18       Q.   And how would it have a negative impact
19  then on pricing?
20       A.   Allied BFI buys trucks from many dealers
```

```
21   in the Mack network.  It's spread throughout the
22   various regions.  They all are equalized to the same
23   discount.  For Allied BFI to be able to buy trucks
24   at potentially at a lower price here than what they
00146:01  normally are buying for, in my opinion, that would
02   raise an inquiry among our other dealers as to -- or
03   the Mack company themselves as to why can I buy it a
04   less price here and not anywhere else?
05        Q.    That would raise an inquiry potentially by
06   Allied BFI, correct?
07        A.    Correct.
08        Q.    And Allied BFI potentially would expect
09   the other dealers or Mack Corporation to sell at
10   that reduced price rather than the normal discount?
11                   MR. HEEP:  Objection to
12                foundation.
13                            - - -
14   BY MR. MACK:
15        Q.    Is that what you are saying?
16        A.    That is a possibility that I was raising.
17        Q.    And then the second thing you said is you
18   were trying to figure out whether Mr. Yeager was
19   going to use these to undercut surrounding dealers.
20                   Did you mean by undercut that
21   Mr. Yeager would try to use these stock trucks to
22   compete against surrounding dealers?
23        A.    That's where -- yes.
24        Q.    And then try to undercut those dealers on
00147:01  price?
02        A.    Yes.
03        Q.    Okay.  Is there anything inappropriate
04   about that, in your mind, sir?
05        A.    Not in a situation where they probably
06   have -- where they are equalizing sales assistance.
07        Q.    Would it be inappropriate, in your view,
08   if Mr. Yeager had a better price than the
09   surrounding dealers?
10        A.    Excuse me.  Can you repeat that?
11        Q.    Would it be inappropriate, in your view,
12   if Mr. Yeager received a better price from Mack than
13   the surrounding dealers?
14                   MR. HEEP:  Can I clarify?  You
15                are asking about these three trucks, if it
16                would have been inappropriate if he got a
17                better price and then for the same three
18                trucks?  And we're not talk about having
19                an end user, but other dealers had to buy
20                at a higher price?
21                   MR. MACK:  I am talking about
22                what he wrote here.
23                   MR. HEEP:  Well, I was trying to
24                get a clarification.
00148:01                THE WITNESS:  I am confuse by
02                the question.  Sorry.
03                            - - -
04   BY MR. MACK:
05        Q.    Would it be inappropriate, sir, if Mr.
06   Yeager got these three trucks from Mack at a reduced
07   discount and then that discount was not made
08   available to other dealers to compete against Mr.
09   Yeager?
10        A.    Yes.  Yes.
```

```
11       Q.   And by the same token, it would be
12  inappropriate if dealers surrounding Mr. Yeager got
13  a discount that Mr. Yeager did not receive when he
14  was trying to compete against them, correct?
15       A.   If Mr. Yeager was not asking for an
16  equalizing sales assistance -- let me backtrack.
17  Just please repeat the question.
18       Q.   Sure.  Read back
19                   - - -
20            (Whereupon, the preceding portion of
21            testimony was read back by the court
22            reporter as follows:
23            "Q. And by the same token, it would be
24            inappropriate if dealers surrounding Mr.
00149:01     Yeager got a discount that Mr. Yeager did
02           not receive when he was trying to compete
03           against them, correct?n")
04                THE WITNESS:  Yes.
```

**39. PAGE 151:19 TO 155:02  (RUNNING 00:03:19.000)**

```
19                   Have you ever seen Exhibit-14
20  before?
21       A.   Probably through corresponding through
22  Pepper Hamilton.
23       Q.   Okay.  This involves a customer that Mr.
24  Yeager was attempting to quote Parrish Leasing?
00152:01     A.   Yes.
02       Q.   And in the email from Mr. McCafferty he
03  wrote, sales assistance is pending with Polzer,
04  currently has been for three days.  Do you see that?
05       A.   Yes, I do.
06       Q.   Do you recall being asked, sir, to delay
07  the sales assistance on this deal?
08       A.   Yes, I was.
09       Q.   And you were asked to do that by Mr.
10  Yellis?
11            MR. HEEP:  Objection.  I think
12            you are leading the witness here to
13            believe that there is -- what you are
14            talking about is event in October of 2002.
15            I am just not sure that --
16            MR. MACK:  I didn't ask him
17            about any dates, Jeremy.
18            MR. HEEP:  You are asking him --
19                   - - -
20  BY MR. MACK:
21       Q.   Turn it over, if it bothers counsel.
22            Let me ask you, do you recall
23  being asked by Mr. Polzer to delay providing sales
24  assistance on an account involving Parrish Leasing.
00153:01          MR. HEEP:  That is Mr. Polzer?
02                   - - -
03  BY MR. MACK:
04       Q.   Do you recall being asked by Mr. Yellis?
05  Thank you.
06       A.   Yes, I do.
07       Q.   What did Mr. Yellis say to you?
08       A.   He told me I forwarded you the Parrish
09  Leasing deal, please delay sending it back Monday.
10       Q.   Did he tell you why he wanted you to
11  delay?
```

```
  12      A.   Yes, he did.
  13      Q.   Did he tell you that the deal was
  14 scheduled to close on Saturday?
  15      A.   He thought there was a good chance the
  16 dealer who traditionally had sold to Parrish Leasing
  17 would be able to get an order Friday, or that Friday
  18 or Saturday.
  19      Q.   Did you have any discretion, sir, in that
  20 instance regarding whether or not you followed what
  21 Mr. Yellis was suggesting?
  22      A.   Yes, I did.
  23      Q.   Okay.  You don't answer to Mr. Yellis; is
  24 that right?
00154:01      A.   That's correct.
  02      Q.   You report to Mr. Flaherty?
  03      A.   Correct.
  04      Q.   Did you talk to Mr. Flaherty about it?
  05      A.   No, I did not.
  06      Q.   Okay.  You made the decision on your own
  07 to go along with what Mr. Yellis was suggesting?
  08      A.   Yes, I did.
  09      Q.   And the reason you did that was because
  10 Mr. Yellis had requested that you do it?
  11      A.   Yes, it was.
  12      Q.   Okay.  Did you make a determination of
  13 whether the reason that Mr. Yellis was giving you
  14 for delaying providing sales assistance to Mr.
  15 Yeager was a legitimate one?
  16                    MR. HEEP:  Can you repeat that
  17           question.
  18                    - - -
  19 BY MR. MACK:
  20      Q.   Did you make a determination of whether
  21 the reason that Mr. Yellis was giving you for
  22 waiting until Monday to provide sales assistance to
  23 Mr. Yeager was a legitimate one?
  24      A.   I made a determination it was probably not
00155:01 a legitimate one.  But I chose to agree to what Mr.
  02 Yellis asked.
```

**40.  PAGE 155:08 TO 159:18  (RUNNING 00:06:05.000)**

```
  08      Q.   Mr. Polzer, is this another exchange of
  09 emails with Mr. Lusty?
  10      A.   This is from -- yes, it is.
  11      Q.   And it involves that same customer,
  12 Parrish Leasing, right?
  13      A.   Correct.
  14      Q.   Except now we're in July of 2003, right?
  15      A.   Correct.
  16      Q.   And Mr. Lusty was requesting some
  17 information from you regarding the sales assistance
  18 that had been approved for Parrish Leasing?
  19      A.   Yes.
  20      Q.   Now, do you know what dealers were
  21 involved with this?
  22      A.   Dealer D549 VOMACK and dealer D567, Toledo
  23 Mac.
  24      Q.   And this was a deal for 20 CX 613s, right?
00156:01      A.   Correct.
  02      Q.   And one of the things that Mr. Lusty asked
  03 you about was what is the status of volume bonus,
```

04  right?
05      A.    Correct.
06      Q.    And you responded to Mr. Lusty's request
07  by saying that Mack will withhold and pay the volume
08  bonus after RDN.   I don't believe this dealer
09  qualifies for net bill VB, that is volume bonus, at
10  the time of invoice because customer would be out of
11  territory for him.   Right?
12      A.    That's what I wrote.
13      Q.    And that is Mack's policy, right, about
14  net billing?
15      A.    Correct.   That is one of the conditions
16  where we will agree to net bill the volume bonus
17  upfront.
18      Q.    And net billing the volume bonus up front
19  is the same as net net billing, correct?
20      A.    It would arrive to the net net price of
21  the truck, correct.
22      Q.    So in this instance the dealer was not
23  entitled to have net net pricing because the
24  customer was out of his territory?
00157:01    A.    In my opinion, the dealer always gets the
02  net net pricing being we had stated earlier there is
03  no condition by which we would ever permanently
04  withhold volume bonus, so the credit that represents
05  volume bonus will eventually be returned to him.
06              So in my opinion the cost of
07  this truck to the dealer would be the same whether
08  we net -- the eventual bottom line cost to the
09  dealer will be the same whether we withheld the
10  volume bonus or not.
11      Q.    There is a little issue of interest, isn't
12  there, Mr. Polzer?
13              MR. HEEP:  Objection to form of
14          the question.
15                      - - -
16  BY MR. MACK:
17      Q.    There is a difference of interest?
18      A.    That would -- it would necessitate that
19  there could potentially be a higher floorplan value
20  for the dealer we did not net volume bonus, which I
21  guess where you are implying there is a bigger
22  interest.
23      Q.    Well, if the dealer gets -- pays the money
24  to Mack, okay, the volume bonus, and then Mack
00158:01  returns it to him several months later, doesn't Mack
02  collect interest on that amount?
03      A.    I would agree with that.
04      Q.    Okay.  Whereas, if the net net pricing is
05  done, the dealer doesn't have to pay that 2 percent
06  to Mack, and then waits several months to get it
07  back.   The dealer can have that money in his own
08  bank account and collect interest on it, right?
09      A.    Sounds logical, yes.
10      Q.    And it is Mack's policy that net net
11  billing is only available if the customer is in the
12  dealer's area of responsibility, right?
13      A.    That is one of the three conditions that
14  has been in existence for a number of years as to
15  whether we would net net invoice a dealer.
16      Q.    What are the other two conditions?
17      A.    It requires one -- of the conditions was

```
18    we would have to be notified in writing actually 30
19    days before placement.  So it would have to be
20    within his AOR.  And I believe the third is it would
21    have to be approved by the field authority, the
22    regional vice president.
23         Q.   Mr. Yellis, in this case?
24         A.   In this case, Mr. Yellis.
00159:01   Q.   And when you say notify in writing 30 days
02    in advance, what do you mean by that?
03         A.   The letter of the ruling is that we would
04    have to receive written correspondence that the
05    dealer is requesting to be net billed, to be net net
06    billed the volume bonus, approved by the regional
07    vice president, and essentially approved by myself
08    30 days -- the ruling is -- I believe it's before
09    your placement of invoice.  It's one much those
10    days.
11         Q.   Not 30 day before the sales assistance
12    request?
13         A.   The sales assistance request is a separate
14    issue from that.
15         Q.   Okay.  In this case, Parrish Leasing was
16    not in Mr. Yeager's area of responsibility, right?
17         A.   That was my understanding which is why I
18    wrote that.
```

**41.  PAGE 160:22 TO 163:05  (RUNNING 00:03:16.400)**

```
22         Q.   The sales assistance forms we've been
23    looking at so far today, they don't show net net
24    billing unless it's included in the comments, right?
00161:01   A.   Correct.  That usually is not a part of
02    the QTS, the documents we looked at.
03         Q.   Went you are trying to equalize -- strike
04    that.
05              Since net net billing is never
06    available to a dealer selling outside of his AOR,
07    when you are dealing with sales assistance requests
08    and the issue of equalizing dealers, that's not
09    anything that you have to worrying worry about,
10    right?
11                   MR. HEEP:  Objection to form.
12                   THE WITNESS:  We would not put a
13              value on that volume bonus.  And if I
14              believe what you are trying to tell me, we
15              would not put a monetary value on that
16              interest that you are talking about and
17              increase a sales assistance to a dealer
18              not being net net billed.
19                        - - -
20    BY MR. MACK:
21         Q.   And in fact because Mack's policy is --
22    strike that.  The AORs don't overlap, right?
23         A.   As far as I know.  I'm pretty sure they do
24    not overlap.
00162:01   Q.   And because Mack's policy is that net net
02    billing is only available for sales within an AOR by
03    the dealer in that AOR, right?
04         A.   That is the policy.
05         Q.   It's impossible to equalize dealers on net
06    net billing under Mack's policies, right?
07                   MR. HEEP:  Objection to form.
```

08                    THE WITNESS:  I guess there is
09          some truth to your -- I do not believe
10          that -- I do not believe that is what we
11          are required to do.
12                          - - -
13  BY MR. MACK:
14      Q.   That is nothing that you've done, correct?
15      A.   Correct.
16      Q.   And you have just -- I think you said
17  this.  I want to make sure we're clear.  You have
18  never tried to assign a dollar value to the net
19  billing when you sat around -- sat down to determine
20  what levels of sales assistance you needed to
21  equalize people at?
22      A.   That is correct.
23      Q.   Do you, sir, have any understanding of the
24  reason why net net billing is not available to a
00163:01 dealer selling in another dealer's area of
02  responsibility?
03      A.   Not really.
04      Q.   You never asked why we have this policy?
05      A.   No.

## 42. PAGE 163:11 TO 170:03  (RUNNING 00:06:31.200)

11      Q.   Polzer Exhibit-16 is document that was
12  produced to us by counsel in this case.  It says Top
13  U.S. Mack Retail Sales Ranked by Five Year Total.
14  Do you recognize this, sir?
15      A.   Yes, I do.
16      Q.   And is this a list of Mack's top sales to
17  national accounts for the five year time period 1998
18  through 2003?
19      A.    It is a combination of national accounts
20  and the largest dealer fleet customers.
21      Q.   Okay.  Ryder.  That is a Mack national
22  account, correct?
23      A.   Correct.
24      Q.   Waste Management, that is a Mack national
00164:01 account, right?
02      A.   Currently it is.
03      Q.   Okay.  Was there any period of time from
04  1998 to 2003 that it was not?
05      A.    Is it my understanding at one point in
06  time, Waste Management may have been handled through
07  a dealer.  I do not remember when that switch
08  occurred.
09      Q.   Okay.  Was it handled through the Chicago
10  subsidiary?
11      A.    I believe they were one of the two that
12  would have been involved.
13      Q.   McNeilus.  That is a Mack national
14  account, right?
15      A.   Correct.
16      Q.   UPS?
17      A.   National account.
18      Q.   Okay.  And if we say national account is
19  it fair to assume, then, that the number of sales
20  here are national account sales numbers?
21      A.   Yes.
22      Q.   Comcar?
23      A.   National account.

```
    24      Q.   New York City, national account?
00165:01    A.   Yes.
    02      Q.   Can you go down?  Republic.  Is that a
    03  national account?
    04      A.   No, that is dealer fleet account.
    05      Q.   Which dealer, do you know?
    06      A.   Nextran, Jacksonville.
    07      Q.   Okay.  BFI?
    08      A.   That is a dealer various.
    09      Q.   Okay?
    10      A.   Fleet sold through various dealers.
    11      Q.   Schwing.  Is that a national account?
    12      A.   No.
    13      Q.   That is sold through Mr. Nuss, Rochester?
    14      A.   Yes.  Yes.
    15      Q.   Putzmeister?
    16      A.   Dealer.
    17      Q.   Dealer.  What dealer?
    18      A.   Milwaukee Mack.
    19      Q.   Mr. Paven?
    20      A.   I am sorry.  Which one?
    21      Q.   Is Milwaukee Mack George Paven?  You don't
    22  know?
    23      A.   The dealer owner is Roger Creet.  I know
    24  George is there.  I don't know his official
00166:01  capacity.
    02      Q.   Tyson Foods is Shippley?
    03      A.   Correct.
    04      Q.   Shippley, are they in -- what part of
    05  Arkansas?
    06      A.   They have a small store in Fort Smith.  I
    07  believe is Lowell.
    08      Q.   Did you say Fort Smith?
    09      A.   They have a -- one of there two locations
    10  is Fort Smith.  But I think their main operation is,
    11  I believe Lowell.
    12      Q.   Penske Truck Leasing.  That is a Mack
    13  national account, right?
    14      A.   Correct.
    15      Q.   Is that Pennsylvania Department of
    16  Transportation?
    17      A.   Correct.
    18      Q.   Is that a national account?
    19      A.   Correct.
    20      Q.   McClain Industries, is that a national
    21  account?
    22      A.   Yes.
    23      Q.   Florida Rock.  That's a Nextran account,
    24  right?
00167:01    A.   Correct.
    02      Q.   Heil, national account?
    03      A.   Correct.
    04      Q.   Roadrunner?
    05      A.   National account.
    06      Q.   Ruan?
    07      A.   National account.
    08      Q.   Kenan?
    09      A.   Dealer, fleet.
    10      Q.   What dealer, do you know?
    11      A.   At the time it was Tallahassee Mack.  Now
    12  they are called Capital Mack.
    13      Q.   Lily?
```

CONFIDENTIAL

```
14      A.   National account.
15      Q.   Air Products is national, right?
16      A.   No.  Dealer.
17      Q.   Allentown Mack?
18      A.   Allentown Mack, yes.
19      Q.   Arnold/New Penn?
20      A.   Dealer.
21      Q.   What dealer?
22      A.   I always get it mixed up between two.
23  It's either Leicher or Interstate.
24      Q.   Beelman?
00168:01      A.   National account.
02      Q.   U.S. Postal Service, national account?
03      A.   Correct.
04      Q.   McElroy?
05      A.   McElroy, dealer, Gulf Coast.
06      Q.   You are doing pretty good.  We made it
07  through 26.  I'm impressed.
08      A.   Now we get to the hard ones, the smaller
09  ones.
10      Q.   R&J Truck?
11      A.   National account, currently.
12      Q.   Okay.
13      A.   It may have always -- I honestly don't
14  know the past history.  I know it is today.
15      Q.   Okay.  Oakley?
16      A.   Dealer through Nextran Orlando.
17      Q.   Matlack?
18      A.   I believe that was a national account.
19  I'm pretty positive.
20      Q.   Now, Capital Mack, are they part of the
21  Nextran group?
22      A.   No, they are not.
23      Q.   They are not.  DM Bowman?
24      A.   Dealer fleet.  I believe that is Leicher
00169:01  Mack.  That could be Interstate.  I get DM Bowman
02  and the other one mixed up.  One is Leicher and one
03  is Interstate.
04      Q.   Okay.  Ashford Concrete?
05      A.   I believe they were -- I -- I believe they
06  were a national account.  I -- I don't remember.  We
07  have not sold since 2000.
08      Q.   Okay.
09      A.   They may have bought some through a
10  dealer.  I just don't remember.
11      Q.   Supervalu?
12      A.   National account.
13      Q.   TIC United?
14      A.   I don't have a -- I don't remember.
15      Q.   Okay.
16      A.   I believe national account.
17      Q.   Milwaukee Mack Leasing?
18      A.   I assume that's a dealer.  That is a
19  dealer.
20      Q.   Suntrust Leasing?
21      A.   That would be sold through a dealer.
22      Q.   What dealer?
23      A.   To be honest with you, I am not sure that
24  this is a buying entity or it is like a financing
00170:01  operation that becomes the legal owner of the truck.
02      Q.   RDK Truck Sales?
03      A.   That would -- that was a dealer.
```

**43. PAGE 171:02 TO 172:09 (RUNNING 00:01:36.300)**

```
02      Q.   ADM trucking?
03      A.   Dealer.
04      Q.   McKenzie Tank Lines?
05      A.   That was also a dealer.
06      Q.   Do you know what dealer ADM or McKenzie
07 is?
08      A.   ADM is -- I do know it's Central region.
09 I just don't remember.
10      Q.   McKenzie?
11      A.   McKenzie is sold out of Tallahassee Mack
12 or now today Capital Mack.
13      Q.   Conway Beam leasing?
14      A.   That would be a dealer.  That is the Mack
15 leasing system subsidiary of that dealership.
16      Q.   R&L?
17      A.   National account.
18      Q.   Savage?
19      A.   Dealer, Salt Lake City.
20      Q.   Transport Services?
21      A.   Dealer, Chicago Mack?
22      Q.   ABC Supply Company?
23      A.   Dealer.  It's -- I believe it's Madison.
24 It's somebody in Wisconsin, I believe.
00172:01      Q.   Ready Mixed Concrete?
02      A.   That is a dealer.  I believe that is
03 Talsby Mack.
04      Q.   Shippers Rental Company?
05      A.   That is a leasing system of a dealer in
06 the central region and I believe it's Quincy.
07      Q.   A duie Pyle, Inc.?
08      A.   Dealer.  I could -- it's the Northeast
09 region.  I don't know the exact dealer.
```

**44. PAGE 173:18 TO 174:04 (RUNNING 00:00:25.900)**

```
18      Q.   Indian River?
19      A.   Nextran.  I'm sorry.  Dealer, Nextran
20 Tampa.
21      Q.   Georgia Pacific?
22      A.   National account.
23      Q.   NEMF?
24      A.   New England Motor Freight, national
00174:01 account.
02      Q.   Freight Equipment Leasing?
03      A.   That is a dealer Pittsburgh Mack or
04 otherwise known as Pitt Ohio.
```

**45. PAGE 177:18 TO 181:01 (RUNNING 00:03:37.300)**

```
18      Q.   Do you know how McNeilus distributes or
19 sells the trucks that it purchases from Mack?
20      A.   Can I say that with 100 percent certainty?
21 No.
22      Q.   Wouldn't that information, sir, be
23 material to making a determination whether or not
24 McNeilus was competing with Mack dealers when it
00178:01 sells the trucks?
02              MR. HEEP:  Objection to the use
03          of the term material.  It's vague.  Go
04          ahead.
05              THE WITNESS:  My opinion, no.
06                      - - -
```

07  BY MR. MACK:
08      Q.   In expressing your opinion on whether or
09  not McNeilus completes with its Mack dealers, it's
10  not important for you to know how McNeilus actually
11  sells the trucks?
12                  MR. HEEP:  Objection to form.
13                  THE WITNESS:  Just repeat that
14          again.
15                          - - -
16              (Whereupon, the preceding portion of
17          testimony was read back by the court
18          reporter as follows:
19              "Q.In expressing your opinion on
20          whether or not McNeilus completes with its
21          Mack dealers, it's not important for you
22          to know how McNeilus actually sells the
23          trucks?")
24                          - - -
00179:01  BY MR. MACK:
02      Q.   What I meant to say was completes with
03  Mack dealers, not competes with its Mack dealers?
04      A.   I will answer, no.
05      Q.   Do you know how McClain distributes or
06  sells the trucks that it purchases from Mack?
07      A.   With a hundred percent certainty, no.
08      Q.   Do you know how Heil distributes or sells
09  the trucks that it purchases from Mack?
10      A.   With 100 percent certainty, no.
11      Q.   If I asked you the same question about
12  competition and your opinion on competition that I
13  asked you with respect to McNeilus, if I asked you
14  that same question for Heil and McClain would your
15  answer be the same?
16                  MR. HEEP:  Can you ask what the
17          question is?
18                  MR. MACK:  Sure.
19                          - - -
20  BY MR. MACK:
21      Q.   Let me try is in a compound fashion and
22  see if I can get this by you.  What I mean by
23  compound is I want to include Heil and McClain in
24  the same question.  If you want me to do it the long
00180:01  way, we can do it the long way.
02                  In expressing an opinion on
03  whether or not McClain completes with Mack dealers,
04  is it important for you to know how Mack -- how
05  McClain sells the products that it purchases from
06  Mack?
07      A.   I will answer no.
08      Q.   In expressing an opinion on whether or not
09  Heil competes with Mack dealers, is it important for
10  you to know how Heil sells the trucks that it
11  purchases from Mack?
12      A.   I will answer no.
13      Q.   Now, do you know where the trucks that
14  McClain purchases from Mack are invoiced?
15                  MR. HEEP:  Go ahead.
16                  THE WITNESS:  Not with a hundred
17          percent certainty.  I do not really see
18          the ending invoice.
19                          - - -
20  BY MR. MACK:

CONFIDENTIAL

```
21      Q.   And how about Heil?
22      A.   Not with -- again, I do -- they -- the
23   final invoices do not come to me.  I will say, I
24   have seen some.  I can't guarantee that they are all
00181:01   invoiced the same way.  I do not know.
```

**46. PAGE 183:06 TO 189:03 (RUNNING 00:08:05.400)**

```
06      Q.   Do you recognize this as being an email to
07   you from Mr. Thomas?
08      A.   Yes.
09      Q.   Do you recognize any of the handwriting on
10   the document, sir?
11      A.   That -- No, I do not.
12      Q.   Now, Schwing is not a national account,
13   right?
14      A.   Correct.
15      Q.   Does Mack have an agreement with Schwing
16   regarding the pricing that it will charge Schwing
17   for the 2003 model year?
18      A.   I wouldn't say Mack -- Mack is part of the
19   negotiation that the dealer goes through with
20   Schwing when they determine what the pricing will be
21   for a new model year.
22      Q.   But Mack is involved and Mack agrees
23   upfront that it will charge the dealer a particular
24   price for all the trucks the dealer sells to Schwing
00184:01   in that year?
02      A.   Yes.  I would say Mack definitely has a
03   say into what type of price increase or whatever
04   we're willing to do for a new model year.
05      Q.   Now, how many customers are there like
06   this, that you are aware of, sir, where Mack has
07   agreed upfront with the dealer that for all sales to
08   the dealer -- for all sales by the dealer for that
09   customer in a particular year there will be a
10   specific level of pricing?
11               MR. HEEP:  I am sorry to do
12          this.  But would you mind reading that
13          back.
14                     - - -
15          (Whereupon, the preceding portion of
16          testimony was read back by the court
17          reporter as follows:
18          "Q.Now, how many customers are there
19          like this, that you are aware of, sir,
20          where Mack has agreed upfront with the
21          dealer that for all sales to the dealer --
22          for all sales by the dealer for that
23          customer in a particular year there will
24          be a specific level of pricing?")
00185:01                     - - -
02               MR. HEEP:  I will object as
03          vague and confusing to the extent you are
04          restating his prior testimony, I don't
05          think it was right.
06               THE WITNESS:  I would imagine
07          there are probably about at least 50 if
08          not more accounts where there is a Mack
09          representative working with the dealer
10          involved in coming up with either a range
11          or a specific price for another model year
```

```
12              or whatever.
13                      - - -
14  BY MR. MACK:
15      Q.    DO any of those, sir, involve a dealer
16  selling to a customer outside his AOR?
17      A.    I would have to go through what I think to
18  be the list.  Offhand, I can't think of one,
19  offhand.
20      Q.    Okay.  Schwing is what dealer?
21      A.    I believe within the Bob Nuss, quote,
22  empire somewhere in Minnesota.
23      Q.    Are you involved or have you been involved
24  with each of those approximately 50 customers?
00186:01      A.    Yes.
02      Q.    And what is your involvement with those
03  negotiations?
04      A.    With the direct negotiations, very little.
05  What normally happens is the district manager and/or
06  usually the RVP will call with me and say it's time
07  to go quote this customer for the next model year.
08  Or if they want a -- whatever.
09                      Anyway, they would ask my
10  opinion in most cases as to what type of price
11  increase we should be trying to get.
12      Q.    If another dealers want to quote one of
13  those customers and that dealer is from outside the
14  AOR where the customer is located, is that dealer
15  equalized with the pricing given as part of these
16  negotiations?
17                      MR. HEEP:  Objection.  Vague
18              and.  The clarification that I'm looking
19              for is are you asking him -- at the time
20              of the negotiation of the deal itself
21              would another dealer be equalized?  Or are
22              you asking after the deal was done during
23              the one year period, whatever, if a dealer
24              would be able to get that pricing?
00187:01                      MR. MACK:  The later.
02                      - - -
03  BY MR. MACK:
04      Q.    After the deal is done if another dealer
05  comes along and said -- if another dealer from
06  outside the AOR comes along and says I want that
07  pricing, would he get it?
08      A.    What do you mean by deal is done?  That
09  we've come to an agreement on where the price would
10  be?  Or they have actually put an order in?
11      Q.    Let's talk about Schwing.
12      A.    Okay.
13      Q.    Maybe it will be easier if we talk about a
14  specific customer.
15      A.    Okay.
16      Q.    If another dealer from outside the AOR
17  which Schwing is located put in a sales request,
18  sales assistance request to you, would that dealer
19  be equalized with the pricing that you had given to
20  Mr. Nuss to sell to Schwing?
21      A.    Yes.  That is what we try.  I mean, yes,
22  that is our policy.  They should be equalized.
23      Q.    Does the dealer have to supply a letter
24  from the customer indicating that the customer is
00188:01  interested in purchasing from that dealer before he
```

```
02  is equalized?
03       A.    Not -- in virtually all cases, no.
04       Q.    You are not aware of that being part of
05  the requirement to get equalization?
06       A.    I am aware it is in place for Toledo Mac
07  now.
08       Q.    Is it in place for any other dealers?
09       A.    I -- I do not know.
10       Q.    Okay.  When did it go in place for Toledo
11  Mac?
12       A.    Once we understood the lawsuit had been
13  filed.
14       Q.    And who put that requirement in place?
15       A.    I can only matter there were a bunch of --
16  a bunch of people were discussing the situation and
17  that it became a consensus, a way to go.
18       Q.    Were you involved in that, Mr. Polzer?
19       A.    I believe I was at the meeting where that
20  was discussed.
21       Q.    Did you ever say to Mr. Lusty that by
22  requiring Mr. Yeager to submit a letter is how we
23  keep him in his box?
24             MR. HEEP:  Objection to form.
00189:01             THE WITNESS:  I don't know if I
02          used those exact words.  But I will say I
03          agree with the sentiment.
```

**47. PAGE 193:22 TO 193:23 (RUNNING 00:00:02.800)**

```
22       Q.    Is McNeilus one of those accounts?
23       A.    No, it is not.
```

**48. PAGE 203:10 TO 204:24 (RUNNING 00:01:40.600)**

```
10       Q.    Let's talk about a dealer.  Well, let me
11  ask you this.  Are there any national accounts that
12  Mack gives free floorplan to?
13       A.    We give payment terms.
14       Q.    That's what I thought.  So let's talk
15  about a dealer.  When Mack -- if Mack would give
16  free floorplan to a dealer, the dealer would still
17  have to draw down on his credit line, even though
18  during the period of time he was receiving the free
19  floorplan?
20             MR. HEEP:  Objection to form and
21          foundation.
22             THE WITNESS:  That may or may
23          not have been the case.  Or is the case.
24                    - - -
00204:01  BY MR. MACK:
02       Q.    Do you know, are you saying it can differ
03  from bank to bank?
04             MR. HEEP:  Same objection.
05             THE WITNESS:  I guess the way I
06          am thinking what you are asking me in
07          terms of this -- to restate the question,
08          yes, as far as drawing down their current
09          floorplan line.  But there were -- there
10          may have been ways to extend the floorplan
11          in addition to that, is what I was trying
12          to get at.
13                    - - -
14  BY MR. MACK:
```

```
15      Q.   Perhaps we'll get do that letter.  I think
16 I know what you are referring to.  Are you referring
17 to some assistance that Mack may have given to some
18 dealers in early in 2001 and 2002 in connection with
19 limits placed on the floorplan?
20      A.   That's what --
21                MR. HEEP:  Objection.  Vague and
22           as to form and foundation.
23                THE WITNESS:  Yes.
24                     - - -
```

**49. PAGE 205:02 TO 205:17  (RUNNING 00:00:35.800)**

```
02      Q.   For example, Central Indi Mack and Chicago
03 Mack received guarantees from Mack so they could
04 extend the floorplans, right?
05                MR. HEEP:  Objection to form and
06           vagueness.
07                THE WITNESS:  I am not aware of
08           Central Indiana Mack.  But yes to Chicago
09           Mack.
10                     - - -
11 BY MR. MACK:
12      Q.   And that had to do with some trucks or
13 significant number of trucks that those dealers --
14 essentially Chicago Mack had received on free
15 floorplan for Mack, correct?
16                MR. HEEP:  Objection.
17                THE WITNESS:  Correct.
```

**50. PAGE 205:23 TO 206:12  (RUNNING 00:00:43.000)**

```
23         Q.   When a national account has extended
24 payment terms, let's say there are extended payment
00206:01 terms of 120 days.  That means he doesn't have to --
02 that national account doesn't have to pay dollar one
03 until the 120th day, correct?
04      A.   The national account?
05      Q.   Right.
06      A.   Needs to pay us by day 120, correct.
07      Q.   And during the interim there is no draw
08 down on his credit line, assuming he has one?
09      A.   I guess you are asking something
10 theoretical.
11      Q.   Yes, I am.
12      A.   Okay.  I guess theoretically, yes.
```

**51. PAGE 206:18 TO 206:22  (RUNNING 00:00:18.700)**

```
18      Q.   Was that also a problem with McNeilus in
19 2002?
20      A.   2002?  I don't know when it stopped
21 becoming a problem.  But my perception is it's not a
22 problem now anymore.
```

**52. PAGE 207:06 TO 208:05  (RUNNING 00:00:54.200)**

```
06      Q.   Is this also a problem with McClain?
07                MR. HEEP:  Objection to
08           vagueness.
09                THE WITNESS:  I am not aware
10           that if it was.
11                     - - -
12 BY MR. MACK:
13      Q.   Are you aware of any other national
```

CONFIDENTIAL

```
14   account customers that this was a problem?  And by
15   the this, I am referring to what was reported in
16   these minutes, other than McNeilus?
17        A.   I have limited knowledge that the New York
18   City municipal account, there was some delays in
19   payment of certain monies.
20        Q.   To your knowledge, sir, did make take any
21   legal action against McNeilus to collect these past
22   due amounts?
23        A.   I am not aware of that.
24        Q.   To your knowledge, sir, did Mack ever
00208:01   charge McNeilus for interest on these past due
02   account amounts?
03        A.   I just don't remember that.  I'm not
04   aware.
05                          - - -
```

**53. PAGE 209:08 TO 214:06  (RUNNING 00:06:50.800)**

```
08                    This is an email with McDaniel.
09   McDaniel is complaining about a deal lost to
10   Schwing, right?
11        A.   Yes.
12        Q.   And he is raising an issue with you about
13   the pricing to Schwing?
14        A.   I believe that is part of what he is
15   raising here, yes.
16        Q.   He is also raising an issue about the
17   pricing to McNeilus?
18        A.   He refers to selling body companies.  If
19   that is what you are taking to mean McNeilus by
20   name, very possible.
21        Q.   Well, he says to you -- and this is -- he
22   is the regional vice president for the Southeast
23   region of Mack, right?
24        A.   Correct.
00210:01        Q.   He says to you, Steve if we keep selling
02   body companies, Mack needs to upfront equate the
03   dealer on sales assistance and avoid the hostile
04   exchanges.  Correct?
05        A.   Correct.
06        Q.   Have you ever spoken with him about that
07   subject?
08        A.   This particular case or --
09        Q.   Just general.  That general subject?
10        A.   Yes.
11        Q.   And have any other regional vice
12   presidents also expressed to you that they believe
13   Mack needed to upfront equate the dealer on sales
14   assistance with body companies?
15        A.   There have been some that have.
16        Q.   Okay.
17        A.   And some who have not.
18        Q.   Okay.  Well, tell me the ones that have?
19             MR. HEEP:  You want to know
20        which RVPs have?
21             MR. MACK:  Yes.
22             THE WITNESS:  I believe the RVPs
23        that expressed concerned were John Thomas
24        in the Southwest region particularly in
00211:01        the Texas market.  Dennis on a couple of
02        occasions, but he has also been one who
```

```
03              had said McNeilus is not a competitor on
04              other occasions.  Mike McNally had --
05              excuse me -- he had not complained.  And
06              Jeff Yellis I'm sure on occasions on
07              certain deals.
08                              - - -
09  BY MR. MACK:
10      Q.   Has expressed concern about competition
11  from McNeilus?
12      A.   Yes.
13      Q.   And Mr. Favia in his email, which is the
14  second email says that he -- the second email on the
15  first page -- he tries to stop McNeilus when I can
16  when they have 84 percent of the mixer market it's
17  swimming with croc's.  Do you see that?
18      A.   Yes.
19      Q.   Did Mr. Favia send this email to you?
20      A.   I would have seen that, yes.
21      Q.   Now in the string of emails, the third
22  email is one from you, right?
23      A.   Correct.
24      Q.   Are we working backwards here?  In other
00212:01  words, from a chronology standpoint?  I started on
02  first page.
03      A.   Correct.
04      Q.   Can we tell by looking at the times which
05  is the first email, which is the second, and which
06  is the third?
07      A.   It should be the last one on page two.
08      Q.   It should be the first one?
09      A.   Excuse me.  The last email on page two at
10  the bottom of the page, it starts with, Steve, for
11  your information MTM is quoting a customer named
12  Wayne David?  That should have been the first one.
13      Q.   Who is Joe, there?  Joe Favia, correct?
14      A.   Correct.
15      Q.   And Mr. Favia sent you an email and said,
16  McNeilus is quoting a customer named Wayne David.  I
17  do not know where they are located but I know they
18  are going in with Kenworths and Macks.  Please
19  advise if Mack customer, right?
20      A.   Correct.
21      Q.   Do you know why Mr. Favia would have been
22  asking you if Wayne David was a Mack customer?
23      A.   He would have been -- he would have been
24  asking me because there was an informal friendly
00213:01  arrangement with McNeilus that we had asked them not
02  to target certain accounts as part of our deal.
03      Q.   And, in fact, you had asked McNeilus to
04  keep hands off established Mack dealer business,
05  right?
06      A.   Based on my understanding, I would -- I
07  would basically reiterate that sentiment, yes.
08      Q.   Well, what was your understanding based
09  upon?
10      A.   My -- I -- I believe it's what I said.  My
11  understanding was we sold trucks direct to McNeilus.
12  However, they were -- there were certain -- I should
13  say certain accounts.  But there were certain
14  instances where we did not feel we wanted them
15  trying to steal, deal business, or quote certain
16  dealer customers.
```

CONFIDENTIAL                                                        page 38

```
17      Q.   And who told you that?
18      A.   I believe it would have came in general
19 conversations with Joe Favia.
20      Q.   Anyone else you talked to at Mack about
21 that subject?
22      A.   Not directly.  It's possible Joe's
23 superior, John Williams, would have overheard that.
24      Q.   But it certainly was -- when you wrote
00214:01 your email, which would be the second email that you
02 sent, the one at 9:06 on April 30 of 2003, you
03 wrote, as for McNeilus I thought they're supposed to
04 keep hands off established Mack dealer business,
05 right?
06      A.   Yes.
```

## 54.  PAGE 215:07 TO 216:05  (RUNNING 00:00:53.000)

```
07      Q.   Did Mr. Favia identify for you any
08 particular Mack accounts that McNeilus was supposed
09 to keep its hands off of?
10      A.   He would not have given me -- no.  As far
11 as keeping hands off, no.
12      Q.   Did he use the phrase established Mack
13 dealer business, which is the phrase you used in
14 your email?
15      A.   Did he ever use that phrase?  I don't
16 think.  He might have used that.
17      Q.   But that was your understanding?
18      A.   Yes.
19               MR. HEEP:  Wait.  Was it his
20          understanding that Mr. Favia used that
21          phrase or?
22                      - - -
23 BY MR. MACK:
24      Q.   No.  His understanding that the
00216:01 arrangement with McNeilus was that they would keep
02 their hands off established Mack dealer business?
03      A.   If it was my understanding?
04      Q.   Yes, sir.
05      A.   Yes.
```

## 55.  PAGE 216:13 TO 217:05  (RUNNING 00:01:06.600)

```
13      Q.   Now, these accounts that McNeilus is
14 supposed to keep its hand off of, are those accounts
15 where McNeilus is competing with the dealers?
16               MR. HEEP:  Objection to form and
17          foundation.
18               THE WITNESS:  If it was, I could
19          see where they would perceive it to be
20          competing if they were competing for a
21          truck to be available within a very short
22          timeframe.
23                      - - -
24 BY MR. MACK:
00217:01      Q.   Has Mr. Favia ever told you that he tries
02 to stop McNeilus from selling to established Mack
03 customers when I can?
04      A.   I can only go by what he wrote on this
05 email.
```

## 56.  PAGE 221:03 TO 221:08  (RUNNING 00:00:23.100)

```
03      Q.   Did you provide that level of sales
```

```
04  assistance in the instance referred to in Polzer
05  Exhibit-22?
06      A.   No, we did not.  We had no idea Schwing --
07  those trucks from Schwing were part of the
08  competition.
```

**57. PAGE 224:04 TO 226:09  (RUNNING 00:03:01.300)**

```
04      Q.   And in the third paragraph there is a
05  reference to net net net price.  Third paragraph,
06  fifth line -- fourth line.  Sorry.
07      A.   When you say, the third break paragraph?
08      Q.   Yes.
09      A.   I think that dealt with specifically one
10  truck that was pulled out of corporate inventory.
11      Q.   And my question to you, sir, is what is a
12  net net net price?
13      A.   Actually, that is actually net net.  I
14  think I refined the use of those terms over the last
15  couple of year.
16      Q.   Well, was there some period of time at
17  Mack when there was triple net pricing?
18      A.   I am not aware of that.  That would have
19  been in reference tow truck pricing.
20              The only possible thing if there
21  is a reference to RDS credit here, and I don't know
22  if that may have constituted what the third net was.
23      Q.   What it an RDS credit?
24      A.   I would say we discontinued that probably
00225:01  somewhere in the year either 2001 or 2002.  I don't
02  know the exact date.
03              But we at Mack corporate
04  developed what we thought were good specs,
05  pre-engineered specs, so-to-speak, trucks that we
06  thought obviously if the dealer orders that same
07  engineered spec it is going to save on our
08  engineering time to configure a truck.
09              And so we came up with a program
10  where we put maybe 15 maybe 20 of these
11  pre-engineered type trucks that could have been
12  highway, vocational, whatever, and to incentivise a
13  dealer to order that in lieu of maybe ordering
14  something with all of their individuals bells and
15  whistles they wanted, we would give them an
16  additional credit.
17      Q.   Is that the easy spec program?
18      A.   It's similar.  Easy spec was -- I would
19  call that a semi-engineered.  RDS being pretty much
20  a completely engineered truck.
21      Q.   Were there credits available on easy spec
22  trucks?
23      A.   Yes, there were.
24      Q.   And when was -- was that a credit against
00226:01  the purchase price or was that money that was paid
02  by the dealer and then returned to the dealer?
03      A.   I believe it was a purchased credit.  It
04  was credit upfront at the time of invoice.
05      Q.   Was RDS a credit at invoice or paid to the
06  dealer at a regular time?
07      A.   In those situations where we recognized
08  that it was an RDS it was a credited invoice.
09                  - - -
```

CONFIDENTIAL

**58. PAGE 226:14 TO 226:20  (RUNNING 00:00:27.300)**

    14      Q.   Is Exhibit-24, sir, an email exchange
    15 between you and Mr. Favia and Mr. Ginter?
    16      A.   Correct.
    17      Q.   And who is Steve Ginter?
    18      A.   Steve Ginter is in our marketing
    19 department.  He is -- his responsibilities involve
    20 mostly the vocational product development.

**59. PAGE 227:04 TO 229:08  (RUNNING 00:03:04.000)**

    04      Q.   And you were taking a look at some
    05 invoicing on trucks to McNeilus in March, right?
    06      A.   Yes.
    07      Q.   And you became concerned, did you not,
    08 about the pricing on those trucks to McNeilus?
    09      A.   Yes.
    10      Q.   And you determined that the pricing on
    11 those trucks to McNeilus was ten to thirteen
    12 thousand dollars better from a margin standpoint
    13 than the pricing to the dealers, correct?
    14      A.   No, that is not what I am saying here.  My
    15 concern was that the margin we showed for those
    16 granite bridge formula, and that was a newer type
    17 model we had just developed for specific
    18 applications, the first 13 of those or first one or
    19 excuse me, maybe all 13 of those we sold showed a
    20 ten or thirteen thousand dollars worse margin than a
    21 similar spec RD that we were selling to McNeilus.
    22      Q.   Well, didn't you say that the pricing was
    23 considerably lower than CVs we invoiced to our
    24 dealer base?
00228:01      A.   Excuse me.  I did say that.  But that is
    02 not what the margin reference is to.
    03      Q.   Well, did you determine that the pricing
    04 to McNeilus on these 13 trucks was considerably
    05 lower than pricing to the dealer base?
    06      A.   I expressed concern that that could be a
    07 problem, yes.
    08      Q.   And then you said, I know we have -- we
    09 allow McNeilus to have a little better price than
    10 our dealers.  However, we're talking ten to thirteen
    11 thousand dollars better from a margin standpoint.
    12 Right?
    13      A.   That's what I said.
    14      Q.   And I take it that was a truthful
    15 statement when you made it?
    16      A.   It was truthful in that the margin was ten
    17 to thirteen thousand dollars lower, yes.  At the
    18 time I first looked at it and fired off the email.
    19      Q.   Okay.  Was it also truthful that Mack
    20 allows McNeilus to have a little better price than
    21 the dealers?
    22      A.   I think we've established that throughout
    23 here, today.
    24      Q.   And that's what you were talking about
00229:01 there?
    02      A.   Yes.
    03      Q.   And at least in this instance when you
    04 looked at it on April the 3rd of 2001, the pricing
    05 to McNeilus on these 13 CVs was -- there was a
    06 difference of ten thousand to $13,000 a margin

```
07  standpoint?
08      A.   Yes.
```

**60. PAGE 229:13 TO 230:10  (RUNNING 00:01:03.600)**

```
13      Q.   Well, you said 10 to $13,000 in the same
14  sentence that you were talking about the pricing to
15  the dealers, right?
16      A.   My note to Joe is that --
17      Q.   Could you answer my question, sir?
18      A.   We sold RDs to McNeilus and there was a
19  net net selling price and that resulted in a margin
20  of X.  We came out with this new type truck, the
21  Bridge Formula Granite, and we sold some of those to
22  McNeilus because we wanted them to try and get that
23  product off the ground particularly in the West
24  Coast which is where this product was predominantly
00230:01  made for.  And there was a concern that when we sold
02  them the margin that came back on those reports that
03  I told you about earlier were significantly lower
04  from the RD.  That means there could be two things
05  going on:  Either we have a selling price problem or
06  we have a costing problem.
07      Q.   Well, did you determine what it was?
08      A.   Yes.
09      Q.   What was it?
10      A.   A costing problem.
```

**61. PAGE 230:11 TO 231:06  (RUNNING 00:00:41.000)**

```
11      Q.   The RDs that Mack sold to McNeilus, were
12  those sold to McNeilus at a little better price than
13  the dealers?
14              MR. HEEP:  Objection.  Asked and
15          answered.
16              THE WITNESS:  I believe we sold
17          those based off of the net net pricing
18          matrix we had with McNeilus and then came
19          to some agreement on where we would want
20          those prices.
21              I believe it would have been --
22          it would have been independent of any
23          pricing we had done with the dealers on
24          the few dealers who had bought that type
00231:01  of truck up to then.
02                       - - -
03  BY MR. MACK:
04      Q.   Regardless whether or not it was
05  independent, was it better than the dealer's price?
06      A.   Yes.
```

**62. PAGE 233:14 TO 233:18  (RUNNING 00:00:14.100)**

```
14      Q.   Was it just these 13 trucks, sir?
15      A.   That is what I was -- when I wrote the
16  email, that is what I -- that is what I had in front
17  of me of what we sold McNeilus.
18      Q.   Okay.
```

**63. PAGE 234:09 TO 234:13  (RUNNING 00:00:13.733)**

```
09      Q.   Do you consider the pricing that Mack
10  gives to McNeilus to be information that the dealer
11  shouldn't know?
12      A.   Yes.
```