```
            13      Q.    And why is that?
```

**64. PAGE 234:14 TO 235:12 (RUNNING 00:01:27.300)**

```
            14      A.    I guess, in my belief that we are -- we
            15 were not to equalize -- or in my belief of making
            16 pricing decisions that did not equalize a dealer to
            17 McNeilus, I saw no benefit in a dealer knowing where
            18 that pricing was.
            19      Q.    Do you consider that information to be
            20 competitively sensitive to Mack?
            21      A.    Yes.
            22      Q.    And is that one of the reasons you don't
            23 want the dealers to have it?
            24      A.    I think my belief is there have been many
    00235:01 instances where we did not equalize a dealer to
            02 McNeilus where the comment says, I am competing with
            03 McNeilus and the dealer did get the deal.  And
            04 therefore, it is my opinion in the best financial
            05 interest of the company that necessarily giving the
            06 McNeilus price to the dealer was not warranted.
            07      Q.    My question to you is whether you
            08 considered it to be competitively sensitive?
            09      A.    Yes.
            10      Q.    And is that one of the reasons why you
            11 didn't want the dealers to have it?
            12      A.    Yes.
```

**65. PAGE 235:13 TO 236:13 (RUNNING 00:00:52.300)**

```
            13      Q.    Can you identify those transactions for
            14 me, sir, when the dealers told you they were
            15 competing against McNeilus, you didn't give the
            16 discount that you gave to McNeilus and the deal went
            17 through?
            18                 MR. HEEP:  I am sorry.  That was
            19           a lot.  There was a lot to that question.
            20           Can you just do it again.
            21                 - - -
            22                 (Whereupon, the preceding portion of
            23           testimony was read back by the court
            24           reporter as follows:
    00236:01                 "Q. Can you identify those
            02           transactions for me, sir, when the dealers
            03           told you they were competing against
            04           McNeilus, you didn't give the discount
            05           that you gave to McNeilus and the deal
            06           went through?")
            07                 MR. HEEP:  The deal went through
            08           for who?
            09                 - - -
            10 BY MR. MACK:
            11      Q.    For the dealer?
            12      A.    I do not have specific examples with me
            13 now, but I would be able to provide them.
```

**66. PAGE 237:19 TO 245:12 (RUNNING 00:10:17.100)**

```
            19      Q.    Now, let's look at Exhibit-25?
            20      A.    Okay.
            21      Q.    February 12th and 11th of 2001, right?
            22      A.    Correct.
            23      Q.    And this is an email between you and Mr.
            24 Favia, right?
```

```
00238:01         A.    Yes.  I am sorry.  I'm reading.
      02         Q.    You are welcome to do that.  I want to ask
      03   you about the middle email, the one that you sent to
      04   Joe Favia on February 11 at 12:04.  Are you with me?
      05         A.    Yes.
      06         Q.    This concern McNeilus pricing for 2002,
      07   right?
      08         A.    Yes.
      09         Q.    And asked Joe, are there any rebates/
      10   bonuses outstanding with them or are we square?
      11         A.    Correct.
      12         Q.    What were you referring to there, sir?
      13         A.    That was referring to situations I
      14   thought -- I think we addressed earlier where -- or
      15   maybe we did not address.  Where we had some rebate
      16   programs available to the dealer on vocational
      17   trucks.  And McNeilus complained about them and said
      18   that made them uncompetitive.
      19         Q.    Right?
      20         A.    And we came to some agreement to keep
      21   McNeilus happy, financial agreement to keep McNeilus
      22   happy.
      23         Q.    You also used the word bonuses?
      24         A.    I believe -- again, I am not a hundred
00239:01   percent sure.  But I do believe there may have --
      02   there may have -- maybe there was some volume
      03   quantity.  I just don't know exactly.
      04         Q.    Do you recall, sir, Mack contributing
      05   money to McNeilus for advertising?
      06         A.    I don't remember.  It's possible.  I
      07   may -- I just don't remember.
      08         Q.    Do you recall Mack -- other than this
      09   instance you told us about with the rebate on the
      10   program offered to the dealers, do you recall any
      11   other rebates, bonuses, payments of any form that
      12   were made by Mack to McNeilus?
      13         A.    In what timeframe?
      14         Q.    During your years from 1998 to the
      15   present?
      16         A.    In addition to this period where I believe
      17   we made some settlement when we ran a rebate program
      18   for the dealers, I am aware that we do have in place
      19   now with their deferred payment terms the 120 days
      20   that we keep a basically a running tally of all
      21   those trucks, for lack of a better description, a
      22   plus/minus account kept on them.
      23         Q.    Okay.  Anything else?
      24         A.    I am not aware of anything else.
00240:01         Q.    Do you know what an Eaton rebate is?
      02   E-A-T-O-N?
      03         A.    I'm guessing that would be a vendor
      04   rebate.
      05         Q.    Do you know anything about Mack paying a
      06   rebate to Ryder in connection with the Eaton
      07   product?
      08         A.    I am aware of their pricing includes the
      09   assumption that either -- I don't remember if we
      10   collected or if Eaton paid it direct to Ryder.
      11         Q.    And that is a rebate that Mack would
      12   otherwise be entitled to from Eaton if it did agree
      13   to pay it to Ryder?
      14                     MR. HEEP:  Objection to form.
```

```
         15             And confusing question.
         16                        - - -
         17   BY MR. MACK:
         18        Q.   Is that a rebate from Eaton for including
         19   Eaton's product in the Mack Trucks sold to Ryder?
         20        A.   It is definitely related to that, yes.
         21        Q.   And Mack made a decision, did they not, to
         22   give that rebate to Ryder?
         23                  MR. HEEP:  Objection to
         24             foundation.
00241:01                  THE WITNESS:  I believe we have,
     02             yes.
     03                        - - -
     04   BY MR. MACK:
     05        Q.   Now, are there other product rebates that
     06   you are aware of that have been given to national
     07   account?
     08        A.   I'm sure there are.  I just can't tell you
     09   anything specific.
     10        Q.   How about a meritor rebate.  Do you know
     11   anything about that?
     12        A.   That really doesn't -- that is more
     13   negotiated by the salesmen and usually our marketing
     14   arm.  They go hand and hand to work with this
     15   customer.
     16        Q.   When you look at the issue of whether or
     17   not to equalize a Mack dealer with a national
     18   account pricing, do you consider those rebates?
     19                  MR. HEEP:  Objection to
     20             foundation and mischaracterizing his
     21             former testimony.
     22                        - - -
     23   BY MR. MACK:
     24        Q.   Okay.  You can answer.
00242:01                  MR. HEEP:  Can you read it back.
     02                        - - -
     03                  (Whereupon, the preceding portion of
     04             testimony was read back by the court
     05             reporter as follows:
     06                  "Q.When you look at the issue of
     07             whether or not to equalize a Mack dealer
     08             with a national account pricing, do you
     09             consider those rebates?")
     10                        - - -
     11                  THE WITNESS:  I will answer no.
     12                        - - -
     13   BY MR. MACK:
     14        Q.   Okay. Back to Exhibit-25.  You say, I
     15   would suggest we try and hold pricing at least flat
     16   with some veiled promise we will help them out more
     17   on specific deals, particularly when they are not
     18   competing against our dealers.  I think they
     19   realized we have come to the table with special
     20   deals programs in the past?
     21        A.   Correct.
     22        Q.   When you talked about helping McNeilus out
     23   on specific deals, what were you referring to?
     24        A.   I was referring to deals where McNeilus
00243:01   would be going in with a Mack product and try and
     02   compete with an account that bought something other
     03   than Mack.
     04        Q.   Is that extra sales assistance that's
```

```
          05  available to McNeilus?
          06      A.  I would say if there was a special deal
          07  and we -- and Joe Favia definitely knew and the
          08  request came from McNeilus, we will try and take a
          09  Kenworth account out and put Mack's in, yes.
          10      Q.  Has that been done?
          11      A.  I believe it has been done, yes.
          12      Q.  And when -- strike that.
          13              When you look at taking the
          14  Kenworth account out, are you aware of the pricing
          15  that Kenworth is using on that account?
          16      A.  Am I aware?  No, I am not.
          17      Q.  Does Joe provide you with any information
          18  regarding what that pricing is?
          19      A.  Joe makes a recommendation in his sales
          20  assistance request where he thinks the sales
          21  assistance would need to be for us to possibly be
          22  able to win that deal.
          23      Q.  Is it a recommendation to meet the pricing
          24  of Kenworth or to beat the pricing of Kenworth?
00244:01      A.  I cannot answer.  He does not tell me if
      02  it's to meet or beat.
      03      Q.  But it is a recommendation, as you
      04  understand, it to win the account?
      05      A.  Correct.
      06              MR. HEEP:  Belated objection to
      07          form.
      08                 - - -
      09  BY MR. MACK:
      10      Q.  Now, you said here that you Joe should
      11  make some veiled promises to help them out more on
      12  specific deals, particularly when they are not
      13  competing against our dealers.
      14              What did you mean there when you
      15  said when they are not competing against our
      16  dealers?
      17      A.  When they are -- I believe I'm referring
      18  here to when they are competing against accounts
      19  that have previously purchased somebody other than
      20  Mack Truck.
      21      Q.  Is it fair to say, sir, that in
      22  February 11, 2001, when you wrote this email to Mr.
      23  Favia you recognized that there were situations when
      24  McNeilus did compete against the dealers?
00245:01              MR. HEEP:  Objection to form.
      02              THE WITNESS:  I believe there
      03          are some situations.
      04                 - - -
      05  BY MR. MACK:
      06      Q.  And then you said, I think they realize we
      07  have come to the table with special deals programs
      08  in the past.  What special deals or programs are you
      09  referring to?
      10      A.  I would have been referring to additional
      11  sales assistance over and above the current or the
      12  known net net pricing.
```

67. PAGE 246:01 TO 246:15 (RUNNING 00:01:01.500)

```
00246:01      Q.  Mr. Polzer, Exhibit-26, is this a memo
      02  that you sent to regional vice presidents and
      03  district managers on January 21, 200?
```

```
04      A.   Correct.
05      Q.   And this concerned a number of Mack sales
06 programs; is that right?
07      A.   Yes.  Among other things.
08      Q.   Okay.  I wanted to ask you about the
09 sentence, Centennial Sweep Incentive Program?
10      A.   Okay.  Okay.
11      Q.   Under the sentence Centennial Sweep
12 Incentive Program I see, this is a customer rebate
13 program only.  What does that mean?
14      A.   That means we were only going to pay the
15 rebate to the customer, not to the dealer.
```

### 68. PAGE 248:04 TO 250:10 (RUNNING 00:02:21.100)

```
04      Q.   Exhibit-27 is a document we marked in Mr.
05 Favia's deposition.  The last two pages appear to be
06 a letter that you were cc'd on?
07      A.   Yes.
08      Q.   And do you recall, sir, that McClain was
09 permitted to participate in the Centennial Sweep
10 Program?
11      A.   Yes.
12      Q.   Was McNeilus also permitted to
13 participate?
14      A.   I think, as I had stated earlier, I do
15 believe that there was a complaint from our national
16 account Body Builders that when this program came
17 out that they felt they had been disadvantaged.  And
18 we did go back and make some financial settlement
19 with them.
20      Q.   So the national account Body Builders were
21 permitted to participate in the Centennial Sweep
22 Program?
23      A.   I believe there were some financial
24 payments made to the Body Builders.
00249:01      Q.   Well, doesn't Mr. Favia's letter indicate
02 that McClain was going to participate in the current
03 Centennial Sweep Incentive Program?
04      A.   Yes, it does.
05      Q.   And McClain was permitted to participate
06 in the program.  Who got the rebates?
07              MR. MACK:  Objection to
08           foundation.
09              THE WITNESS:  I don't know
10           100 percent.  I am going to guess it was
11           McClain.
12                      - - -
13 BY MR. MACK:
14      Q.   You know that a check was cut to McClain,
15 don't you?
16              MR. HEEP:  I am objection to
17           foundation.  And you are not supposed to
18           guess.  But if you do know the answer,
19           please give it to him.
20              THE WITNESS:  I don't know
21           100 percent.  My recollection back at that
22           time was I believe we did cut a check to
23           McClain.
24                      - - -
00250:01 BY MR. MACK:
02      Q.   Now, why were -- if a dealer sold to a
```

```
        03  body company, the dealer wasn't eligible to
        04  participate in the Centennial Sweep Program.  But if
        05  Mack sold to a body company like McClain or McNeilus
        06  the Centennial Sweep Program applied.  Why was that?
        07                  MR. HEEP:  Objection to
        08          foundation.
        09                  THE WITNESS:  I believe that was
        10          a decision that was made to allow happen.
```

### 69. PAGE 250:22 TO 255:03  (RUNNING 00:04:52.300)

```
        22      Q.  Mr. Polzer, Exhibit-28 is a sales
        23  assistance request for Chicago Mack dated April 3rd,
        24  2000, right?
00251:01      A.  Correct.
        02      Q.  And your comments at the bottom of this
        03  sales assistance request reference, an agreement
        04  that I don't agree with, right?
        05      A.  Correct.
        06      Q.  What agreement were you referring to
        07  there?
        08      A.  I believe that agreement was that in
        09  return for the Shelby Howard group which would be
        10  Chicago and/or Central Indiana Mack to order large
        11  stock, some quantity of factory or stock trucks, as
        12  we would say, we agreed to some following
        13  conditions.
        14                  I believe there was agreement to
        15  discounting on those trucks they ordered.  And I do
        16  believe there was an agreement to help move the
        17  existing inventory that he already had.  Because he
        18  was going to be getting all these trucks that he had
        19  put on order.
        20      Q.  Did you approve that agreement?
        21      A.  Personally, no, I did not.
        22      Q.  And you didn't agree with that agreement,
        23  did you?
        24      A.  My personal opinion was no, I did not like
00252:01  that agreement.
        02      Q.  And why didn't you like that agreement?
        03      A.  I thought the sales assistance that had
        04  been promised to him on the old inventory was a
        05  little excessive.
        06      Q.  And do you know who entered into that
        07  agreement for Mack?
        08      A.  I believe it would have been obviously
        09  Jeff Yellis in agreement with -- and I don't know if
        10  Kevin Flaherty was our -- I don't know the timing of
        11  when he was senior vice president of sales, or Paul.
        12  But I am sure it would have been done at the
        13  regional vice president level with his boss'
        14  acknowledgement.
        15      Q.  Is it fair to say, Mr. Polzer, that there
        16  were a number of these pricing agreements with
        17  Chicago Mack in 2000 and 2001 that you did not
        18  personally agree with?
        19                  MR. HEEP:  Objection to form.
        20                  THE WITNESS:  I don't know if a
        21          number would be a fair assessment.
        22                      - - -
        23  BY MR. MACK:
        24      Q.  Well, is there any other than this one on
```

```
00253:01  April 3rd of 2000 that you didn't agree with?
      02       A.   I'm sure there were probably some others.
      03       Q.   Was this pricing that was part of this
      04  agreement to Chicago Mack offered to the chain as a
      05  whole?
      06                 MR. HEEP:  Offered to the chain
      07       as a whole?
      08                 MR. MACK:  Yes, sir.
      09                       - - -
      10  BY MR. MACK:
      11       Q.   The Mack chain?
      12       A.   You mean the entire dealer network?
      13       Q.   Yes.  That is what I call a chain.
      14       A.   Judging by the date when this was coming
      15  down, my recollection is the RVPs were requested to
      16  go out to dealer, and I am not saying they would
      17  have went to all dealers.  But I am sure they would
      18  have went to their bigger dealers to get factory
      19  orders in the house.
      20                 And then from that there would
      21  have been, I am sure, not with any specific to offer
      22  this, this, this or this.  It would see if you can
      23  get some factory orders and we will -- we will look
      24  at any deal.  You know, we will look at the deals as
00254:01  they are presented.
      02       Q.   Are you aware, sir, of any dealer other
      03  than Chicago Mack or Central Indi Mack that receives
      04  special pricing as a result of that effort to move
      05  company inventory?
      06                 MR. HEEP:  Objection.  Vague.
      07       And specifically the term special pricing.
      08                       - - -
      09  BY MR. MACK:
      10       Q.   You can answer.
      11       A.   I believe something simple -- I am not
      12  aware was anybody else other than Chicago or Central
      13  Indi.
      14       Q.   You are aware, are you not, that a number
      15  of dealers were offered free floorplan to move
      16  company inventory?
      17                 MR. HEEP:  Objection.  Vague as
      18       to time.
      19                 THE WITNESS:  That came later in
      20       the time line, correct.
      21                       - - -
      22  BY MR. MACK:
      23       Q.   But, as you sit here today, you don't
      24  recall any special pricing matrices for any dealers
00255:01  other than Central Indi Mack and Chicago Mack; is
      02  that right?
      03       A.   That is correct.
```

**70. PAGE 256:19 TO 259:17  (RUNNING 00:03:34.300)**

```
      19       Q.   Now, do you wish to expand on something?
      20       A.   I -- I guess I was going to explain how
      21  that came about or how that came about in connection
      22  with the corporate inventory part.
      23       Q.   Okay.  What do you want to explain?
      24       A.   When we built as a corporation roughly
00257:01  1500 corporate inventory trucks in that timeframe of
      02  March to about June of 2000, maybe April, and by
```

```
03   that I mean they were -- they were specs of trucks
04   that we came up with.  We had no dealer in mind.  I
05   shouldn't say it that way.  There was no specific
06   dealer that we knew they would be going to, no
07   customer in mind.
08                    But we came up with what we
09   thought were pretty popular type specs.  And roughly
10   there were about anywhere from a thousand to 1500
11   trucks built.  And we were under pressure to get
12   those invoiced to dealers.  So we went to the
13   dealers and we asked if they would let -- would they
14   be willing to take these trucks?  All dealers were
15   given that opportunity to buy our corporate
16   inventory.
17        Q.    Were all --
18        A.    Excuse me.
19        Q.    Sorry.  Please finish.
20        A.    Initially, only a few trucks were sold to
21   dealers.  So to entice them to get more of those
22   corporate inventory units invoiced or for dealers
23   willing to take them, we had to come up with some
24   other type of program to entice the dealers to take
00258:01   corporate inventory trucks.
02                    And that is where with developed
03   the two-for-one program, which I am sure you have
04   been made aware of.  And that is said for every
05   corporate inventory truck you could -- you will let
06   us invoice you, you have basically a right to order
07   two trucks in the future at which we will allow you
08   to bill them.  We will pick up the free floorplan
09   inventory or pick up the floorplan.
10                    Now, what certain dealers did --
11   what certain dealers did was instead of saying yes,
12   I will take some corporate inventory but I really
13   don't need future production orders.  We did allow
14   on a deal by deal basis then to go backwards and
15   take existing corporate inventory and we would pick
16   up the free floorplan in lieu.
17        Q.    That was something that was done on a deal
18   by deal basis but not offered to the chain as a
19   whole?
20                    MR. HEEP:  Objection to form.
21                    THE WITNESS:  I disagree.  I
22            believe it was offered to the dealers in
23            whole.
24                         - - -
00259:01   BY MR. MACK:
02        Q.    The dealers as a whole were advised that
03   they -- if they wanted they could have free
04   floorplan on existing units in their inventory as
05   part of this two-for-one program; is that what your
06   testimony is, sir?
07        A.    It was my understanding the DMs, the RVPs
08   have told the DMs to go canvas your dealers and
09   explain what we were willing to do.
10                    Now, did they specifically say
11   we will go back and look at?  That, I will not
12   attest to.
13        Q.    Well that's what I was asking.
14        A.    Okay.
15        Q.    And you don't know?
16        A.    I do not know if it was universally
```

```
           17   communicated.
```

**71. PAGE 260:16 TO 268:01 (RUNNING 00:07:59.100)**

```
           16        Q.   Do you recognize this, sir?
           17        A.   Yes, I do.
           18        Q.   Now, at the top there is some handwriting
           19   to someone Jack.  Is that your writing?
           20        A.   That is my writing.
           21        Q.   Who is Jack?
           22        A.   Jack Haggarty is our manager of sales
           23   billing.
           24        Q.   And you wrote more GSOs that should say
  00261:01   MLSII as COE name and get 17 and a half percent
       02   total assistance as per letter?
       03        A.   Correct.
       04        Q.   MLSII, is that leasing?
       05        A.   MLSII stands for leasing.  Yes, the Mack
       06   leasing system, correct.
       07        Q.   And what letter were you referring
       08   thereto?
       09        A.   That would be the letter --
       10        Q.   This letter?
       11        A.   I'm sorry.  Now, I believe the use of the
       12   term letter in my handwritten note refers to either
       13   an email or a letter that outlined these additional
       14   orders we just discussed that we were willing to
       15   take or we were -- we -- we made the deal with
       16   Central Indiana Mack and/or Chicago Mack.  And part
       17   of that agreement was the Macungie type trucks would
       18   have a net billed discount of 17 and a half percent.
       19        Q.   Now, MLSII is a pricing matrix, right?
       20        A.   No.  I believe here MLSII was just a
       21   little name that Jack McCafferty instructed the
       22   dealer to use so we would easily identify that these
       23   were part of that ordering arrangement.
       24        Q.   These trucks weren't being ordered for
  00262:01   leasing, were they?
       02        A.   No.
       03        Q.   But MLSII is a leasing program, isn't it?
       04                MR. HEEP:  Objection.  Asked and
       05             answered.
       06                THE WITNESS:  Yes.  I -- yes.
       07             MLSII is leasing.  But it could have
       08             said -- as far as I'm concerned, it could
       09             have said any particular letters or codes
       10             that would allow us to identify that these
       11             were part of that arrangement.
       12                        - - -
       13   BY MR. MACK:
       14        Q.   What does COE mean?
       15        A.   Customer order entry.  That is -- that is
       16   a mainframe system that would let us look at what
       17   name the dealer put on the order when he submitted
       18   it.
       19        Q.   And the letter to you says these are the
       20   GSO numbers that should have been net billed to us
       21   at higher numbers.  By higher numbers does he mean a
       22   higher discount?
       23        A.   Yes.
       24        Q.   Okay.  He was saying we were billed too
  00263:01   much for these, please reissue some invoices?
```

```
02      A.   Excuse me.  Repeat that.
03      Q.   Was he saying that we were billed too much
04 for these, we are entitled to a higher discount,
05 please reissue the invoices?
06                MR. HEEP:  Objection as to form
07           and foundation.
08                THE WITNESS:  This was not
09           dealing with free invoicing.
10                    - - -
11 BY MR. MACK:
12      Q.   Okay.  Was he dealing with net billing?
13      A.   This was dealing with -- these GSOs were
14 obviously not invoiced at the net billed 17 and a
15 half discount that the agreement said we would
16 honor.
17      Q.   So what did you do to make an adjustment?
18      A.   We had --
19                MR. HEEP:  Objection to
20           foundation.
21                    - - -
22 BY MR. MACK:
23      Q.   It says please make the necessary
24 adjustments.  Did you make an adjustment?
00264:01      A.   I'm sure we did.
02      Q.   Okay.  And did you change the COE name to
03 MLSII?
04      A.   I don't believe we would have concerned
05 ourselves with changing the COE name.
06      Q.   Well, that's what you wrote there, Mr.
07 Polzer.  It's your writing, right?  Please, it
08 should say MLSII is COE name?
09                MR. HEEP:  Objection to form and
10           asked and answered.
11                THE WITNESS:  What my note says
12           is if these were trucks that were part of
13           the agreement we made, they probably
14           should have came in with this designation
15           so it would have been easier for sales
16           billing to recognize that they were these
17           truck.
18                For whatever reason maybe they
19           forgot to put that name on, so this is in
20           reaction to -- or this is Central Indi
21           saying, hey, these trucks were part of the
22           agreement, inferring maybe we forgot to
23           use the code name that Jack -- excuse
24           me -- that John McCafferty said we would
00265:01           identify those trucks as.  But these
02           trucks should be part of the treatment.
03                    - - -
04 BY MR. MACK:
05      Q.   Wasn't the code name that Mr. McCafferty
06 gave you also the name for the Mack leasing pricing
07 matrix?
08                MR. HEEP:  Objection.  Asked and
09           answered twice, at least.
10                MR. MACK:  Well, he hasn't.  He
11           is moving all over the place.
12                THE WITNESS:  It very well could
13           have been.  I don't remember what the MLS
14           matrix for a Macungie truck was.  We
15           didn't do many of those.
```

```
16                       - - -
17   BY MR. MACK:
18       Q.   Wasn't the pricing on the MLS matrix, did
19   it have higher discounts than the regular matrix?
20       A.   Can you repeat that?
21       Q.   Did the MLS pricing matrix have higher
22   discounts than the regular pricing matrix?
23                  MR. HEEP:  What do you mean by
24             the regular pricing?
00266:01                  - - -
02   BY MR. MACK:
03       Q.   Standard pricing matrix?
04       A.   If I understand your question correctly,
05   the discounts with our Mack leasing system program
06   were generally higher than a retail.
07       Q.   Now, putting this document aside.  Is a
08   Mack dealer entitled to those Mack leasing discounts
09   if the truck is not going to be leased?
10       A.   No, they should not be.
11       Q.   Did you ever talk with Mr. McCafferty as
12   to why he was going to use the code name MLSII for
13   these units with these increased levels of sales
14   assistance?
15       A.   No, never.
16       Q.   And is that the code name that was used
17   for all of the units that came through with this
18   pricing?
19                  MR. HEEP:  Objection.  Vague.
20                  THE WITNESS:  My understanding
21             we were going to use -- the dealer was
22             going to use the name MLSII to identify
23             the trucks that were part of the agreement
24             that we made back in February on the
00267:01            ordered -- to be ordered units.
02                       - - -
03   BY MR. MACK:
04       Q.   What is normally filled in the CEO field?
05       A.   For customer name?
06       Q.   Um-hmm.  Is that what the CEO name is
07   usually for, customer name?
08       A.   Yes.  If it is for -- traditionally
09   dealers, if it is for a known customer, they will
10   put that customer's name in there.  If they are just
11   ordering trucks for stock purposes, as we discussed
12   earlier, meaning they don't know who the customer
13   is, but hopefully somebody will come eventually and
14   buy them, they will use the term stock or they will
15   usually put in an identifying spec so they know what
16   is it.  It really varies.
17       Q.   What if they are going to buy them for
18   their leasing fleet, what do they put in?
19       A.   They would -- it could be anything I just
20   mentioned there.  Or they might be putting in the
21   name, as an example, Chicago Mack Leasing.
22       Q.   Now, once you saw MLSII on these GSOs, you
23   knew then that who the units were that received this
24   special pricing; is that right?
00268:01     A.   Correct.

72.  PAGE 268:12 TO 268:19 (RUNNING 00:00:26.100)

     12       Q.   And how long did that arrangement stay in
```

```
          13    place?
          14         A.   It is my understanding he had put the
          15    order in for the trucks that were part of that
          16    agreement within the next couple weeks.  I don't
          17    know the exact timeframe he was given to put orders
          18    in.  But then it became a product of when we could
          19    bill them.
    73.  PAGE 269:01 TO 277:05  (RUNNING 00:09:44.600)
    00269:01         Q.   Is Exhibit-30 an email that Mr. McCafferty
          02    sent to you in May of 2000?
          03         A.   Correct.
          04         Q.   And is that your writing at the top,
          05    another note to Jack?
          06         A.   Correct.
          07         Q.   And again you say use MLSII as customer
          08    name, right?
          09         A.   I used the term using which means that
          10    hopefully that is what was on there.  That was a COE
          11    name that was used.
          12         Q.   You were telling Jack when you see an
          13    order come in from these dealer for Macungie units
          14    with as MLSII as the customer name, they are
          15    entitled to the discounts indicated in this email,
          16    correct?
          17         A.   Correct.
          18         Q.   And according to this email the deal
          19    involved Indi, R&H, Chicago, right?
          20         A.   Correct.
          21         Q.   And Central Tennessee was included on the
          22    CX portion of the deal but not on the Macungie
          23    portion, right?
          24         A.   Correct.
    00270:01         Q.   Were the CX units that received the
          02    discount indicated here also to have MLSII as the
          03    customer name?
          04         A.   I believe if I read the memo, it was only
          05    the Macungie units that he was going to use the term
          06    MLSII.
          07         Q.   Okay.  How if he was ordering some CX
          08    units and wanted the discounts indicated in this
          09    document, how was he going to notify you of that?
          10              MR. MACK:  How was he going to
          11              fill the customer field in?
          12                         - - -
          13    BY MR. MACK:
          14         Q.   Sure.  That is a better question.
          15         A.   I do not remember.
          16         Q.   Okay.  But regardless, you remember these
          17    discounts?
          18         A.   Yes.
          19         Q.   Were these also deep discounts?
          20              MR. MACK:  Objection to the
          21              vagueness.  Form.
          22                    THE WITNESS:  Any in particular
          23              or across the board?
          24                         - - -
    00271:01    BY MR. MACK:
          02         Q.   Well, I am looking at 24 percent on CX613,
          03    the 1999 models?
          04         A.   Well, it was 24 percent.  They were two
```

```
05  year old outdated models.  It very well could have
06  been what the street price it took to sell a two
07  year old model.
08       Q.   Well, did you consider any of the
09  discounts in this email to be excessive?
10                 MR. HEEP:  Objection.  Vague.
11            Form.
12                 THE WITNESS:  Obviously it must
13            have because there was a previous exhibit
14            that said I did not agree.
15                         - - -
16  BY MR. MACK:
17       Q.   What I am asking you is whether as of May
18  the 15, 2000 you still didn't agree with any or all
19  of these discounts?
20       A.   Excuse me.  Repeat that.
21       Q.   As of May 15 of 2000, did you still not
22  agree with any or all of these discounts?
23       A.   I mean, I may have a person 1 dislike for
24  them.  But if you are asking for my personal
00272:01  opinion, which is what it would be, they possibly
02  were a little high.
03       Q.   Were they higher than the discounts that
04  were being given to other dealers as part of the
05  sales assistance process?
06       A.   Probably.
07       Q.   And these discounts were in excess of the
08  level of authority of the regional vice president?
09       A.   Yes, they would have been.
10       Q.   And they were also in excess of the level
11  of authority that you had, right?
12       A.   At that time, probably not.
13       Q.   Okay.  Did you -- do you recall equalizing
14  any dealers with these discounts being given to
15  these three dealers or four dealers?
16       A.   I do not recall any specific instances.
17  But if these trucks would have been used outside of
18  the AOR to compete with another dealer and they
19  would have notified me with that.  If they would
20  have liked to have been equalized, we would have
21  done that.
22       Q.   Well, was it your understanding that the
23  dealers that purchased these trucks were not
24  permitted to sell them outside of their AOR?
00273:01       A.   That was my understanding.
02       Q.   Now, these dealers are asking for net
03  billing, right?
04       A.   Correct.
05       Q.   Now, when they use the term -- or when the
06  term net billing is used there do you understand
07  that to mean including the volume bonus?
08       A.   No, not the volume bonus in these.
09       Q.   Was there billing to these dealers that
10  included the volume bonus?
11       A.   I don't remember.  I -- I don't believe we
12  were giving them the volume bonus also.  But I can't
13  be a hundred percent sure.  I would have to look.
14       Q.   Now, Mr. McCafferty says on the second
15  page of the email, I have not talked to Stephen
16  Polzer concerning how he would like these units
17  ordered.  I would prefer MLSII.  This covers a lot
18  of ground.
```

```
19                 Now, do you see that?
20     A.    Yes.  Actually, I must have misread this.
21  Like I said, I was trying to go back on my memory.
22  I didn't realize there was a period after the word
23  ground.  I thought that was an entire sense that
24  said, I would prefer MLSII this covers a lot of
00274:01  ground concerning the Macungie product.
02                 It's very possible he used MLSII
03  for all the models.
04     Q.    Do you know what he meant when he said
05  MLSII covers a lot of ground?
06     A.    No, I do not.
07     Q.    Okay.  Now, Mr. McCafferty says,
08  concerning the Macungie product, group requested
09  something in righting.  Told them it was not going
10  to happen.  Did you see that when you got this
11  email?
12     A.    Yes, I did see it.
13     Q.    Okay.  Did you think that was unusual?
14     A.    I thought it was unnecessary.
15     Q.    Why did you think it was unnecessary?
16     A.    Unnecessary to make that comment.  Excuse
17  me.
18     Q.    Well, did you think about why Mr.
19  McCafferty would find it necessary to say it was not
20  going to happen?
21     A.    To be honest, I just thought that was John
22  being John.
23     Q.    Well, as you read it here, today, does it
24  sound suspicious to you?
00275:01                 MR. HEEP:  Objection to form.
02           Vague.
03                 THE WITNESS:  To be honest, it
04           looks more suspicious than the entire
05           arrangement does to me.
06                      - - -
07  BY MR. MACK:
08     Q.    Well, don't we have a situation here where
09  Mr. McCafferty is using a fictitious customer name,
10  MLSII, and saying parts of this deal is not going to
11  be put in writing?
12                 MR. HEEP:  Objection to form.
13           It's leading and it mischaracterizes what
14           he already described what he understood an
15           MLSII to be used as.
16                 THE WITNESS:  I just disagree to
17           the term MLSII as a fictitious name.  It
18           could have been dealers used a wide
19           variety of names when they are ordering
20           stock units.  There is no set pattern of
21           what they should put in there.  To me that
22           is like an irrelevant field, I mean.
23                      - - -
24  BY MR. MACK:
00276:01     Q.    Was there a customer ordering these trucks
02  by the name of MLSII, sir?
03                 MR. HEEP:  Objection.  Haven't
04           we asked answered multiple times what was
05           intended by MLSII, what he understood
06           MLSII to be, and everything about MLSII?
07                 MR. MACK:  Mr. Heep, we have a
08           memo where the man says this covers a lot
```

```
          09           of ground.  I think I am entitled to
          10           follow-up and see whether that refreshes
          11           his recollection as to what that means.
          12           That is what I am trying to do.
          13                  MR. HEEP:  Are you asking him
          14           then if --
          15                           - - -
          16  BY MR. MACK:
          17      Q.   Can you answer my question, sir?
          18                  MR. HEEP:  Well I don't think he
          19           testified that he forgot what it meant.  I
          20           don't what know what recollection needs to
          21           be refreshed.
          22                           - - -
          23  BY MR. MACK:
          24      Q.   You circled I would prefer MLSII, right?
00277:01                    MR. HEEP:  Objection to form.
      02                    THE WITNESS:  I believe I
      03           circled that for Jack Haggerty so he knew
      04           what to look for when those orders came
      05           in.
```

74. PAGE 278:05 TO 279:01 (RUNNING 00:01:01.600)

```
          05      Q.   Was it the code name, sir?
          06      A.   It was not a, quote, code name.  It was a
          07  way to identify units that we agreed to the stock
          08  order.  We needed a way to identify these units.
          09      Q.   Well, why didn't you just say Central Indi
          10  Mack and Chicago Mack?  Because those were the
          11  customers that were buying the trucks, right?
          12                  MR. HEEP:  Objection to
          13           foundation and form.
          14                  THE WITNESS:  Is that a
          15           question?
          16                  MR. HEEP:  Yes.  The question is
          17           still on the table.  If you want it read
          18           back, I am sure the court reporter would
          19           be happy to do it.
          20                  THE WITNESS:  The dealer code
          21           and the dealer name would be on any
          22           invoice.  It is also on the same document
          23           from which this COE name come.  To me that
          24           would be potentially redundant or
00279:01           unnecessary.
```

75. PAGE 280:01 TO 281:19 (RUNNING 00:02:09.300)

```
00280:01      Q.   Is Exhibit-31 an email that you received
      02  from Mr. McCafferty in July of 2000?
      03      A.   Yes.
      04      Q.   And this email concerns another
      05  arrangement between Mack Trucks and Chicago Mack and
      06  Indiana Mack, correct?
      07                  MR. HEEP:  Objection to form of
      08           the question.
      09                  THE WITNESS:  Yes.
      10                           - - -
      11  BY MR. MACK:
      12      Q.   And these are -- in this instance, the
      13  dealers are being granted floorplan assistance; is
      14  that right?
      15      A.   This is per our request to all dealers,
```

```
        16   Chicago and Indi's response to buying this corporate
        17   inventory pool of trucks that we were hoping the
        18   dealers would take and not allow us to invoice them
        19   for.
        20        Q.   Well, does this say anything about other
        21   dealers, sir?
        22        A.   Yes.  I guess it's yes to your question.
        23        Q.   Where does it say this was a program that
        24   is offered to other dealers?
00281:01        A.   I added that myself.
     02        Q.   Okay.  It actually says per our
     03   conversation with Kevin Flaherty on June 28, 20000,
     04   doesn't it?  Did I read that right.
     05        A.   Yes.  Yes, it does.
     06        Q.   Now, at the bottom of the email there is a
     07   reference to any future programs involving models
     08   that we purchased under this agreement needs to have
     09   the understanding that the discounting under any of
     10   our previous agreements or new Mack programs,
     11   whichever is greater, will apply to our inventory at
     12   that time.
     13                  Now, what previous agreements
     14   does that refer to?
     15                  MR. MACK:  Objection to
     16             foundation.
     17                  THE WITNESS:  I believe that
     18             would have referred to the previous
     19             exhibit dealing with the stock order.
```

**76. PAGE 281:22 TO 282:15  (RUNNING 00:00:56.500)**

```
        22        Q.   Does Chicago Mack presently have any
        23   trucks in its inventory that Mack is paying
        24   floorplanning on?
00282:01                  MR. HEEP:  Does Chicago Mack
     02             have any trucks currently in its inventory
     03             that Mack is paying floorplanning?
     04                  MR. MACK:  Yes.
     05                  THE WITNESS:  We have had -- I
     06             know we had programs, gener l programs
     07             since then that I believe they have taken
     08             advantage of that involved some extended
     09             floorplan arrangement.  Like Dogs Gone
     10             Wild was -- there was an ordering program
     11             feature that guaranteed extra floorplan
     12             days.  Summer Sizzle was a highway program
     13             that had an ordering feature that allowed
     14             extended dates.  So I -- yes, I believe
     15             they would have some of those truck.
```

**77. PAGE 283:16 TO 285:08  (RUNNING 00:02:18.200)**

```
        16        Q.   Is this an email you exchanged with Mr.
        17   McCafferty in February 2001?
        18        A.   Correct.
        19        Q.   And this email relates to the pricing
        20   matrix for Chicago, Indi, and R&H, right?
        21        A.   Yes, it does.
        22        Q.   And Mack had agreed that those dealers
        23   would have a pricing matrix good through December 31
        24   of 2001; is that right?
00284:01        A.   That's what the letter says, correct.
     02        Q.   And you then reference the real world
```

```
           03  matrix in the end of your email, right?
           04       A.   Yes, I do.
           05       Q.   Is that a reference to the pricing matrix
           06  in effect for the rest of the chain, for the rest of
           07  the dealer network?
           08       A.   Yes.  What I meant here by matrix, that is
           09  a name to the standard discount that has been used.
           10       Q.   And by real world you meant everyone else
           11  that was a dealer other than these three, right?
           12              MR. HEEP:  Objection to form.
           13              THE WITNESS:  Yes.  I believe,
           14         as I said earlier, this was the only
           15         dealer that came up and offered to fill
           16         some factory line slots in return for some
           17         guaranteed discounts and some programs.
           18         So they would have been the only dealer at
           19         the time -- dealers at the time who would
           20         have had stock trucks with some type of a
           21         guaranteed pricing, as you see on this
           22         letter.
           23                     - - -
           24  BY MR. MACK:
00285:01        Q.   These dealers weren't have pricing under
     02   the real world matrix.  They were having pricing
     03   under the other matrix that had been worked out with
     04   them, right?
     05        A.   If we take the real world matrix to mean
     06   just the standard discounting at the standard
     07   discount at which stock trucks would normally be
     08   invoiced for other dealers, yes.
```

**78. PAGE 287:10 TO 288:08  (RUNNING 00:01:28.100)**

```
           10       Q.   You agree with me that this is a different
           11  percentage discount in Exhibit-32 than Exhibit-30?
           12              MR. HEEP:  Are the discounts in
           13         32 different from the discounts in 30?  Is
           14         that the question?
           15              MR. MACK:  It's that simple of a
           16         question.
           17              THE WITNESS:  That answer would
           18         be no.  RD, RB -- per Exhibit-32, RB, RD,
           19         EN, CL, are Macungie trucks.  And it said
           20         17.5 percent in Exhibit-32.  And it says
           21         17.5 percent in Exhibit-30.
           22                     - - -
           23  BY MR. MACK:
           24       Q.   So it's the same matrix?
00288:01        A.   Yes.
     02        Q.   Is there another pricing matrix that you
     03   believe was out there that I haven't shown you a
     04   document for?
     05        A.   What do you mean by another matrix?
     06        Q.   A different level of discounts for these
     07   dealers during this timeframe?
     08        A.   No.
```

**79. PAGE 288:14 TO 290:16  (RUNNING 00:04:10.100)**

```
           14       Q.   Is Exhibit-33 emails that you exchanged
           15  with Mr. McCafferty?
           16       A.   Yes, it is.
           17       Q.   And now we're February 19 of 2001?
```

```
18      A.   Correct.
19      Q.   And in addition to requesting the pricing
20 discounts that we talked about previously, he is now
21 requesting rebates for the group of $2,500 on CXs
22 and --
23      A.   He is requesting the use of a Bulldog
24 Bucks program, yes.
00289:01      Q.   And did you -- why you did say this is
02 about the best we can hope for?
03      A.   Well, I believe this was that point in
04 time where I wasn't particularly thrilled on a
05 personal basis with the deal we had struck.  And
06 therefore, knowing that we were going to have to
07 live with it based on the agreement that had been
08 made, I was just responding, exactly as I said, this
09 is about the best.  And that was basically inferring
10 on a personal note on the agreement that had been
11 made here.
12      Q.   Now, the rebates under the Bulldog Bucks
13 program on CX613s was $2,500; is that right?
14      A.   That I believe was the maximum amount of
15 Bulldog Bucks that any dealer could turn in on our a
16 truck they retail given certain conditions of the
17 program.
18                  - - -
19              At this time Polzer-34 has been
20          marked for identification purposes.
21                  - - -
22 BY MR. MACK:
23      Q.   Exhibit-34.  Is this an email from Mr.
24 McCafferty to you?
00290:01      A.   Correct.  March 12, 2001.
02      Q.   So we're three or four weeks after
03 Exhibit-33, right?
04      A.   Correct.
05      Q.   And Mr. McCafferty says, I have discussed
06 discounts with group on CX613s and he is now
07 requesting a $5,000 rebate on corporate transfers,
08 on dealer ordered units, and on 100 Anniversary
09 CX613s, right?
10      A.   Yes.
11      Q.   And did you approve that, sir?
12      A.   I'm going to guess, yes, I did.
13              MR. HEEP:  Same thi l.  No one
14          wants you to guess.
15              THE WITNESS:  Okay.  Yes, I
16          believe we did.
```

**80. PAGE 293:09 TO 294:16 (RUNNING 00:02:10.900)**

```
09      Q.   Is this an email you exchange with
10 Mr. McCafferty, sir?
11      A.   Yes, it is.
12      Q.   February 2002?
13      A.   Correct.
14      Q.   And in the middle email which you sent to
15 Mr. McCafferty you say that Central Indiana Mack is
16 the same dealer group that you feel I have a bur up
17 my you-know-what.
18      A.   I think that is where I was reading also.
19      Q.   Did you have a bur up your you-know-what
20 about Central Indiana Mack?
```

```
         21        A.   I did not feel I did.  John McCafferty
         22   thought I did.
         23        Q.   And Mr. McCafferty felt you did because
         24   you were challenging the across the board nature of
00294:01   the discount and rebates that were being given to
     02   Central Indiana Mack; is that right?
     03        A.   Correct.
     04        Q.   And why were you challenging that, sir?
     05        A.   Obviously, I thought that was a little
     06   much.
     07        Q.   A little too much?
     08        A.   I thought it would be too much.
     09        Q.   Okay.  And you felt, did you not, that Mr.
     10   McCafferty had agreed to highly discounted dealer
     11   plus pricing on the Macungie units?
     12        A.   I am sorry.  Repeat the first part of
     13   that.
     14        Q.   Yes.  Do you see the phrase highly
     15   discounted dealer plus pricing?
     16        A.   Correct.
```

**81. PAGE 300:03 TO 302:18 (RUNNING 00:03:32.800)**

```
         03        Q.   This is an email exchange between you and
         04   Mr. McCafferty?
         05        A.   Correct.
         06        Q.   And now there is disagreement between you
         07   two over how many of those units at Chicago Mack and
         08   Chicago Mack were actually free floorplan units?
         09        A.   That is -- yes, that is a fair assumption.
         10        Q.   And you stated to Mr. McCafferty, you
         11   absolutely have to be smoking dope to think to have
         12   this many free floorplan units, no F-ing way?
         13        A.   Correct.
         14        Q.   And then you went on to say, the more I'm
         15   looking into this based on your reply below the more
         16   I believe were getting raked over the coals?
         17        A.   That's what I wrote.
         18        Q.   And you concluded by saying you were going
         19   to instruct sales billing to honor the remaining six
         20   units even though five of them are bogus, right?
         21        A.   That's what I wrote.
         22        Q.   Why did you believe that five of the units
         23   were bogus?
         24        A.   I believe what was -- I know what was
00301:01   transpiring here is in addition to all the corporate
     02   inventory trucks that they bought, they were
     03   entitled under the two-for-one program to order two
     04   times that many.
     05                  I don't know the exact number,
     06   but I believe they bought at least 2 to 300
     07   corporate inventory units which entitled them to
     08   anywhere from 300 to 600 two-for-one future orders
     09   that would have come at free floorplan.
     10                  At some point in time there was
     11   a pressure from above or whatever to get all these
     12   units off of the free floorplan.  And part of that
     13   was trying to get a handle on how many units Chicago
     14   Mack really had eligible under this program.  And
     15   that is what we were trying to do.
     16                  And what had happened here is I
     17   believe I asked John McCafferty send me a list of
```

```
           18   what you think they still have to bill that would be
           19   part of this program?  I believe I got -- actually
           20   got a list from the Chicago Mack, Chicago dealer
           21   sales manager, Dennis Bozwinkle, and he had a lot of
           22   trucks on there that I started looking at all of
           23   them to see if they matched up to kind of my
           24   understanding of what they were.  And there were
00302:01   discrepancies.
           02        Q.   And that is what led you to conclude that
           03   five of the units listed were bogus?
           04        A.   I looked at every single truck that he
           05   listed that he thought to be free floorplan, and I
           06   made a -- I researched each of them and made a
           07   determination that they could not possibly have been
           08   part of the two-for-one program.
           09        Q.   And you concluded, at that time, that Mack
           10   was getting raked over the coals by this dealer; is
           11   that right?
           12        A.   At that time, I thought they were trying
           13   to get more units than they were entitled to placed
           14   under the free floorplan program.
           15        Q.   Well, raked over the coals was the word
           16   you used.  I didn't make that up, right?
           17        A.   I used the words raked over the coals,
           18   correct.
```

**82. PAGE 315:22 TO 316:21 (RUNNING 00:01:28.200)**

```
           22        Q.   Do you recall any special sales incentive
           23   programs being set up for Mr. Nuss's dealership?
           24        A.   A special program, I don't recall.  But as
00316:01   a general rule we will always help dealers with
           02   their existing inventory to help them get rid of
           03   them, especially if we know they will be within
           04   their AOR.  We believe we have done that
           05   consistently for any dealer who is asked.
           06        Q.   But one of the stipulations is that the
           07   inventory must be sold in the dealer's AOR?
           08        A.   Yes.
           09        Q.   That is a common stipulation for one of
           10   these special programs?
           11        A.   I would say if we would entertain a
           12   special program, yes, we would hope.
           13        Q.   And why is that?
           14        A.   I -- we just believe -- I believe speaking
           15   for Mack, we believe that we want dealers to be
           16   successful.  And the best scenario is for dealers to
           17   be successful selling to customers within their AOR.
           18        Q.   And you don't want dealers to undercut
           19   other dealers outside of their AOR, right?
           20        A.   If we had our preference.  Obviously we're
           21   not crazy about that.
```

TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 03:07:25.233)