Polzer, Stephen (Vol. 01) - 01/18/2005                                  1 CLIP (RUNNING 00:49:45.033)

JURY TRIAL - DAY 9    SEPTEMBER 25, 2006

POLZER2                   53 SEGMENTS (RUNNING 00:49:45.033)

1. PAGE 8:13 TO 9:16 (RUNNING 00:01:14.100)

```
        13      Q.   Was this a promotion?
        14      A.   I believe it was.
        15      Q.   Do you get an increase in your pay?
        16      A.   Yes, I did.
        17      Q.   Mr. Hellowell was the first one that spoke
        18 to you about this position?
        19      A.   He would have been one of many who did.
        20      Q.   Well, who was the first person that spoke
        21 to you?
        22      A.   I wouldn't know who the first person was.
        23 I mean, it was well-known that the position had been
        24 vacant for three, four, or five months, and they
00009:01 were having trouble finding somebody to take it.  It
     02 very well could have been Gordon who was the first
     03 person, and asked if I would be interested in coming
     04 back.
        05      Q.   Did Mr. Flaherty raise the issue with you?
        06      A.   Only after I told him I was considering
        07 it.
        08      Q.   I take it, that -- let me ask you, was
        09 this move a voluntary move on your part, as opposed
        10 to being formally transferred by the company?
        11      A.   Absolutely.
        12      Q.   You didn't have to take this move?
        13      A.   No, I did not.
        14      Q.   Could you have stayed in your current
        15 position in Allentown?
        16      A.   Yes, I could.
```

2. PAGE 13:08 TO 13:11 (RUNNING 00:00:12.000)

```
        08      Q.   Was the fact that you would no longer be
        09 involved in the sales assistance process part of the
        10 reason why you were interested in the new job?
        11      A.   No, I wouldn't say that.
```

3. PAGE 13:19 TO 13:24 (RUNNING 00:00:18.800)

```
        19      Q.   Were you burnt out with the whole sales
        20 assistance process?
        21      A.   I would not say I was burnt out with the
        22 sales assistance process.  I maybe was burned out
        23 with the overall demand of the director of
        24 commercial administrative function.
```

4. PAGE 14:14 TO 14:17 (RUNNING 00:00:09.000)

```
        14      Q.   So that in your testimony here, today that
        15 was just a neutral factor, the fact that you would
        16 no longer be involved in sales assistance?
        17      A.   I would agree with that.
```

5. PAGE 33:01 TO 33:16 (RUNNING 00:00:56.100)

```
00033:01        Q.   Now, at your last deposition, you told us
```

```
            02  that at one point in time you were asked by Mr.
            03  Yelles to sit on the sales assistance request for a
            04  company -- I think it was Parrish Leasing -- over a
            05  weekend.  Do you remember that?
            06       A.   That's correct.
            07       Q.   And were you ever asked by any other
            08  regional vice president to sit on or delay sales
            09  assistance requests?
            10       A.   None that I can remember.
            11       Q.   And I believe you complied with Mr.
            12  Yelles' request in that instance, right?
            13       A.   That is correct.
            14       Q.   And I believe you told me at your last
            15  deposition that that was something that -- a mistake
            16  that you made, correct?
```

6. PAGE 33:21 TO 34:16 (RUNNING 00:01:21.900)

```
            21       Q.   Let me ask you, was that a mistake, as you
            22  look back on it?
            23       A.   I think the exact word was, was that a
            24  legitimate reason to delay the sales assistance?
   00034:01  And I agreed that it was probably not a legitimate
            02  reason.  It was not a legitimate reason.
            03       Q.   Had you ever delayed any other sales
            04  assistance for -- on a deal at the request of a
            05  regional vice president or district manager?
            06       A.   I cannot recall anything.
            07       Q.   That instance that we talked about with
            08  Parrish Leasing was not consistent with Mack's
            09  practice, right?
            10       A.   I do not believe it was a legitimate
            11  reason to delay the sales assistance.
            12       Q.   If a regional vice president had come to
            13  you and said, Please delay sales assistance on this
            14  deal because one of my dealers is real close to
            15  closing it, under Mack's practice you should not
            16  have delayed the sales assistance, right?
```

7. PAGE 34:18 TO 34:24 (RUNNING 00:00:22.900)

```
            18                 THE WITNESS:  If I was -- if I
            19            would have been in a position to have
            20            acted on that sales assistance request,
            21            meaning, I was at work that day, that was
            22            one of the functions that I had the time
            23            to work on that day?  No, that should not
            24            have been a legitimate reason.
```

8. PAGE 52:17 TO 53:15 (RUNNING 00:01:04.100)

```
            17       Q.   Were there different fixed costs that you
            18  are aware of?
            19       A.   I would need a better understanding of the
            20  engineering costs that were part of the burden
            21  piece.  If you had a customer who bought the same
            22  truck and 100 of them, obviously, there is a much
            23  smaller engineering cost associated with having to
            24  make that truck up one time over a hundred trucks
   00053:01  than somebody -- than the engineering cost making
            02  101 -- 100 individual trucks.  So, I am not saying I
            03  totally understand how the engineering component of
            04  the burden is calculated.
            05       Q.   You are not sure about that?
```

```
06       A.    I', not sure about that.
07       Q.    One way or the other?
08       A.    Correct.
09       Q.    Who would have -- who would we have to ask
10  about that?
11       A.    There is an industrial accounting group.
12       Q.    What is that group called?
13       A.    I believe each of the plants have their
14  own costs.  I honestly don't know their official
15  name.
```

**9. PAGE 70:15 TO 70:24  (RUNNING 00:00:42.000)**

```
15       Q.    Mr. Polzer, Exhibit-4 is a document, Mack
16  Trucks Business Plan 2004/2006.  It says, "Issued to
17  Stephen Polzer."  Did you receive this?
18       A.    I have a copy of this, yes.
19       Q.    What is this?
20       A.    I believe you will find this is the three
21  year business plan for Mack Trucks.
22       Q.    A limited number of people received this,
23  right?
24       A.    That is correct.
```

**10. PAGE 77:03 TO 77:09  (RUNNING 00:00:22.000)**

```
03       Q.    What was your understanding of what this
04  document was, sir?
05       A.    My -- my understanding?
06       Q.    I'm asking you, not Mr. Heap.
07       A.    No.  I realize that.  I guess I just
08  decided to look at him.
09       Q.    Okay.
```

**11. PAGE 77:15 TO 78:24  (RUNNING 00:01:47.000)**

```
15       Q.    What was your understanding of what this
16  document was, if any?
17       A.    My understanding is this was more for, I
18  will call it, the senior management of the company
19  of where we were headed.
20       Q.    Go to the page MW0018404.  Now, this is
21  Mr. Flaherty's handwriting, right?
22       A.    Um-hmm.
23       Q.    Yes?
24       A.    I believe this is Mr. Flaherty's
00078:01  handwriting.
      02       Q.    And this is a section called Functional
      03  Strategies.  And I see down there at the bottom Mr.
      04  Flaherty wrote your name?
      05       A.    That is correct.
      06       Q.    Besides Price Increases?
      07       A.    Excuse me?  What was that?
      08       Q.    Beside the heading Price Increases Would
      09  Be Supported By?
      10       A.    Correct.
      11       Q.    Was it part -- do you know what that
      12  refers to there, the price increase part?  Is that
      13  something you reviewed?
      14       A.    I definitely read this section.
      15       Q.    Okay.  And were you charged or responsible
      16  for attempting to get price increases, as part of
      17  Mack's business plan?
      18       A.    I -- yes.
```

```
19      Q.   Okay.  And that was part of the company's
20 strategy in 2004?
21      A.   Yes.
22      Q.   Okay.  And was Mack successful in getting
23 price increases in 2004?
24      A.   I believe we were.
```

**12. PAGE 79:17 TO 80:10  (RUNNING 00:00:54.400)**

```
17      Q.   Did you balance volume product mix and
18 margin to ensure profitable growth?
19      A.   I really did not have much control over
20 that.  I think this gets back to what were the -- as
21 we stated earlier, the vocational product is more
22 profitable than the highway segment.
23      Q.   Were you able to get price increases in
24 the vocational segment?
00080:01      A.   Yes.
02      Q.   And were you able to get larger price
03 increases in the vocational segments than you were
04 in the highway segment?
05      A.   I believe the reports will show, yes, we
06 did.
07      Q.   And is that because -- or why were you
08 able to get larger price increases in the vocational
09 segment than the highway segment?
10      A.   Are you asking for my opinion?
```

**13. PAGE 80:15 TO 81:01  (RUNNING 00:00:39.800)**

```
15      Q.   Yes, sir.
16      A.   I don't know that I can say.  I mean, I
17 have an understanding of why I think that happened.
18      Q.   Well, give me your understanding of why
19 you think that happened?
20      A.   The acceptance, the equality of the Mack
21 vocational product was very, very good.
22 Particularly, the new Granite model product.  And,
23 unfortunately, the quality of the highway segment
24 product was perceived, I believe, by the customer
00081:01 base to be deteriorating.
```

**14. PAGE 93:23 TO 95:09  (RUNNING 00:01:17.400)**

```
23      Q.   Well, if it was a combiner Mack
24 Freightliner dealer, isn't that a competitive
00094:01 situation?
02      A.   I should have answered, I don't believe
03 there is such a thing.
04      Q.   Any more?
05      A.   If -- I -- if there was one, I don't
06 believe there is anymore.
07      Q.   Well, there is certainly Mack Peterbilt
08 dealer and Mack Kenworth dealers?
09      A.   I am aware that there may be one or two of
10 them.
11      Q.   Would you take that into consideration?
12      A.   I believe I would be relying on the DM and
13 the RVP who have the local knowledge of that for
14 their advice in something like that.  That would
15 have been one of the factors in the sales assistance
16 request to consider.
17           MR. HEEPS:  Just to be clear,
18      you are asking just generally whether it's
```

```
            19          a dual dealer as opposed to whether he had
            20          knowledge that there was actual
            21          competition from the competitors, whether
            22          it be Peterbilt or anyone else in a
            23          particular --
            24                MR. MACK:  I am on the ladder --
00095:01                because he said if it's a dual dealer he
            02          didn't mind.  Now I am asking him if its
            03          competition, would that be relevant?
            04                THE WITNESS:  I don't know if I
            05          would say it didn't mind.  If I give you
            06          that -- competition was definitely a
            07          major -- a big factor in determining where
            08          a sales assistance level should be.
            09                        - - -
```

**15. PAGE 98:10 TO 98:14  (RUNNING 00:00:11.300)**

```
            10      Q.   Mr. Polzer, I have handed you a document
            11  marked as Exhibit-5.  It has your name on it,
            12  business plan update May 14, 2004.  Did you prepare
            13  this?
            14      A.   Yes, I did.
```

**16. PAGE 101:13 TO 102:16  (RUNNING 00:01:35.000)**

```
            13      Q.   Okay.  What are the data entry points
            14  there on that graft you prepared?
            15      A.   This is a financial index that the finance
            16  department prepared from monthly data that tried to
            17  measure the relative movement in the price of a
            18  truck.
            19      Q.   What is 106 -- the last point is 106.9.
            20  What is 106.9 what?
            21      A.   That is telling me -- that if you look
            22  back to J02, which is the first point, at 100, at
            23  that time period, I guess that is January of '02.
            24  Where we -- more or less that was the baseline.  We
00102:01    are saying that for just the price side of the
            02  truck, we believe we are now receiving 106.9.
            03      Q.   So a 6.9 percent increase?
            04      A.   Yes.
            05      Q.   6.9. increase?
            06      A.   You could say if we were getting a hundred
            07  thousand dollars on that same truck we were now
            08  getting a hundred and six point nine, a hundred and
            09  six, nine hundred.
            10      Q.   And the -- you used January '02 as the
            11  base point?
            12      A.   That was the base point.
            13      Q.   So this chart showed that your price
            14  increased efforts were working, right, on deals less
            15  than ten?
            16      A.   More or less, yes.
```

**17. PAGE 108:08 TO 108:12  (RUNNING 00:00:20.700)**

```
            08      Q.   And the Mack margins, if we look at the
            09  third page, on -- on sales to the dealers for
            10  customers who bought more than ten truck in the
            11  Refuse segment are much higher than the margins in
            12  the other segments, right?
```

**18. PAGE 108:24 TO 109:11  (RUNNING 00:00:40.400)**

```
         24       Q.   10021.  Look at that Refuse margins.
00109:01          A.   Okay.
       02         Q.   Those margins are the highest than any of
       03   the other segments, right?
       04         A.   For one particular model, I would agree,
       05   yes.  The MR.
       06         Q.   And the average margin for the LE and the
       07   MR are greater than the average margin for any of
       08   the other segments, right?
       09         A.   That is correct.
       10         Q.   And is that because of the customer
       11   presence for that model -- those models?
```

**19. PAGE 109:14 TO 109:18  (RUNNING 00:00:04.000)**

```
       14                    THE WITNESS:  I believe that is
       15         one of the factors.
       16                    - - -
       17   BY MR. MACK:
       18         Q.   Can you think of any other factors?
```

**20. PAGE 109:21 TO 109:22  (RUNNING 00:00:06.100)**

```
       21                    THE WITNESS:  There is just an
       22         acceptance of the Mack refuse product.
```

**21. PAGE 115:20 TO 116:04  (RUNNING 00:00:27.000)**

```
       20         Q.   If we look at the vocational price
       21   improvement actions in the past, on deals that were
       22   for customers that were less than ten trucks there
       23   was no model year price protection window.  And for
       24   dealers that sold to customers that bought more than
00116:01   ten trucks in National Accounts, there was price
       02   protection on sold orders placed by January 16,
       03   right?
       04         A.   That is what it says.
```

**22. PAGE 116:08 TO 117:01  (RUNNING 00:01:15.800)**

```
       08         Q.   Why was there price protection offered to
       09   customers who purchased -- customers of dealers who
       10   purchased more than ten trucks and no price
       11   protection offered to dealers who sold to customers
       12   who purchased less than ten trucks?
       13         A.   We felt that the market for the vocational
       14   product was strong enough that we should be able to
       15   obtain price increases on all new model vocational
       16   trucks that were ordered.  However, we did recognize
       17   in January, which is about the time we probably
       18   announced when the new -- and I don't have the
       19   specific date -- when the new model year would take
       20   place, that there were already deals on order that
       21   the customer had quoted that end price -- excuse me.
       22   The dealer had quoted the end price to the customer
       23   that we did not feel it was fair for the dealer to
       24   have to go back and say, Oh, by the way, now you
00117:01   have to pay me more money.
```

**23. PAGE 146:24 TO 149:13  (RUNNING 00:03:12.300)**

```
         24       Q.   Before these accounts converted to --
00147:01   maybe we can get a date.  At some point in time Mack
       02   stopped selling to the body builders direct, right?
```

```
03       A.   Just recently?
04       Q.   Yes.
05       A.   We transitioned them to be sold to a
06  dealer.  That is correct.
07       Q.   And that was while you were still at Mack,
08  right?
09       A.   That is correct.
10       Q.   Sometime in early 2004, right?
11       A.   That's correct.
12       Q.   Prior to that time frame, okay, were
13  dealers equalized with the discount given to
14  McClain?
15       A.   In which situation?  If the dealers wanted
16  to sell to McClain direct or a different end user?
17       Q.   Either situation?
18       A.   So okay.  Which one do we want to tell
19  about first?
20       Q.   Why don't you give me the dealers who want
21  to do sell to a different end user first and they
22  said I am competing with McClain?
23       A.   That is where a dealer had a -- whatever
24  the third party end user was, he wanted to sell a
00148:01  truck and part of his -- part of his comments to me
02  were either I believe McNielus or McClain will also
03  be competing for the sale to this end user.  Or they
04  used the standard -- it didn't sound like they were
05  competing.  They just said we want to equalize to
06  any existing body builder dealer whatever?
07       Q.   Yes.
08       A.   I mean, that is a different situation
09  there.  They weren't saying they were competing.
10  They were just using some standard terminology that
11  I guess they thought would have meant something.
12            In my opinion -- as I said, in
13  my opinion, one of the factors that I would have
14  looked at or considered was, was there in fact a
15  situation where McClain would be invoicing -- or
16  excuse me -- McClain would be quoting that third
17  party end user versus was the dealer also quoting
18  that third party?
19       Q.   Okay.  What was your practice in that
20  situation?
21       A.   I -- my -- I would look at, as I said, the
22  factors.  I would look at who the third party end
23  user was.  Did I have any knowledge that McClain had
24  previously sold to that third party end user, that,
00149:01  in fact, it was logical that they were also -- they
02  would be selling again.
03       Q.   And if you determined it was logical, you
04  would do what?
05       A.   Another factor would be if the DM or RVP
06  was -- or the -- the comments or the opinion of the
07  field personnel, as to that.  If I thought that was
08  logical, there -- there was a good chance there
09  would have been a discount that was -- that was very
10  close if not equal to McNielus -- or excuse me --
11  McClain, as in the situation we're talking about.
12       Q.   We covered that at your last deposition?
13       A.   Correct.
```

**24. PAGE 150:01 TO 150:06  (RUNNING 00:00:20.400)**

```
00150:01       Q.   While they were still Mack National
      02  Accounts?
      03       A.   I believe there, my practice would have
      04  been to get some confirmation that, in fact, the
      05  dealer was eligible and -- or wanted to be quoted by
      06  McClain or McNielus or Heil.
```

**25. PAGE 151:24 TO 152:14  (RUNNING 00:00:57.900)**

```
      24       Q.   Is Exhibit-8 an e-mail that you sent to
00152:01  Mr. Flaherty and Mr. Nuss, which included pricing to
      02  sell to McNielus for 2005 models?
      03       A.   I believe it is a -- it's an e-mail from
      04  me, that is correct.  It definitely is the
      05  recommended price to sell to McNielus.  Or a
      06  recommend price, in this case, I guess, the Bob Nuss
      07  group should sell to McNielus.
      08       Q.   And the related, did it not, to Mr. Nuss
      09  actually selling to McNielus, rather than Mack
      10  selling to McNielus?
      11       A.   I'm sorry.  Can you repeat that?
      12       Q.   Was this a decision was made that the
      13  McNielus account would be serviced and sold to by
      14  Mr. Nuss, rather than Mack direct?
```

**26. PAGE 152:16 TO 156:13  (RUNNING 00:04:22.100)**

```
      16                 THE WITNESS:  To my
      17            understanding, McNielus designated the Bob
      18            Nuss group to be the dealer that they
      19            wanted to deal with after we had made the
      20            decision we wanted it to transition back
      21            through a dealer.
      22                     - - -
      23  BY MR. MACK:
      24       Q.   And was this after that decision and
00153:01  designation was made?
      02       A.   I was not party to when an official
      03  decision.  I don't have it.
      04       Q.   This related, did it not, to pricing that
      05  Mr. Nuss would charge to McNielus, not pricing that
      06  Mack would charge to McNielus?
      07       A.   I am sorry?  "This" is?
      08       Q.   The Exhibit-8?
      09       A.   Okay.  Repeat the question, then.
      10       Q.   Yes.  This related to pricing that
      11  Mr. Nuss would charge to McNielus when he was
      12  selling to them, not Mack selling direct to
      13  McNielus?
      14       A.   I think that most important for Mack is --
      15       Q.   Can you answer my question, sir?
      16       A.   It was a recommended price.  We have no
      17  control over what Mr. Nuss could sell to McNielus.
      18       Q.   I am not trying to argue with you, sir.  I
      19  am trying to clarify that this was about Nuss
      20  selling to McNielus, not Mack selling to McNielus.
      21                 We're in the time frame now
      22  where Nuss is trying to sell to McNielus and Mack is
      23  out of the direct sales business to McNielus.  That
      24  is all I am trying to clarify?
00154:01       A.   That is what this is about, yes.
      02       Q.   And you want to emphasize that that was
```

```
03  just a recommended price, right?
04       A.   Correct.
05       Q.   Why do you want to you emphasis that?
06  Because I haven't ask you about that.  Why do you
07  want to make that clear?
08       A.   I thought the important point when I'm
09  looking at the exhibit is the exhibit establishes
10  the price we would expect to receive from the Nuss
11  group for the trucks, and that is what is important
12  to the Mack point of view.
13       Q.   Also, it included a price that Mack was
14  recommending that Mr. Nuss sell to McNielus, right?
15       A.   Exactly.
16       Q.   And built into that price was a $1,500
17  profit to Mr. Nuss, right?
18       A.   That was a recommended number, yes.
19       Q.   Okay.  And $750 additional floor plan
20  above the normal 15 days, right?
21       A.   I don't know if you can make that direct
22  link.
23       Q.   Okay.  Why don't you read your e-mail that
24  you sent to Mr. Nuss.  Right above your name.  The
00155:01  last sentence?
02       A.   Plus additional above the normal -- okay.
03  Above the normal 15 days plus $700.  Okay.
04       Q.   So on normal deals to other dealers, they
05  got 15 days plus $700 floor plan allowance from
06  Mack; is that right?
07       A.   For a vocational model truck.  For a
08  chassis that was designated as a truck, yes.
09       Q.   Those were the terms that Mack was giving
10  to other dealers?
11       A.   That's correct.
12       Q.   Okay.  And what you are saying here is
13  you're building into the price $700 -- recommended
14  price, excuse me, $750 additional floor plan?
15       A.   That was a recommendation.
16       Q.   Okay.  And how did you come up with that
17  number?
18       A.   I don't know if there was any -- it was a
19  round number.
20       Q.   Well, a thousand is a round number, too.
21  Why not a thousand?
22       A.   I picked $750.
23       Q.   Well, does at relate to the 120 day
24  payment terms that McNielus had been getting from
00156:01  Mack?
02       A.   I could do the math.  It may be close.  It
03  may not.
04       Q.   Well, did you do any math in coming up
05  with $750 or did you just reach into a hat and pull
06  out a number?
07       A.   I don't know if I got a calculator out.
08  But I probably made an assumption as to about where
09  that may be.
10       Q.   Okay.  And you made an assumption that 120
11  days invoicing was worth about $750 in additional
12  floor planning?
13       A.   Probably.
```

**27. PAGE 157:12 TO 157:15  (RUNNING 00:00:07.400)**

```
12                       You understood, didn't you, that
13   McNielus was expecting to receive from Mr. Nuss
14   similar payment terms that it had received from
15   Mack?
```

**28. PAGE 157:18 TO 158:14  (RUNNING 00:00:49.000)**

```
18                       THE WITNESS:  To be honest with
19               you, I don't know exactly what was
20               happening once we invoiced the chassis
21               from Mr. Nuss to McNielus.
22                         - - -
23   BY MR. MACK:
24        Q.   Well, why did you put any amount in then
00158:01  for additional floor planning if you didn't have a
02   clue what was happening?
03        A.   This was a recommendation.
04        Q.   Okay.  Why did you recommend that Mr. Nuss
05   build into his price $750 for additional floor
06   planning, if you did not know what was happening on
07   the other end when Mr. Nuss billed McNielus?
08        A.   Because I was aware we did give 120 day
09   terms when we were invoicing to McNielus as a
10   National Account.
11        Q.   And you assumed that Mr. Nuss would have
12   to give something like that when he invoiced
13   McNielus, right?
14        A.   That was an assumption.
```

**29. PAGE 159:10 TO 159:12  (RUNNING 00:00:14.100)**

```
10        Q.   You billed into your price a price
11   increase from the 2004 model?
12        A.   Correct.
```

**30. PAGE 160:01 TO 160:17  (RUNNING 00:01:06.500)**

```
00160:01        Q.   Are there any other customers or any other
02   dealers that you have ever given recommended pricing
03   to?
04        A.   Any other dealers?
05        Q.   Yes.  That is the question.  Dealers?
06        A.   I would say yes.
07        Q.   Okay.  Tell me who?
08        A.   There are -- there were dealer fleet -- I
09   will call them dealer fleet customers -- bigger
10   customers of -- that were being sold through the
11   dealer where we did have an agreement as to -- as to
12   what profit we would allow or we thought the dealer
13   should have in that deal.  So, in effect, we were
14   giving a recommended selling price to the customer
15   or recommending a selling price to the customer.
16        Q.   Why did you have an agreement with respect
17   to what profit the dealer would make on these deals?
```

**31. PAGE 161:05 TO 161:08  (RUNNING 00:00:08.800)**

```
05        Q.   On those other bigger fleet deals, why did
06   you have an understanding with the dealer as to the
07   profit that Mack would allow him to have on those
08   deals?
```

**32. PAGE 161:11 TO 161:21  (RUNNING 00:00:32.000)**

```
11                    THE WITNESS:  There were certain
12          situations where we because of the
13          competitive nature and we did want -- we
14          would prefer to have that customer, Mack
15          Trucks, we did give some significant
16          discounts where we were willing or had --
17          or the math said we were going to take a
18          very small gross profit or a gross margin
19          loss, so we -- we tried to hold,
20          therefore, the profit the dealer should
21          have.  It was recommended.
```

**33. PAGE 166:03 TO 167:16  (RUNNING 00:02:49.000)**

```
03        Q.   Now, if the deal was between Mr. Nuss and
04   McNielus, why were you at all involved in talking to
05   Mr. Nuss about what his profit would be, what his
06   floor plan allowance would be, or what actually he
07   would -- you would recommend he would charge
08   McNielus for those trucks?
09        A.   I am guessing.  I don't know why.
10        Q.   You don't know why he did it?
11        A.   I know Mr -- Bob Nuss probably wanted to
12   confirm just all the various details of what was
13   going to happen here, so he had need to call me.  He
14   wanted to make sure the invoicing to him would be
15   correct.
16        Q.   But why did you -- this has a lot more
17   information than just what the products will be
18   invoiced to him for, doesn't it?
19        A.   Yes, it does.
20        Q.   Why didn't you just stop there?
21        A.   I don't know.
22        Q.   Did anybody at the company ask you to
23   perform an analysis of the recommended price for
24   Mr. Nuss?
00167:01        A.   No.
02        Q.   Well, in Mr. Favia in an e-mail to you
03   says, I think Bob needs to get him 05 pricing and I
04   need to get him back the purchase orders with the 05
05   pricing units billed after April 1, before he
06   leaves.
07                  Do you understand Mr. Favia to
08   be asking you to provide Mr. Nuss with a recommended
09   price?
10        A.   I don't believe that part of the e-mail
11   dealt with the recommended price.
12        Q.   So this was just something that you came
13   up with on your own as a favor to Mr. Nuss?
14        A.   I don't know.
15        Q.   You really don't know?
16        A.   I don't know.
```

**34. PAGE 170:04 TO 170:06  (RUNNING 00:00:20.133)**

```
04        Q.   I handed you a document we marked as
05   Exhibit-9.  Do you recognize the handwriting, sir?
06        A.   That is mine.
```

**35. PAGE 173:10 TO 173:13  (RUNNING 00:00:13.600)**

```
10        Q.   The dealer that sells to Heil, does he get
11   the same discount as the dealer who sells to
```

```
            12  McNielus?
            13      A.    Yes.  The same discount percentage, yes.
```

**36. PAGE 174:14 TO 175:13  (RUNNING 00:01:16.000)**

```
            14      Q.    Then you list muni discount.  Are these
            15  discounts on municipal sales?
            16      A.    Correct.
            17      Q.    And you have central southwest listed,
            18  right?
            19      A.    Correct.
            20      Q.    Are those central southwest regions?
            21      A.    Correct.
            22      Q.    And then you say, southeast and northeast,
            23  no more than above possibly 1 percent less?
            24      A.    Correct.
   00175:01      Q.    Why are the discounts possibly 1 percent
        02  less in the southeast and northeast region on sales
        03  to municipal accounts?
        04      A.    Our experience has shown that due to
        05  competitive forces, factors, that are in Mack's
        06  favor, that this is Mack territory, quote, unquote,
        07  we are able to acquire municipal business at
        08  sometimes discounts less than what might be required
        09  in the central or the southwest.
        10      Q.    Southeast and northeast are Mack's
        11  territory, in quotes?
        12      A.    I believe the market share reports would
        13  show that.
```

**37. PAGE 188:02 TO 188:18  (RUNNING 00:00:59.000)**

```
        02      Q.    So, we're back to Exhibit-10.  And you
        03  wanted to get some thoughts on paper for this
        04  conference call about sales to McNielus, right?
        05      A.    That is correct.
        06      Q.    And what was going to be discussed at that
        07  conference call that you felt it was important to
        08  put your thoughts on paper because you couldn't be
        09  there?
        10      A.    I believe the conference call was going to
        11  deal with body builders, the issue of selling to
        12  body builders.
        13      Q.    Well, the memo that you wrote talks about
        14  McNielus, doesn't it?  A price increase to McNielus?
        15      A.    That is correct.
        16      Q.    And, apparently, Mr. Flaherty was having a
        17  meeting with McNielus on Tuesday to show our
        18  displeasure at McNielus' recent sales tactics?
```

**38. PAGE 189:04 TO 190:01  (RUNNING 00:01:11.000)**

```
        04             THE WITNESS:  My understanding
        05         was that was going to be one of many
        06         issues.
        07                   - - -
        08  BY MR. MACK:
        09      Q.    What sales tactics were you talking about
        10  there?
        11      A.    It appeared that they were targeting
        12  legacy or customer accounts who had traditionally in
        13  the past so many buying cycles over the years had
        14  purchased through the dealer, and McNielus was now
        15  trying to quote them directly.
```

```
           16      Q.   And it was your belief that that flew in
           17  the face of previous understandings with McNielus?
           18      A.   Based on e-mails I had seen from Joe Favia
           19  or something, I thought it was a condition, yes.
           20      Q.   And you said fly in the face?  I didn't
           21  make that up, right?
           22      A.   No.  I used that terminology.
           23      Q.   And you said previous understandings?
           24  That was your terminology, right?
  00190:01      A.   That's what is written here.
```

### 39. PAGE 205:01 TO 205:17  (RUNNING 00:01:09.200)

```
  00205:01      Q.   This is an e-mail exchange between you and
        02  Mr. Nuss?
        03      A.   That is correct.
        04      Q.   Exhibit-11?
        05      A.   Correct.
        06      Q.   We're now February 15 --
        07      A.   Okay.
        08      Q.   -- 2004.
        09                And you were having an exchange
        10  of e-mails with Mr. Nuss about the quoted price
        11  given to McNielus, right?
        12      A.   I believe that is what this e-mail was
        13  referring to was trying to make sure we had the
        14  right price for the trucks already on order when
        15  they were being treated as a National Accounts that
        16  were going to be part of any transition to Bob Nuss
        17  as the dealer.
```

### 40. PAGE 206:09 TO 206:11  (RUNNING 00:00:06.000)

```
        09      Q.   And he was working out with you what the
        10  sales assistance would be and what profit he would
        11  get, right?
```

### 41. PAGE 206:13 TO 206:19  (RUNNING 00:00:07.400)

```
        13                THE WITNESS:  I wouldn't agree
        14           to the profit.
        15                - - -
        16  BY MR. MACK:
        17      Q.   Well, he says "Dealer margin came up
        18  almost zero at 17 percent total sales assistance,"
        19  doesn't he?
```

### 42. PAGE 207:10 TO 207:24  (RUNNING 00:00:36.100)

```
        10                THE WITNESS:  I believe the
        11           price to McNielus for this group of trucks
        12           because they had already been ordered as
        13           National Accounts, was fixed and
        14           predetermined.  And this was -- this was
        15           myself and Bob just making sure we had the
        16           right discount that would back in to that
        17           price that McNielus should be charged for
        18           those trucks.
        19                - - -
        20  BY MR. MACK:
        21      Q.   And part of your discussion was how much
        22  profit Mr. Nuss would get on those truck?
        23      A.   That would have definitely been a
        24  component of this.
```

**43. PAGE 216:10 TO 216:12  (RUNNING 00:00:10.000)**

```
10      Q.   Is this an e-mail that you sent to
11 Regional Vice President Flaherty, March 22nd, 2004?
12      A.   That is correct.
```

**44. PAGE 219:08 TO 220:19  (RUNNING 00:01:52.000)**

```
08      Q.   And then you said in the next to he last
09 paragraph, "I believe they need our MR units to keep
10 their factory and refuse sale business going."  I
11 take it that was a belief that you had at that time?
12      A.   I think that was the belief based off of
13 the last five or ten years of sales and the models
14 that they were purchasing in their annual sales.
15      Q.   Well, why couldn't McNielus just stop
16 buying MRs from Mack and slid in some other
17 competitor and kept its factory and refuse sales
18 business going?
19      A.   They could have, but --
20      Q.   Well, you said "I believe they need our MR
21 units to keep their factory and refuse sales
22 business going"?
23      A.   I was kind of hoping against hope that it
24 was that widely accepted, the SD/MR.
00220:01      Q.   You used the word "believe."  That wasn't
02 a hope against hope.  That was something you
03 believed, wasn't it?
04      A.   Yes.  It was my personal belief.
05      Q.   That if you didn't seal to MRs their
06 factory and refuse sales business was going to be
07 affected?
08      A.   It was a personal belief, not based on any
09 fact, other than I noticed how many quantities of
10 MRs and LEs they had purchased in the past.
11      Q.   Well, it was a personal belief that you
12 were making recommendations on -- based on,
13 regarding the pricing and discounts that Mack should
14 give to McNielus, right?
15      A.   I believe my job was to make pricing
16 recommendations.  But in this particular case, it
17 would not have been the -- it would not have been
18 the final decision from me.  I was making
19 recommendations.
```

**45. PAGE 255:11 TO 257:04  (RUNNING 00:02:51.000)**

```
11      Q.   I wanted to ask you, Mr. Polzer -- you are
12 welcome to look at all this.  I wanted to ask you
13 about the second page in the e-mail that appears in
14 Exhibit-28 at the top of the second page, which
15 concludes "Steve."
16      A.   Okay.
17      Q.   That is an e-mail you sent, right?
18      A.   Correct.
19      Q.   Okay.  And you sent it to Mr. Flaherty?
20      A.   Yes, I did.
21      Q.   And this is 2003.  And it is talking about
22 McNielus pricing, right, and dealer discounts?
23      A.   Talking about McNielus pricing.  And you
24 are looking at point number one?
00256:01      Q.   Yes.
02      A.   Okay.
03      Q.   I wanted to ask you what you meant when
```

```
          04   you said, You will note the dealer equivalent
          05   discount on the CV model is quite significant and
          06   puts us in the that delicate -- and you put delicate
          07   in quotes -- position, of trying to hold normal
          08   discounting on dealer one to two truck deals where
          09   they claim they are competing against McNielus Mack
          10   units?  What delicate position were you referring to
          11   there?
          12        A.   Of holding normal discount on a dealer one
          13   to two truck CV model.
          14        Q.   Where he caved in and was trying to get
          15   the McNielus discount because he claimed he was
          16   completing against McNielus?
          17        A.   I am sorry.  Repeat that.
          18        Q.   Where the dealer came in and tried --
          19   wanted the McNielus CV discount because he claimed
          20   he was completing against McNielus?
          21        A.   Correct.
          22        Q.   And it was your goal to try to hold the
          23   normal discount, not give that dealer the CV
          24   discount given to McNielus, right?
00257:01                      MR. HEEPS:  Objection.
          02                  THE WITNESS:  Yes.  I believe my
          03        job was to, yes, get the highest price for
          04        the truck we could.
```

**46. PAGE 274:14 TO 275:01 (RUNNING 00:00:43.000)**

```
          14        Q.   Mr. Polzer, Exhibit-30, an e-mail from
          15   Mr. McCafferty, August 20, 2003, right?
          16        A.   That's correct.
          17        Q.   You were cc'd on it?
          18        A.   Yes, I was copied.
          19        Q.   Transport Service, that is a customer of
          20   Chicago Mack, right?
          21        A.   That is correct.
          22        Q.   And Mr. McCafferty is writing in this
          23   e-mail about accrual dollars.  Do you see that?
          24        A.   Yes, I do.
00275:01        Q.   What are accrual dollars?
```

**47. PAGE 275:04 TO 277:09 (RUNNING 00:02:16.100)**

```
          04                  THE WITNESS:  I believe -- I
          05        believe these were trucks that had been --
          06        the referenced serial numbers were trucks
          07        that had been sold to Chicago Mack with
          08        trade-back residuals.  I think we went
          09        through with what those had been in a
          10        previous -- and it is Mack policy that
          11        when we do allow residuals or make them
          12        part of the deal, we will accrue money for
          13        the back end, just in case the market
          14        value of that we will have to get to -- to
          15        take these trucks back and resell them
          16        won't be the amount of money that was
          17        committed to the customer.
          18                      - - -
          19   BY MR. MACK:
          20        Q.   And at the end of the e-mail Mr.
          21   McCafferty says, "Information concerning this deal
          22   should not be shared with anyone outside of Kevin
          23   Flaherty or Steve Polzer."  Do you see that?
```

```
          24      A.   Yes, I see that.
    00276:01      Q.   Was this a secret deal?
          02      A.   I don't know why he wrote that.
          03      Q.   This was not a deal that was available as
          04 part of a program, right?
          05      A.   As part of -- excuse me?
          06      Q.   A program?  Dogs Gone Wild?
          07                MR. HEEPS:  Were these trucks
          08           purchased pursuant to some kind of
          09           program?
          10                MR. MACK:  Sure.
          11                THE WITNESS:  The trucks here.
          12           The trucks here or the --
          13                MR. HEEPS:  Do you recognize the
          14           trucks that are listed on this page, one
          15           way or another, as having been --
          16                THE WITNESS:  Transport Service
          17           would have not been a program type truck.
          18           It would have been specifically an ordered
          19           truck, at that time.
          20                       - - -
          21 BY MR. MACK:
          22      Q.   What is an over allowance on a residual?
          23 It's not in the memo.  I am just asking if you ever
          24 heard that term?
    00277:01      A.   Excuse me.  What is?
          02      Q.   An over allowance?
          03      A.   Versus a residual?  Is that the question?
          04      Q.   Yes.  Yes.
          05      A.   An over allowance is -- to be honest, it's
          06 nothing different if you take your car in and you
          07 want to trade it in, you think it's worth 13.  They
          08 are only -- they put an inventory for 10 but they
          09 give you 13.
```

**48. PAGE 278:13 TO 278:17 (RUNNING 00:00:24.500)**

```
          13      Q.   Well, let's see.  Exhibit-31 is an
          14 exchange of e-mails with you, Mr. McCafferty,
          15 relating to Central Indiana Mack, right?  Do you see
          16 down at the bottom of page one D534?
          17      A.   I am sorry.
```

**49. PAGE 278:19 TO 279:03 (RUNNING 00:00:27.000)**

```
          19                THE WITNESS:  Okay.  Yes.
          20                       - - -
          21 BY MR. MACK:
          22      Q.   Okay.  And Mr. McCafferty in the e-mail at
          23 the top says, Steve, yes, asking for total net net
          24 billing on total discount approval, paren, which
    00279:01 would include OV dollars and volume bonus.
          02      A.   Okay.
          03      Q.   Was that approved by you?
```

**50. PAGE 279:05 TO 279:15 (RUNNING 00:00:24.000)**

```
          05                THE WITNESS:  If this is
          06           relating to that 42 unit trade out, which
          07           I believe it is, I recognize some of
          08           those.  My guess is we would have tried to
          09           accommodate that, yes.
          10                       - - -
          11 BY MR. MACK:
```

```
            12      Q.   What he was asking for there is that the
            13 over allowance on the trades actually be credited to
            14 the dealer upfront as part of the deal for net net
            15 billing?
```

**51. PAGE 279:22 TO 280:03  (RUNNING 00:00:11.800)**

```
            22      Q.   Do you see the reference to total discount
            23 approval including OV dollars?
            24      A.   Yes.
   00280:01      Q.   Okay.  And volume bonus?
         02      A.   And volume bonus.
         03      Q.   What was he asking for?
```

**52. PAGE 280:06 TO 281:07  (RUNNING 00:01:12.800)**

```
            06                  THE WITNESS:  This is a deal
            07           where we had agreed to replace the 42
            08           units that were in D534s MLS fleet with
            09           new units.  And the difference between the
            10           agreed to price of the units that were
            11           coming off versus the new units created,
            12           it was a significant -- it was a large gap
            13           in those dollars, which would have
            14           included over allowance.
            15                  And he -- and we had not yet
            16           invoiced the new units.  So he was just
            17           saying, Okay, you are getting ready to
            18           invoice the new units that are part of
            19           these deals.  Just include all the credits
            20           related to that were -- that agreed to the
            21           worksheet that --
            22                       - - -
            23 BY MR. MACK:
            24      Q.   Including over allowance dollars?
   00281:01      A.   Correct.
         02      Q.   That was done?
         03      A.   I believe it was.
         04      Q.   That wasn't part of any program that was
         05 available to all the dealers, was it?
         06      A.   I believe this was a special situation
         07 that was approved by Kevin and Jeff.
```

**53. PAGE 281:13 TO 283:19  (RUNNING 00:02:33.100)**

```
            13      Q.   Exhibit-32 is an exchange e-mails from you
            14 and Mr. McCafferty regarding a sales of trucks to
            15 D534, right?
            16      A.   Correct.
            17      Q.   And the customer here was a customer by
            18 the name of Vitran?
            19      A.   Vitran, correct.
            20      Q.   Fleet customer?
            21      A.   A dealer fleet.  They -- they usually
            22 bought about a hundred trucks at a time, yes.
            23      Q.   And there is a rather testee exchange here
            24 between you and Mr. McCafferty about how much sales
   00282:01 assistance the dealer should get?
         02      A.   This was one of those deals that we would
         03 have worked from the back end price that was agreed
         04 to or that was required to sell to the customer up,
         05 which would have included how much profit we thought
         06 central Indiana should be allowed on this deal.
         07 And, yes, we had a disagreement as to what I thought
```

```
08   the sales assistance should be to agree to that from
09   the back -- I will say from the bottom up price and
10   how John got to that.
11        Q.   And Mr. McCafferty made some comments
12   about pissing in your Cheerios and taking night shop
13   math classes, and few other not nice thing?
14        A.   And I believe I wasn't as equally as nice,
15   going back, either.
16        Q.   You are not quite as graphic?
17        A.   No.
18        Q.   Okay.  How was this resolved?
19        A.   I would have to look at the deal -- you
20   know, the deal file to see what the final --
21        Q.   Page three?
22        A.   Okay.
23        Q.   There is an e-mail beginning "JMack"?
24        A.   Okay.
00283:01       Q.   "Estimating gross margin includes Mack
02   picking up extended warranty internally like last
03   deal."  What does that mean?
04        A.   This was a situation where there was going
05   to be an extended warranty on all of these trucks,
06   and the form would be sent in and we would put them
07   on our warranty, and we would internally record the
08   cost of that.
09        Q.   So the dealer wasn't being charged for
10   that?
11        A.   It was not part of the dealer sales
12   assistance.
13        Q.   And this was a deal on this for this
14   particular customer, not a general program for all
15   the dealers, right?
16        A.   We have done it on more than one occasion.
17        Q.   But there is not a general program where
18   Mack does it?
19        A.   There is not a general program.
```

TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:49:45.033)