matter of law be reduced to $50,000, which is the amount actual development costs incurred by Mack in connection with MACSPEC 2001.[12]

Where a court finds evidence sufficient to support a finding of liability against a defendant, a jury award should still be reduced or a new trial should be granted where the award has no relation to any evidence of harm to the plaintiff. See Gumbs v. Pueblo International, Inc., 823 F.2d 768, 773-74 (3d Cir. 1987) (noting that appellate courts have an increasing willingness to review damages awards and vacating judgment with instructions to further reduce $900,000 damages award which had been remitted to $575,000 to $239,117.75); Williams v. Martin Marietta Alumina, Inc., 817 F.2d 1030, 1041 (3d Cir. 1987) (vacating $600,000 damages award and holding that new trial was appropriate unless plaintiff agreed to remittitur of damages in excess of $383,038).

While Mack asserted at trial that its total costs to develop MACSPEC 2001 exceeded $32 million, the undisputed evidence at trial, including the testimony of Mack's own witness, established that virtually all of that $32 million did not relate to MACSPEC 2001, but rather to

---

[12] "A motion to alter or amend a judgment under Fed. R. Civ. P. 59(e) may be granted if there was a clear error of law or to correct manifest injustice." Haymond, Napoli Diamond, P.C. v. Haymond, 2004 U.S. Dist. LEXIS 17276, at *30 (E.D. Pa. Aug. 27, 2004). "A motion under Rule 59(e) of the Federal Rules of Procedure is the appropriate manner in which to challenge the size of the verdict." Keystone Truck Equip. Co. v. Russell Chevrolet Motors, Inc., 1996 U.S. Dist. LEXIS 7213, at *13 (E.D.Pa. May 30, 1996); see also MOORE'S FEDERAL PRACTICE § 59.30[4] (Matthew Bender 3d ed.) (noting that "[c]ourts have considerable discretion in determining whether to grant or deny a motion to alter or amend").

The standard in determining whether remittitur should be granted is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake or corruption. Haines v. Raven Arms, 536 Pa. 452, 640 A.2d 367 (1994). Reversal of an excessive verdict award is within the sound discretion of the trial court. Corabi v. Curtis Publishing Co., 441 Pa. 432, 273 A.2d 899 (1971).

DM1\700514.1

the development of other products including various versions of paper parts books, microfiche and predecessor versions of MACSPEC. In fact, the development costs identified by Mack that related specifically to MACSPEC 2001 totaled only $50,000.[13] (See Ex. D-1235 at pg. 29). However, Mack already received a payment of $50,000 as part of its settlement with PAI, (N.T. 9/29/06 at 79-80; See Settlement Agreement between Mack and PAI attached hereto as Ex."A"). Thus, even assuming *arguendo* that Mack were entitled to recover the development costs specifically related to MACSPEC 2001, Mack would nevertheless not be entitled to recover anything from Toledo Mack because it has already been compensated for its MACSPEC 2001 development costs by the settlement money paid to it by PAI.

Therefore, ignoring the fact that Mack has already been reimbursed in full by PAI for the development costs Mack incurred in connection with MACSPEC 2001, the evidence presented at trial regarding the development costs of MACSPEC 2001 obviously does not support the jury's damages award of over $11.3 million. As such, that award must be amended by reducing to not more than $50,000.[14]

---

[13] Mack did present a second invoice in the amount of $48,903.95 pertaining to costs it incurred in connection with MACSPEC 2001. (See Ex. D-1235 at pg. 30) But that invoice related to costs (such as the creation of a master set of 26 CDs, along with 500 duplicates, jewel cases for the duplicate CDs, and boxes to ship the CDs) associated with the production of hundreds of extra copies of the database for Mack to lease to its dealers. Those additional production costs are not properly included as development costs and, in any event, they would not have been incurred by an entity such as PAI which only had use for a single copy of MACSPEC 2001 and thus would have had no need for, or interest in having, multiple copies, much less the hundreds of copies with which these additional production costs were associated.

[14] At trial, Toledo sought to introduce evidence that Mack settled its claims against PAI for misappropriation of trade secrets for among other things, a payment by PAI to Mack of $50,000. Pursuant to Pennsylvania's Uniform Contribution Among Tort-feasor's Act, 42 Pa. C.S. § 8321 et seq., any damages awarded against Toledo should be reduced by the amount of this settlement payment. See 42 Pa. C.S. § 8326 ("A release by the injured person of one joint tort-feasor . . . reduces the claim against the other tort-feasors in the
(Continued...)

### III. JUDGMENT SHOULD BE ENTERED IN FAVOR OF TOLEDO ON MACK'S CLAIM FOR MISAPPROPRIATION OF MACSPEC 2001 BECAUSE THAT COUNTERCLAIM IS BARRED BY THE GIST OF THE ACTION DOCTRINE AND THE ECONOMIC LOSS RULE

Toledo is entitled to judgment in its favor on Mack's claim for misappropriation of MACSPEC 2001 under the gist of the action doctrine and the economic loss rule, because that claim actually arises from a breach of a licensing agreement and sounds in contract rather than tort.

Although Mack characterizes its claim as one of "misappropriation" of MACSPEC 2001, the fact is that Toledo merely ordered MACSPEC 2001 from Mack using Mack's own order form and paid Mack the asking price for that system. As such, Mack's claim turns on Mack's contention that Toledo was contractually bound by a license agreement not to distribute MACSPEC 2001 to third parties like PAI and that Toledo breached that obligation by providing MACSPEC 2001 to PAI without Mack's authorization. Indeed, Mack specifically alleged in its Complaint that the terms of a license agreement signed by Toledo forbid Toledo from providing MACSPEC 2001 to third parties such as PAI. Under the gist of the action doctrine and the

---

(Continued...)

    amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid."). See also Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 433 (3d Cir. 1993) (setting off amounts received by plaintiff in settlement of antitrust claim from damages award). Thus, pursuant to Fed. R. Civ. P. 59(e), any judgment against Toledo should be reduced by $50,000, meaning that the award should be reduced here to zero.

    In the alternative to a reduction of the jury's award, Toledo should be awarded a new trial on this claim. See Alling v. Johnson Controls, Inc., No. 00-5228, 2002 U.S. Dist. LEXIS 635, at **7-10 (E.D. Pa. Jan. 16, 2002) (Buckwalter, J) (concluding $3 million verdict was grossly excessive and reducing verdict to $1.5 million where plaintiff lost two fingers because of the defendant's negligence).

economic loss rule, Mack should have pursued a claim for breach of contract; its tort claim for misappropriation of MACSPEC 2001 is barred.

"Under the gist of the action test, 'to be construed as a tort action, the tortious wrong ascribed to the defendant must be the gist of the action with the contract being collateral.'" Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103 (3d Cir. 2001). The crux of the analysis under the gist of the action doctrine is whether actions "lie from a breach of duties imposed as a matter of social policy" or "from the breach of duties imposed by mutual consensus." Redevelopment Authority of Cambria County v. International Ins. Co., 685 A.2d 581, 590 (Pa. Super. Ct. 1995).

Many Pennsylvania courts applying the gist of the action doctrine focus the inquiry on whether the action arose from fraud in the inducement of a contract or from the performance of the contract. See, e.g. Etoll, Inc. v. Elias/Savion Adver., 811 A.2d 10, 19 (Pa. Super. Ct. 2002) (noting that if the action arises out of performance of the contract then the gist of the action doctrine applies). Where a duty of confidentiality arises from an agreement, an action for misappropriation of those trade secrets cannot be sustained. Ellwood Group, 247 F.3d at 106.

As in Ellwood Group, Mack contends that the licensing agreement directly prohibited the very same conduct that underlies Mack's claim that Toledo misappropriated MACSPEC 2001 by providing that information to PAI. In fact, Mack stated in its Answer and Counterclaims that this conduct directly violated a licensing agreement between Toledo and Mack: "Mack only authorized Toledo to receive a copy of MACSPEC 2001 and an unlock code on the express agreement that Toledo was to maintain the secrecy and confidentiality of the MACSPEC system." Answer and Counterclaims of Defendant, Exhibit 4, Counterclaims at ¶ 40. It is

21

apparent based on Mack's own pleadings that Mack's counterclaim for misappropriation of trade secrets is not a tort, but rather arises out of a breach of a duty imposed by contract.

In addition to being precluded by the gist of the action doctrine, Mack's misappropriation of trade secrets counterclaim is also barred the economic loss doctrine. The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from contract." Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995). In making this determination, Pennsylvania courts generally look to whether the "loss of the benefit of a bargain is the plaintiff's sole loss." Id.

Here, Mack's counterclaim for misappropriation of MACSPEC 2001 cannot be sustained because Mack presented no evidence that it suffered any harm, in the form of lost profits or otherwise. Any damages associated with that claim relate directly to Mack being denied the benefit of its bargain that Toledo would not provide MACSPEC 2001 to third parties such as PAI. Mack's claim therefore fails under the economic loss doctrine as well as the gist of the action doctrine, and this Court should enter judgment as a matter of law in favor of Toledo on that claim.

IV. **TOLEDO SHOULD BE GRANTED A NEW TRIAL ON ALL CLAIMS AND COUNTERCLAIMS BECAUSE HIGHLY PREJUDICIAL AND IRRELEVANT EVIDENCE WAS ADMITTED REGARDING PRIOR UNRELATED LITIGATION**

Toledo is entitled to a new trial[15] on all of its claims against Mack as well as on all of Mack's counterclaims against Toledo because the Court improperly admitted highly prejudicial

---

[15] Under Fed. R. Civ. P. 59, the grant of a motion for a new trial on the ground that the verdict is against the weight of the evidence is within the sound discretion of the trial judge. Lind v. Schenley Indus., Inc., 278 F.2d 79, 88-89 (3rd Cir. 1960), cert. denied, 364 U.S. 835 (1960). Additionally, the jury's verdict should be more closely scrutinized where the trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of the jurors. Id. at 90-91. Where a motion for a new trial
(Continued...)

22

and irrelevant evidence of prior litigation involving Dave and Sally Yeager. See N.T. 9/11/06 at 4:3-5 (denying Toledo's Motion *in Limine* to Exclude Evidence of Prior Unrelated Litigation).

More specifically, Mack's counsel was permitted to introduce evidence about several other cases involving Dave and Sally Yeager, which had no relation to this lawsuit. This prior litigation included a lawsuit accusing Dave Yeager of participating in a price-fixing conspiracy and a lawsuit in with the opposing party had alleged that Mr. Yeager had misappropriated trade secrets. All of this litigation involved events occurring over 15 years ago. None of this litigation involved Toledo or even the heavy duty truck industry.

In an antitrust case with a counterclaim alleging misappropriation of trade secrets, it is difficult to conceive of anything more prejudicial than allegations that the plaintiff has engaged in price-fixing and misappropriated trade secrets, yet those were precisely the allegations in the prior unrelated litigation.

Mack previously argued that evidence of this prior litigation was relevant to establish that Dave Yeager was distracted from selling trucks for Toledo. However, there was no support for this theory at trial. Indeed, the evidence reflected that Toledo enjoyed its greatest success in the late 1980s while these lawsuits were pending. (N.T. 9/15/06 at 5).

Mack's real reason for introducing evidence about the Yeagers' prior litigation was revealed at trial. Mack argued repeatedly that the Yeagers and Toledo had a pattern of blaming others for what Mack characterized as "self-inflicted" wounds. In other words, Mack argued that

---

(Continued...)

       addresses an issue other than that the jury verdict was against the weight of the evidence, district courts possess wide discretion in determining whether to grant it. Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993); Henry v. Hess Oil Virgin Is. Corp., 163 F.R.D. 237, 243-44 (D.V.I. 1995).

23

the Yeagers were litigious and had a history of blaming others for the failures of their businesses. Mack asserted this improper theme from the very beginning of the trial. Indeed, in the *second sentence* of his opening statement, Mack's counsel described this case as "the story of a businessman who constantly blames others for his own actions or, more accurately, his own inactions over many years." (N.T. 9/13/06 at 54). Counsel then discussed three of the unrelated prior lawsuits and criticized Mr. Yeager for blaming the other parties in those lawsuits for problems with Mr. Yeager's business and personal dealings. (N.T. 9/13/06 at 79-80).[16] It was nothing more than a shameless appeal to the worst prejudices of the jury.

Evidence related to the Yeagers' prior litigation was simply not relevant to this case. That prior litigation involved a different business, a different industry, resulted in no findings of liability against the Yeagers or Toledo (indeed, it did not even *involve* Toledo), and related to incidents occurring between 15 to 23 years ago. Accordingly, pursuant to Fed. R. Evid. 401, it should have been excluded at trial.

Other federal courts have held that evidence of prior litigation should be excluded even where a *judgment* (not mere allegations) was entered against a defendant and even where the prior litigation involved the same industry. See United States Football League v. National Football League, 842 F.2d 1335, 1371 (2d Cir. 1988) (finding that evidence of prior judgments earlier antitrust actions involving the NFL was inadmissible unless the "conduct underlying those prior judgments had a direct, logical relationship to the conduct at issue in this case"). If

---

[16] Moreover, Mack's reference to the Yeagers' prior unrelated lawsuits went well beyond exploring whether the Yeagers were too busy to operate their business. Counsel also explored the subject matter and the claims asserted in those lawsuits. (See e.g. N.T. 9/15/06 at 144-46, 153-59).

DM1\700514.1

evidence of prior litigation should not be omitted in *those* circumstances, it clearly should not have been admitted here.

This Court also should have excluded evidence regarding that prior litigation because such evidence was highly prejudicial to Toledo, confused the jury and unduly delayed a complex and lengthy trial while adding no probative value to the real issues at trial.

According to Rule 403 of the Federal Rules of Evidence,

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403. "Unfair prejudice means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 Advisory Comm. Notes.

In this case, there are several layers of prejudice to Toledo that flowed from the admission of evidence regarding the unrelated prior litigation. First, Mack invited the jury to infer from the numerous earlier cases that Dave and Sally Yeager—and by implication, Toledo—are chronic litigants whose claims therefore may lack merit. This presents a very real threat of prejudice. See Outley v. New York, 837 F.2d 587, 592 (2d Cir. 1988) ("The charge of litigiousness is a serious one, *likely to result in undue prejudice against the party charged*, unless the previous claims made by the party are shown to have been fraudulent.") (emphasis added) (citations omitted). Furthermore, the fact that Mr. Yeager has previously been forced to defend himself against a (meritless) claim of misappropriation of trade secrets (a claim made against him by BFI in the case filed in *1983*) presented the risk that the jury may have considered that fact to be probative or relevant to Mack's trade secret misappropriation counterclaim here.

25

Another layer of prejudice to Toledo that likely resulted from evidence regarding the unrelated prior litigation arose from the fact that the litigation with BFI included claims of antitrust violations by BFI against Mr. Yeager. Given the breadth of the claims and the seriousness of the allegations in the previous lawsuits, evidence related to that litigation could well have sparked an emotional reaction from the jury that resulted in substantial prejudice to Toledo. See Advisory Committee Notes to Rule 403 ("Unfair prejudice within its context means a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

Introduction of prior litigation not only prejudiced Toledo, but also complicated and lengthened the trial. The Third Circuit has recognized that "[t]he introduction of dissimilar past acts runs the risk of confusing the issues in the trial and wasting valuable time." Johnson v. Elk Lake Sch. Dist., 283 F.3d 138, 156 (3d Cir. 2002). Moreover, there was a particularly great danger of jury confusion because of the superficial similarity between certain of the claims in the current action and the causes of action raised in prior litigation, as both involved claims under the antitrust laws as well as claims of misappropriation of trade secrets (although the involved parties and underlying facts and circumstances were completely different). See Blancha v. Raymark Indus., 972 F.2d 507 (3d Cir. 1992).

Lastly, evidence regarding the unrelated prior litigation should have been excluded as "similar act" character evidence. See Federal Rule of Evidence 404(b). Evidence of prior litigation intended to show a party's litigious nature is not probative of fact issues. See Nat'l Util. Serv., Inc., v. Huntsman Chem. Corp., 70 F. Supp. 2d 496, 510-11 (D.N.J. 1999) (granting plaintiff's motion *in limine* to exclude as irrelevant evidence which was intended to prove that the party was "in the business of litigation"). Nor would evidence of prior litigation involving

the Yeagers meet any of the criteria for admission identified in the second clause of the Rule 404(b). Such evidence is not probative of any material issue in this case and such evidence could well lead the jury to believe that Toledo's owners were unduly or inappropriately litigious or habitual misappropriators of trade secrets.

V.  **TOLEDO IS ENTITLED TO A NEW TRIAL BECAUSE JUDGMENT WAS ERRONEOUSLY ENTERED AGAINST TOLEDO AS A MATTER OF LAW ON MACK'S CLAIM FOR MISAPPROPRIATION OF MACSPEC 2001**

Toledo is entitled to a new trial because the Court erroneously entered judgment as a matter of law against Toledo on Mack's counterclaim of misappropriation of MACSPEC 2001. The Court entered judgment on this claim based on a decision by the Ohio Court of Appeals made in the course of dealership termination proceedings wholly separate from the instant litigation. The determination by this Court was erroneous because the Ohio Court of Appeals did not issue findings that encompass every element of a claim for misappropriation of trade secrets under Pennsylvania law. Rather, the appeals court only issued a finding as to one element – the existence of a trade secret. Therefore, Mack was not entitled to judgment on its misappropriation of trade secrets counterclaim.

Under Pennsylvania law, in order to prevail on a claim for the misappropriation of trade secrets a plaintiff must prove four distinct elements: (1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff. Frank W. Winne and Son, Inc. v. Palmer, No. 91-2239, 1991 U.S. Dist. LEXIS 11183, *4 (E.D. Pa, August 7, 1991). The Ohio Court of Appeals failed to make any finding with respect to the latter three elements of such a claim and, consequently, the decision of that court is not entitled to preclusive effect as to Mack's misappropriation of trade secrets counterclaim. See Aetna Life & Casualty Corp. v.

27

Maravich, 824 F.2d 266 (3d Cir. 1987); Monahan v. Eagle Picher Indus. Inc., 486 N.E.2d 1165, 1168 (Ohio Ct. App. 1984).

## VI. TOLEDO IS ENTITLED TO A NEW TRIAL BECAUSE JUDGMENT WAS ERRONEOUSLY ENTERED AGAINST TOLEDO AS A MATTER OF LAW ON ITS CLAIM UNDER SECTION 1 OF THE SHERMAN ACT

At the close of Toledo's case in chief, the Court entered judgment as a matter of law in favor of Mack and against Toledo on Toledo's claim under Section 1 of the Sherman Act. Although the Court has not issued any written opinion explaining its rationale for that ruling, the Court verbally indicated that its decision was based on the statute of limitations and evidence regarding the knowledge of Toledo's representatives about the alleged conspiracy as early as 1989.

"In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971). Thus, even had Toledo possessed complete knowledge back in 1989 of Mack's participation in the illegal conspiracy among Mack dealers to fix prices of Mack trucks, Toledo's claim still would not be barred by the statute of limitations because Toledo produced evidence of acts in furtherance of the conspiracy after July 1, 1998, which is the beginning of the applicable limitations period here. See Pennsylvania Dental Assoc. v. Medical Service Assoc., 815 F.2d 270 (3d Cir. 1987), cert. denied, 484 U.S. 851 (1987); In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144 (3d Cir. 1993).

At a minimum, Toledo should have been permitted to pursue its antitrust claim for all damages caused by the conspiracy after July 1, 1998, because Toledo presented evidence of multiple overt acts in furtherance of the conspiracy during the statutory period. Toledo presented

28

evidence that Mack continuously and repeatedly discriminated against Toledo and that Mack enforced a number of "unwritten" and "unofficial" policies designed to keep Toledo "in its box."

Toledo introduced direct evidence of concerted action showing that a conspiracy between Mack and its dealers existed beginning in 1989 and continued after July 1, 1998. Under the controlling case law in this Circuit, Toledo presented far more than a "mere scintilla" of evidence of concerted action and it is should have been left to the jury to determine whether Mack engaged in concerted action in violation of Section 1 of the Sherman Act.

Toledo presented extensive evidence of concerted action.[17] In this case, there is substantial evidence from several different sources that there were "gentlemen's agreements" restricting competition among Mack dealers in order to maintain existing profit structures. Toledo also presented direct evidence and admissions regarding Mack's agreement with body builders to allocate customers. Respectfully, nothing more should have been required to create an issue of fact for the jury. Nevertheless, Toledo also produced compelling evidence that Mack: (1) received complaints about Toledo from other dealers and Mack employees; (2) threatened Toledo; (3) attempted to harass and berate Toledo into complying with the unlawful price fixing agreement; (4) monitored dealers' compliance with that illegal agreement; (5) established mechanisms to enforce that illegal agreement through Mack's sales assistance pricing policy and cross check system; (6) acted against its own corporate policies; and (7) acted in a manner

---

[17]    For an extensive examination of the record and the evidence supporting this contention, see Toledo's Memorandum of Law in Opposition to Defendant's Motion for Judgment as a Matter of Law and in Support of Plaintiff's Motion for Reconsideration, Sept. 28, 2006 (Docket No. 141) at 9-22. That Memorandum of Law is incorporated by reference herein in its entirety.

29

inconsistent with its economic interests but for the existence of a conspiracy. In light of this evidence, Toledo's Section 1 claim should have been submitted to the jury.[18]

### VII. TOLEDO IS ENTITLED TO A NEW TRIAL BECAUSE HIGHLY PROBATIVE DIRECT EVIDENCE OF THE ILLEGAL ANTITRUST CONSPIRACY WAS IMPROPERLY EXCLUDED AT TRIAL

Toledo is entitled to a new trial because the Court improperly excluded highly probative direct evidence of the illegal conspiracy in violation of the Sherman Act. The evidence in question was a recorded telephone conversation between Dave Yeager and Dan Lounsbery of the Pozzo Mack dealership. See Transcript, August 17, 1989 (attached hereto as Exhibit "B"); N.T. 9/14/06, at 131:11-12 (excluding the Lounsbery tape from evidence). Pozzo Mack was at various times a member of the Dealer Council and Lounsbery was Pozzo Mack's parts manager. Mack asserted that this evidence was both prejudicial and hearsay. See Mack's Motion *in Limine* to Exclude the Sales of Truck Parts (Docket No. 91); N.T. 9/13/06 at 134:4-11. Evidence is not prejudicial merely because it is harmful to a litigant. Here, the conversation between Lounsbery and Yeager reflects the state of mind of a member of the Dealer Council who is a party to precisely the sorts of "gentlemen's agreements" that Toledo alleged existed

---

[18] Toledo also presented evidence that Mack fraudulently concealed the existence of the conspiracy between it and its dealers. The evidence showed numerous affirmative acts by Mack to conceal the conspiracy between it and its dealers. Moreover, by its very nature, Mack's sales assistance program was self-concealing since only Mack knew what sales assistance discount was given to competing dealers. As established by the testimony of Bill Harris and the expert reports he prepared in conjunction with this case, as well as by internal Mack emails and letters, it was only once those secret pricing records and secret emails and letters were finally revealed that it became clear that Toledo consistently received lower sales assistance discounts and less favorable terms of sale than other competing dealers. Toledo had no way of knowing this prior to the litigation because such records were internal to Mack and Mack absolutely refused to disclose any information regarding the pricing or terms of sale it offered to other dealers. Whenever Toledo inquired about this issue, it was advised that it was being treated equally with other dealers. Accordingly, the issue of whether the statute of limitations was tolled by Mack's fraudulent conduct is should have been determined by the jury.

30

throughout the time period relevant to this case. Furthermore, any statements made by Lounsbery in his capacity as an agent of Pozzo Mack would be admissible as a nonhearsay declaration of a co-conspirator. Fed. R. Evid. 801(d)(2)(E).

A brief examination of the transcript reveals that this conversation was much more about the intentions of members of the Dealer Council than it was about the sales of parts. Included in the transcript are the following statements made by Lounsbery:

- "Yeah, and, you know, like the way we operate here is, you know, we like to protect our backyard the best we can."

- "Mack Trucks Incorporated believes an assigned territory is an assigned territory and it should be respected."

- "Well, get a hold of Ray [Page of Mack]. Yeah, because, you know, to tell you the truth, Dave, I've got two other dealerships that are ready to unite with me and put you out of business as far as the State of Michigan, and, you know, this surrounding area goes. And I don't want that to happen. It's not good for you and it's not good for us. . . . I'm not going to mention any names, but the blueprint's on the drawing board, bud. And, you know, if you people want to make a living at all, you're going to have to start respecting territory."

- "Well, give Ray Page a call and get a confirmation that territorial respect is where it's at."

Transcript, Ex. "B", at 2, 3-4, 8-13. These quotes are especially significant because they concern the "gentlemen's agreements" between Mack dealers and Mack's policies with respect to territorial restrictions. Throughout its case Toledo has maintained that Mack has a stated policy with respect to territories (dealers are entitled to sell anywhere) that is totally at odds with the actual policy Mack has pursuing in furtherance of the conspiracy (the attempted elimination of price competition among dealers). The statements made by Lounsbery are direct evidence of three fundamental allegations in this case: first, that Mack's stated policy with respect to extra-territorial sales was sheer pretext; second, the existence of illegal horizontal "gentlemen's agreements" among certain Mack dealers, including members of the Dealer Council; and third,

31

that Mack and certain Mack dealers were of one mind and cooperating with respect to the allocation of territories and customers and the elimination of competition among Mack dealers.

### VIII. TOLEDO IS ENTITLED TO A NEW TRIAL BECAUSE SUMMARY JUDGMENT WAS ERRONEOUSLY ENTERED AGAINST TOLEDO ON ITS CLAIM UNDER THE ROBINSON-PATMAN ACT

Before trial, this Court granted summary judgment in Mack's favor on Toledo's claims under the Robinson-Patman Act ("RPA"). The basis of that decision was Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc., 126 S. Ct. 860 (2006). The Reeder-Simco case involved a narrow evidentiary question regarding one way of determining competitive injury — direct evidence of lost sales caused by the discrimination.

Here, the record evidence establishes discrimination by Mack against Toledo in several instances of head-to-head competition between Toledo and another Mack dealer. In fact, Mack's own expert acknowledged that Mack offered less favorable discounts to Toledo in nearly 30% of the instances he identified of head-to-head competition between Toledo and other Mack dealers. (N.T. 10/03/06 at 74).

Moreover, Reeder-Simco reaffirmed that the continued viability of the Morton Salt presumption of competitive injury, under which competitive injury under the RPA may be shown by proof of substantial discrimination over time. This second way of proving competitive injury in an RPA case was established by the Supreme Court in FTC v. Morton Salt Co., 334 U.S. 37 (1948), and was clearly explained by the Third Circuit in J.F. Feeser, Inc. v. Serv-A-Portion Inc., 909 F.2d 1524 (3d Cir. 1990).

In contrast to Reeder-Simco, where the evidence was that the plaintiff Volvo truck dealer rarely competed against other Volvo dealers, here Toledo adduced evidence that Mack engaged in systematic price discrimination and other tactics to thwart Toledo's extensive efforts to compete with other Mack dealers. This case is further factually distinguishable from Reeder-

32

Simco because there virtually all of the trucks in question were sold prior to being built, meaning that the case did not involve the sale of products out of inventory by dealers. Here, Kevin Flaherty of Mack testified that approximately half of all Mack trucks were sold out of dealer inventory. (N.T. 9/26/06 at 161) Thus, the rationale underlying the Reeder-Simco decision, which posited that the non-inventory nature of the sales at issue narrowed the "relevant market" to only those dealers who were asked to bid on a certain deal, is inapplicable here.

Moreover, unlike the plaintiff dealer in Reeder-Simco, which offered only "selective" price comparisons as evidence of discrimination, Toledo presented evidence, including in the form of a systematic pricing study, showing that Mack's price discrimination against Toledo was pervasive, substantial and continued for more than a decade. This evidence falls squarely within the framework for proof of competitive injury under the RPA as set forth in longstanding Supreme Court and Third Circuit RPA cases and reaffirmed in Reeder-Simco.

Because Toledo has adduced sufficient evidence of competitive injury under both the direct evidence method and the "proof of substantial discrimination over time" method, and for all of the other reasons set forth in its briefing in connection with Mack's motion and renewed motion for summary judgment (Docket Numbers 56, 62, 64 and 78), Toledo is entitled to a jury trial on its RPA claims.

## IX. TOLEDO IS ENTITLED TO A NEW TRIAL ON ALL OF ITS CLAIMS BECAUSE COUNSEL FOR MACK ENGAGED IN PREJUDICIAL MISCONDUCT IN HER CLOSING ARGUMENT

Before closing arguments, counsel for both parties discussed with the Court how the jury would be instructed regarding the entry of judgment as a matter of law against Toledo on its claim under Section 1 of the Sherman Act. Counsel for Toledo expressed their concern that notifying the jury that Toledo's antitrust claim had been dismissed by the Court would have a severely prejudicial impact on Toledo with respect to its remaining claims. It was agreed at the

33

charging conference that the jury would not be notified that the Court had decided this issue as a matter of law against Toledo.

Nevertheless, at the outset of her closing argument, Mack's counsel stated to the jury "you should know that the Court has determined that antitrust claims are no longer at issue." (N.T. 10/10/06 at 68). In effect, Mack's counsel told the jury that the Court had rejected the evidence and arguments that was at the heart of Toledo's case.

In fact, there was no legitimate reason for Mack's counsel to inform the jury that "the Court ha[d] determined" that Toledo's antitrust claims were "no longer at issue" because those claims were not being submitted to the jury for consideration. The only conceivable and plausible reason for informing the jury of the Court's treatment of Toledo's antitrust claim was to imply or suggest that in rejecting that claim the Court had rejected Toledo's view of the evidence and that the jury should therefore reject Toledo's view of the evidence on Toledo's remaining claims, as well.

This utterly improper statement by counsel for Mack had a terribly prejudicial effect on Toledo's remaining claims because it strongly suggested that the Court had fundamentally rejected Toledo's view of the evidence. Statements by counsel suggesting that a court has a particular view of the evidence are fundamentally improper and warrant a new trial. See United States v. Gambert, 410 F.2d 383, 384 (4th Cir 1969) (granting a new trial where counsel stated during closing argument that the fact that the State was being permitted to go to the jury on its claims showed that it had proved those claims to the satisfaction of the court). As such, Toledo is entitled to a new trial on its Ohio Motor Vehicle Dealer Law claim and its claim against Mack for tortious interference with prospective contractual relations.

X.  **TOLEDO IS ENTITLED TO A NEW TRIAL ON ALL CLAIMS AND COUNTERCLAIMS BECAUSE THE COURT FAILED TO PROVIDE COUNSEL WITH THE JURY INSTRUCTIONS PRIOR TO CLOSING ARGUMENTS AS REQUIRED BY FEDERAL RULE OF CIVIL PROCEDURE 51**

Pursuant to Fed. R. Civ. P. 51(b), the Court "must inform the parties of its proposed instructions and proposed action on the requests *before instructing the jury and before final arguments*." (Emphasis added). This rule, which was amended in 2003, requires not only that the Court inform the parties about the Court's use of the parties' proposed instructions but also that the Court notify the parties of all instructions the Court intends to provide to the jury. See 9 Moore's Federal Practice, § 51.21[3]. (Matthew Bender 3d ed.).

At trial, the Court held a charging conference at which the Court discussed its action on the parties' proposed instructions. However, the Court did not provide the parties with advanced notice of the instructions the Court, on its own, included in the jury instructions. This was particularly prejudicial to Toledo. Toledo focused its closing argument on the discriminatory treatment by Mack and Mack's bullying conduct against a small family business and its owners. The Court, without prior notice to Toledo, then provided extensive instructions directly addressing and undermining these themes. For example, the Court instructed the jury that "we all have biases" and then directed the jury not to root for the underdog. (N.T. 10/10/06 at 132-33). Toledo's counsel also emphasized during closing argument the many inconsistent statements by Mack's witnesses under oath. However, during the charge the Court instructed the jury that "inconsistencies in statements and testimony are not uncommon." (N.T. 10/10/06 at 154). The failure to follow Rule 51 severely prejudiced Toledo, as its counsel certainly would have altered the focus and themes of its closing arguments had it known that the Court was going to instruct the jury in such a way as to undermine the main themes counsel for Toledo was planning to argue during closing.

35

## XI.   CONCLUSION

For all of the foregoing reasons, Toledo respectfully requests the entry of judgment as a matter of law in its favor on Mack's counterclaims, or in the alternative amendment or remittur of the jury award against Toledo, or a new trial on Mack's counterclaims. For all of the foregoing reasons, Toledo further respectfully requests a new trial on each of its claims against Mack.

                                               Respectfully Submitted,

                                               DUANE MORRIS LLP

Date:  October 26, 2006                By:/s/Wayne A. Mack
                                                      Wayne A. Mack
                                                        J. Manly Parks
                                                       James H. Steigerwald
                                                       David A. Degnan
                                                       30 South 17th Street
                                                       Philadelphia, PA  19103-4196
                                                       215.979.1000

                                                       Attorneys for Plaintiff/Counterclaim Defendant Toledo Mack Sales & Service, Inc.

DM1\700514.1