## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TOLEDO MACK SALES & SERVICE, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 2:02-CV-04373-RLB |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| MACK TRUCKS, INC. | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| MACK TRUCKS, INC., | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| TOLEDO MACK SALES & SERVICE, INC., | : | |
| | : | |
| Counterclaim Defendant. | : | |

## ORDER

And now, on this _____ day of _____, 2006, upon consideration of Toledo Mack Sales & Service, Inc.'s Motion Renewed Motion for Judgment as a Matter of Law and for Other Post-Trial Relief, and Mack Trucks, Inc.'s Opposition thereto, it is hereby **ORDERED** that the Motion is **DENIED**.

By:    _____
       Buckwalter, R., U.S.D.J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TOLEDO MACK SALES & SERVICE, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 2:02-CV-04373-RLB |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| MACK TRUCKS, INC. | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| MACK TRUCKS, INC., | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| TOLEDO MACK SALES & SERVICE, INC., | : | |
| | : | |
| Counterclaim Defendant. | : | |

**DEFENDANT/COUNTERCLAIM PLAINTIFF MACK TRUCKS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF/COUNTERCLAIM DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR OTHER POST-TRIAL RELIEF**

I. **INTRODUCTION**

This case is a commercial dispute between Mack Trucks, Inc. ("Mack"), a leading manufacturer of heavy duty truck chassis and truck parts, and Toledo Mack Sales & Service, Inc. ("Toledo"), an authorized Mack distributor in Toledo, Ohio. After years of discovery and extensive summary judgment briefing, trial commenced on September 11, 2006. After a four-week trial, the jury returned a verdict against Toledo on its claims and in favor of Mack on its Counterclaims.

Toledo has now filed a lengthy Motion to reverse the jury verdict on the Counterclaims and to obtain a new trial on all of its affirmative claims. Toledo's grab bag of alleged legal defects and evidentiary errors consists of nothing but attempts to second guess the jury's factual determinations or groundless legal contentions that this Court has previously rejected. At the core of Toledo's arguments is the claim that the jury's verdict of $11.3 million is excessive. But the jury heard most of the arguments raised in Toledo's current Brief and awarded approximately one-third of the total damages claimed by Mack, thus surely crediting some, and discrediting some, of the arguments advanced on both sides during trial. The verdict was amply supported by the evidence, and Toledo cites not one case overturning a jury verdict in an analogous trade secrets case.

Toledo had its day in court, with a full opportunity to persuade the jury of its theory of the case. Toledo's Motion should accordingly be denied.

## II.    **PROCEDURAL HISTORY**

Toledo brought suit against Mack on July 1, 2002 for alleged violations of Section 1 of the Sherman Act, the Robinson Patman Act, the Ohio Motor Vehicles Dealer Law, and the Michigan Franchise Investment Law, as well as common law claims for breach of contract, breach of the duty of good faith and fair dealing, and tortious interference with prospective contractual relations. Mack counterclaimed for copyright infringement, misappropriation of trade secrets and confidential business information, breach of contract, and civil conspiracy.[1]

Shortly before trial, the Court dismissed Toledo's claim under the Robinson Patman Act for lack of evidence of harm to competition, and at the close of Toledo's case in

---

[1] Mack originally joined PAI Industries, Inc. ("PAI"), Toledo's co-conspirator, as a counterclaim defendant. PAI quickly settled Mack's claims, agreeing to return the stolen computer database system MACSPEC 2001 and Mack price lists, to pay Mack money, and to enter into a broad Consent Decree. Toledo also agreed to settle Mack's Motion for Preliminary Injunction through entry of a Consent Decree.

chief the Court dismissed Toledo's claim under Section 1 of the Sherman Act as barred by the applicable statute of limitations. During the charging conference, Toledo voluntarily withdrew its claims under the Michigan statute and for breach of contract and breach of the duty of good faith and fair dealing.

Mack similarly withdrew two of its counterclaims: copyright infringement and breach of contract. The Court also determined that, with regard to Mack's claim for misappropriation of trade secrets as to MACSPEC 2001, it would instruct the jury that liability was already determined in Mack's favor based on the collateral estoppel effect of the Ohio Court of Appeals' ruling in Mack Trucks, Inc. v. Motor Vehicle Dealers Board, No. 05AP-768, 2006-Ohio-2748, 2006 WL 1495122 (Oh. Ct. App. June 1, 2006).[2]

On October 11, 2006, after four weeks of trial, the jury rendered its verdict. The jury found that Toledo failed to prove that Mack violated the Ohio Motor Vehicle Dealer Law or tortiously interfered with Toledo's prospective contractual relations. The jury further found that Mack is entitled to $11,340,000 in damages for the misappropriation of MACSPEC 2001; that Toledo's provision of Mack price lists and microfiche database updates to Mack competitor PAI Industries, Inc. ("PAI") constituted misappropriation of Mack's trade secrets and confidential business information, for which Mack is entitled to damages of $16,500; and that Toledo and PAI engaged in a civil conspiracy to misappropriate Mack's trade secrets and confidential business information. On October 12, 2006, in accordance with the verdict, the Court entered judgment in Mack's favor in the amount of $11,356,500.

---

[2] At the time of the Court's ruling, Toledo had a pending Petition for Review with the Ohio Supreme Court. The Ohio Supreme Court declined to review this case on October 18, 2006. See Mack Trucks, Inc. v. Motor Vehicle Dealers Board, __ Oh. St. 3d __, __ N.E.2d __, 2006-Ohio-5351 (Oct. 18, 2006). On October 30, 2006, Toledo moved for reconsideration of the denial of its Petition for Review. That motion is pending.

Toledo has brought the instant Motion, seeking two forms of relief. First, Toledo seeks to overturn the jury's verdict on Mack's Counterclaims. Toledo asserts that it is entitled to judgment as a matter of law on Mack's Counterclaims because there was supposedly no evidence of damages. In the alternative, Toledo also argues that Mack's tort claims are barred by the gist of the action and economic loss doctrines, an argument that this Court previously rejected in its Memorandum Opinion of August 9, 2006. The second form of relief that Toledo seeks is a "do over" of the 4-week trial. Toledo offers a smorgasbord of alleged errors that it claims justify an entirely new, multi-week trial on all claims and counterclaims. These contentions of error are wrong and are discussed below.

## III.   THIS COURT SHOULD DENY THE RENEWED MOTION FOR JUDGMENT AS MATTER OF LAW

### A.    <u>Standard of Review</u>

The standard of review for a motion for judgment as a matter of law is well-established. The Court may only grant such a motion "if, viewing the evidence in the light most favorable to the non-movant and, giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." <u>Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.</u>, 46 F.3d 258, 269 (3d Cir. 1995) (citation omitted). "In making such a determination, 'the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.'" <u>Id.</u> at 269-270 (citation omitted). As detailed below, there was more than sufficient evidence to support the jury's verdict on Mack's counterclaims.

### B.    <u>Evidence Regarding Mack's Counterclaims</u>

The bulk of Toledo Mack's Memorandum is devoted to arguing that there is insufficient evidence of damages regarding Mack's Counterclaims, thereby entitling Toledo to

judgment as a matter of law. See Toledo Memorandum at 1-19. To explain the full evidence of damages and harm in context, Mack will briefly summarize the key evidence presented at trial.

1.     **The After Market Parts Business**

Mack's Counterclaims center upon the highly competitive after market parts business. The after market is divided between brand name manufacturers like Mack, which manufacture replacement parts for their own line makes of vehicles, and "will fits" like PAI, which manufacture imitation replacement parts for various line makes. 9/29/06 Tr. at 28:17-29:14 (D. Covey). Mack sells its parts through its independent distributor network. 9/29/06 Tr. at 29:19-29:22 (D. Covey). PAI similarly sells its will fit parts through its distributor network. Deposition Transcript of Navid Yavari ("Yavari Dep. Tr.") at 26:7-26:23.

It is hard to overestimate the importance of parts sales to Mack and to Mack's distributors. Mack sells between $400 and $500 million in parts each year to its distributors. 9/27/06 Tr. at 26:7-26:8 (K. Flaherty); 9/29/06 Tr. at 29:15-29:18 (D. Covey). Ken Murphy, a Parts Manager at a third party Mack distributor with over thirty years of experience, testified that parts sales are the "backbone" of a distributor's business and that distributors attempt to use their parts and service profits to cover all overhead expenses. 10/4/06 Tr. at 51:12-52:6 (K. Murphy).

Of the various will fit competitors, PAI is clearly the most significant. Mack Senior Vice President Kevin Flaherty testified that PAI is the "the number one competitor against the Mack Company in parts." 9/27/06 Tr. at 26:11-26:12 (K. Flaherty). The major difficulty for a will fit like PAI is lack of information. Because it does not manufacture MACK trucks, PAI does not know how the parts in those trucks were assembled and fit together, or which MACK parts are interchangeable.

This information is key, because, unlike cars, truck chassis are not mass produced but are manufactured to customer specifications. 9/26/06 Tr. at 106:4-106:25 (K. Flaherty);

-5-

10/4/06 Tr. at 53:22-54:2 (K. Murphy). Thus, as the Ohio Court of Appeals clearly understood, "without knowing which parts are used and how the parts fit together in any particular custom vehicle, PAI would be unable to determine which parts are necessary to repair a Mack owner's vehicle." Mack Trucks, 2006-Ohio-2748 at ¶ 23, 2006 WL 1495122 at *6.

## 2.    The Truck Specifications Database

To give its distributors a key competitive advantage, Mack has spent over $30 million to develop a comprehensive database of virtually every unique truck assembly record, amounting to a total of over one million truck assembly records, with each truck containing approximately 40,000 separate parts. 9/29/06 Tr. at 5:6-6:24, 33:22-37:8 (D. Covey); Mack Trial Exhibit No. 1243; Mack Trucks, 2006-Ohio-2748 at ¶¶ 6, 23, 2006 WL 1495122 at *1, 6. The earliest form of the databases was distributed in microfiche form. 9/29/06 Tr. at 27:11-27:20 (D. Covey); Mack Trucks, 2006-Ohio-2748 at ¶ 6, 2006 WL 1495122 at *1. Mack later computerized the database, creating first the MACSPEC system, then MACSPEC II, and subsequently MACSPEC 2001. 9/29/06 Tr. at 25:23-27:6 (D. Covey); Mack Trucks, 2006-Ohio-2748 at ¶ 7, 2006 WL 1495122 at *1. Beginning with the microfiche and through the advent of MACSPEC 2001, each of these tools has built upon, improved, and updated the previous versions, while the underlying database has remained the same. See generally 9/29/06 Tr. at 35:22-36:8 (D. Covey).

With the benefit of these tools, Mack distributors alone can accurately and near instantaneously diagnose what replacement parts are needed. See generally 9/29/06 Tr. at 6:25-21:21 (D. Covey) (describing accuracy, operation, and speed of MACSPEC 2001). As the Ohio Court of Appeals found:

> The economic value of the MACSPEC 2001 system is patently derived from a competitor's difficulty in servicing a customer's Mack vehicle without the system, while a Mack dealer with the

> MACSPEC 2001 [system] would be able to determine the
> necessary parts and how they fit together instantly via access to the
> assembly record for the customer's particular vehicle. . . .
> MACSPEC 2001 [has] numerous tools – such as illustrations of the
> parts on each specific vehicle, a virtual magnifying glass for the
> intricate details, and a super-session capability to recognize
> updated parts – that allow the user to quickly identify the needed
> parts for each unique customer.

Mack Trucks, 2006-Ohio-2748 at ¶ 23, 2006 WL 1495122 at *6; see also 10/4/06 Tr. at 53:17-

54:5 (K. Murphy) (describing how a Mack distributorship uses MACSPEC 2001).

Recognizing the database's competitive importance, Mack has taken measures to

protect its confidentiality and to keep it away from competitors like PAI.  Mack has never

distributed a complete assembly record database, whether in microfiche or computer form, to any

entity other than an authorized Mack distributor or service dealer.  9/29/06 Tr. at 27:7-28:13,

40:12-40:15 (D. Covey); see also Mack Trucks, 2006-Ohio-2748 at ¶ 24, 2006 WL 1495122 at

*7.  Each microfiche order form, including those signed by Toledo Mack, contained a warning

stating:

> The information contained within the Mack [microfiche] is
> **confidential information** and the sale, use, or duplication of this
> data to or by anyone other than Mack Trucks, Inc. Authorized
> Subsidiaries/Distributors or Sub Dealers, without written
> permission **is prohibited** . . .

See Mack Trial Exhibit 94 (emphasis added).

Moreover, the Ohio Court of Appeals held that Mack took extensive measures to

protect the secrecy and confidentiality of MACSPEC 2001, including strict controls on

distribution of the system, confidentiality warnings when the system is installed, and the

requirement of an "unlock code" to operate a system.  Mack Trucks, 2006-Ohio-2748 at ¶¶ 24-

26, 2006 WL 1495122 at *7.

3. **The Conspiracy Between Toledo Mack and PAI to Steal Mack's Trade Secrets**

   a. **The "Nancy's Trucking" Help Desk Call**

In the Summer of 2002, Mack discovered that Toledo had betrayed its trust and confidence and funneled the powerful MACSPEC 2001 system – at the time, the most recent, powerful, and comprehensive version of the database – to PAI. On July 24, 2002, Bill Black, the manager of the Help Desk for MACSPEC 2001, received a call from a woman named Yolanda May who was having trouble operating a new update disc for her system. 9/29/06 Tr. at 93:6-94:18 (W. Black). Mr. Black determined that Ms. May received a faulty disc and needed a replacement. 9/29/06 Tr. at 94:19-94:20 (W. Black). He directed that a replacement disc be sent to her overnight at the address she provided: Nancy's Trucking, 950 Northbrook Parkway, Suwanee, Georgia. 9/29/06 Tr. at 94:21-95:13 (W. Black).

Mr. Black called Ms. May back the next day to confirm that she received the disc and that it was working. 9/29/06 Tr. at 95:14-95:22 (W. Black). That is when Ms. May made the fatal mistake – she put Mr. Black on hold. 9/29/06 Tr. at 95:23-96:6 (W. Black). While on hold, Mr Black, who thought he was speaking to an employee of "Nancy's Trucking," heard an infomercial advertising PAI. 9/29/06 Tr. at 96:7-96:13 (W. Black). Surprised to hear this message, Mr. Black investigated further after the call ended. 9/29/06 Tr. at 96:14-97:12 (W. Black). Mr. Black found PAI's web page and learned that PAI and "Nancy's Trucking" happened to have the exact same address and phone number. Id. His suspicions aroused, Mr. Black called Ms. May back again, and asked for her Mack distributor code. 9/29/06 Tr. at 97:13-97:23 (W. Black). Ms. May said that she did not know what her dealer code was, but that she had received MACSPEC 2001 from Toledo. Id.

In sworn video deposition testimony played at trial, Ms. May has since confirmed that PAI was indeed using the false name "Nancy's Trucking" to trick Mack into helping PAI with the illicitly gained software. Deposition Transcript of Yolanda May ("May Dep. Tr.") at 91.2-92.9. Ms. May further testified that PAI concealed its identity with the ***express agreement*** of Toledo Parts Manager James Toth. May Dep. Tr. at 95.9-96.12.

### b.    Further Evidence of the PAI-Toledo Conspiracy

After Mack learned that Toledo had provided MACSPEC 2001 to PAI, it promptly filed the instant Counterclaims. As Mack learned in discovery and proved at trial, the MACSPEC 2001 theft was not a one-time occurrence. Toledo and PAI had engaged in a conspiracy spanning at least ***seven years*** from 1996 to 2002 to misappropriate Mack's trade secrets and confidential business information. The evidence showed that Toledo provided PAI with annual updates of the database in microfiche form ***every year*** between 1996 and 2001. See Yavari Dep. Tr. at 40:19-42:1, 56:10-59:8, 59:12-61:17, 63:3-63:22, 65:67:18. Similarly, the evidence showed that Toledo provided PAI with copies of Mack's confidential Master Price List[3] in 1996, 1997, 1999, and 2001. See Yavari Dep. Tr. at 114:11-115:11, 120:10-120:15, 121:3-121:19, 134:4-135:15, 137:12-139:10, 140:14-141:2.

The evidence at trial also showed why Toledo colluded with PAI: money. During the middle to late 1990's, Toledo was foundering, selling barely any new MACK trucks.

---

[3] The Master Price List shows Mack's prices to its distributors to purchase Mack parts for resale. 10/4/06 Tr. at 4:6-6:13 (B. Smith). Mack only provides the Master Price List to authorized Mack distributors. 10/4/06 Tr. at 5:10-5:11 (B. Smith). As the Master Price List reveals the cost structure for Mack distributors' parts business, Mack considers it to be highly confidential. 10/4/06 Tr. at 6:16-6:23, (B. Smith); 10/4/06 Tr. at 55:20-56:8 (K. Murphy). Thus, the Master Price List contains clear confidentiality warnings, on the top of nearly each page:

> ***CONFIDENTIAL*** -- This material, and the content thereof, is owned by Mack Trucks, Inc. and is provided to authorized Mack distributors and service dealers with the express understanding that ***it will not be copied or made available to others for any purpose except as authorized by Mack Trucks, Inc.***

Mack Trial Exhibit 199 (emphasis added).

See, e.g., 9/15/06 Tr. at 15:1-15:12 (D. Yeager).  During this same time, though, Toledo sold millions of dollars in MACK parts to PAI and PAI dealers.  10/4/06 Tr. at 18:15-19:17 (B. Smith) (summarizing Toledo parts invoices).  Good business for a failing distributorship – and plenty of incentive to keep PAI happy.

PAI was not an ordinary parts buyer looking for replacement parts to fix vehicles in its trucking fleet.  Rather, as PAI executive Navid Yavari candidly testified, PAI purchased parts from Toledo to obtain samples for reverse engineering.  See Yavari Dep. at 43:11-43:23. Indeed, PAI's copies of its purchase orders to Toledo contained notations such as "engineering sample for reverse engineering."  See Mack Trial Exhibit 226.  Mr. Yavari also testified that PAI must be able to reverse engineer MACK parts to compete.  Yavari Dep. Tr. at 23:6-23:24.

Toledo and PAI knew what they were doing was wrong, and they took care to conceal their conduct.  For example, the help desk call was not the first time that the conspirators used the "Nancy's Trucking" ruse; for years, Toledo ordered parts from Mack vendors for shipment to "Nancy's Trucking" at PAI's address in Georgia.  See Mack Trial Exhibits 260 and 339; Yavari Dep. Tr. at 179:8-179:13, 179:18-179:25, 180:6-180:17, 181:14-182:6, 187:24-188:3, 188:8-188:10.  Likewise, when Toledo Mack ordered MACSPEC 2001 for PAI, the order form that Toledo sent to Mack made no mention of PAI, while Toledo's internal copy had "PAI" written on it.  9/29/06 Tr. at 31:14-33:6 (D. Covey).  Indeed, the Ohio Court of Appeals found that Toledo deliberately concealed PAI's identity from Mack representatives in telephone conversations when ordering the system and that Toledo's "deliberate omission of PAI's identity" is "*deafeningly telling*."  Mack Trucks, 2006-Ohio-2748 at ¶ 29, 2006 WL 1495122 at *9 (emphasis added).

Weighing this extensive evidence of years of collaboration and concealment, the jury concluded that Toledo and PAI had engaged in an unlawful civil conspiracy with one another. It is clear that this was a true joint enterprise between the conspirators: Toledo and PAI worked together over a long period of time. Toledo is therefore equally responsible for the theft of Mack's trade secrets and for the injury caused to Mack.

**4.      PAI's Use of the Stolen Database**

Mr. Yavari testified that PAI used the databases to respond to customer inquiries and to provide accurate cross reference information between MACK and PAI parts numbers for its catalogs. Yavari Dep. Tr. at 42:23-44:14, 86.12-87:5, 87:15-90:15. Accurate cross reference information between MACK and PAI part numbers is "crucial" to PAI's ability to sell knock off replacement parts. May Dep. Tr. at 34:16-34:20. It is hard to overstate the importance of the stolen databases for PAI's customer service. Yolanda May, who handled customer inquiries for PAI, testified that she would not have been able to do her job at all without the stolen databases. May Dep. Tr. at 84:7-84:14, 85:19-85:23. Ms. May testified as well that MACSPEC 2001 was significantly easier to use than the microfiche, permitting even more rapid responses to customer inquiries. May Dep. Tr. at 75:20-76:13.

Mr. Yavari further testified that PAI used the stolen databases to determine which MACK brand parts to order from Toledo. Yavari Dep. Tr. at 43:1-43:9. This testimony is significant because PAI was ordering parts from Toledo for reverse engineering. It was thus reasonable for the jury to conclude that PAI was using the stolen database to figure out which parts to knock off. As Mack Parts Executive David Covey explained at trial:

> Q: In addition to the opportunity or the ability to figure out what
> the right part is when a problem presents itself by a customer, can
> the system also be used to determine which are the most common
> or popular parts that Mack uses in constructing its vehicles?

> A: Yes, there's features in the system that would allow someone to go in there and find the frequency that a part is used. So then I could associate that part number with number of units and have a high probability that if I went out into the market or put stock on my shelf that it would come off the shelf. . . .

9/29/06 Tr. at 22:5-22:19 (D. Covey); see also 9/29/06 Tr. at 25:20-25:22 (D. Covey) (the stolen database "would give [competitors] information that they could then use in order to determine what spots in the market they wanted to enter and sell against the Mack dealers").[4]

### C.  The Damages Verdict Is Amply Supported in the Record

#### 1.  The Jury Properly Awarded Damages Based on PAI's Saved Research and Development Costs

Nevertheless, despite the findings of the jury and the Ohio Court of Appeals that Toledo and PAI engaged in an illegal civil conspiracy spanning several years and that Toledo clearly misappropriated Mack trade secrets, Toledo wants a free pass for its misconduct. According to Toledo, it should not have to pay any damages for funneling trade secrets to Mack's largest parts competitor.

It is black letter law that a trade secrets plaintiff may broadly recover either its actual losses or the wrongdoers' gain. See generally Restatement (Third) of Unfair Competition § 45 (1995). The authors of the Restatement note that "courts have recognized the need for flexibility in formulating monetary remedies" based on the specific facts of each case. See Restatement (Third) of Unfair Competition § 45 cmt. b (1995).

In this case, PAI illicitly obtained possession and use of MACSPEC 2001,[5] a powerful computer system that enabled PAI to answer customer inquiries, provide cross

---

[4] PAI likewise used the stolen price lists to set its own prices in competing against Mack and its distributors. Yavari Dep. Tr. at 132:22-133:13. Ms. May also testified that she consulted the stolen price lists regularly to determine which Mack part numbers are current. May Dep. Tr. at 85:24-86:8.

reference numbers between its parts and Mack's parts, and to determine which parts to reverse engineer. In particular, PAI was able to eliminate the competitive gap between it and Mack distributors using MACSPEC 2001 because PAI could answer customer questions with the exact same few quick strokes on a keyboard.

However, unlike Mack, PAI did not pay to develop this tool. Instead of spending millions of dollars to assemble and organize the underlying data and to develop the necessary software, PAI stole the system after Mack spent its resources to create it. Put simply, PAI saved enormous quantities of money by misappropriating MACSPEC 2001 instead of developing a comparable database system on its own.

Where theft of a trade secret permits a competitor to avoid otherwise necessary research and development costs, it is well-established that the unlawful gain – which Mack is entitled to recover – may be established based on the amount of research and development costs saved through the misappropriation; similarly, the loss to Mack can be measured by the extent to which it may have lost its investment in developing the trade secret at issue. See Patio Enclosures, Inc. v. Four Seasons Mktg. Corp., No. 22458, , 2005-Ohio-4933 at ¶¶ 30, 63-64, 2005 WL 2291916 at *7, 13 (Oh. Ct. App. Sept. 21, 2005) (affirming multi-million dollar jury verdict in trade secrets case where plaintiff presented evidence that defendant saved millions of dollars in development costs); Avery Dennison Corp. v. Four Pillars Enter. Co., 45 Fed. Appx. 479, 483-487 (6th Cir. 2002) (affirming $10 million jury verdict for misappropriation in trade secret case based on, inter alia, saved research and development costs); Advanced Power Sys.,

(continued...)

[5] Toledo does not challenge the damages award for misappropriation of the microfiche and the price lists. Accordingly, Mack only discusses the basis for the damage award as to MACSPEC 2001.

Inc. v. Hi-Tech Sys., Inc., Civ. A. No. 90-7952, 1994 WL 116121 at *10 (E.D. Pa. Mar. 21, 1994) (Pollak, J.) ("Hi-Tech stresses that a proper measure of damages is the cost of acquiring that information. I agree"); Salsbury Labs., Inc. v. Merieux Labs., Inc., 908 F.2d 706, 714-715 (11th Cir. 1990) (affirming $1 million damages judgment in trade secrets case after bench trial based on saved development costs); Computer Print Sys., Inc. v. Lewis, 422 A.2d 148, 157 (Pa. Super. Ct. 1980) (affirming damages judgment in trade secrets case after bench trial based on saved development costs); Telex Corp. v. Int'l Business Machines Corp., 510 F.2d 894, 932 (10th Cir. 1975) (affirming $10 million jury verdict in trade secrets case based on saved development costs); see generally Restatement (Third) of Unfair Competition § 45 cmt. f (1995) (trade secret damages may be measured as the costs of acquisition of the trade secret through independent development).

        In keeping with this settled damages law, the Court in this case instructed the jury as follows on damages:

> If you find in favor of Mack on its claims for misappropriation of trade secret or misappropriation of confidential business information, you are also entitled to award as damages, the benefit to PAI from the misappropriation. Mack contends that the benefit to PAI was the amount of money that is saved by not having to pay to develop for itself the database and software in MACSPEC 2001, the database and the microfiche or the compiled information in the price list. If Mack has proven to you the amount of money that it would cost to develop those items, then you may consider these development costs in determining what an appropriate amount of damages is to award.

10/10/06 Tr. at 152:1-152:13. Toledo did not object to this charge. Applying the Court's instruction, the jury determined that the development costs that PAI saved by stealing MACSPEC 2001 were $11,340,000. This verdict is well-grounded in the evidence.

        To establish the development costs for MACSPEC 2001, Mack called David Covey, the Mack parts executive who supervised the development of MACSPEC 2001 and its

predecessor systems. 9/29/06 Tr. at 5:11-5:19 (D. Covey).[6] Mr. Covey testified that Mack outsourced the development of these systems to an outside vendor under his supervision. 9/29/06 Tr. at 5:20-6:3 (D. Covey). Specifically, Mr. Covey testified to the accuracy of the figures set forth within Mack Trial Exhibit 1243, a memorandum from Lloyd Kendall, an executive at GGS, Mack's principal vendor, that summarizes the amounts that Mack paid GGS to develop MACSPEC 2001. 9/29/06 Tr. at 33:12-34:7 (D. Covey).

Mr. Covey testified that the database creation charges were for the expense of creating detailed, accurate, and properly organized illustrations and parts listings for the assembly breakdowns of each unique MACK vehicle manufactured. 9/29/06 Tr. at 34:8-34:24 (D. Covey). MACSPEC 2001 contains approximately 185,000 separate sets of illustrations. 9/29/06 Tr. at 6:17-6:24 (D. Covey).

From 1988 until the end of 2002 – when PAI returned its stolen MACSPEC 2001 as part of its settlement with Mack – Mack spent more than $30 million on creating the database contained within MACSPEC 2001. See Mack Trial Exhibit 1243. Mack typically spent in excess of $2 million per year to update the database. Id. Mr. Covey testified that it was necessary to include database expenses from the years before MACSPEC 2001's roll out in 2001, because the database contained within MACSPEC 2001 was created cumulatively over many years. 9/29/06 Tr. at 35:22-36:8, 61:16-61:21 (D. Covey).

Thus Mack presented evidence at trial that it spent in excess of $30 million to develop MACSPEC 2001. This estimate was conservative, as it did not include Mack's charges

---

[6] There is no requirement to use an expert witness to demonstrate development costs, and courts have approved the testimony of knowledgeable businessmen like Mr. Covey as proper evidence of these costs. See Patio Enclosures, 2005-Ohio-4933 at ¶¶ 63-64, 2005 WL 2291916 at *13 (lay opinion testimony as to development costs properly admitted); Avery Dennison, 45 Fed. Appx. at 484-485 (same).

from vendors other than GGS or Mack's internal costs. 9/29/06 Tr. at 6:1-6:3, 35:4-35:11, 51:5-51:12 (D. Covey). This cost is understandable given the scope of the MACSPEC 2001 system – information on all roughly 40,000 parts in over *one million* different custom-made trucks – and the fact that MACSPEC 2001 is a crucial driver of Mack's $400-500 million in annual parts sales.

It is well-established that Mack's actual development costs are relevant evidence of what it would have cost PAI to develop MACSPEC 2001. See Patio Enclosures, 2005-Ohio-4933 at ¶ 30, 2005 WL 2291916 at *7 (plaintiff's actual development costs used to show competitor's saved costs); Salsbury Labs., 908 F.2d at 714-715 (same); Telex, 510 F.2d at 932 (same); Restatement (Third) of Unfair Competition § 45 cmt. f (1995) ("In determining the costs of proper acquisition, the court may consider the actual development costs of the plaintiff . . ."). Mack accordingly presented sufficient evidence of cognizable damages.

Toledo had ample opportunity to attack Mack's evidence. Toledo's counsel cross-examined Mr. Covey at considerable length regarding Mr. Kendall's Memorandum and the underlying relevant invoices. See 9/29/06 Tr. at 45:11-46:20, 48:21-78:25 (D. Covey). In closing arguments, Toledo argued vigorously that Mack's development cost number was inaccurate, that Mr. Covey was supposedly not a credible damages witness, and that PAI could have spent less than $30 million developing MACSPEC 2001 because it previously stole a MACSPEC II system. See 10/10/06 Tr. at 59:25-66:11.

Of the more than $30 million that Mack claimed it would cost PAI to develop MACSPEC 2001 on its own, the jury only awarded $11,340,000. Thus, Toledo successfully persuaded the jury to reduce substantially Mack's asserted damages. That this amount equals five times the annual amount to update the database shows only that the jury was comfortable

awarding roughly a third of Mack's claimed damages. It is perfectly proper for the jury to apportion a part of plaintiff's actual development costs as the competitor's saved development costs. See Salsbury Labs., 908 F.2d at 714 (plaintiff properly awarded $1 million of its $3 million in actual development costs); Telex, 510 F.2d at 932 (plaintiff properly awarded $10 million of its $30 million in actual development costs).

In sum, the jury declined to adopt in full either party's damages position. The jury's ultimate verdict was firmly supported in the record and based on the Court's correct (and unobjected to) instruction on the legal standard for trade secret damages.

## 2.    Toledo's Arguments to the Contrary Are Without Merit

Toledo offers a laundry list of contentions as to why Mack is supposedly entitled to no damages, and why this Court should disregard the jury's fact-finding. As a threshold matter, it is significant what Toledo fails to marshal in support of its various and sundry points: it cites not one single trade secrets case where a court ever rejected, as a matter of law, plaintiff's attempt to recover its competitor's saved development costs.

Apparently recognizing the weakness of its position, Toledo devotes several pages of its Memorandum to arguing about damages theories that Mack did not argue, and on which the Court did not instruct the jury. See Toledo Memorandum at 12-13 (arguing that Mack failed to present damages under a lost profits theory); 15-17 (arguing that Mack failed to show the amount of a "reasonable royalty"). This is irrelevant. The only question before the Court is whether the jury's verdict is based on sufficient evidence under the legal standard in the Court's instruction, not on alternate theories never advanced.

Toledo further contends that Mack is entitled to no damages, because the benefit to PAI should supposedly have been measured based on the amount of time saved by PAI in responding to customer service inquiries using MACSPEC 2001, and not how much it would

have cost PAI to develop the stolen system. See Toledo Memorandum at 13-15. In other words, according to Toledo, the Court instructed the jury on the wrong legal standard for trade secret damages – even though Toledo failed to object to the Court's charge and thus waived any challenge to it. See, e.g., Hampden Real Estate, Inc. v. Metro. Mgmt. Group, Civ. A. No. 02-1160, 2006 WL 2460893 at *3 (E.D. Pa. Aug. 22, 2006) ("the Third Circuit has clearly held that failure to object at the time the jury received proposed jury instructions or proposed verdict sheet constitutes a waiver of this objection.").

Moreover, this argument misapprehends the purpose of trade secret damages, which is to capture the value of the stolen item to the wrongdoer, not to find some rigid yardstick. See Avery Dennison, 45 Fed. Appx. at 486 (emphasis added). Toledo was free to argue to the jury that the value of MACSPEC 2001 to PAI should have been measured differently, but chose not to. Toledo must live with the consequences of its own tactical decisions.[7]

As a fallback, Toledo serves up several spurious arguments to distinguish the numerous trade secret cases applying the saved development costs measure of damages. First, Toledo argues, without citing a single case, that Mack continues to license MACSPEC 2001 to its distributors, and thus Mack allegedly cannot recover any damages for Toledo's misappropriation. See Toledo Memorandum at 10. Toledo argued this point to the jury. See 10/10/06 Tr. at 65:12-65:21 (Closing Argument of Toledo). To the extent that Toledo contends that Mack's continued use of MACSPEC 2001 reduced the system's value to PAI, this was a factual question for the jury to decide.

---

[7] In the only case cited by Toledo in support of its alternate standard, Int'l Indus., Inc. v. Warren Petroleum Corp., 248 F.2d 696 (3d Cir. 1957), the court did not even address the propriety of measuring damages based on saved development costs.

Second, Toledo points out that PAI only had MACSPEC 2001 for approximately ten months,[8] and thus Toledo argues – again, without a single supporting case – that Mack is entitled to no damages.  See Toledo Memorandum at 10.  However, as detailed above, PAI made the most of its time possessing MACSPEC 2001.  See supra pp. 11-12.  Notably, Mack has never sought any damages that would have accrued *after* PAI returned the system, i.e., Mack sought no future damages.  See 9/29/06 Tr. at 35:4-35:21 (D. Covey).  It was for the jury to weigh the value of MACSPEC 2001 to PAI given the length of time that it possessed the system, which it apparently did by only awarding a fraction of what Mack claimed.[9]

Toledo offers a third argument – that development costs are an inappropriate measure of damages because PAI was supposedly incapable of developing MACSPEC 2001 on its own.  See Toledo Memorandum at 10.  However, Toledo expressly argued in its closing that, because PAI allegedly possessed a copy of MACSPEC II, it could easily – and cheaply – develop MACSPEC 2001 on its own.  See 10/10/06 Tr. at 64:4-64:16.  The position of Toledo's counsel renders this point moot.  Moreover, Toledo once more fails to cite a single case in support of this argument.

Finally, Toledo offers the argument, based on its interpretation of one invoice from GGS to Mack, that the development costs for MACSPEC 2001 amount to only $50,000 and thus requests a remitter of the verdict.  See Toledo Memorandum at 17-19.  But Mr. Covey,

---

[8] Of course, the only reason that PAI possessed the system for so little time was that Mr. Black's diligence uncovered the theft of the system, and Mack promptly sued PAI to recover its stolen property.  PAI chose to settle quickly, and return MACSPEC 2001.

[9] Toledo also contends that the development costs saved by PAI allegedly exceeded its profits for the time that PAI possessed MACSPEC 2001.  See Toledo Memorandum at 2.  Even if true, this is irrelevant.  Mack has the right to recover the amount that PAI saved through its illicit conspiracy with Toledo, even if PAI's profits from using the stolen database were lower than the costs of development.  See Salsbury Labs., 908 F.2d at 714 (plaintiff entitled to recover $1 million in saved development costs even though defendant's profits totaled only $52,000).  If anything, this alleged disparity shows the huge extent of PAI's windfall.

when questioned about this invoice, vigorously denied that it covered the entire cost to develop the system. 9/29/06 Tr. at 64:2-64:16 (D. Covey). It was for the jury to weigh Mr. Covey's credibility and decide, as a matter of fact, the correct amount of Mack's development costs.[10] See Jaguar Cars, Inc., 46 F.3d at 269-270.

### D.    This Court Was Correct to Reject Toledo Mack's Arguments under the Gist of the Action and Economic Loss Doctrines

In the alternative, Toledo argues that all of Mack's Counterclaims are barred as a matter of law by the gist of the action and economic loss doctrines. See Toledo Memorandum at 20-22. This Court has already rejected this argument. See Memorandum dated August 9, 2006, at 2 n. 1. Toledo does not even mention the Court's earlier ruling, much less offer any basis for reconsideration. Toledo simply rehashes its prior contentions. See Kennedy Indus., Inc. v. Aparo, Civ. A. No. 04-5967, 2006 WL 1892685, at *1 (E.D. Pa. July 6, 2006) (Bartle, C.J.) (rehashing of earlier arguments is not a valid ground for reconsideration).

The Court's prior decision is clearly correct. Toledo's argument is that supposedly all of its duties not to disclose MACSPEC 2001[11] arose from a license agreement, and not any tort duty. This argument flatly contradicts Toledo's position that there is and was *no* license agreement to govern MACSPEC 2001, i.e., Toledo now argues that the trade secrets claim is barred by a contract that it has argued never existed. See Summary Judgment Opinion at 27 (noting that "Toledo Mack contends that the license agreement applies only to MACSPEC II, and not to MACSPEC 2001"). This is improper. See DeAngelo Bros., Inc. v. Long, No. 05-CV-0800, 2005 WL 1309037 at *4 (M.D. Pa. June 1, 2005) (declining to apply gist of the action

---

[10] Toledo does correctly note that the judgment should be reduced by $50,000 based on Mack's settlement with Toledo's joint tortfeasor, PAI, pursuant to Pennsylvania's Uniform Contribution Among Tortfeasor's Act. See Toledo Memorandum at 19, n. 14.

[11] Once more, Toledo's argument does not address the microfiche and the price lists.

doctrine to claim for misappropriation of trade secrets because "if Defendant himself contends that there is no contract, it is difficult for us to conceive why we should find that one exists in a hypothetical sense"); <u>Gemini Bakery Equip. v. Baktek</u>, No. 3204, 2005 WL 957635 at *3 (Pa. Com. Pl. April 11, 2005) (declining to dismiss claim for misappropriation of trade secrets based on gist of the action because "it is not clear whether defendants admit to or deny the existence of an agreement between themselves and plaintiff"); <u>Comsup Commodities, Inc. v. Osram Sylvania, Inc.</u>, No. 01438, 2003 WL 22977519 at *1 (Pa. Comm. Pl. Dec. 3, 2003) (declining to dismiss tort claims under gist of the action doctrine because "defendants apparently deny the existence of the contract").

Moreover, Mack's Amended Counterclaims expressly plead that Toledo was under an obligation to protect the secrecy of MACSPEC 2001 based on a relationship of confidence with Mack, and not merely on the license agreement. <u>See</u> First Amended Counterclaims, ¶¶ 51-52, 55. In addition, the Ohio Court of Appeals found that Toledo procured MACSPEC 2001 through fraud, a finding that is entitled to collateral estoppel effect here. <u>Mack Trucks</u>, 2006-Ohio-2748 at ¶¶ 28-29, 2006 WL 1495122 at *8-9. The duties to protect confidences and refrain from fraud arise in tort, not contract. <u>See</u> <u>Koresko v. Bleiweis</u>, Civ. A. No. 04-769, 2004 U.S. Dist. LEXIS 26062 at *8 (E.D. Pa. Dec. 30, 2004) (duties under trade secret law do not derive from contract terms); <u>see also</u> <u>Den-Tal-Ez, Inc. v. Siemens Capital Corp.</u>, 566 A.2d 1214, 1224 (Pa. Super. 1989) (trade secrets claim not barred by the existence of a confidentiality agreement).[12]

---

[12] The only case cited by Toledo where a court barred a trade secrets claim based on the gist of the action is <u>Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.</u>, 247 F.3d 79 (3d Cir. 2001). The Court's holding, however, was based on an express admission in the plaintiff's brief that there was no basis other than a license agreement for the asserted duty of confidentiality as to certain alleged trade secrets. <u>See</u> <u>Bohler-Uddeholm</u>, 247 F.3d at 106. By contrast, Mack has asserted that there is a confidential relationship based on the parties' overall relationship and course of dealing and, moreover, that Toledo breached an independent tort duty not to procure trade secrets through

(continued...)

**IV.    THERE IS NO BASIS FOR ORDERING A NEW TRIAL**

    **A.    Standard of Review**

        The standard of review on a motion for new trial is well-settled:

> A court should grant a new trial under Rule 59 to prevent a
> miscarriage of justice only when the jury's "verdict is contrary to
> the great weight of the evidence," Roebuck v. Drexel Univ., 852
> F.2d 715, 736 (3d Cir. 1988), or when a "court commits an error of
> law which prejudices a substantial right of a party." Paul Morelli
> Design, Inc. v. Tiffany and Co., 200 F.Supp.2d 482, 484 (E.D. Pa.
> 2002). With regard to jury trials, a court should only exercise its
> discretion to grant a new trial "when the record shows that the
> jury's verdict resulted in a miscarriage of justice or where the
> verdict, on the record, cries out to be overturned or shocks our
> conscience." Williamson v. Consol. Rail Corp., 926 F.2d 1344,
> 1353 (3d Cir. 1991).

Ellis v. Nat'l R.R. Passenger Corp., Civ. A. No. 02-8059, 2004 WL 1221355 at *2 (E.D. Pa. June

3, 2004) (Buckwalter, J.). Toledo offers no fewer than *seven* disparate alleged grounds for new

trial. As explained below, none shows that there was a miscarriage of justice in this case.

    **B.    There Was No Error in the Court's Evidentiary Rulings**

        **1.    Evidence of the Yeagers' Prior Lawsuits Was Properly Admitted**

        Toledo contends that it is entitled to a new trial because this Court allegedly

improperly denied its earlier motion in limine to exclude evidence relating to prior lawsuits that

David and Sally Yeager, Toledo's owners, prosecuted against Waste Management and BFI in the

early to middle 1990's. See Toledo Memorandum at 22-27. According to Toledo, "Mack

invited the jury to infer from the numerous earlier cases that Dave and Sally Yeager – and by

implication, Toledo – are chronic litigants whose claims may therefore lack merit." Id. at 25.

---

(continued...)

fraud Accordingly, Bohler-Uddeholm is off point. See Koresko, 2004 U.S. Dist. LEXIS 26062 at *10, n. 2
(distinguishing Bohler-Uddeholm because claims asserted were based on tort duties of confidentiality and honesty,
in addition to confidentiality agreement).

This sweeping accusation is not followed by a citation to the record – and with reason. Mack did not argue to the jury that the Yeagers were chronic litigants; it argued that they were preoccupied by various lawsuits in the first half of the 1990's, and that this preoccupation resulted in a neglect of their business. This is directly relevant to Toledo's damages claims, and thus the evidence was properly admitted.

　　　　Toledo presented the testimony of Dr. Donald Nichols to establish its damages. Dr. Nichols measured damages based on a "before and after" model, comparing Toledo's sales history to the period before 1989 – when Mack purportedly changed its pricing policies – to the period after 1989. See 9/26/06 Tr. at 6:17-14:19, 61:10-61:21 (D. Nichols). Dr. Nichols opined that Toledo's steep sales decline after 1989 was attributable solely to Mack's alleged policy change. See 9/26/06 Tr. at 19:2-20:7 (D. Nichols).

　　　　To rebut Dr. Nichols' testimony, Mack presented evidence that the Yeagers were involved in several lawsuits in the early to middle 1990's that distracted them from running their dealership. See generally 10/10/06 Tr. at 99:12-101:22 (Closing Argument of Mack Counsel). Indeed, in 1991, Mr. Yeager swore an Affidavit that he had become "obsessed" with his dispute with BFI and that he consequently "suffered from stress, anxiety, and depression." See Mack Trial Exhibit 524, ¶¶ 14-20. Mr. Yeager further averred that his distress over the BFI situation directly impacted his ability to run Toledo: "My relationship with my business partners also changed, because I felt ashamed and untrustworthy, and at the same time was no longer able to trust their motivations." Id. ¶ 22. As Mr. Yeager later recalled:

　　　　　　MR. MCDIVITT: Well, I can remember, you know, what, ten or so years ago that you folks were doing some -- some novel things shall we say.

　　　　　　MR. YEAGER: Yeah.

　　　　　　MR. MCDIVITT: And then it just went away literally for years.

> **MR. YEAGER**: Well, I kind of took a sabbatical for a number of
> years, Jack. I was in the waste handling business as you may or
> may not know.
>
> **MR. MCDIVITT**: Sure, yeah.
>
> **MR. YEAGER**: And we did pretty well in that business. *We
> ended up being put out of business by a couple of national
> companies. I spent a lot of years in litigation with them, and
> once that was over with, I just took off for a number of years*. At
> that point in time I was going to -- trying to sell the company and
> just kind of let it go . . .

Transcript of telephone conversation between David Yeager and Jack McDivitt (3/12/01), at 7:2-

17 (Mack Trial Exhibit 1171) (emphasis added).

Mrs. Yeager also submitted an Affidavit in 1991. See Mack Trial Ex. 525. She

averred that Mr. Yeager's emotional difficulties arising from his disputes with BFI severely

impacted Mr. Yeager's ability to manage Toledo Mack:

> Because I also work with David in his business, I know that during
> this time he would sometimes leave work for several hours during
> the day without saying. When he returned, it was obvious that he
> had been drinking. He also began to drink at home, something he
> had not done before. . . .
>
> David had mood swings both at home and at work, and his anger
> and anxiety affected his ability to deal with both his family and his
> employees.

Id. ¶¶ 14, 16. Mrs. Yeager further averred that Mr. Yeager "continues to suffer from stress and

anxiety" because of his litigation with BFI. Id., ¶ 18.[13]

This evidence certainly provided an alternative explanation for Toledo's sales

decline after 1989. The Third Circuit has made clear that it is appropriate to attack the credibility

---

[13] At trial, Mack only introduced *four* documents relating to the Yeagers' past litigation, although Mack
produced thousands of pages of such documents in discovery. Two of these documents were the affidavits quoted
above. The other two were a settlement agreement between Mr. Yeager and BFI and one of Mr. Yeager's
Complaints against BFI. See Mack Trial Exhibits 523 and 534.

of a "before and after" damages model by showing that "other business complications," and not defendant's misconduct, account for any sales decline in the "after" period. Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275 (3d Cir. 1995) ("before and after" damages model insufficient to support verdict where model failed to account for "other business complications" causing sales decline); see also Gastineau v. Fleet Mortgage Corp., 137 F.3d 490, 495-496 (7th Cir. 1998) (evidence of plaintiff's prior lawsuits against other former employers properly admitted at trial to rebut damages evidence). This Court thus correctly held that evidence regarding the Yeagers' prior lawsuits was relevant and admissible.

### 2.    The Lounsberry Tape Was Properly Excluded

Toledo also asserts its entitlement to a new trial based on another evidentiary ruling, the Court's exclusion as inadmissible hearsay of a secretly recorded conversation in 1989 between Mr. Yeager and a man named Dan Lounsberry. See Toledo Memorandum at 30-32. According to Toledo, the tape should have been admitted as the statement of a co-conspirator in further of the conspiracy pursuant to Fed. R. Evid. 801(d)(2)(E). Id. at 31. Toledo claims that Mr. Lounsberry spoke "in his capacity as an agent of Pozzo Mack" and that Pozzo Mack was an alleged member of the "conspiracy." Id. Once more, Toledo's assertions lack record support.

To invoke the co-conspirator rule, Toledo was required to show that Mr. Lounsberry was a member of the alleged conspiracy. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 375 (3d Cir. 2004). Toledo must establish Mr. Lounsberry's participation by a preponderance of the evidence before his out of court statements can be admitted. See Bourjaily v. United States, 483 U.S. 171, 176 (1987) ("we hold that when the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence"). In meeting its burden, Toledo must present evidence beyond the hearsay statement itself. See Fed. R. Evid. 801(d)(2) ("The contents of the statement shall be considered **but are**

-25-

*not alone sufficient to establish . . .* the existence of the conspiracy and *the participation therein of the declarant . . ."* (emphasis added)).

Toledo cites no evidence that Pozzo Mack was a conspirator or that Mr. Lounsberry was it agent. The alleged conspirators are Mack and the 1989 members of the Mack National Distributor Advisory Council ("NDAC"). See Toledo's Memorandum in Support of its Motion for Reconsideration at 12-13. But the evidence at trial was undisputed that Pozzo Mack was not a member of the 1989 NDAC. Robert Nuss, the NDAC Chairman at the time, testified that Mr. Salmon, the owner of Pozzo Mack, was only an alternate on the NDAC in 1989 and that he never attended a single meeting. 9/28/06 Tr. at 74:3-76:10 (R. Nuss).

Furthermore, Toledo presented no evidence beyond the hearsay statement that Mr. Lounsberry was Pozzo's agent. Even on the tape, Mr. Lounsberry does not claim to be Pozzo Mack's agent. He states only that he is the Parts Manager of an Associate Dealer of Pozzo Mack, and that all of his information comes from the manager of that Associate Dealership. See Lounsberry Transcript at 2:22-3:1, 5:15-5:23, 6:2-6:4, 8:23-9:4.[14] In fact, on the tape, Mr. Lounsberry never discussed the sale of trucks, nor did he ever state that he had any involvement in truck sales. There is no evidence that Pozzo Mack owned or controlled this Associate Dealer, or directed or approved of – or even knew of – Mr. Lounsberry's actions. See generally Restatement (Third) of Agency § 1.01 (2006) (defining elements of an agency relationship).[15]

---

[14] The transcript of the Lounsberry tape is attached as Exhibit B to Toledo's Memorandum.

[15] In addition, as explained in Mack's Memorandum of Law in Support of its Motion for Judgment as a Matter of Law, there is no evidence of any alleged 1989 conspiracy between Mack and the NDAC. If there is no conspiracy, then there can obviously not be any statements made in furtherance of it, thereby rendering Rule 801(d)(2)(E) inapplicable.

C.    **This Court Correctly Held that the Opinion of the Ohio Court of Appeals Is Entitled to Collateral Estoppel Effect**

Toledo argues as well that it is entitled to a new trial because the Court allegedly erred in instructing the jury that, based on the collateral estoppel effect of the opinion of the Ohio Court of Appeals, Mack had already established that Toledo was liable for misappropriation of trade secrets when it provided MACSPEC 2001 to PAI. See Toledo Memorandum at 27-28. Toledo's argument is without merit.

Collateral estoppel prevents relitigation of an issue when five elements are met: (1) there was a final judgment on the merits in the prior action; (2) the party against whom estoppel was asserted was a party to the prior action; (3) there was a full and fair opportunity to litigate the issue in the prior action; (4) the issue is identical to the issue in the prior action; and (5) the issue was actually litigated and necessary to the final judgment. Young v. Gorski, No. L-03-1243, 2004 Ohio App. LEXIS 1170 at *3-4 (Oh. Ct. App. Mar. 19, 2004). The only element that Toledo disputes is the last. According to Toledo, the Ohio Court of Appeals never decided that Toledo engaged in misappropriation of trade secrets.

The elements of a claim for misappropriation of trade secrets are (1) the existence of a trade secret; (2) that Toledo used and/or disclosed the trade secret; (3) that Toledo discovered the trade secrets by improper means or that the disclosure or use of such trade secrets was in breach of a confidence. See Den-Tal-Ez,, 566 A.2d at 1228-29, 1231. Toledo concedes that the Court of Appeals found the first element, that MACSPEC 2001 is a trade secret. See Toledo Mack Memorandum at 27. The second element – disclosure of the trade secret by Toledo Mack to PAI – has never been in dispute. See Mack Trucks, 2006-Ohio-2748 at ¶ 33, 2006 WL 1495122 at *10 ("Toledo Mack divulged Mack's trade secret by giving the MACSPEC 2001 system to PAI").

Finally, the Court of Appeals found in Mack's favor as to the third element, holding that "the MACSPEC 2001 was a trade secret *that was subject to confidentiality by Toledo Mack.*" Id. (emphasis added).  While the discussion should stop there, Mack does not need to show a breach of confidence if Toledo acquired the trade secret, MACSPEC 2001, by improper means, such as fraud.  See Den-Tal-Ez, 566 A.2d at 1228-29 (one may be liable for misappropriation of trade secrets if either the trade secrets were acquired by "improper means" *or* were disclosed in breach of a confidential relationship); Coll. Watercolor Group, Inc. v. Newbauer, 360 A.2d 200, 205 (Pa. 1976) (obtaining trade secrets through fraud constitutes misappropriation).  Here, the Court of Appeals found that Toledo Mack procured MACSPEC 2001 through fraudulent representations to Mack.  Mack Trucks, 2006-Ohio-2748 at ¶ 29, 2006 WL 1495122 at *9.

**D.    This Court Properly Dismissed Toledo Mack's Antitrust Claims**

    **1.    Section 1 of the Sherman Act**

Toledo demands a new trial as well on the ground that the Court supposedly erred in granting Mack's Motion for Judgment as a Matter of Law as Toledo's claim under Section 1 of the Sherman Act.  See Toledo Memorandum at 28-30.  This is Toledo's *second* request for reconsideration of the Court's ruling, as the Court has already denied a previous Motion for Reconsideration.  Toledo offers no new arguments, and thus this Court should reject this new reconsideration request.  See Kennedy Indus., 2006 WL 1892685 at *1 (reconsideration not warranted where party merely repeats earlier contentions).

Moreover, the Court's ruling was correct.  Toledo's Sherman Act claim was based on an alleged "conspiracy" between Mack and the members of the NDAC to restrict sales assistance discounts to only in-AOR sales *in 1989*.  Because this action was not filed until

*thirteen years* later, the Court logically dismissed it as barred by the applicable four-year statute of limitations. See 15 U.S.C. § 15b.

In his Opening Statement, Toledo's counsel promised to present evidence that would toll the statute of limitations based on fraudulent concealment. See 9/13/06 Tr. at 35:4-35:18. During trial, however, Mr. Yeager admitted that he was "suspicious" of the existence of the alleged conspiracy as far back as 1989. See 9/15/06 Tr. at 101:3-101:10 (D. Yeager). This admission doomed any claim of fraudulent concealment. See In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1178-79 (3d Cir. 1993) ("'any fact that should excite [the plaintiff's] *suspicion* is the same as actual knowledge of [the] entire claim'" (citation omitted; emphasis added); see also Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975) (fraudulent concealment requires proof of "failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period"); In re Milk Prods. Antitrust Litig., 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997) (same), aff'd 195 F.3d 430 (8th Cir. 1999).[16]

Toledo has all but abandoned its fraudulent concealment theory, which it now relegates to a footnote. See Toledo Memorandum at 30, n. 18. Toledo primarily seeks reconsideration based on the supposed evidence that the 1989 conspiracy "continued" into the period from July 1, 1998 to the present. See generally In re Lower Lake Erie, 998 F.2d at 1171-73 (continuing conspiracy permits recovery of damages incurred during the limitations period, but not before). This argument is equally meritless.

---

[16] In addition, the record is replete with other evidence of Mr. Yeager's knowledge, as detailed on pages 4 and 5 of Mack's Memorandum of Law in Support of its Motion for Judgment as a Matter of Law, which are incorporated herein by reference.

An antitrust conspiracy is not presumed to run indefinitely, and "[t]he party bringing the antitrust action must therefore show that the conspiracy continued into the limitations period." United States v. Therm-All, Inc., 373 F.3d 625, 633 (5th Cir. 2004); cf. In re Lower Lake Erie, 998 F.2d at 1173 (approving District Judge Fullam's instruction to the jury that "'the plaintiffs would have to establish that the conspiracy was still in effect'" during the limitations period to recover under a continuing conspiracy theory). The Third Circuit has explained the standard for proving the existence of a conspiracy under Section 1 of the Sherman Act:

> The extent of what constitutes a reasonable inference in the context of an antitrust case, however, is somewhat different from cases in other branches of the law in that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." . . . Therefore, the Supreme Court has held in the antitrust context "that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Thus . . . "a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged competitors acted independently.

In re Baby Food Antitrust Litig., 166 F.3d 112, 124 (3d Cir. 1999) (citations omitted).

Mack has already explained in detail in its Memorandum opposing Toledo's initial Motion for Reconsideration that none of Toledo's so-called evidence of a continuing conspiracy after July 1, 1998 meets the standard of tending to exclude the possibility that Mack acted independently. Mack incorporates those arguments herein by reference and respectfully refers the Court to its earlier Memorandum.[17]

---

[17] Mack also incorporates by reference each of the arguments set forth in its Memorandum of Law in Support of its Motion for Judgment as a Matter of Law that relate to Toledo's claims under Section 1 of the Sherman Act, and respectfully refers the Court to that Memorandum for a full discussion of the many legal defects in Toledo's case.

2.     **Robinson Patman Act**

Toledo also asserts that it is entitled to a new trial on its claims under the

Robinson Patman Act because this Court supposedly erred in granting summary judgment to

Mack in its Memorandum and Order of August 16, 2006.  See Toledo Memorandum at 32-33.

Toledo's arguments are merely a regurgitation of its previous, rejected contentions.  There is

therefore no basis to reconsider this Court's prior ruling.  See Kennedy Indus., 2006 WL

1892685 at *1 (reconsideration not warranted where party merely repeats earlier contentions).

For a full explanation of the many fatal defects in Toledo's Robinson Patman claim, Mack

respectfully refers the Court to its briefs in support of Mack's Motion for Summary Judgment

and Motion for Reconsideration, all of which are hereby incorporated by reference.

E.     **This Court Complied with Rule 51**

Toledo next argues that it is entitled to a new trial because the Court purportedly

failed to comply with Rule 51 of the Federal Rules of Civil Procedure by not providing advance

notice of the final jury instructions before closing arguments.  See Toledo Memorandum at 35.

This argument, again accompanied by no supporting case law, is groundless.

While Rule 51 requires the Court to provide notice of the jury charges before

closing arguments, "it has long been settled that 'a trial judge is not required to write out his

charge in advance and submit it to counsel for their editing and exceptions.'"  Emerick v. U.S.

Suzuki Motor Corp., 750 F.2d 19, 22-23 (3d Cir. 1984) (citation omitted).  "It is enough that

counsel be apprised of the substance of the instructions" and receive notice of the "guiding

principles under which closing argument should be made."  Jones v. S. Pac. R.R., 962 F.2d 447,

451 (5th Cir. 1992).  Here, the Court conducted a lengthy charging conference in its chambers

before closing argument, during which it notified the parties of the substance of the charges on

the various claims.  The Court thus properly discharged its burden under Rule 51.

Moreover, Toledo's contention is clearly waived, because Toledo never requested a copy of the Court's charges before its closing argument:

> If a district judge fails to articulate the instructions to counsel prior to closing arguments, counsel must attempt to persuade the district judge to reveal the planned instructions or counsel will lose the opportunity to show prejudice. Counsel has a duty to register proper objections, even at the risk of incurring the wrath of the trial judge.

Siddiqi v. Leak, 880 F.2d 904, 912 (7th Cir. 1989) (citations omitted); see also Luther v Maple, 250 F.2d 916, 920 (8th Cir. 1958) (when defendant's counsel failed to request jury instructions, failure of court to provide them was not reversible error); Gwinett v Albatross S.S. Co., 243 F.2d 8, 9-10 (2d Cir. 1957) (failure to provide jury instructions not reversible error when counsel proceeded with closing argument without requesting instructions and there was no showing of prejudice); Western Mach. Co., v. Consol. Uranium Mines, Inc., 247 F.2d 685, 689 (10th Cir. 1957) (when counsel failed to request instructions or inquire about them prior to close of evidence, counsel could not complain about court's failure to provide instructions on appeal).

Finally, Toledo cannot show any prejudice. Toledo claims that it was unfairly surprised by two instructions. As a threshold matter, Toledo has not disputed that they are proper statements of the law. Nor did either instruction relate to any substantive question of liability or damages.

First, Toledo claims that the Court undermined its improper attempt to appeal to the prejudices of the jury by correctly instructing the jury that it should not be swayed by sympathy for the "underdog:"

> Now, you know, we all have biases and I think the biases we most commonly think of are age, sex, race, religion are the most common biases. But as a young man growing up, I know there was a bias in America, in those days, at least, I was taught that, that America is always for the underdog. Any of you remember that? That's what they used to tell me in my family. Americans always

> root for the underdog. Well, in a courtroom, the underdog and the
> top dog are treated exactly the same. And you know, it doesn't
> matter whether you're the underdog or the big guy, each one is
> treated equally in the eyes of the law. And that's the way you
> ought to look at it as you're reviewing the facts of this case.

10/10/06 Tr. at 132:22-133:8. It comes with ill grace for Toledo to complain about the Court's

instruction curing Toledo's own attempt to invoke the jury's prejudices in closing. Cf. Terminal

R.R. Assoc'n v. Staengel, 122 F.2d 271, 278 (8th Cir. 1941) ("It is not unusual that the

arguments themselves bring out matters which affect the charge to be given"). Furthermore, the

only prejudice asserted appears to be that Toledo's counsel's credibility was undermined. This is

an insufficient basis for ordering a new trial. See Acosta v. Honda Motor Co., Inc., 717 F.2d

828, 843 (3d Cir. 1983) (Becker, J.) (new trial not warranted for failure to provide advance

notice of jury charge where only prejudice was counsel's loss of credibility).[18]

       Toledo's second contention is nothing short of bizarre. Toledo complains that the

Court undermined its argument that Mack's witnesses were allegedly not credible because they

provided inconsistent testimony. The Court, however, expressly instructed the jury that it could

choose to disregard a witness' testimony based on such contradictions:

> If you determine there's a major inconsistency or discrepancy in
> the testimony, then you've got to say, that person is not telling the
> truth with respect to that issue. And if you find that a person has
> been untruthful with respect to an issue, you may, although you're
> not required to, you may ignore all of his or her testimony.

10/10/06 Tr. at 154:8-154:14.

---

[18] Moreover, the Court provided counsel with an opportunity to request corrections of any errors in the charges. See 10/10/06 Tr. at 155:14-155:19. Toledo did not request that the Court alter or correct this charge in any way

**F.    Mack's Counsel Did Not Engage in Misconduct**

Toledo asserts an entitlement to a new trial based on alleged misconduct of Mack's counsel in her closing argument. See Toledo Memorandum at 33-34. However, Toledo failed to object during Mack's closing, and did not even bother to request a curative instruction to the jury. As a result, this argument is waived. See Dunn v. Hovic, 1 F.3d 1371, 1377-1378 (3d Cir. 1993) (objection to closing argument must be made during trial, or else waived).

Furthermore, there was no impropriety. The alleged misconduct was Mack's counsel's passing reference to the Court's decision to grant Mack's motion for judgment as a matter of law as to Toledo's Sherman Act claim:

> So, the first claim I'm going to deal with is the Toledo claim against Mack. On that claim, you should know that the Court has determined that antitrust claims are no longer at issue and that interest which showed on the charts that you saw earlier is no longer at issue and should not be considered by you. The remaining claims are whether Mack violated the Ohio Dealer Act for the period 1996 to the present and whether Mack tortiously interfered with prospective contractual relations for the period 1998 to the present.

10/10/06 Tr. at 68:11-68:20. This brief explanation as to what claims remained was perfectly proper. In its Opening Statement, Mack discussed Toledo's antitrust claim at length and promised to present evidence to rebut this claim. See 9/13/06 Tr. at 63:7-72:22. As the jury may well have been confused by Mack's subsequent failure to argue against Toledo's antitrust theory in its closing, Mack's counsel merely explained, very briefly, why she was not addressing that claim. Moreover, contrary to Toledo's argument, Mack's counsel was careful *not* to state why the antitrust claim was no longer at issue.[19]

_____

[19] Nevertheless, Toledo argues that Mack's counsel acted improperly because it was purportedly "agreed at the charging conference that the jury would not be notified that the Court" had dismissed Toledo's antitrust claim. See Toledo Memorandum at 33-34. This is contrary to Mack's counsel's recollection of the charging conference.

(continued...)

It is absurd to believe that, in a four-week trial, half of one sentence in a 90-minute closing argument so poisoned proceedings as to render it impossible for the jury to have rendered a fair verdict. See ISCO Int'l, Inc. v. Conductus, Inc., 279 F.Supp.2d 489, 509-510 (D. Del. 2003) (after 2-week trial, "isolated comments" in closing argument did not create "manifest injustice" sufficient to warrant a new trial); see generally Dunn, 1 F.3d at 1377 ("'improper comments during closing arguments rarely rise to the level of reversible error'" (citation omitted)). Toledo certainly did not say so at the time. This argument should be rejected out of hand.

## V.    CONCLUSION

For the reasons set forth herein, this Court should deny Toledo Mack's Motion.

Respectfully submitted,

Barbara Mather
Jeremy Heep
Barak A. Bassman
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Attorneys for Defendant/Counterclaim Plaintiff
Mack Trucks, Inc.

Dated:  November 9, 2006

(continued...)

Mack recalls no such agreement, but instead remembers the Court stating that it would find an appropriate way to explain to the jury that the antitrust claims were no longer in the case.

## CERTIFICATE OF SERVICE

I, Jeremy D. Heep, hereby certify that on November 9, 2006 a true and correct copy of the foregoing Memorandum of Law in Opposition to Toledo Mack Sales & Service, Inc.'s Renewed Motion for Judgment as a Matter of Law and for Other Post-Trial Relief was served via hand delivery upon the following:

> J. Manly Parks
> Duane Morris LLP
> 30 South 17th Street
> Philadelphia, PA 19103

_____
Jeremy D. Heep